07 CV 11581

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER E. RYAN, JR., derivatively on behalf of CITIGROUP, INC., | Civil Action No. |
| Plaintiff | |
| v. | |
| CHARLES PRINCE, ROBERT E. RUBIN, SIR WINFRIED BISCHOFF, ROBERT DRUSKIN, WILLIAM R. RHODES, SALLIE L. KRAWCHECK, DAVID C. BUSHNELL, STEVEN J. FREIBERG, JOHN C. GERSPACH, MICHAEL S. HELFER, MICHAEL KLEIN, STEPHEN R. VOLK, LEWIS B. KADEN, GARY CRITTENDEN, RICHARD D. PARSONS, FRANKLIN A. THOMAS, KENNETH T. DERR, C. MICHAEL ARMSTRONG, JOHN M. DEUTCH, ALAIN J.P. BELDA, ROBERTO HERNANDEZ RAMIREZ, GEORGE DAVID, ANNE M. MULCAHY, JUDITH RODIN, ANDREW N. LIVERIS, ROBERT L. RYAN, THOMAS G. MAHERAS, |  |
| Defendants, | |
| CITIGROUP, INC., a Delaware Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

## DERIVATIVE ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT

Plaintiff, Walter E. Ryan, Jr., for his derivative action complaint, based upon the investigation of his counsel, alleges as follows on information and belief:

1.     This shareholder's derivative action is brought in the right of and for the benefit of nominal defendant Citigroup, Inc. ("Citigroup" or "Citi" or the "Company") against its former Chief Executive Officer ("CEO") and Chairman of the Board of

-1-

Directors, Charles Prince ("Prince"), its officers and former officers, Robert Druskin ("Druskin"), William R. Rhodes ("Rhodes"), Sallie L. Krawcheck ("Krawcheck"), David C. Bushnell ("Bushnell"), Steven J. Freiberg ("Freiberg"), John C. Gerspach ("Gerspach"), Michael S. Helfer ("Helfer"), Michael Klein ("Klein"), Stephen R. Volk ("Volk"), Lewis B. Kaden ("Kaden"), and Gary Crittenden ("Grittenden"), as well as members and former members of the Board of Directors, Richard D. Parsons ("Parsons"), Franklin A. Thomas ("Thomas"), Kenneth T. Derr ("Derr"), Sir Winfried Bischoff ("Bischoff"), C. Michael Armstrong ("Armstrong"), John M. Deutch ("Deutch"), Alain J.P. Belda ("Belda"), Roberto Hernandez Ramirez ("Ramirez"), George David ("David"), Anne M. Mulcahy ("Mulcahy"), Judith Rodin ("Rodin"), Robert E. Rubin ("Rubin"), Robert L. Ryan ("Ryan"), Andrew N. Liveris ("Liveris"), and Thomas G. Maheras ("Maheras") (collectively referred to as the "Individual Defendants") all of whom as authorized, or through abdication of duty permitted, failed to disclose the Company's vast exposure in its sub-prime portfolio at the expense of Citigroup and its shareholders.

2.     The Individual Defendants have breached their fiduciary duties of care, good faith and loyalty, and substantially damaged the Company. Among other things, the Individual Defendants:

(a)     failed to ensure that the Company implemented adequate internal controls to prevent a variety of improper business practices, including controls over the Company's subprime lending practices;

(b)     failed to cause the Company to implement adequate internal controls to prevent fraud related to the reporting of the Company's financial condition;

(c)     caused the Company to issue materially false and misleading financial statements; and

(d)     failed to cause the Company to implement adequate internal controls to prevent insider trading by the Company's senior management.

3.     The Individual Defendants failed to disclose material information relating to its subprime exposure that allowed the Individual Defendants to entrench themselves in the Company and enrich themselves through insider sales. Further, while insiders sold common stock in Citi, the Board was authorizing $1.645 billion in share repurchases. These actions are not consistent with the Individual Defendants' affirmative duties of care, loyalty, good faith, and candor.

4.     The Individual Defendants exposed Citigroup to numerous liabilities, including:

(a)     substantial civil liability because of misstatements;

(b)     damage to the Company's reputation within the market;

(c)     a loss of financial goodwill;

(d)     a loss of goodwill of the Company's name and brand for the purposes of its banking activities;

(e)     damages to the Company's reputation in the financial community, exposing itself, to, *inter alia*, loss of its corporate client base;

(f)     substantial expenses resulting from costly investigations and defense costs;

(g)     damages and legal defense costs in connection with securities fraud class action litigation and ERISA class action litigation; and

(h)    substantial additional future costs to remediate its failed corporate governance processes and institutional operations.

## JURISDICTION AND VENUE

5.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332 as complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds the jurisdiction minimum of this Court.

6.    Venue is proper because Citigroup's principal place of business is located at 399 Park Avenue, New York, NY 10043.

## PARTIES

7.    Plaintiff Walter E. Ryan Jr. brings this action derivatively in the right and for the benefit of Citigroup to redress injuries suffered by Citigroup as a direct result of the Individual Defendants breaches of fiduciary duty alleged herein.    Plaintiff will adequately and fairly represent the interest of Citigroup in enforcing and prosecuting its rights.    Plaintiff is and was a continuous owner of stock of Citigroup throughout all relevant times.    Specifically, Mr. Ryan has been a shareholder since 2003 and currently owns at least 51,900 shares of Citigroup common stock.

8.    Nominal Defendant Citigroup is a Delaware corporation with its principal executive offices located at 399 Park Avenue, New York, New York. Citigroup is a multibank holding company that provides various financial services to customers in the United States and internationally.

9.    Defendant Prince was Citigroup's CEO and a director from 2003 to November 2007.   Prince was also Citigroup's Chairman of the Board from 2006 to November 2007.   Prince was Citigroup's Chairman and CEO, Global Corporate and Investment Bank from 2002 to 2003; Chief Operating Officer ("COO") from 2001 to

-4-

2002; Chief Administrative Officer from 2000 to 2001; and General Counsel and Corporate Secretary from 1983 to 2000.  Prince was a member of the Company's Executive Committee from 2004 to November 2007.  Because of his positions, Defendant Prince knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of the Company.  During all relevant times, Prince participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.  Defendant Prince sold 146,243 shares of Citigroup stock for $7,895,074.25 in proceeds while in possession of material non-public information.

*Director Defendants or ("Board Member" Defendants)*

10.     Defendant Armstrong is a Citigroup director and has been since 1989. Armstrong is also Chairman of Citigroup's Audit and Risk Management Committee and has been since 2004; a member of the Audit and Risk Management Committee and has been since 1995; and a member of the Executive Committee and has been since 2006. Because of his positions, Defendant Armstrong knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of the Company.  During all relevant times, Armstrong participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

11.    Defendant Belda is a Citigroup director and has been since 1997. Belda is also a member of Citigroup's Executive Committee and has been since 2005 and a member of the Personnel and Compensation Committee and has been since 2004. Belda was a member of Citigroup's Audit and Risk Management Committee from October 1998 to 2005. Because of his positions, Defendant Belda knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Belda participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

12.    Defendant David is a Citigroup director and has been since 2002. David is also a member of Citigroup's Audit and Risk Management Committee and has been since 2003. Because of his positions, Defendant David knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, David participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

13.    Defendant Derr is a Citigroup director and has been since 1987. Derr is also a member of Citigroup's Personnel and Compensation Committee and has been since 2004. Derr was a member of Citigroup's Audit and Risk Management Committee from October 1998 to 2004 and a member of the Executive Committee from October 1998 to 2007. Because of his positions, Defendant Derr knew, consciously disregarded, was reckless

and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Derr participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

14.     Defendant Ramirez is a Citigroup director and has been since 2001. Because of his position, Defendant Ramirez knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Ramirez participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

15.     Defendant Deutch is a Citigroup director and has been since 1996. Deutch was also a Citigroup director from 1987 to 1993 and a Citibank, N.A. director from 1987 to 1993 and from 1996 to 1998.  Deutch is a member of Citigroup's Audit and Risk Management Committee and has been since October 1998. Because of his positions, Defendant Deutch knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Deutch participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

16.     Defendant Liveris is a Citigroup director and has been since 2005. Liveris is also a member of Citigroup's Audit and Risk Management Committee and has been since 2006. Because of his positions, Defendant Liveris knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup.  During all relevant times, Liveris participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

17.     Defendant Mulcahy is a Citigroup director and has been since 2004. Mulcahy is also a member of Citigroup's Audit and Risk Management Committee and has been since 2007. Because of her positions, Defendant Mulcahy knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup.  During all relevant times, Mulcahy participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

18.     Defendant Parsons is a Citigroup director and has been since 1996.  Parsons was also a Citibank, N.A. director from 1996 to 1998. Parsons is a member of Citigroup's Executive Committee and has been since 2007; a member of the Personnel and Compensation Committee and has been since October 1998; and Chairman of the Personnel and Compensation Committee and has been since 2003.  Because of his positions, Defendant Parsons knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of

Citigroup. During all relevant times, Parsons participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

19.     Defendant Rodin is a Citigroup director and has been since 2004. Rodin is also a member of Citigroup's Audit and Risk Management Committee and has been since2005 and a member of the Executive Committee and has been since 2007. Because of her positions, Defendant Rodin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Rodin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

20.     Defendant Rubin has been Chairman of Citigroup's Executive Committee since 1999 and has been a director since October 1999. Rubin was also a member of Citigroup's Office of the Chairman from October 1999 to at least January 2007. On November 4, 2007, Rubin was appointed Chairman of the Board. Because of his positions, Defendant Rubin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Rubin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

21.     Defendant Ryan is a Citigroup director and has been since July 2007. Ryan is also a member of Citigroup's Audit and Risk Management Committee and has been since 2007. Because of his positions, Defendant Ryan knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Ryan participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

22.     Defendant Thomas is a Citigroup director and has been since 1970. Thomas was also a Citibank, N.A. director from 1970 to 1998.  Thomas was a member of Citigroup's Executive Committee from October 1998 to 2007 and a member of the Personnel and Compensation Committee from October 1998 to 2003. Because of his positions, Defendant Thomas knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Thomas participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

*Officer Defendants*

23.     Defendant Bischoff is Citigroup's Acting CEO and has been since November 2007.  Bischoff is also Chairman of Citi Europe and a member of the Citi Business Heads, Management and Operating Committees and has been since May 2000. Because of his positions, Defendant Bischoff knew, consciously disregarded, was

reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Bischoff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Bischoff sold 33,127 shares of Citigroup stock for $1,793,046.56 in proceeds while in possession of material non-public information.

24.    Defendant Druskin is Citigroup's COO and Corporate and Investment Banking Chairman and has been since January 2007. Druskin is also the Citigroup Corporate and Investment Banking President and has been since August 2002 and the Citigroup Corporate and Investment Banking CEO and has been since December 2003. Druskin was Citigroup's Chief Operations and Technology Officer from September 2000 to August 2002 and the Citigroup Corporate and Investment Banking COO from August 2002 to December 2003. Because of his positions, Defendant Druskin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Druskin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

25.    Defendant Crittenden is Citigroup's Chief Financial Officer ("CFO") and has been since March 2007. Because of his position, Defendant Crittenden knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During

all relevant times, Crittenden participated in the issuance of improper statements, including the preparation of the improper press releases an SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

26.    Defendant Krawcheck is Citigroup's Chairman and CEO of Global Wealth Management and has been since March 2007.  Krawcheck was also Citigroup's Head of Strategy and CFO from November 2004 to March 2007 and Chairman and CEO of Smith Barney from October 2002 to November 2004.  Because of her positions, Defendant Krawcheck knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Krawcheck participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Krawcheck sold 50,339 shares of Citigroup stock for $2,745,992.45 in proceeds while in possession of material non-public information.

27.    Defendant Kaden is Citigroup's Vice Chairman and Chief Administrative Officer and has been since September 2005. Because of his positions, Defendant Kaden knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Kaden participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Kaden sold 11,200 shares of Citigroup stock for $610,960 in proceeds while in possession of material non-public information.

28.     Defendant Rhodes is Citigroup's Senior Vice Chairman and has been since at least March 2002. Rhodes is also Citibank, N.A.'s Chairman and has been since at least March 2003 and Citicorp Holdings' Chairman and has been since at least March 2003. Rhodes is Citibank, N.A.'s Chairman, President and CEO.   Rhodes is also Citibank Holdings', President and CEO.   Rhodes was Citigroup's Vice Chairman from at least March 2000 to at least March 2002. Because of his positions, Defendant Rhodes knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Rhodes participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Rhodes sold 80,614 shares of Citigroup stock for $4,319,376.82 in proceeds while in possession of material non-public information.

29.     Defendant Bushnell is Citigroup's Senior Risk Officer and has been since December 2003.  Bushnell is also Citigroup's Chief Administrative Officer.  Because of his positions, Defendant Bushnell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup.  During all relevant times, Bushnell participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Bushnell sold 50,861 shares of Citigroup stock for $2,700,042.09 in proceeds while in possession of material non-public information.

30.     Defendant Freiberg is Citigroup's Co-Chairman and Co-CEO, Global Consumer Group-North America and has been since 2005. Freiberg was also Citi Cards' Chairman and CEO from 2000 to at least August 2005. From 1997 to 2000, Freiberg assumed responsibility for several major Strategic Business Groups in Citigroup's Credit Card Division. From 1980 to 1997, Freiberg served in a variety of senior management positions. Because of his positions, Defendant Freiberg knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Freiberg participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Freiberg sold 32,753 shares of Citigroup stock for $1,747,034.93 in proceeds while in possession of material non-public information.

31.     Defendant Gerspach is Citigroup's Controller and Chief Accounting Officer and has been since March 2005.  Gerspach was also CFO of Citigroup Latin America from July 2003 to March 2005; Chief Administrative Officer of Citigroup Latin America from April 2002 to March 2005; and Chief Administrative Officer of Citigroup e-Business from February 2000 to April 2002. Because of his positions, Defendant Gerspach knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Gerspach participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.

Defendant Gerspach sold 23,702 shares of Citigroup stock for $1,261,956.74 in proceeds while in possession of material non-public information.

32.     Defendant Helfer is Citigroup's General Counsel and Corporate Secretary and has been since February 2003. Because of his positions, Defendant Helfer knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Helfer participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders.  Defendant Helfer sold 19,590 shares of Citigroup stock for $1,068,634.50 in proceeds while in possession of material non-public information.

33.     Defendant Klein is Citigroup's Chairman and Co-CEO, Citi Markets & Banking and has been since May 2007.  Klein is also Citigroup's Vice Chairman, Citibank International. Klein was Citigroup's Co-President, Corporate and Investment Banking from January 2007 to at least March 2007; CEO, Global Banking from February 2004 to at least May 2006; CEO, Global Corporate and Investment Banking for Europe, the Middle East, and Africa from March 2003 to February 2004; CEO, Global Corporate and Investment Banking for Western Europe from 2002 to March 2003; Global Co-Head of the Investment Bank from 1999 to March 2003; and a Managing Director from 1993 to 1999. Because of his positions, Defendant Klein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Klein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings

and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Klein sold 19,282 shares for $1,006,327.58 in proceeds while in possession of material non-public information.

34.     Defendant Volk is Citigroup's Vice Chairman and has been since July 2004. Because of his position, Defendant Volk knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Volk participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup shareholders. Defendant Volk sold 16,347 shares of Citigroup stock for $891,728.85 in proceeds while in possession of material non-public information.

35.     Defendant Maheras was Citigroup's Chairman and Co-CEO of Citi Markets & Banking from May 2007 to October 2007. Maheras was also Citigroup's Co-President of Citi Markets & Banking in 2007 and CEO of Global Capital Markets from 2004 to 2007. From 1984 to 2004, Maheras held various positions with Salomon Smith Barney (acquired by Citigroup) and Citigroup. Because of his positions, Defendant Maheras knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Citigroup. During all relevant times, Maheras participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Citigroup

shareholders. Defendant Maheras sold 23,964 shares of Citigroup stock for $1,266,257.76 in proceeds while in possession of material non-public information.

## DEFENDANTS' FIDUCIARY DUTIES

36.     The Individual Defendants are current and former officers and directors of Citigroup and control the business and corporate affairs of Citigroup.  The Individual Defendants owe Citigroup and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and are required to use their utmost ability to control and manage Citigroup in a fair, just, honest and equitable manner.  Defendants, at all times, were required to act in the best interest of Citigroup and its shareholders, without regard to their own self-interest.

37.     By virtue of their positions as directors and officers of Citigroup, the Individual Defendants had at all relevant times, the power to and did control, influence and cause Citigroup to omit material information alleged herein.

38.     Each of the Individual Defendants is sued individually as a conspirator in his capacity as an officer and/or director of Citigroup, and the liability of each arises from the fact that each engaged in actions that breached their fiduciary duties complained of herein.

39.     Each of the Individual Defendants herein had an affirmative fiduciary obligation to act in good faith, truthfully, and in the best interests of Citigroup and its shareholders.  To diligently comply with these duties, the directors were obligated to refrain or prevent any action that:

(a)     advanced or protected the interest of themselves or their colleagues at the expense of or to the detriment of the shareholders;

(b)     wasted corporate assets; and

(c)    allowed Citigroup to disseminate material misleading or incomplete information.

40.    In accordance with their duties of care, candor, loyalty, and good faith, the Individual Defendants were obligated to disclose all material facts to shareholders.

41.    By reason of their positions as directors and/or fiduciaries of Citigroup and because of their ability to control the business and corporate affairs of Citigroup, the Individual Defendants owe Citigroup and its shareholders fiduciary obligations of loyalty, trust, candor and good faith and fair dealing. Delaware law mandates that the Individual Defendants were and are required to act in furtherance of the best interests of Citigroup and its shareholders.

## SUBSTANTIVE ALLEGATIONS

42.    Throughout 2000 – 2006, the United States home market was booming. Part of this boom was due to and increase in "subprime" mortgage transactions. These risky agreements were brought on by banks appetite for what was perceived at the time to be stronger earnings and risk adversity due to rising home prices. In short, Citigroup believed that if it had to foreclose on a home, it could recover their investment easily because the value of the home exceeds the amount of the mortgage. If they did not have to foreclose, they would reap the benefits of high interest rates for subprime lenders.

43.    This sudden downturn in the subprime housing market was not unforeseen. In fact, one of Citigroup's competitors, Goldman Sachs, dumped its subprime portfolio just before the "crisis" occurred (with Citigroup buying a large portion). For years, there has been speculation, as there always is with a "bubble-like" market, that a crash was on the horizon. Citigroup did not account for this eventual downturn or sufficiently control its lending practices in the subprime market to

adequately prepare for any downturn, let alone one of tremendous size. As reported in *The Wall Street Journal* ("*WSJ*"): Citigroup's subprime exposure -- and source of its problems -- is found in two big buckets that together total $55 billion in its securities and banking unit, the bank said. The first bucket totals $11.7 billion, including securities tied to subprime loans that were being held, or warehoused, until they could be added to debt pools for investors. The second, totaling $43 billion, covers so-called super-senior securities.

44.     These highly rated super-senior securities are portions of collateralized debt obligations, or CDOs. CDOs are repackaged pools of lower-rated securities backed by subprime loans into pieces with different levels of risk and return. Analysts estimate that $60 billion in such super-senior tranches are sitting on the books of banks, insurers and investment funds. *WSJ*, Heard on the Street, 11/5/07.

45.     Indeed, Citi's troubles can be traced back to the heyday of the U.S. housing boom, when Citi became one of the biggest players in the lucrative world of CDOs backed by subprime-linked bonds. Overall, Citi was the second-largest underwriter of CDOs in 2006, doing $34 billion in deals, according to data provider Dealogic. As a result, Citi's holdings of subprime exposures vary from the actual loans to the most highly rated slices of CDOs, the bank said. They include securities the bank had warehoused to later package into CDOs, extended to the super-senior tranches of CDOs that Citi helped create. Banks often kept the super-senior pieces of CDOs, because their low returns made them unattractive to investors despite their extremely high ratings. WSJ, Heard on the Street, 11/5/07.

46.     The Individual Defendants, attempting to either cover-up or ignore the problem, serially misstated or omitted material information regarding the Company's health and well being.  From January 2007 until November 2007, the Company failed to properly disclose the extent of its subprime exposure.   The Individual Defendants either knowingly or recklessly misstated this information to the detriment of Citigroup and its shareholders.

## DEFENDANTS' CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS

### The January 19, 2007 Misstatement

47.     In January 2007, Citi made the first in a series of misstatements in connection with its subprime mortgage practices.   Moreover, the extent of Citi's subprime risk was never discussed or disclosed.

48.     On January 19, 2007, Citigroup reported net income for the 2006 fourth quarter of $5.13 billion, or $1.03 per share. Return on common equity was 17.2%.  For the full year 2006, net income was $21.54 billion, or $4.31 per share, and return on common equity was 18.8%. On that date, the stock price closed at $54.50.

49.     Specifically, Citi's press release disclosed a view of the Company that was merely a mirage, stating:

**Management Comment**

"Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative investment businesses.  In U.S. consumer, we continued to see positive trends from our strategic actions.  Performance in these businesses was partially offset by lower results in international consumer, which included significant charges in our Japan consumer finance business.  Customer balances continued to grow strongly, partly driven by our investment in new distribution," said Charles Prince, Chairman and Chief Executive Officer of Citigroup.

-20-

"Our 2007 priorities are clear: generating sustainable growth in U.S. consumer, growing international consumer, corporate and investment banking and wealth management businesses more quickly, focusing sharply on expense management, and remaining highly disciplined in credit management. We will continue to invest to integrate our businesses and expand our reach, while at the same time taking a thorough review of our entire expense base to ensure that we operate as efficiently and effectively as possible," said Prince.

**Fourth Quarter Summary**

Revenues were a record, up 15%, driven by 14% revenue growth in corporate and investment banking, 79% in alternative investments, and 21% in global wealth management. Global consumer revenues increased 9%.

International revenues grew 11%, with international corporate and investment banking up 20% and international wealth management up 48%. International consumer revenues increased 2%, including the impact of charges in Japan consumer finance.

Deposits and loans grew 20% and 16%, respectively. In global consumer, investment AUMs increased 17%. Capital markets and banking ranked #1 in global debt underwriting, #2 in announced M&A and #2 in global equity underwriting and global loan syndications for the full year 2006. In global wealth management, client assets under fee-based management grew 15%.

Operating expenses increased 23%, including 4 percentage points due to increased investment spending, 3 percentage points due to acquisitions and foreign exchange, and 2 percentage points due to SFAS 123(R) accruals. The remaining expense growth was driven by higher business volumes, and the absence of a net release of legal reserves that lowered expenses in the prior-year period.

The company opened a record 380 new branches, including 288 internationally, and 92 in the U.S. For the full year 2006, a record 1,165 branches have been opened, of which 862 are international and 303 are in the U.S.

Credit costs increased 10%, as lower costs in U.S. consumer were more than offset by increased credit costs in international consumer and corporate and investment banking. U.S. consumer credit costs declined due to lower bankruptcy filings. In international consumer, credit costs primarily reflected portfolio growth, including a significant increase in Mexico due to target market expansion. The international and U.S.

consumer credit environment was generally stable. The global corporate credit environment also remained stable.

Excluding charges in Japan consumer finance, the net interest margin was even with the 2006 third quarter.

Share repurchases totaled $1 billion, or approximately 19 million shares. For the full year 2006, share repurchases totaled $7 billion and dividends paid to common shareholders totaled $9.8 billion.

### Capital Markets and Banking

Fixed income markets revenues increased 32% to $2.75 billion, primarily driven by improved results in interest rate and credit products and foreign exchange.

Equity markets revenues grew 17% to $900 million, on higher results in cash trading, convertibles and equity finance and prime brokerage.

Investment banking revenues increased 16% to a record $1.34 billion, reflecting higher debt and equity underwriting revenues, up 17% and 47%, respectively.

Operating expenses increased 21% due to increased staffing, higher business volumes and SFAS 123(R) accruals.

Net income declined due to the absence of a $386 million pre-tax gain on the sale of Nikko Cordial shares in the prior-year period.

### Transaction Services

Revenues and net income, up 21% and 37%, respectively, were driven by higher customer volumes, reflecting increased liability balances, up 24%; assets under custody, up 21%; and the positive impact of higher short-term interest rates.

Operating expenses increased 15%, primarily driven by increased business volumes.

### Other

Net income declined due to the absence of a $375 million after-tax release of WorldCom/research litigation reserves in the prior-year period.

50.     Inconsistent with the January 19, 2007 misstatement, numerous insiders

sold substantial amounts of Citigroup common stock at prices over $50 per share.

## Citigroup Omits Material Information From Its Annual Report

51.     On February 23, 2007 10-K, which was certified by The Individual Defendants Prince and Krawcheck and approved by the Board of Directors, states: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Notably, the 10-K contained no discussion of the Company's risk for subprime loans.

## Citigroup Omits Material Information From Its Proxy Statement

52.     On March 13, 2007, Citigroup disseminated its proxy statement which omitted disclosure of risks associated with its subprime portfolio.

## The April 16, 2007 Misstatement

53.     On April 16, 2007, Citigroup again misstated its earnings while issuing a "positive" press release.

54.     Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. Results include a previously disclosed charge of $1.38 billion, or $871 million after-tax, related to a structural expense review conducted during the quarter. Excluding the charge, net income was $5.88 billion, or $1.18 per share. Return on common equity was 17.1%. That day, the stock price closed at $52.93 per share.

*Management Comment*

"We generated strong momentum this quarter, with revenues increasing 15% to a record, driven by growing customer business volumes. Global consumer deposits were up 12% and global consumer loans grew 11%. In our international franchises, revenues grew 18%, led by international markets & banking revenue up 20%. Our revenue growth combined with improving expense management and, after adjusting for certain non-recurring items, we generated positive operating leverage. Offsetting our

improved revenue and expense performance were higher credit costs and a lower level of tax benefits than last year," said Charles Prince, Chairman and Chief Executive Officer of Citi.

"We continued to invest in expanding our distribution and enhancing our technology as we build a broad, strong foundation for future growth. We also announced the acquisition of Egg, Ltd. in the U.K., the world's largest internet bank, and we launched a tender offer to acquire 100% of Nikko Cordial in Japan, consistent with our effort to drive growth through a balance of organic investment and targeted acquisitions and expand internationally." said Prince.

"We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises," said Prince.

## FIRST QUARTER SUMMARY

**Revenues** were a record, up 15%, driven by 23% revenue growth in markets & banking, including record revenues in fixed income and equity markets, investment banking and transaction services.   International consumer revenues grew 14% and global wealth management revenues were a record, up 13%. U.S. consumer revenue growth continued to trend positively, up 6%.

Revenue growth reflected customer volume growth.  Deposits and loans grew 18% and 15%, respectively.  In global consumer, investment AUMs increased 12%.   Securities and banking ranked #1 in global debt and equity underwriting and #2 in completed M&A for the first quarter.  In global wealth management, client assets under fee-based management grew 13% and client capital in alternative investments grew 52%.

Net interest revenues grew 8% as volume growth was partially offset by net interest margin compression.

Excluding the impact of gray zone in Japan consumer finance, the net interest margin declined 14 basis points versus the fourth quarter 2006, with slightly less than half of the decline in trading portfolios.

**Operating expenses** increased 17%, including a $1.38 billion charge related to a structural expense review completed in the quarter.  Excluding the charge, compensation accruals related to the revenue impact of adopting SFAS 157, and $648 million pre-tax in SFAS 123(R) accruals recorded in the prior year period, expenses grew 10%, driven by increased business volumes and investment spending.

The company opened 99 new branches during the quarter, including 48 internationally and 51 in the U.S.

**Credit costs** increased $1.26 billion, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to increase loan loss reserves. The $597 million net charge compares to a net reserve release of $154 million in the prior-year period.

In U.S. consumer, higher credit costs reflected an increase in net credit losses of $164 million and a net charge of $182 million to increase loan loss reserves. The $182 million net charge compares to a net reserve release of $196 million in the prior year period. Credit costs increased primarily in U.S. consumer lending and U.S. retail distribution, reflecting portfolio growth, an increase in delinquencies in second mortgages, and a change in estimate of loan losses inherent in the portfolio.

In international consumer, higher credit reflected an increase in net credit losses of $331 million, and a net charge to increase loan loss reserves of $112 million. Higher credit costs primarily reflected portfolio growth, including target market expansion in Mexico cards and the integration of Credicard in Brazil, increased net credit losses in Japan consumer finance, and a change in estimate of loan losses inherent in the portfolio. The international consumer credit environment was generally stable.

Markets & banking credit costs increased primarily due to a net charge of $286 million to increase loan loss reserves due to portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The $286 million net charge compares to a $33 million net charge to increase reserves in the prior-year period. The global corporate credit environment remained stable.

**Taxes.** The effective tax rate on continuing operations was 26.9% versus 21.5% in the prior year period. The current period tax rate includes the impact of a charge related to the structural expense review and certain APB 23 benefits described below. The 2006 first quarter tax rate included a $598 million tax benefit on continuing operations, or $657 million in total, due to resolution of a federal audit.

Share repurchases totaled $645 million, or approximately 12.1 million shares.

**Summary of highlighted items.** During the quarter, the following charges and benefits were recorded:

*U.S. Consumer Lending*

Revenues increased 23%, driven by growth in net interest revenues and net servicing revenues, and higher gains on sales of securities. Net interest

revenues increased 12%, as growth in average loans, up 16%, offset lower net interest margins.

Higher credit costs reflected increased net credit losses in second mortgages, an increase in loan loss reserves due to portfolio growth, seasoning, and increased delinquencies in second mortgages. The net credit loss ratio in real estate lending increased 14 basis points to 0.33%.

Net income declined 18% due to higher credit costs and the absence of a $31 million tax benefit recorded in the prior-year period.

**Credit costs** increased $1.26 billion, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to increase loan loss reserves. The $597 million net charge compares to a net reserve release of $154 million in the prior-year period.

In U.S. consumer, higher credit costs reflected an increase in net credit losses of $164 million and a net charge of $182 million to increase loan loss reserves. The $182 million net charge compares to a net reserve release of $196 million in the prior year period. Credit costs increased primarily in U.S. consumer lending and U.S. retail distribution, reflecting portfolio growth, an increase in delinquencies in second mortgages, and a change in estimate of loan losses inherent in the portfolio.

In international consumer, higher credit reflected an increase in net credit losses of $331 million, and a net charge to increase loan loss reserves of $112 million. Higher credit costs primarily reflected portfolio growth, including target market expansion in Mexico cards and the integration of Credicard in Brazil, increased net credit losses in Japan consumer finance, and a change in estimate of loan losses inherent in the portfolio. The international consumer credit environment was generally stable.

Markets & banking credit costs increased primarily due to a net charge of $286 million to increase loan loss reserves due to portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The $286 million net charge compares to a $33 million net charge to increase reserves in the prior-year period. The global corporate credit environment remained stable.

**Taxes.** The effective tax rate on continuing operations was 26.9% versus 21.5% in the prior year period. The current period tax rate includes the impact of a charge related to the structural expense review and certain APB 23 benefits described below. The 2006 first quarter tax rate included a $598 million tax benefit on continuing operations, or $657 million in total, due to resolution of a federal audit.

Share repurchases totaled $645 million, or approximately 12.1 million shares.

### On July 10 – We're still dancing

55.     On July 10, 2007, in an article in the Wall Street Journal, Defendant Prince stated that his bank hasn't pulled back from making loans to provide funds for private equity deals, despite a skittish credit market and concerns that the recent run of big buyout deals could be losing steam.  This statement championed Citi's financial health and ability to absorb large risks.  Citi did not acknowledge that it would have to take an enormous write-down less than four months later.

### The July 20, 2007 Misstatement

56.     On July 20, 2007, the Company reported net income for the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. International revenues and net income were a record, up 34% and 35% respectively. Return on equity was 20.1%.   This positive outlook further concealed Citi's material problems in its subprime lending practices.

#### Management Comment

"We have very clear priorities to drive growth and we are executing on all of them. We generated record revenues, up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results," said Charles Prince, Citi Chairman and Chief Executive Officer.

"We continued to generate revenue and volume growth in our U.S. consumer franchise, while making excellent progress in re-weighting Citi towards our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace," said Prince.

"We also began to implement the structural expense initiatives announced in April, which are generating improved efficiencies. These initiatives, coupled with strong revenue growth, drove positive operating leverage this quarter and helped offset increased credit costs."

"We made excellent progress in expanding our business through targeted acquisitions, completing three international transactions, including an

increase in our ownership of Nikko Cordial Corporation in Japan to 68%," said Prince.

*** 

## SECOND QUARTER SUMMARY

**Revenues** were a record, up 20%, led by 34% growth in international revenues. International markets & banking revenues grew 50%, international consumer revenues increased 16%, and wealth management revenues more than doubled. Revenue growth reflected double-digit customer volume growth. Deposits and loans grew 20% and 17%, respectively. Securities and banking ranked #1 in global debt underwriting, #2 in announced M&A, and #3 in global equity underwriting, and achieved record revenues in equity markets and transaction services. In global wealth management, client assets under fee-based management grew 40%, and client capital in alternative investments increased 55%.

Strong volume growth drove a 16% increase in net interest revenues. Excluding the impact of acquisitions, organic revenue growth was 16%.

The net interest margin declined 6 basis points versus the first quarter 2007, as the benefit from lower cost of funds was offset by growth in lower yielding trading assets.

**Operating expenses** increased 16%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007, and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom/Research matters (1).

The company opened or acquired 160 new retail bank or consumer finance branches during the quarter, including 136 internationally and 24 in the U.S. Over the last twelve months, 1,001 retail bank and consumer finance branches have been opened or acquired.

Excluding the impact of acquisitions, organic expense growth was 12%.

**Credit costs** increased $934 million, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period.

In U.S. consumer, higher credit costs reflected an increase in net credit losses of $183 million and a net charge of $245 million to increase loan loss reserves. The $245 million net charge compares to a net reserve release of $274 million in the prior-year period. The increase in net credit

losses and loan loss reserves primarily reflected higher delinquencies in second mortgages in consumer lending, a change in estimate of loan losses inherent in the cards portfolio, and portfolio growth.

In international consumer, higher credit costs reflected an increase in net credit losses of $155 million and a net charge to increase loan loss reserves of $236 million. The $236 million net charge compares to a net reserve release of $62 million in the prior-year period. The increase in net credit losses and loan loss reserves primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions.

Markets & banking credit costs declined, reflecting a stable global credit environment and the absence of a $118 million increase to loan loss reserves recorded in the prior-year period.

**Taxes.** The effective tax rate on continuing operations was 29.9% versus 30.3% in the prior-year period. The current period tax rate includes the impact of certain APB 23 benefits of $96 million described below.

57.     The press release does not discuss Citi's grave exposure in its subprime lending portfolio. Less than three months later, it would begin to disclose the true nature and extent of its omissions.

## CITIGROUP BEGINS TO COME CLEAN

58.     On October 1, 2007, Citi finally chose to disclose some of its subprime exposures. Citi announced that it expected third quarter 2007 net income to decline in the range of 60%, subject to finalizing third quarter results. The press release stated:

### CITI EXPECTS SUBSTANTIAL DECLINE IN THIRD QUARTER NET INCOME

New York, NY — Citigroup Inc. (NYSE:C) announced today that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi currently estimates that it will report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results.

"Our expected third quarter results are a clear disappointment. The decline in income was driven primarily by weak performance in fixed

income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.

"Our fixed income trading business has a long history of earnings power and success, as shown in this year's record first half results. In September, this business performed at more normalized levels and we see this quarter's overall poor trading performance as an aberration. While we cannot predict market conditions or other unforeseeable events that may affect our businesses, we expect to return to a normal earnings environment in the fourth quarter," said Prince.

The following accounts for a significant portion of the expected decline in third quarter results:

**Securities and Banking**
Revenue reductions from:

Write-downs of approximately $1.4 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments. These commitments totaled $69 billion at the end of the second quarter, and $57 billion at the end of the third quarter.   Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.

Losses of approximately $1.3 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

Losses of approximately $600 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

These revenue reductions were partially offset by lower expenses in Securities and Banking.

**Global Consumer**

An increase in credit costs of approximately $2.6 billion pre-tax versus the prior-year quarter due to continued deterioration in the credit environment, organic portfolio growth, and acquisitions. Approximately one-fourth of the increase in credit costs was due to higher net credit losses and approximately three-fourths was due to higher charges to increase loan loss reserves.

"Despite unusually poor results in certain businesses this quarter, Citi continues to execute its growth strategy and generate momentum across many of its franchises. Citi's international franchise continues to expand rapidly. Globally, revenues in equity underwriting, advisory, and transaction services are growing at a healthy double-digit pace, and customer volumes in the consumer business continue to show good growth. In Wealth Management, Citi's ability to serve client needs through the market dislocations is generating solid results. The structural expense initiatives announced in early April 2007 are on track and delivering the cost savings projected," said Prince.

59.     October 15, 2007, Citi continued its partial disclosure of its subprime exposure and reported net income for the 2007 third quarter of $2.38 billion, or $0.47 per share, a decline of 57% from the prior-year quarter. Results included a $729 million pre-tax gain on the sale of Redecard shares. Return on equity was 7.4%. The stock price fell $1.50.

**Management Comment**

This was a disappointing quarter, even in the context of the dislocations in the sub-prime mortgage and credit markets. A significant amount of our income decline was in our fixed income business, where we have a long track record of strong earnings, and this quarter's performance was well below our expectations. Although we generated strong momentum in many of our franchises, our fixed income results, along with higher credit costs in global consumer, led to significantly lower net income," said Charles Prince, Chairman and CEO.

"Importantly, many of our businesses performed well this quarter. Our international franchise continued to expand rapidly, with revenues up 30%. Our global wealth management franchise generated record revenues and transaction services posted another record quarter on double-digit earnings growth. In securities and banking, equity markets and underwriting revenues were up a combined 33%, and our advisory revenues grew 29%. Volumes in our consumer franchise continued to grow strongly with deposits up 18%, managed loans up 13%, and we opened 96 new branches around the world," said Prince.

"As we move in to the fourth quarter, we are focusing closely on improving those areas where we performed below expectation, while at the same time continuing to execute on our strategic priorities," said Prince.

## THIRD QUARTER SUMMARY

**Revenues** were up 6%, led by 30% growth in international revenues.

Global consumer revenues increased 14%, driven by international consumer up 35%, which included a $729 million pre-tax gain on the sale of Redecard shares. Excluding the gain, international consumer revenues increased 21%, reflecting deposit and loan growth of 18% and 29%, respectively, and higher investment sales, up 26%. U.S. consumer revenues were flat with the prior-year period as deposit and managed loan growth of 16% and 8%, respectively, was offset by lower securitization results in cards and the absence of gains on sale of securities in the prior-year period in consumer lending.

Markets & banking revenues declined 24%, reflecting record transaction services revenues, up 38%, offset by a 44% decline in securities and banking. Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets, including:

Write-downs of $1.35 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments.

Losses of $1.56 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

U.S. markets & banking revenues declined 87% and international revenues grew 7%. International revenues included strong double-digit revenue growth in Asia, Latin America, and Mexico.

Global wealth management revenues increased 41%, as U.S. revenues grew 14% and international revenues more than doubled, due to double-digit organic growth and increased ownership in Nikko Cordial.

Alternative Investments revenues declined 63% as strong growth in client revenues was offset by lower revenues from proprietary investment activities.

Excluding acquisitions and the gain on sale of Redecard shares, total organic revenues declined 3%.

The net interest margin declined 3 basis points versus the second quarter 2007.

**Operating expenses** increased 22%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007.

The company opened 96 new retail bank or consumer finance branches during the quarter, including 47 internationally and 49 in the U.S. Over the last twelve months, 820 retail bank and consumer finance branches have been opened or acquired.

Excluding the impact of acquisitions, organic expense growth was 14%.

**Credit costs** increased $2.98 billion, primarily driven by an increase in net credit losses of $780 million and a net charge of $2.24 billion to increase loan loss reserves.

In U.S. consumer, higher credit costs reflected an increase in net credit losses of $278 million and a net charge of $1.30 billion to increase loan loss reserves. The $1.30 billion net charge compares to a net reserve release of $197 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment, portfolio growth, and a change in estimate of loan losses inherent in the portfolio but not yet visible in delinquencies ("a change in estimate of loan losses").

In international consumer, higher credit costs reflected an increase in net credit losses of $460 million and a net charge of $717 million to increase loan loss reserves. The $717 million net charge compares to a net charge of $101 million in the prior-year period. The increase in credit costs primarily reflected the impact of recent acquisitions, portfolio growth, and a change in estimate of loan losses.

Markets & banking credit costs increased $98 million, primarily reflecting higher net credit losses and a $123 million net charge to increase loan loss reserves for specific counterparties. Credit costs reflected a slight weakening in portfolio credit quality.

**Taxes.** The effective tax rate on continuing operations was 21.1% versus 27.4% in the prior-year period. The decline in the tax rate primarily reflects a higher proportion of earnings in foreign jurisdictions that have lower tax rates.

*Securities and Banking*

Fixed income markets revenues declined $1.64 billion to $671 million, driven primarily by:

Losses of $1.56 billion, net of hedges, on sub-prime mortgages warehoused for future CDO securitizations, CDO positions, and leveraged loans warehoused for future CLO securitizations.

Losses of $636 million in credit trading due to significant market volatility and disruption of historical pricing relationships.

These losses were partially offset by strong double-digit revenue growth in interest rate and currency trading, and municipals.

## CITIGROUP REPORTS A CATASTROPHIC WRITEDOWN

60.    Finally, on November 4, 2007, Citigroup detailed the extent of its subprime exposure that led it to write down $11 billion. By all accounts, this was a catastrophe. Citigroup shares dropped from $37.73 to $35.90. By November 8, 2007, the stock was trading under $33, a drop of over $20 per share from the January 19, 2007 press release.

### CITI's SUB-PRIME RELATED EXPOSURE IN SECURITIES AND BANKING

New York, NY — Citigroup Inc. (NYSE: C) announced today significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. Citi estimates that, at the present time, the reduction in revenues attributable to these declines ranges from approximately $8 billion to $11 billion (representing a decline of approximately $5 billion to $7 billion in net income on an after-tax basis).

These declines in the fair value of Citi's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter. The impact on Citi's financial results for the fourth quarter from changes in the fair value of these exposures will depend on future market developments and could differ materially from the range above.

Citi also announced that, while significant uncertainty continues to prevail in financial markets, it expects, taking into account maintaining its current

dividend level, that its capital ratios will return within the range of targeted levels by the end of the second quarter of 2008. Accordingly, Citi has no plans to reduce its current dividend level.

The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30, 2007 consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).

## Lending and Structuring Exposures

Citi's approximately $11.7 billion of sub-prime related exposures in the lending and structuring business as of September 30, 2007 compares to approximately $13 billion of sub-prime related exposures in the lending and structuring business at the end of the second quarter and approximately $24 billion at the beginning of the year.(1)   The $11.7 billion of sub-prime related exposures includes approximately $2.7 billion of CDO warehouse inventory and unsold tranches of ABS CDOs, approximately $4.2 billion of actively managed sub-prime loans purchased for resale or securitization at a discount to par primarily in the last six months, and approximately $4.8 billion of financing transactions with customers secured by sub-prime collateral.(2)   These amounts represent fair value determined based on observable transactions and other market data.  Following the downgrades and market developments referred to above, the fair value of the CDO warehouse inventory and unsold tranches of ABS CDOs has declined significantly, while the declines in the fair value of the other sub-prime related exposures in the lending and structuring business have not been significant.

## ABS CDO Super Senior Exposures

Citi's $43 billion in ABS CDO super senior exposures as of September 30, 2007 is backed primarily by sub-prime RMBS collateral. These exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions.

Although the principal collateral underlying these super senior tranches is U.S. sub-prime RMBS, as noted above, these exposures represent the most senior tranches of the capital structure of the ABS CDOs.  These super senior tranches are not subject to valuation based on observable market transactions.  Accordingly, fair value of these super senior exposures is

based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value. The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior exposures.

## Other Information

The fair value of S&B sub-prime related exposures depends on market conditions and assumptions that are subject to change over time.  In addition, if sales of super senior tranches of ABS CDOs occur in the future, these sales might represent observable market transactions that could then be used to determine fair value of the S&B super senior exposures described above.  As a result, the fair value of these exposures at the end of the fourth quarter will depend on future market developments.

Citi has provided specific targets for its two primary capital ratios: the Tier 1 capital ratio and the ratio of tangible common equity to risk-weighted managed assets (TCE/RWMA ratio).  Those targets are 7.5% for Tier 1 and 6.5% for TCE/RWMA.  At September 30, 2007, Citi had a Tier 1 ratio of 7.3% and a TCE/RWMA ratio of 5.9%.

Citi is providing the above information in light of recent market developments. Citi's quarterly report for the period ending September 30, 2007 will contain other information regarding S&B and Citi's other businesses.

Citi expects that market conditions will continue to evolve, and that the fair value of Citi's positions will frequently change.  Given these anticipated fluctuations, Citi does not intend to update the information provided in this release until it announces its fourth quarter 2007 earnings in January 2008.  Investors also should not expect Citi to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates.

In the third quarter, Citi recorded declines in the aggregate of approximately $1.0 billion on a revenue basis in the lending and structuring business, and to a much lesser extent the trading positions described in footnote 2, and declines of approximately $0.5 billion on a revenue basis on its super senior exposures (approximately $0.3 billion greater on a revenue basis than the losses reported in Citi's October 15 earnings release).  Citi also recorded declines in the third quarter of approximately $0.3 billion on a revenue basis on collateralized loan obligations warehouse inventory unrelated to sub-prime exposures.

S&B also has trading positions, both long and short, in U.S. sub-prime residential mortgage-backed securities (RMBS) and related products, including ABS CDOs, that are not included in these figures. The exposure from these positions is actively managed and hedged, although the effectiveness of the hedging products used may vary with material changes in market conditions. Since the end of the third quarter, such trading positions have not had material losses.

61.     Citi's write-down ran ripples through the financial world, garnering headlines in the Wall Street Journal and resulted in the immediate resignation of Defendant Prince.

## NUMEROUS THE INDIVIDUAL DEFENDANTS ENGAGED IN INSIDER SELLING WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION

62.     From January 2007 until the present, insiders have sold stock at an inflated price for their own benefit.   The Individual Defendants Bischoff, Bushnell, Druskin, Freiberg, Gerspach, Helfer, Kaden, Klein, Krawcheck, Maheras, Prince, Rhodes, Rubin and Volk, (collectively referred to as "Insider Selling Defendants"), took advantage of the Company's misstatements and reaped a windfall benefit, which has been unavailable to the Company's other shareholders.   The table below shows the benefits that the Insider Selling Defendants reaped by trading on non-public information.   Citigroup's compensation and corporate governance and audit committees, consisting of the Individual Defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin, Ryan, Belda, Derr and Parsons, had primary responsibility for establishing controls to prevent insider sales based on material non-public information.

| Insider | Sale Date | No. of Shares | Price | Total Gain |
|---------|-----------|---------------|-------|------------|
| Bischoff | 1/2/07 | 17,708 | $54.55 | $1,793,046.56 |
| | 2/23/07 | 15,419 | $53.64 | |
| Bushnell | 1/22/07 | 25,528 | $54.55 | $2,700,042.09 |
| | 2/27/07 | 6,940 | $52.10 | |
| | 2/27/07 | 5,070 | $52.68 | |

| Insider | Sale Date | No. of Shares | Price | Total Gain |
|---|---|---|---|---|
| | 2/27/07 | 1,514 | $52.68 | |
| | 7/23/07 | 11,809 | $50.73 | |
| | 1/22/07 | 43,639 | $54.55 | |
| Druskin | 1/29/07 | 20,000 | $54.02 | $5,253,690.85 |
| | 4/18/07 | 10,000 | $53.07 | |
| | 7/13/07 | 23,885 | $52.84 | |
| Freiberg | 1/22/07 | 21,162 | $54.55 | $1,747,034.93 |
| | 7/20/07 | 11,591 | $51.13 | |
| Gerspach | 1/22/07 | 4,574 | $54.55 | $1,261,956.74 |
| | 4/17/07 | 19,128 | $52.93 | |
| Helfer | 1/22/07 | 19,590 | $54.55 | $1,068,634.50 |
| Kaden | 1/22/07 | 11,200 | $54.55 | $610,960.00 |
| Klein | 7/17/07 | 19,282 | $52.19 | $1,006,327.58 |
| Krawcheck | 1/22/07 | 50,339 | $54.55 | $2,745,992.45 |
| Maheras | 7/13/07 | 23,964 | $52.84 | $1,266,257.76 |
| | 1/22/07 | 81,087 | $54.55 | |
| Prince | 4/17/07 | 13,419 | $52.93 | $7,895,074.25 |
| | 5/17/07 | 13,395 | $54.91 | |
| | 7/13/07 | 38,342 | $52.84 | |
| | 1/22/07 | 24,686 | $54.55 | |
| Rhodes | 2/5/07 | 8,000 | $55.03 | $4,319,376.82 |
| | 7/13/07 | 47,928 | $52.84 | |
| Rubin | 1/22/07 | 77,500 | $55.05 | $4,266,375.00 |
| Volk | 1/22/07 | 16,347 | $54.55 | $891,728.00 |
| **TOTAL** | | | | $36,826,498.38 |

63.     The Insider Selling Defendants, while in possession of adverse non-public

information regarding Citi's reckless lending practices and lack of internal controls, sold

their stock for proceeds of $36,826,498.38.

64.     Thus, notwithstanding their access to material non-public information

concerning the Company's deteriorating mortgage exposure, true financial condition and

reasons for the potential impact of such improper activities on the Company's reported

financial condition and future operations, as well as their duty to disclose such adverse

information before selling Citi stock, the Insider Selling Defendants capitalized on their

insider knowledge and sold their stock at artificially inflated prices and at highly suspicious times.

65.     In engaging in this activity or failing to prevent it, the Individual Defendants breached their fiduciary duty of loyalty. Moreover, those Individual Defendants that did not engage in insider trading further breached their fiduciary duties by either failing to keep adequately informed about the Insider Selling Defendants' insider trading activity or, if adequately informed about it, failed to ensure that the Company maintained and followed adequate internal controls polices, practices and procedures to prevent such activity.

## THE INDIVIDUAL DEFENDANTS AUTHORIZED A SHARE BUYBACK AT AN ARTIFICIALLY INFLATED PRICE

66.     The Individual Defendants, by virtue of their fiduciary duty of loyalty, had an obligation to the Company to make sure the Company's assets were not wasted.  To perform sufficiently these duties, the Individual Defendants had to know and understand the reasons for the Company's inflated stock price and the adverse effect to the Company to continue stock repurchases at a time when the Company's stock price was artificially inflated due to the Individual Defendants' materially false and misleading disclosures.

67.     On January 22, 2007, the Company announced that it had repurchased $1 billion worth of the Company's stock at a price at least above $50 per share.

68.     Similarly, on April 19, 2007, The Individual Defendants announced that the Board had repurchased $645 million in stock, at prices above $50 per share.

69.     The Individual Defendants authorized these buybacks, harming the Company, to the tune of $20 per share.  Importantly, these buybacks were being approved while insiders were selling large portions of their own Citigroup portfolio.

## DAMAGES TO THE COMPANY

70.    The Individual Defendants' breach of their fiduciary duties in connection with Citigroup's mortgage practices and related securities fraud expose the Company to a wide variety of financial harm including:

(a)    demands by purchasers of CDOs sold by Citigroup to take-back or unwind the transactions;

(b)    restatements of Citigroup's annual revenue and income due to the Generally Accepted Accounting Principles ("GAAP") revenue recognition principles and standards;

(c)    a loss of financial goodwill;

(d)    damages and legal defense costs for securities fraud and ERISA litigation;

(e)    costs related to compensation, severance and benefits paid to the Individual Defendants who have breached their fiduciary duties to Citigroup; and

(f)    substantial additional future costs to remediate its failed corporate governance processes and institutional operations.

71.    In addition, the Individual Defendants' breach of their fiduciary duties relating to the mortgage practices also have exposed the Company to other harm resulting from injury to Citigroup's corporate image and reputation.

72.    Further, as a result of the Individual Defendants' breach of their fiduciary duties, the Company has expended $1.645 billion to purchase shares of the Company's stock at artificially inflated price.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.   The current Board of Citigroup consists of the following fourteen Individual Defendants:  Armstrong, Belda, Bischoff, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Rubin, Ryan, and Thomas (the "Board Member Defendants").  Plaintiff has not made any demand on the present Board of Citigroup to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

### The Board Has Breached Its Fiduciary Duties And Cannot Exercise Independent Judgment To Prosecute Litigation Against Themselves

74.   Citigroup's Board of Directors consists of fourteen Board Member Defendants.  To bring this suit, all of the directors of Citi would be forced to sue themselves and persons with whom they have extensive business and personal relationships, which they will not do, thereby excusing demand.  Indeed, the entire Board is antagonistic to this lawsuit.

75.   As more fully detailed herein, the Board Member Defendants participated in, approved and/or permitted the wrongs alleged to have occurred and participated in efforts to conceal or disguise those wrongs from Citi's shareholders, or recklessly and/or negligently disregarded the wrongs complained of, and are therefore not disinterested parties, as each faces a substantial likelihood of liability for his or her conduct as described herein.

76.   By virtue of their specific duties as Board members, each of the Board Member Defendants was charged with the management of the Company and to conduct its business affairs.  Each of these Board Member Defendants breached the fiduciary

duties that they owe to Citi and its shareholders because they caused or failed to prevent and correct the internal control deficiencies, improper statements and financials.

77.    In addition, as alleged in the securities fraud litigation, each of Board Member Defendants authorized and/or allowed the Company to release inaccurate statements directly to the public or securities analysts that were then made available and disseminated to shareholders.

78.    The Board Member Defendants cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because they are interested personally in the outcome as it is their actions that have subjected Citi to potentially hundreds of millions of dollars in liability for violations of applicable securities laws, engaging in possible consumer fraud, and damaging the Company's goodwill.

79.    In the event that Board Member Defendants were to bring this derivative action against themselves, they would be forced to expose their own misconduct which also underlies allegations against certain of them and the Company in pending securities fraud class action litigation, ERISA class action litigation, and possible consumer fraud class action litigation.  The potential total liability arising form such civil litigation and criminal investigations is likely to exceed the limits of insurance coverage available to the Board Member Defendants exposing them to personal liability. Thus, the Board Member Defendants cannot exercise the independent judgment to prosecute the claims alleged herein since it would require them to take positions contrary to their defenses in the pending class action litigations.

80.    Indeed, as a result of the wrongdoings complained of, Citi has and will continue to be exposed to substantial losses.  However, to date, the Board Member Defendants have not filed any lawsuits against themselves or others who were responsible for wrongdoing.

### Board Members' Personal Financial Interests Preclude The Board From Exercising Independent Judgment To Prosecute Litigation Against Themselves

81.    As alleged in further detail in the Complaint, each of the Individual Defendants directly benefited from the wrongdoings alleged herein.  The Individual Defendants Bischoff, Bushnell, Druskin, Freiberg, Gerspach, Helfer, Kaden, Klein, Krawcheck, Maheras, Prince, Rhodes, Rubin and Volk, generated substantial proceeds from insider trading.  All of the Board Member Defendants were awarded stock and stock option grants.  Each of the Board Member Defendants faces the substantial likelihood of disgorgement of their wrongful enrichment and therefore cannot exercise independent judgment in deciding whether to initiate and prosecute this litigation.

82.    In addition, to the extent Citi's Board members are protected against personal liability arising from any acts of mismanagement, abuse of control and breach of fiduciary duties, such as those alleged in this Complaint, by directors' and officers' liability insurance, those policies were purchased with  corporate funds, *i.e.*, money belonging to Citi's shareholders.  However, the "insured versus insured exclusion" typically contained in such policies precludes coverage for claims by a corporation against its own officers and directors for engaging in wrongful conduct.

83.    As a result, if Citi's Board members were to bring this action against themselves, coverage under the directors' and officers' policy may be denied by the insurance carrier, exposing the directors to substantial personal liability.  None of the

Board Member Defendants therefore can exercise independent judgment to bring this litigation if it may result in direct financial harm to them. In contrast, a derivative action such as this litigation, does not run afoul of the "insured versus insured exclusion" enabling the Company to seek recovery from its insurers.

84.     The Individual Defendants Belda, Derr and Parsons served as members of the Board's Compensation Committee.

85.     Citi's Compensation Committee is responsible for determining the compensation for the Office of the Chairman and Chief Executive Officer and for approving the compensation structure for senior management.

86.     Because they had the ability to review internal corporate documents; request documents for review; communicate directly with other senior Company managers, corporate officers and employees and attend management and Board meetings; each of the Board Member Defendants either knew about the matters alleged herein and failed to take appropriate action, or failed to obtain adequate information about the matters alleged herein so they could remain properly informed about the Company's practices, policies controls and business operations.

87.     The Individual Defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan, served as members of the Audit and Risk Management Committee.

88.     Citi's Audit and Risk Management Committee is directly responsible for, and participates in fulfilling its oversight responsibility relating to (i) the integrity of Citigroup's financial statements and financial reporting process and Citigroup's systems of internal accounting and financial controls; (ii) the performance of the internal audit function; (iii) the annual independent integrated audit of Citigroup's consolidated

financial statements and internal control over financial reporting, the engagement of the independent registered public accounting firm and the evaluation of the independent auditors' qualifications, independence and performance; (iv) policy standards and guidelines for risk assessment and risk management; (v) the compliance by Citigroup with legal and regulatory requirements including Citi's disclosure control and procedures; and (vi) other responsibilities.

89.    The Individual Defendants Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan breached their fiduciary duty of loyalty because the Audit Committee participated in the preparation of improper financial statements and earnings press releases that contained false and/or misleading material information.  Furthermore, the Audit Committee (and Board) failed to ensure that the Company implements requisite internal controls over its lending practices to prevent the Company from making loans to unqualified persons.  Finally, the Individual Defendants had the opportunity, but failed to review and correct Prince's improper financial statements and other public disclosures.

90.    Therefore, as members of the Audit Committee, Armstrong, David, Deutch, Liveris, Mulcahy, Rodin and Ryan face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and demand upon them is futile.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duties of Care, Loyalty and Good Faith

91.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants owed and owe Citi fiduciary obligations.  By reason of their fiduciary relationships, these the Individual Defendants owed and owe Citi the highest obligation of good faith, fair dealing loyalty and due care.

93.     All the Individual Defendants violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith and supervision as alleged herein.

94.     Each of the Individual Defendants had actual or constructive knowledge of the wrongdoing alleged herein.  As such, the Individual Defendants' actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Citigroup has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     Plaintiff on behalf of Citi has no adequate remedy of law.

## COUNT II

### Breach of Fiduciary Duty for Insider Trading and Misappropriation of Information

97.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Citi common stock on the basis of such information.

99.     The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a

proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Citi common stock.

100.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Citi common stock, while in possession and control of material adverse non-public information was a breach of their fiduciary duties of loyalty.

101.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## COUNT III

### Waste of Corporate Assets

102.   Plaintiff incorporates by reference and realleges each an every allegation contained above, as though fully set forth herein.

103.   As a result of the Individual Defendants' breaches of fiduciary duties, Citigroup engaged in reckless lending practices, lacked internal control and failed to properly consider the interest of the Company and the public shareholders.  Further, by failing to conduct proper supervision, the Individual Defendants have caused Citi to waste valuable corporate assets by, among other things, purchasing $1.645 billion the Company's stock at a time when it was artificially inflated.  As a result of defendants' wrongdoing, Citigroup will have to incur potentially hundreds of millions of dollars of legal liability and/or legal costs to investigate, defend and resolve the various criminal civil and regulatory proceedings arising from the Individual Defendants wrongful actions.

104.   Plaintiff, on behalf of Citi, has no adequate remedy at law.

## COUNT IV

### Unjust Enrichment

105.    Plaintiff incorporates by reference and realleges each and every allegation set fourth, as though fully set forth herein.

106.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched as the expense and detriment of Citi.

107.    Plaintiff, as a shareholder and representative of Citi, seeks restitution from those defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by each of the Individual Defendants from their wrongful conduct and breaches of fiduciary duties.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding judgment against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the individual the Individual Defendants breaches of their fiduciary duties;

B.      Directing Citi to take all necessary action to reform and improve their corporate governance and internal procedures to comply with applicable law and to protect Citi and its shareholders from a repeat of the damaging events descried herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's by-laws or Article of Incorporation and taking such other action as may be necessary to place before shareholders for a vote for Corporate Governance Policies that include (i) a proposal to strengthen the Boards' supervision of operation and develop and implement procedures the greater shareholder input into the policies and guidelines of the Board ; (ii) a provision to permit the shareholders of Citi to

nominate at least three candidates for election to the Board; and (iii) test to strengthen the internal audit and control functions;

     C.     Awarding extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including but not limited to attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Defendants trading activities or their other assets so as to ensure that Plaintiff on behalf of Citi has an effective remedy;

     D.     Awarding to Citi restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

     E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys, accountants and experts' fees, costs and expenses; and

     F.     Granting such other and further relief as this Court seems just and proper.

Dated: December 26, 2007     FARUQI & FARUQI LLP

          Christopher Marlborough (CM-6107)
          David Leventhal (DL-7673)
          Beth A. Keller (BK-9421)
          369 Lexington Avenue, 10th Floor
          New York, New York 10017
          Tel: 212-983-9330
          Fax: 212-983-9331

          Clinton A. Krislov
          Jeffrey M. Salas
          KRISLOV & ASSOCIATES, LTD.
          20 North Wacker Drive, Suite 1350
          Chicago, IL 60606
          Tel: 312-606-0500
          Fax: 312-606-0207

## ATTORNEY'S VERIFICATION

I, Clinton A. Krislov, hereby declare as follows:

1.      I am a member of the law firm of Krislov & Associates, Ltd., counsel for Plaintiff Walter E. Ryan, Jr. in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because Plaintiff is currently absent from the County of Cook where I maintain my office.

Executed this 26th day of December, 2007, at Chicago, Illinois.

_____
Clinton A. Krislov