**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

| | |
|---|---|
| JEFFREY HARRIS, Derivatively On Behalf of CITIGROUP, INC., | : Case No. 07-cv-9841 (SHS) |
| Plaintiff, | : |
| vs. | : |
| CHARLES PRINCE, ET AL., | : |
| Defendants, | : |
| -and- | : |
| CITIGROUP, INC., a Delaware corporation, | : |
| Nominal Defendant. | : |

-------------------------------------------------------------

| | |
|---|---|
| GARY CINOTTO, Derivatively On Behalf of CITIGROUP, INC., | : Case No. 07-cv-9900 (SHS) |
| Plaintiff, | : |
| vs. | : |
| CHARLES PRINCE, ET AL., | : |
| Defendants, | : |
| -and- | : |
| CITIGROUP, INC., a Delaware corporation, | : |
| Nominal Defendant. | : |

-------------------------------------------------------------

| | |
|---|---|
| BENJAMIN NATHANSON, Derivatively On Behalf of CITIGROUP, INC., | : Case No. 07-cv-10333 (SHS) |
| Plaintiff, | : |
| vs. | : |
| CHARLES PRINCE, ET AL., | : |
| Defendants, | : |
| -and- | : |
| CITIGROUP, INC., a Delaware corporation, | : |
| Nominal Defendant. | : |

| | |
|---|---|
| SAM COHEN, Derivatively On Behalf of CITIGROUP, INC., | : Case No. 07-cv-10344 (SHS) |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| CITIGROUP, INC., ET AL., | : |
| | : |
| Defendants. | : |
| | : |
| WALTER E. RYAN, JR., derivatively on behalf of CITIGROUP, INC., | : Case No. 07-cv-11581 (UA) |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| vs. | : |
| | : |
| CHARLES PRINCE, ET AL., | : |
| | : |
| Defendants, | : |
| | : |
| -and- | : |
| | : |
| CITIGROUP, INC., a Delaware Corporation, | : |
| | : |
| Nominal Defendant. | : |

-------------------------------------------------------------X

## SUPPLEMENTAL DECLARATION OF THOMAS G. AMON IN FURTHER SUPPORT OF PLAINTIFF JEFFREY HARRIS' MOTION TO CONSOLIDATE ALL RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT A LEADERSHIP STRUCTURE

I, THOMAS G. AMON, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of New York. I am an attorney with The Amon Law Firm, one of counsel of record for plaintiff Jeffrey Harris in the above entitled action. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Attached are true and correct copies of the following exhibits:

Exhibit A:      *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345 (JS)(ETB), Stipulation and Agreement of Settlement (E.D.N.Y. Mar. 12, 2007);

- 1 -

Exhibit B:     *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345 (JS)(ETB), Declaration of Brian J. Robbins in Support of Plaintiff's Motion for Final Approval of Derivative Settlement and Approval of Attorneys' Fees and Reimbursement of Expenses (E.D.N.Y. Mar. 12, 2007).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 4th day of February, 2008, at New York, New York.

*s/Thomas G. Amon*
_____
THOMAS G. AMON

318136_1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————————— x | | |
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : : : | Civil Action No. CV 05-4296(JS)(ETB) <br> <u>CLASS ACTION</u> |
| ———————————————————— | : | |
| This Document Relates To: | : : | |
| ALL ACTIONS. | : : | |
| ———————————————————— x | | |
| In re DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | : : : | Civil Action No. CV 05-4345(JS)(ETB) <br> <u>DERIVATIVE ACTION</u> |
| ———————————————————— | : | |
| This Document Relates To: | : : | |
| ALL ACTIONS. | : : | |
| ———————————————————— x | | |

STIPULATION AND AGREEMENT OF SETTLEMENT

This Stipulation and Agreement of Settlement (the "Stipulation"), dated as of November 30, 2006, is made and entered into pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure and contains the terms of a settlement (the "Settlement"), initially outlined in a Memorandum of Understanding, dated as of July 12, 2006 ("MOU"), (a) by and among the Class Defendants (as defined below in Section IV, ¶1 as are other capitalized terms herein, except as otherwise noted) and the Class Plaintiffs, on behalf of themselves and Members of the Class in connection with *In re DHB Industries, Inc. Sec. Litig.*, No. CV 05-4296(JS)(ETB) (the "Class Action"), pending in the United States District Court, Eastern District of New York (the "Court"); and (b) by and among the Derivative Defendants and the Derivative Plaintiff, derivatively and on behalf of DHB Industries, Inc. ("DHB" or the "Company"), in connection with *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345(JS)(ETB) (the "Derivative Action") pending in the Court (collectively, the "Actions").

This Stipulation is intended by the Class Plaintiffs, the Derivative Plaintiff and the Defendants to fully, finally and forever resolve, discharge and settle the Released Class Claims against the Released Class Persons and the Released Derivative Claims against the Released Derivative Persons, but not the Non-Released Claims, upon and subject to the terms and conditions hereof and subject to the approval of the Court.

## I.  THE CLASS ACTIONS AND THE DERIVATIVE ACTIONS

On and after September 9, 2005, multiple actions were filed in the Court as class actions on behalf of persons who purchased or otherwise acquired certain of the publicly traded shares of DHB alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78(j)(b) and 78(t).  On January 31, 2006, the Court consolidated the class actions as *In re DHB Industries, Inc. Sec. Litig.*, No. CV 05-4296(JS)(ETB) and appointed RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Baciu as Lead Plaintiffs (the "Lead Plaintiffs" or

- 1 -

the "Class Plaintiffs") and, pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), approved the Class Plaintiffs' choice of Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow & Rudoff LLP as Lead Counsel.

On and after September 14, 2005, multiple actions were filed in the Court as derivative actions on behalf of DHB. The complaints in the derivative actions generally allege causes of action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. On January 31, 2006, the Court consolidated the derivative actions filed as *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345(JS)(ETB) and appointed Robbins Umeda & Fink, LLP and Law Offices of Thomas G. Amon as Co-Lead Counsel.

## II.    DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

The Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Class Plaintiffs and the Derivative Plaintiff (collectively the "Plaintiffs") in the Actions. The Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them or any of them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Actions, or either of them. The Defendants also have denied and continue to deny, *inter alia*, the allegations that the Plaintiffs, the Class Members or DHB have suffered damage, that the price of DHB's common stock was artificially inflated by reason of any alleged misrepresentations, non-disclosures or otherwise, or that the Plaintiffs, the Class Members or DHB were harmed by any of the conduct alleged in the Actions or that could have been alleged therein, or either of them.

Nonetheless, the Defendants have concluded that further conduct of the Actions would be protracted, expensive, and distracting, including, without limitation, to DHB and its management, and that it is desirable that the Actions be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation. The Defendants also have taken into account the

uncertainty and risks inherent in any litigation, especially in complex cases like the Actions. The Defendants have, therefore, determined that it is desirable that the Actions be settled in the manner and upon the terms and conditions set forth in this Stipulation.

Neither this Stipulation nor any document referred to herein nor any action taken to carry out this Stipulation is, may be construed as or may be used as an admission by or against the Defendants, or any of them, of any fault, wrongdoing or liability whatsoever. Entering into or carrying out this Stipulation (or the Exhibits hereto) and any negotiations or proceedings related thereto shall not in any event be construed as, or be deemed to be evidence of, any admission or concession with regard to any of Plaintiffs' claims, or contrary to any of Defendants' denials and defenses, and shall not be offered by any of the Settling Parties, Class Members or Current DHB Shareholders in any action or proceeding in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Stipulation (and the Exhibits hereto) or the provisions of any related agreement or release; except that this Stipulation and the Exhibits hereto may be filed in any of the Actions or related litigation, as evidence of the Settlement, or in any subsequent action against or by the Defendants or the Released Persons or any of them to support a claim or defense of *res judicata*, collateral estoppel, release or other theory of claim or issue preclusion or similar defense.

## III.  CLAIMS OF THE CLASS PLAINTIFFS AND THE DERIVATIVE PLAINTIFF AND BENEFITS OF SETTLEMENT

The Plaintiffs believe that the claims asserted in the Actions have merit. However, counsel for the Plaintiffs recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Actions against the Defendants through trial and appeal. Counsel for the Plaintiffs also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Actions, as well as the difficulties and delays inherent in such litigation. Counsel for the Plaintiffs also are mindful of the inherent problems of proof of, and

possible defenses to, the violations asserted in the Actions. Counsel for the Plaintiffs believe that the Settlement set forth in this Stipulation confers substantial benefits upon and is in the best interests of the Class and each of the Members of the Class. Counsel for the Derivative Plaintiff believe that the Settlement set forth in this Stipulation confers substantial benefits upon, and is also in the best interests of, DHB and the Current DHB Shareholders.

## IV.    TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the Class Plaintiffs (for themselves and the Class Members), the Derivative Plaintiff (derivatively on behalf of DHB), and the Defendants, by and through their respective counsel or attorneys of record, that, subject to the approval of the Court, the Actions and the Released Claims shall be finally and fully compromised, settled and released, and the Actions shall be dismissed with prejudice, upon and subject to the terms and conditions of this Stipulation, as follows:

### 1.    Definitions

As used in this Stipulation the following terms have the meanings specified below:

1.1    "Authorized Claimant" means any Class Member whose claim for recovery has been allowed pursuant to the terms of this Stipulation.

1.2    "Claimant" means any Class Member who submits a Proof of Claim and Release in such form and manner, and within such time, as the Court shall prescribe.

1.3    "Claims" means any and all claims, demands, rights, liabilities, damages and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, including, without limitation, "Unknown Claims" (as defined below) and claims for negligence, gross negligence, breach of fiduciary duty, breach of duty of care, breach of duty of loyalty, waste, insider trading, unjust enrichment, abuse of control, mismanagement, fraud, and violations of any local, state or federal statutes, rules, regulations or common law.

- 4 -

1.4    "Claims Administrator" means the firm of Gilardi & Co. LLC, P.O. Box 5100, Larkspur, CA 94977-5100, Telephone: 1-800-654-5763, www.gilardi.com.

1.5    "Class" means all Persons who purchased or otherwise acquired (including by exchange, conversion or otherwise) the publicly traded securities of DHB (including puts, calls and other securities) on or after November 18, 2003 until and including November 30, 2006, and were allegedly damaged thereby.  Excluded from the Class are the Defendants and Persons related to the Defendants, including any subsidiaries or affiliates of DHB; the officers and directors of DHB during the Class Period; members of the individual Defendants' immediate families; any person, firm, trust, officer, director or any individual or entity in which any Defendant has a controlling interest or which is related to, or affiliated with, any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors in interest or assigns of any such excluded person or entity.  Also excluded from the Class are those Persons who timely and validly request to be excluded from the Class pursuant to the "Notice of Pendency and Settlement of Class Action" to be sent to Class Members.

1.6    "Class Defendants" means DHB, David H. Brooks, Terry Brooks, David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman.

1.7    "Class Member" or "Member of the Class" means a Person who falls within the definition of the Class as set forth in ¶1.5 of this Section of this Stipulation.

1.8    "Class Period" means the period commencing on November 18, 2003 through and including November 30, 2006.

1.9    "Class Plaintiffs' Counsel" means Keith F. Park, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 655 W. Broadway, Suite 1900, San Diego, CA 92101, Samuel H. Rudman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 58 South Service Road, Suite 200, Melville, NY 11747, and Lynda J. Grant, Labaton Sucharow & Rudoff LLP, 100 Park Avenue, 12th Floor, New York, NY 10017.

1.10    "Current DHB Shareholders" means any Person(s) who owned DHB common stock as of the date hereof.

1.11    "Defendants" means the Class Defendants and Derivative Defendants.

1.12    "Derivative Counsel" means Brian Robbins, Robbins Umeda & Fink, LLP, 610 West Ash Street, Suite 1800, San Diego, CA 92101 and Thomas G. Amon, Law Offices of Thomas G. Amon, 500 Fifth Avenue, Suite 1650, New York, NY 10110.

1.13    "Derivative Defendants" means nominal defendant DHB, David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Jerome Krantz, Gary Nadelman, Cary Chasin, Barry Berkman, Larry Ellis, Tactical Armor Products, Inc., David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Terry Brooks and Jeffrey Brooks.

1.14    "Derivative Plaintiff" means Alvin Viray.

1.15    "Effective Date" means the first date by which all of the events and conditions specified in ¶7.1 of this Section of this Stipulation shall have been met and have occurred, unless one or more of such conditions is waived or modified in writing and signed by Class Plaintiffs' Counsel, Derivative Counsel, and counsel for each of the Defendants.

1.16    "Escrow Agent" means Lerach Coughlin Stoia Geller Rudman & Robbins LLP. Further terms relating to the Escrow Agent are contained in a certain Escrow Agreement dated as of

July 27, 2006 (the "Escrow Agreement").  A copy of the Escrow Agreement is attached hereto as Exhibit A.

1.17    "Final" means: (a) the date of final affirmance on an appeal of the Judgments, the expiration of the time for a petition for or a denial of a writ of certiorari to review the Judgments and, if certiorari is granted, the date of final affirmance of the Judgments following review pursuant to that grant; or (b) the date of final dismissal of any appeal from the Judgments or the final dismissal of any proceeding on certiorari to review the Judgments; or (c) if no appeal is filed, the expiration date of the applicable time for the filing or noticing of any appeal from the Judgments.  Any proceeding or order, or any appeal or petition for a writ of certiorari, pertaining solely to any Plan of Allocation and/or application for or award of attorneys' fees or expenses, shall not in any way delay or preclude the Judgments from becoming Final.

1.18    "Judgments" means the final judgments to be rendered by the Court in the Actions, substantially in the forms attached hereto as Exhibits D and E.

1.19    "Non-Released Claims" means all of DHB's obligations to David H. Brooks and to all of the other Defendants to whom DHB has indemnification obligations, of and for indemnification and reimbursement for fees, expenses and liabilities, as provided for in DHB's Articles of Incorporation and By-Laws, in the laws of Delaware, and in this Stipulation, as the latter is approved by the Court, all of which shall remain in full force and effect, and David H. Brooks' undertaking to DHB, regarding his indemnification by DHB, and the undertakings of the other Defendants to whom DHB has indemnification obligations, shall also remain in full force and effect. "Non-Released Claims" shall also include any and all obligations of any Defendant to any other Defendant under any existing contract or agreement between or among them, including, without limitation, any agreement entered into in connection with the Settlement.

- 7 -

1.20    "Person" means an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, joint venture, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, and assignees.

1.21    "Plaintiffs' Counsel" means counsel who have appeared for any of the Plaintiffs in the Actions.

1.22    "Plan of Allocation" means a plan or formula or formulae of allocation of the Settlement Fund (to be described in the notice to be sent to Class Members), whereby the Settlement Fund, plus interest earned thereon, shall be distributed to Authorized Claimants after the payment of the expenses of notice and administration of the Settlement, Taxes and Tax Expenses and such attorneys' fees, expenses and interest and amounts to the Lead Plaintiffs as may be awarded by the Court.  The Plan of Allocation is not part of this Stipulation and Defendants shall have no responsibility or liability with respect thereto.

1.23    "Related Persons" means each of a Defendant's present and former parents, subsidiaries, affiliates, divisions, joint ventures, joint venturers, and his, her or its present and former officers, directors, employees, agents, representatives, attorneys, insurers, excess insurers, advisors, investment advisors, auditors, accountants, spouses and immediate family members, and the predecessors, heirs, successors and assigns of any of them, and any Person in which any Related Person has or had a controlling interest or which is or was related to or affiliated with any Related Person, and any trust of which any Defendant is the settler or which is for the benefit of any Defendant and/or a member(s) of a Defendant's family.  Stockbrokers in their capacity as such are excluded from this definition.

1.24    "Released Claims" means, collectively, the Released Class Claims and the Released Derivative Claims, as defined below.

1.25    "Released Class Claims" means any and all Claims arising from either the purchase or other acquisition (including by an exchange, conversion or otherwise) of any publicly-traded securities of DHB, including, without limitation, put and call options thereon, during the Class Period and based on any facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were or could have been asserted by the Lead Plaintiffs or any Class Member in the Class Action, in a direct, indirect, representative, derivative or other capacity against the Released Class Persons, or any of them.

1.26    "Released Class Persons" means the Class Defendants and each of them, and each of their respective Related Persons in their capacities as such.

1.27    "Released Derivative Claims" means any and all Claims based on any facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were or could have been asserted by the Derivative Plaintiff on behalf of DHB, or by DHB on its own behalf, or by any Current DHB Shareholder in the Derivative Action, in a direct, indirect, representative, derivative or other capacity against the Released Derivative Persons, or any of them. In addition, Released Derivative Claims includes, without limitation, a release by DHB of David H. Brooks and Dawn M. Schlegel, and each of them, from any and all liability under §304 of the Sarbanes-Oxley Act of 2002 to reimburse DHB for any bonus or other incentive-based or equity based compensation received by them or either of them, or for any profits realized by them or either of them from the sale of any securities of DHB.

1.28    "Released Derivative Persons" means the Derivative Defendants, and each of them, and each of their respective Related Persons in their capacities as such.

1.29    "Released Persons" means, collectively, the Released Class Persons and the Released Derivative Persons.

1.30    "Settlement Fund" means the principal amount of Thirty-Five Million Two Hundred Thousand Dollars ($35,200,000) plus 3,184,713 shares of DHB common stock.

1.31    "Settling Parties" means, collectively, each of the Defendants, and the Class Plaintiffs and the Derivative Plaintiff on behalf of, respectively, themselves, the Members of the Class, the Current DHB Shareholders, and derivatively on behalf of DHB.

1.32    "Unknown Claims" means any Released Class Claims or any Released Derivative Claims which any Class Plaintiff or Class Member (as to Released Class Claims), and/or the Derivative Plaintiff, any Current DHB Shareholder, or DHB (as to Released Derivative Claims), respectively, does not know of or suspect to exist in his, her or its favor at the time of the release of the Released Class Persons and/or the Released Derivative Persons which, if known by him, her or it, might have affected his, her or its settlement with, and release of, the Released Class Persons and/or Released Derivative Persons, or might have affected his, her or its decision not to object to this Settlement.  With respect to any and all Released Class Claims and Released Derivative Claims, the Settling Parties stipulate and agree that, upon the Effective Date, the Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived the provisions, rights and benefits of California Civil Code §1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of

the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code §1542. Each of the Class Plaintiffs, the Derivative Plaintiff, the Class Members, DHB, and the Current DHB Shareholders, may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the Released Class Claims or Released Derivative Claims, but each Class Plaintiff, Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, upon the Effective Date, shall be deemed to have, and by operation of the Judgments shall have, fully, finally, and forever settled and released any and all Released Class Claims and Released Derivative Claims, respectively, known or unknown, suspected or unsuspected, contingent or non-contingent, accrued or unaccrued, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Class Plaintiffs, the Derivative Plaintiff, DHB, and the Class Members and the Current DHB Shareholders, shall be deemed by operation of the Judgments to have acknowledged that the foregoing waivers were separately bargained for and are key elements of the Settlement of which this release is a part.

## 2. The Settlement

### a. The Settlement Fund

2.1    The Class cash portion of the Settlement Fund is Thirty-Four Million Nine Hundred Thousand Dollars ($34,900,000) and the Derivative cash portion of the Settlement Fund is Three Hundred Thousand Dollars ($300,000). All but Twelve Million Eight Hundred Seventy Five Thousand Dollars ($12,875,000) of the cash portion of the Settlement Fund was deposited with the

Escrow Agent on July 31, 2006 and has been and will be maintained by the Escrow Agent pursuant to the terms of the Escrow Agreement.

2.2     The remaining Twelve Million, Eight Hundred Seventy Five Thousand Dollars ($12,875,000) of the cash portion of the Settlement Fund was deposited with the Escrow Agent by the Defendants' directors' and officers' liability insurers on August 14, 2006, and has been and also will be maintained by the Escrow Agent pursuant to the terms of the Escrow Agreement.

2.3     In the event the Settlement is not finally approved by the Court in substantially the form of, and containing substantially the same provisions as those set forth in this Stipulation, then the cash portion of the Settlement Fund, plus interest earned thereon, less any permitted expenses therefrom, shall be paid, distributed and/or held by the Escrow Agent in the amounts and to the Persons and in the manner provided for in the Escrow Agreement.

2.4     On the Effective Date, DHB shall deliver to the Claims Administrator 3,184,713 shares of DHB's common stock.  The common stock shall be exempt from registration under §3(a)(10) of the Securities Act of 1933, or registered, if no exemption is available, and shall be freely tradable, except as to Class Members who are affiliates of DHB, as defined in the federal securities laws.  DHB shall be responsible for the costs of registering the stock, if required.  While the Settling Parties acknowledge that DHB's common stock is currently delisted, DHB will undertake its best efforts to obtain a relisting of such shares on the American Stock Exchange and, if and when relisted, to maintain such listing for a period of at least one year.  The total number of shares of DHB's common stock to be contributed to the Settlement Fund will be adjusted to reflect any changes until the time of distribution of the stock to the Authorized Claimants due to stock dividends, stock splits, reverse stock splits, or reclassification (including reclassification in connection with a consolidation or merger in which DHB is the surviving entity) (any of the

- 12 -

foregoing events shall be considered an "Adjustment Event") that occur from the date of this Stipulation until the date of distribution to the Authorized Claimants, such that the percentage of ownership of the equity of DHB represented by this block of DHB stock will remain the same as it was immediately prior to the occurrence of the Adjustment Event.

### b. The Escrow Agent

2.5    The Escrow Agent shall invest the cash portion of the Settlement Fund deposited pursuant to ¶¶2.1 and 2.2 above in instruments backed by the full faith and credit of the United States Government or insured by the United States Government or an agency thereof and shall reinvest the proceeds of those instruments as they mature in similar instruments at their then current market rates, as provided in the Escrow Agreement.

2.6    The Escrow Agent shall not disburse the Settlement Fund except as provided in this Stipulation, by an order of the Court, in the Escrow Agreement, or pursuant to a written agreement among counsel for DHB, counsel for David H. Brooks and Class Plaintiffs' Counsel.

2.7    Subject to further order and/or direction as may be made by the Court, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of this Stipulation and the Escrow Agreement.

2.8    All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court.

2.9    The Escrow Agent shall establish a "Notice and Administration Fund," and deposit $200,000 from the Settlement Fund in it.  The Notice and Administration Fund shall be used by Class Plaintiffs' Counsel to pay costs and expenses reasonably and actually incurred in connection with providing notice to the Class and the Current DHB Shareholders, identifying and locating Class Members and Current DHB Shareholders, soliciting Class claims, assisting with the filing of claims, administering and distributing the "Net Settlement Fund," as defined below in ¶5.1, to Authorized

- 13 -

Claimants, processing Proof of Claim and Release forms and paying escrow costs, if any. The Notice and Administration Fund, like the other cash portion of the Settlement Fund, shall be invested and earn interest as provided for in the Escrow Agreement. Any portion of the Notice and Administration Fund remaining after the payment of the aforesaid costs and expenses shall revert to the Settlement Fund and become part of the Net Settlement Fund, as defined below in ¶5.1.

### c.    Taxes, Tax Expenses and Related Matters

2.10    The Settling Parties and the Escrow Agent agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. §§1.468B-1 through 1.468B-5. In addition, the Escrow Agent shall timely make such elections as are necessary or advisable to carry out the provisions of this ¶2.10, including the "relation-back election" (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filings to occur.

(a)    For the purpose of §468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation the returns described in Treas. Reg. §1.468B-2(k)(l)). Such returns (as well as the election described in this ¶2.10) shall be consistent with this ¶2.10 and in all events shall reflect that all Taxes (including any estimated Taxes, interest or penalties) on the income earned by the Settlement Fund shall be paid out of the cash portion of the Settlement Fund as provided in ¶2.10(b) hereof.

(b)     All (i) Taxes (including any estimated Taxes, interest or penalties) arising with respect to the income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Defendants, their insurers or their respective counsel with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes ("Taxes"), and (ii) expenses and costs incurred in connection with the operation and implementation of this ¶2.10 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing, or failing to file, the returns described in this ¶2.10) ("Tax Expenses") shall be paid out of the cash portion of the Settlement Fund; in all events, the Defendants, their insurers, and their respective counsel shall not have any liability or responsibility for any Taxes or any Tax Expenses or the filing of any tax returns or other documents with the Internal Revenue Service or any other state or local taxing authority.  From the cash portion of the Settlement Fund, the Escrow Agent shall indemnify and hold harmless the Defendants, their insurers and their respective counsel for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification).  Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the cash portion of the Settlement Fund without prior order from the Court. The Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds necessary to pay such Taxes and Tax Expenses, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. §1.468B-2(1)(2)); neither the Defendants, their insurers nor their respective counsel are responsible to pay such Taxes and Tax Expenses, nor shall they have any liability or responsibility therefor.  The Settling Parties hereto

agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this ¶2.10.

(c)    For the purpose of this ¶2.10, references to the Settlement Fund shall include both the Settlement Fund and the Notice and Administration Fund established therefrom and shall also include any interest thereon.

### d.    Termination of Settlement

2.11    In the event that the Effective Date does not occur, or the Settlement is not approved by the Court, or is terminated for any other reason, the cash portion of the Settlement Fund shall be refunded as described in ¶7.4 below.

### e.    Additional Settlement Consideration – Corporate Governance

2.12    DHB, through its Board of Directors, shall adopt the Corporate Governance Principles and Policies set forth below, as soon as practicable after the Effective Date and shall maintain the same in effect for at least two years.  The Settling Parties acknowledge that the Corporate Governance Principles and Policies set forth below were jointly developed and negotiated by the Lead Plaintiffs and Lead Counsel in the Class Action and the Derivative Action.

2.13    Nothing in these Principles and Policies shall dilute any existing or future legal requirements to which DHB is subject as a public corporation or as a publicly-traded stock on any national listing.

### CORPORATE GOVERNANCE PRINCIPLES AND POLICIES

### A.    THE ROLE OF THE BOARD OF DIRECTORS

### 1.    Direct the Affairs of DHB Industries Inc. (the "Company") for the Benefit of Stockholders

The primary responsibility of directors is to oversee the affairs of the Company for the benefit of stockholders. The Board of Directors (the "Board") agrees that day-to-day management of the Company is the responsibility of management and that the role of the Board is to oversee management's performance

of that function. The Board shall also mandate and administer a corporate compliance program, which shall include the creation of a Company Code of Business and Ethics, the maintenance of accounting, financial and other controls, and the review of the adequacy of such controls.

**2.     Long Range Strategy Development**

Long range strategic issues should be discussed as a matter of course at regular Board meetings. The Board may choose to devote one of its regularly scheduled meetings exclusively to strategic planning.

**3.     Review of Financial Goals and Performance**

The Board reviews the annual operating plan and specific goals at the start of the fiscal year and financial performance quarterly (actual and in comparison to plan). The Board also believes it is important to establish and evaluate both short and long term objectives.

**4.     Ethical Business Environment**

The Board insists on an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates. The Board expects that management will conduct operations in a manner supportive of this view. The Board is committed to avoiding any transactions that compromise, or appear to compromise, director independence. The Company shall prepare for the Board's review and approval a Code of Business Conduct and Ethics, and shall receive periodic reports from the Company's General Counsel with respect to such Code.

**5.     Chairman and Chief Executive Officer Performance Evaluation**

The Chairman and Chief Executive Officer's performance should be evaluated annually and as a regular part of any decision with respect to their respective compensation. The Board shall delegate the performance and compensation evaluation as it deems appropriate to specified Board members or to the Compensation Committee of the Board. Notwithstanding such delegation, however, the Board as a whole shall be responsible for the oversight of the Chairman, Chief Executive Officer and senior management. The offices of the Chairman and the Chief Executive Officer may be from time to time combined and may be from time to time separated.  The Board has discretion in combining or separating the positions as it deems appropriate in light of prevailing circumstances.

**6.     Succession Planning**

The Board is responsible for succession planning. The Board will have the Chairman and Chief Executive Officer annually review with the independent directors the abilities of the key senior managers and their likely successors. Additionally, the independent directors may meet periodically to discuss, among

other things, management succession issues. As part of the succession and development process, the Board, or at the Board's direction, the Compensation Committee, will familiarize itself with the Chairman's and Chief Executive Officer's direct reports through periodic management and operating reports and meetings. The independent directors shall call a meeting upon any sudden temporary or permanent incapacity of the Chairman or Chief Executive Officer.

**7.      Material Transactions**

The Board shall evaluate and, if appropriate, approve all material Company transactions not arising in the ordinary course of business.

**8.      Stockholder Communications; Attendance at Annual Stockholders Meetings**

The Board shall establish procedures to allow for stockholders to communicate directly with the Board, the non-management directors, and the committees of the Board.  To further facilitate stockholder communication with the Board, all directors are encouraged to attend the Company's Annual Meeting of Stockholders.

**9.      Governing Documents**

In the event of any conflict between the Company's Certificate of Incorporation, By-laws and these Principles and Policies, the Certificate shall first govern and next the By-law and then these Principles and Policies, in that order.

**B.      MEETINGS OF THE BOARD OF DIRECTORS**

**1.      Selection of Chairman of the Board**

The Chairman of the Board shall be selected by the Board. The Chairman will be elected annually and shall serve at the pleasure of the Board.

**2.      Frequency of Meetings**

The Board will regularly meet at least one time each quarter and one quarterly meeting may be in conjunction with the annual meeting of stockholders. An annual calendar for the succeeding year will be agreed upon from time to time. Special meetings may be called as necessary.

While the Board recognizes that directors discharge their duties in a variety of ways, including personal meetings and telephone contact with management and others regarding the business and affairs of the Company, the Board shall inform its members that it feels it is the responsibility of individual directors to make themselves available to attend both regular and special Board and committee meetings on a consistent basis.  Active attendance at meetings shall be taken into account in the determination whether to nominate for reelection any director.

3.      **Meetings of Independent Directors**

Independent directors should meet routinely and regularly without management as they deem appropriate in their discretion, and should meet at any time upon the request of any director.

4.      **Access to Management and Outside Experts**

Board members shall have reasonable direct access to the Chairman, Chief Executive Officer, Chief Operating Officer and General Counsel, in their discretion. The Board shall have access to other members of senior management on a case by case basis after a courtesy call to the Chairman or Chief Executive Officer.  Upon prior notice to the Chairman and/or General Counsel, the Board or a Board committee may seek legal or other expert advice from a source independent of management. Board members will use judgment to ensure that contact with management is not distracting to the business operation of the Company and that such contact, if in writing, be copied to the Chairman, Chief Executive Officer and General Counsel.

5.      **Attendance of Non-Directors at Meetings**

The Chairman and the Chief Executive Officer shall have discretion to invite any members of management, other Company employees or third parties they deem appropriate to attend Board meetings at appropriate times, subject to the Board's right to request that such attendance be limited or discontinued. The Board shall have the authority to request non-management guests to sign a confidentiality agreement in form satisfactory to the General Counsel prior to such guest's participation in any Board or committee meeting. The Board and committees may exclude any guest from part or all of any meeting upon its determination that it is in the best interests of the Company to do so.

6.      **Agendas and Presentations**

The Board shall indicate it believes the Chairman and Chief Executive Officer are jointly responsible, and should establish, the agenda for each Board meeting, taking into account suggestions of Board members. Board members may include particular items on the agenda by contacting the Chairman and the Chief Executive Officer and the Chairman and Chief Executive Officer are expected to ask directors for their suggestions or opinions on possible agenda items before each meeting.

As with the agenda, the Board shall indicate it believes that the Chairman and Chief Executive Officer should determine the form of each presentation to the Board and the person to make such presentation.  Each meeting should include reports from the Board committees, as appropriate.

It shall be the policy of the Board that the Chief Executive Officer or Chief Financial Officer will give a presentation on the financial and operating results of the Company and related issues at each Board meeting.

## 7.    Information Flow

The Board shall receive salient information helpful in understanding the presentations, discussions and issues to be covered at such meeting, in writing and sufficiently in advance of such meeting to permit appropriate review. Where appropriate, longer and more complex documents shall contain executive summaries. Absent unusual circumstances, in no event will such information be distributed less than three days in advance of any regular Board meeting and 24 hours in advance of any special meeting.

The Board shall periodically review the information flow to Board members to ensure that directors receive the right kind and amount of information from management in sufficient time to prepare for meetings. The Chairman or Chief Executive Officer, or their designee, shall coordinate the information flow to the directors, periodically discuss director satisfaction with Board materials with individual directors and encourage directors to offer suggestions on materials.  In addition, this topic shall be considered annually by the independent directors as part of its regular review of Board performance.

## 8.    Additional Service

From time to time the Company may request the services of a Board member other than in his or her capacity as a director. In such situations, before assigning any task to a Board member that would require additional compensation, the Chairman, Chief Executive Officer or General Counsel shall first review such assignment with the Compensation Committee. Any Board member requested to perform services by the Company that he or she believes do not lie within his or her capacity as a director, shall inform the Compensation Committee prior to accepting such assignment.  Any such engagement will be consistent with the independence requirements of the American Stock Exchange.

## C.    BOARD STRUCTURE

## 1.    Composition of Board

The majority of the members of the Board shall be independent directors. Independent directors should have appropriate skills and characteristics required of Board members. This assessment should include issues of diversity, age and skills, all in the context of an assessment of the perceived needs of the Board at that point in time.  Unless otherwise determined by a majority of the independent directors, all independent directors shall offer their resignation as a matter of course upon a change in employer or other significant changes in their professional roles or responsibilities that might reasonably be seen to affect their ability to serve, and the Board shall consider the appropriateness of continued service in light of such

changes. Any such resignation shall be communicated to the Chairman or Chief Executive Officer and may be considered by the Board or by the independent directors.

The Chairman, Chief Executive Officer, and any other directors other than independent directors, shall offer his or her resignation from the Board as a matter of course upon resignation or any other significant change in his or her professional roles or responsibilities, unless otherwise provided in such individual's employment, consulting or other agreement with the Company.

Any resignation submitted as a matter of course shall be reviewed by the Board as a whole or at the Board's direction the independent directors, and, if the Board or such independent directors determines that such director continues to contribute significantly to the Company, the director's membership on the Board may continue.

Paragraph 18 of the Memorandum of Understanding is incorporated herein.

**2.      Definition of Independent Director**

The Board of Directors defines an "independent director" as a director who, in the opinion of the Board meets the independence requirements of the American Stock Exchange or other market or exchange on which the Company's stock may be listed. To evaluate "independence," the Board may consider all relevant factors. The Board recognizes that director independence is an issue that is actively being reviewed by multiple constituencies and may amend its criteria for determining what constitutes an "independent director" to reflect changing standards.

**3.      Size of the Board**

The Board acknowledges that it should not be too large and understands that the size of the Board will fluctuate from time to time depending on circumstances. The independent directors will make recommendations regarding increasing or decreasing size from time to time.

**4.      Director Retirement Age and Term Limits**

The Board believes that consistent quality in the directorship can be achieved effectively without term limits or any mandatory retirement age. However, each director shall stand for election or re-election annually and serve a one-year term.

**5.      Director Appointments**

A majority of the independent directors shall nominate candidates for election to the Board. It is the independent directors' responsibility to make director recommendations to the full Board for appointments to fill vacancies of any unexpired term on the Board and to recommend nominees for submission to stockholders for approval at the time of the Annual Meeting.

The Company does not set specific criteria for directors except to the extent required to meet applicable legal, regulatory and exchange requirements. The Board shall seek candidates that show evidence of leadership in their particular field, have broad experience and the ability to exercise sound business judgment, have specific knowledge about the Company's business and be able to network in a way to promote the Company's interests.

**6.      Director Evaluation**

The independent directors shall prepare, for the Board's review and approval, Board and director assessment methods and criteria, taking the Chairman's and Chief Executive Officer's views into consideration. The independent directors shall annually evaluate the Board's overall performance and evaluate individual directors performance using the Board approved methods and criteria for such review.

**7.      Director Compensation and Stock Ownership**

The Board believes that the level of director compensation generally should be competitive with that paid to directors of other corporations of similar size and profile in the United States. The Compensation Committee is responsible for making recommendations for the full Board's review and approval with respect to director compensation and benefit programs.

**8.      Interlocking Directorates**

All directors shall seek approval from the independent directors prior to accepting any other board memberships in for-profit companies to avoid legally impermissible interlocking directorships or other conflicts of interest; provided that no director shall serve on more than four (4) outside public boards of for-profit companies. Similarly, the Chairman, Chief Executive Officer and other members of management shall seek approval of the Board prior to accepting outside board memberships in for-profit companies.

**D.      COMMITTEES OF THE BOARD**

**1.      Number and Types of Committees**

The Board shall create and disband committees depending on the particular interests of the Board, issues facing the Company and legal requirements. The current "standing" committees of the Board (that is, committees expected to operate over an extended period) are the Audit Committee, the Compensation Committee, and the Corporate Governance Committee. Each Committee shall be comprised solely of Independent Directors, as described in §C.2. The independent directors shall periodically recommend changes to the composition of the Board committees. Directors shall be free to make suggestions regarding committees at any time and are encouraged to do so. The Board shall consider from time to time the committee structure as part of the review of overall Board effectiveness. The composition, members and responsibilities will also be defined periodically by the Board.

**2.      Assignment and Rotation of Committee Members**

The Board shall make assignments within the following guidelines: assignments may be rotated periodically, though not necessarily within any specified time frame; all shall be comprised solely of independent directors; and committee assignments must comply with any applicable stock exchange and legal requirements.  The Chairman of the Audit Committee and other Audit Committee members shall meet the financial sophistication and independence requirements of the American Stock Exchange and applicable law.

**3.      Frequency of Committee Meetings**

Management will generally recommend an annual committee meeting schedule for all standing committees, but it shall be the responsibility of committee chairpersons, in consultation with committee members, to determine the frequency and length of committee meetings.  The Audit Committee will meet at least quarterly; other committees will meet at least twice annually.

**4.      Committee Agendas**

Committee chairpersons, in consultation with appropriate members of management and committee members, shall determine committee agendas. Any director may suggest an item for consideration as part of any committee agenda. The Chief Financial Officer will act as the primary management liaison to provide committees requested financial data and analyses. The General Counsel will act as the management liaison to assemble and distribute agendas and facilitate minutes and reports preparation.

**5.      Committee Reports**

Reports of committee meetings are submitted to the full Board following each committee meeting. Committee actions shall be binding consistent with such Committee's charter and applicable corporate law. Committee chairpersons shall be offered the opportunity to comment or report on committee activities at each Board meeting.

**6.      Specific Roles and Responsibilities**

The specific roles and responsibilities of each committee shall be outlined in their respective charters.

**f.      Additional Settlement Consideration – Resignations**

2.14    David H. Brooks has voluntarily resigned from the Board of Directors of DHB and

from all of the other positions held by him in DHB and its subsidiaries.

2.15    To the extent that they may be serving on DHB's Board of Directors at the time of the Effective Date of the Settlement, Cary Chasin, Gary Nadelman and Barry Berkman shall be replaced as Board members within one year thereafter.

2.16    Upon cessation of employment with DHB and/or service on its Board of Directors, and for a period of time of 5 years thereafter, David H. Brooks, Dawn M. Schlegel, Sandra Hatfield, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman will not be employed (directly or indirectly) by DHB or any of its subsidiaries or affiliates (but not including Tactical Armor Products, Inc., if the same may be deemed to be such an affiliate), including, but not limited to, serving as any manner of consultant or in any capacity on or in service to the Board of Directors.  This same restriction on employment shall apply to Terry Brooks and Jeffrey Brooks, commencing as of the Effective Date.

### 3.    Preliminary Approval, Notice Orders and Settlement Hearing

3.1    Promptly after execution of this Stipulation by all parties hereto, Class Plaintiffs' Counsel and Derivative Counsel shall submit this Stipulation, together with its Exhibits, to the Court and shall apply for entry of orders (the "Notice Orders"), substantially in the form of Exhibits B and C attached hereto, requesting, *inter alia*, the preliminary approval of the Settlement set forth in this Stipulation, and approval for the mailing and publication of settlement notices (the "Notices"), substantially in the form of Exhibits B-1, B-3, C-1 and C-2 attached hereto, which shall include the general terms of the Settlement set forth in this Stipulation, the  Plan of Allocation, the general terms of the Class Fee and Expense Application and the Derivative Fee and Expense Application, as defined in ¶¶6.2 and 6.5 below, and the date of the Settlement Hearing, as defined below in ¶3.2. Class Plaintiffs' Counsel shall be responsible for providing notice to the Class.  Derivative Counsel shall be responsible for providing notice to the Current DHB Shareholders.

3.2    Class Plaintiffs' Counsel and Derivative Counsel shall request that, after the Notices are mailed and published, the Court hold a hearing (the "Settlement Hearing") to consider and determine whether an order approving the Settlement as fair, reasonable and adequate should be entered and whether Judgments should be entered thereon dismissing the Class Action and Derivative Action with prejudice, and that the Court thereafter approve the Settlement and dismiss the Class Action and Derivative Action with prejudice.  At or after the Settlement Hearing, Class Plaintiffs' Counsel also will request that the Court approve the Plan of Allocation and the Class Fee and Expense Application, and Derivative Counsel also will request that the Court approve the Derivative Fee and Expense Application.

**4.    Releases, Bar and Indemnification**

4.1    Upon the Effective Date, the Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members (whether or not any such Class Member executes and delivers a Proof of Claim and Release) and each of the Current DHB Shareholders, on behalf of themselves and each of their respective predecessors, successors, parents, subsidiaries, affiliates, custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees, trust beneficiaries, administrators, spouses, marital communities, and immediate family members, having any legal or beneficial interest in the publicly traded securities of DHB during the Class Period, shall be deemed to have, and by operation of the Judgments shall have, fully, finally, and forever released, relinquished and discharged all Released Class Claims and all Released Derivative Claims, as the case may be, and any and all claims relating to or arising out of or connected with the Settlement or resolution of the Actions, against all of the Released Class Persons and the Released Derivative Persons, respectively.

4.2    Upon the Effective Date, the Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members (whether or not any such Class Member executes and delivers a Proof of Claim and Release) and each of the Current DHB Shareholders, and each of their respective

predecessors, successors, parents, subsidiaries, affiliates, custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees, trust beneficiaries, administrators, spouses, marital communities, and immediate family members, having any legal or beneficial interest in the publicly traded securities of DHB during the Class Period, will be forever barred and enjoined from commencing, instituting or prosecuting any of the Released Class Claims or any of the Released Derivative Claims, as the case may be, in any action or other proceeding, against any of the Released Class Persons or any of the Released Derivative Persons, respectively.

4.3    The Derivative Plaintiff and DHB further agree that the approval of the Settlement and the dismissal of the Derivative Action shall act to bar the prosecution, by DHB or derivatively on behalf of DHB, of any duplicative or similar claims as those set forth in, or that could or might have been set forth in, the Derivative Action, or of any of the Released Derivative Claims.

4.4    The Proof of Claim and Release to be executed by Class Members shall release all Released Class Claims against all of the Released Class Persons and shall be substantially in the form contained in Exhibit B-2 attached hereto.

4.5    Upon the Effective Date, as more specifically provided for in the Judgments attached hereto as Exhibits D and E, each of the Released Class Persons and Released Derivative Persons shall be deemed to have, and by operation of the Judgments shall have, fully, finally, and forever released, relinquished and discharged the Class Plaintiffs, the Derivative Plaintiff, each and all of the Class Members, each and all of the Current DHB Shareholders, DHB, and Plaintiffs' Counsel, as the case may be, from all Claims (including all Unknown Claims) relating to or arising out of or connected with the institution, prosecution, assertion, settlement or resolution of the Actions, except that nothing in this Stipulation shall affect any Person's rights to enforce the terms of this Stipulation, any of the Non-Released Claims, or any agreements, claims, rights, or obligations that

do or may hereafter exist between or among the Released Class Persons, or any of them, or the Released Derivative Persons, or any of them, as the case may be.

4.6     Notwithstanding the foregoing releases, all of DHB's obligations to David H. Brooks and to all of the other Defendants to whom DHB has indemnification obligations, of and for indemnification and reimbursement for fees, expenses and liabilities, as provided for in DHB's Articles of Incorporation and By-Laws, in the laws of Delaware, and in this Stipulation, as the latter is approved by the Court, shall remain in full force and effect, and David H. Brooks' undertaking to DHB regarding his indemnification by DHB and the undertakings of the other Defendants to whom DHB has indemnification obligations, shall also remain in full force and effect.   Further, notwithstanding the foregoing releases, any and all obligations of any Defendant to any other Defendant under any existing contract or agreement between or among any of them shall also remain in full force and effect, including, without limitation, any agreement entered into in connection with the Settlement.

4.7     In addition, DHB shall indemnify defendants David H. Brooks and Dawn M. Schlegel, and each of them, against any liability under §304 of the Sarbanes-Oxley Act of 2002 incurred by them, or either of them, in any action brought by a third party under §304, and to pay to them, and to each of them, an amount equal to any payment made by them, or either of them, to DHB pursuant to any judgment in any such action.

4.8     Pending final determination of whether the Settlement should be approved and applied in the Actions, all proceedings and all further activity by, between or among the Settling Parties regarding or directed towards the Actions, save for those activities and proceedings relating to this Stipulation or the Settlement, shall be stayed.

4.9    Pending final determination of whether the Settlement should be approved and applied in the Actions, neither the Class Plaintiffs, nor the Derivative Plaintiff, nor DHB, nor any of the Class Members, nor the Current DHB Shareholders, shall commence, maintain or prosecute against the Defendants, the other Released Class Persons, the other Released Derivative Persons, or any of them, any action or proceeding in any court or tribunal asserting or relating to any of the Released Class Claims or Released Derivative Claims.

**5.    Administration and Calculation of Claims, Final Awards and Supervision and Distribution of the Settlement Fund**

5.1    The Claims Administrator, subject to such supervision and direction of the Court and/or Class Plaintiffs' Counsel as may be necessary or as circumstances may require, shall administer and calculate the claims submitted by Class Members and shall oversee distribution of the Net Settlement Fund (defined below) to Authorized Claimants.  The Settlement Fund shall be applied as follows:

(a)    to pay all the costs and expenses reasonably and actually incurred in connection with providing notice, identifying and locating Class Members and Current DHB Shareholders, soliciting claims, assisting with the filing of claims, administering and distributing the Settlement Fund to Authorized Claimants, processing Proof of Claim and Release forms and paying escrow costs, if any;

(b)    to pay the Taxes and Tax Expenses described in ¶2.10 above;

(c)    to pay to Plaintiffs' Counsel attorneys' fees and expenses with interest thereon (the "Fee and Expense Award"), if and to the extent allowed by the Court; and

(d)    to reimburse the time and expenses of the Lead Plaintiffs, if and to the extent allowed by the Court.

Subject to the provisions of ¶5.2(c) below, the balance of the Settlement Fund (the "Net Settlement Fund") shall be distributed to Authorized Claimants as allowed by this Stipulation, the Plan of Allocation, and the Court.

5.2    Upon the Effective Date and thereafter, and in accordance with the terms of this Stipulation, the Plan of Allocation, and such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund shall be distributed to Authorized Claimants, subject to and in accordance with the following:

(a)    Within ninety (90) days after the mailing of the Notice or such other time as may be set by the Court, each Person claiming to be an Authorized Claimant shall be required to submit to the Claims Administrator a completed Proof of Claim and Release, substantially in the form of Exhibit B-2 attached hereto, signed under penalty of perjury and supported by such documents as specified in the Proof of Claim and Release and as are reasonably available to such Person.

(b)    Except as otherwise ordered by the Court, all Class Members who fail to timely submit a Proof of Claim and Release within such period, or such other period as may be ordered by the Court, or otherwise allowed, and all Class Members whose claims are not approved by the Court (in the event the same are rejected in whole or in part by the Claims Administrator and the Court resolves the dispute involved) shall be forever barred from receiving any Settlement payment pursuant to this Stipulation, or otherwise, but will in all other respects be subject to and bound by the provisions of this Stipulation, the releases contained herein, and the Judgments, and be enjoined and barred from bringing any action against any of the Released Class Persons asserting any of the Released Class Claims.  Notwithstanding the foregoing, Class Plaintiffs' Counsel shall

have the discretion to accept late submitted claims for processing, so long as the distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed.

(c)     The Net Settlement Fund shall be distributed to the Authorized Claimants substantially in accordance with a Plan of Allocation to be described in the Notice to the Class Members and approved by the Court.  However, if there is any balance remaining in the Net Settlement Fund after six (6) months from the date of distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), such balance shall be donated to an appropriate 501(c)(3) non-profit organization(s) to be selected by Class Plaintiffs' Counsel, with prior written notice to Defendants' counsel.

5.3     Subject to the terms of the Escrow Agreement, the Released Persons shall have no responsibility for, interest in, or liability whatsoever with respect to the investment or distribution of the Settlement Fund, the Net Settlement Fund, the Plan of Allocation, the determination, administration, or calculation of claims, the payment or withholding of Taxes, the payment of Tax Expenses, the payment of any attorneys' fees and expenses incurred on behalf of Plaintiffs to the Actions, or any losses incurred in connection therewith.

5.4     No Person shall have any claim against Class Plaintiffs, Class Plaintiffs' Counsel, the Claims Administrator, any agent designated by Class Plaintiffs' Counsel, Defendants or their respective counsel, based on the investment or distributions made substantially in accordance with this Stipulation, the Plan of Allocation, or further orders of the Court.

5.5     It is understood and agreed by the Settling Parties that the proposed Plan of Allocation including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of this Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement, and any order

or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel this Stipulation or affect the finality of the Court's Judgments, or any other orders entered pursuant to this Stipulation.  The Plan of Allocation shall be prepared by Class Plaintiffs' Counsel, and Defendants shall have no responsibility or liability therefor.

> **6.**    **Plaintiffs' Counsel's Attorneys' Fees and Reimbursement of Expenses and Reimbursement of the Lead Plaintiffs**

6.1    If so ordered by the Court upon preliminary approval of the Settlement by the Court, Class Plaintiffs' Counsel and Derivative Counsel shall be entitled to provisional reimbursement of 75% of their out-of-pocket expenses, subject to Class Plaintiffs' Counsel's and Derivative Counsel's several obligation to make appropriate refunds or repayments to the Settlement Fund plus interest at the same rate as earned on the cash portion of the Settlement Fund if, and when, as a result of any order, the final fee and/or expense award is lower than that amount, or there shall ultimately be no award of fees and expenses.

6.2    Class Plaintiffs' Counsel may submit an application or applications (the "Fee and Expense Application") for distributions from the Settlement Fund for: (a) an award of attorneys' fees; (b) plus reimbursement of expenses incurred in connection with prosecuting the Class Action; (c) plus any interest on such attorneys' fees and expenses at the same rate and for the same periods as earned by the cash portion of the Settlement Fund (until paid) as may be awarded by the Court; and (d) reimbursement of the costs and expenses of the Lead Plaintiffs prosecuting the Class Action. Class Plaintiffs' Counsel reserve the right to make additional applications for fees and expenses incurred.

6.3    The Fee and Expense Award shall be paid to Class Plaintiffs' Counsel from the Settlement Fund, as ordered, immediately after the Court executes a written order awarding such fees and expenses, notwithstanding the existence of any timely filed objections thereto, or any

potential appeal therefrom, subject to the several obligation of Class Plaintiffs' Counsel to make appropriate refund repayments to the Settlement Fund as more particularly set forth below in ¶6.4. Class Plaintiffs' Counsel shall thereafter allocate the attorneys' fees amongst Class Plaintiffs' Counsel in a manner in which Class Plaintiffs' Counsel in good faith believe reflects the contributions of such counsel to the institution, prosecution and settlement of the Actions.

6.4     In the event that the Effective Date does not occur, or the Judgments or the order making the Fee and Expense Award are/is reversed or modified, or this Stipulation is terminated for any reason, and in the event that the Fee and Expense Award shall have been paid to any extent, then Class Plaintiffs' Counsel shall, within five (5) business days from Class Plaintiffs' Counsel receiving notice from DHB's or David H. Brooks' counsel or from a court of appropriate jurisdiction, refund to the Settlement Fund, the fees and expenses previously paid to them from the Settlement Fund, plus interest thereon at the same rate as earned by the cash portion of the Settlement Fund, in an amount consistent with such reversal or modification. Each Class Plaintiffs' Counsel's law firm, as a condition of receiving such fees and expenses, on behalf of itself and each partner and/or shareholder of it, agrees that the law firm and its partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the provisions of this subparagraph. Without limitation, each such law firm and its partners and/or shareholders agree that the Court may, upon application of counsel for DHB or David H. Brooks, on notice to Class Plaintiffs' Counsel, summarily issue orders, including, but not limited to, judgments and attachment orders, and may make appropriate findings of or sanctions for contempt, against them or any of them should such law firm fail timely to repay fees, expenses and interest pursuant to this ¶6.4.

6.5     Derivative Counsel may apply for fees and expenses to be paid from the Settlement Fund. The amount of such fees and expenses shall not exceed $300,000 (the "Derivative Fee and

Expense Application"), subject to such further negotiations as may occur between Class Plaintiffs' Counsel and Derivative Counsel in the Actions. Any amount awarded shall be subject to the same payment and repayment obligations by Derivative Counsel as set forth in ¶¶6.3 and 6.4 above.

6.6    The procedure for and the allowance or disallowance by the Court of any applications by any of the Plaintiffs' Counsel for attorneys' fees and expenses to be paid out of the Settlement Fund, are not part of the Settlement set forth in this Stipulation, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Stipulation, and any order or proceeding relating to any Fee and Expense Application, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this Stipulation, or affect or delay the finality of the Judgments approving this Stipulation and the Settlement of the Actions set forth herein.

6.7    The Released Persons shall have no responsibility for, and no liability whatsoever with respect to, any payment to Counsel for any Plaintiff in the Actions, including any payment from the Settlement Fund, and no Plaintiffs' Counsel shall have recourse to the Related Persons, or any of them, for any such payments.

6.8    The Released Persons shall have no responsibility for, and no liability whatsoever with respect to, the allocation among Plaintiffs' Counsel, and/or any other Person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Actions.

**7.    Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

7.1    This Stipulation, the Settlement and the Effective Date shall be conditioned on the occurrence of all of the following events:

(a)    the cash portion of the Settlement Fund shall have been deposited with the Escrow Agent as required by ¶¶2.1 and 2.2 above;

- 33 -

(b)     the Court shall have entered the Notice Orders, as required by ¶3.1, above and the same have been complied with;

(c)     the Defendants shall not have exercised the option to terminate this Stipulation pursuant to ¶7.3 hereof;

(d)     the Court shall have entered the Judgments substantially in the form of Exhibits D and E attached hereto; and

(e)     each of the Judgments shall have become Final, as defined in ¶1.17, above.

7.2     A condition of this Stipulation is that this Stipulation and Settlement shall be approved by the Court as provided herein.  However, if (a) the Court enters a judgment, but not the Judgments substantially in the form of Exhibits D and E; or (b) the Court enters the Judgments and appellate review is sought and on such review either of the Judgments is materially modified or reversed; or (c) any of the conditions of ¶7.1 is not met, or satisfied, this Stipulation shall be canceled and terminated unless counsel to Class Plaintiffs' and Derivative Plaintiff and counsel for DHB and David H. Brooks (together with counsel for any other Defendants who is materially and adversely affected by any such change or failure), within ten days from the receipt of such ruling or written notice of such circumstances, agree in writing to proceed with this Stipulation and Settlement.  For purposes of this ¶7.2, no order of the Court or modification or reversal on appeal of any order of the Court or modification or reversal on appeal of any order of the Court concerning the Plan of Allocation or the amount of any attorneys' fees, expenses and interest awarded by the Court, shall be deemed a material modification of or a part of the material terms of the Judgments or this Stipulation, or shall constitute grounds for cancellation or termination of this Stipulation.

7.3     Defendants DHB and/or David H. Brooks, in their, its or his absolute discretion, as the case may be, shall have the option to cancel and terminate this Stipulation and the Settlement in

the event that Class Members who purchased or otherwise acquired more than a certain number of

DHB shares of common stock during the Class Period choose to exclude themselves from the Class,

all as set forth in a separate agreement (the "Supplemental Agreement") executed among the

signatories to this Stipulation.  The Supplemental Agreement will not be filed with the Court unless

and until a dispute arises between the Class Plaintiffs and Defendants concerning its interpretation or

application.  Copies of all requests for exclusion from the Class shall be delivered by overnight

delivery to counsel for DHB and David H. Brooks by Class Plaintiffs' Counsel or the Claims

Administrator as soon as practicable after receipt.

7.4　　In the event the Settlement is not approved by the Court or this Stipulation shall

terminate or shall not become Effective for any reason, within seven (7) business days after written

notification of such event is sent by same day or overnight delivery by counsel for DHB, David H.

Brooks or Class Plaintiffs' Counsel to the Escrow Agent and all of the other parties hereto, the

Settlement Fund (including accrued interest), plus any amount then remaining in the Notice and

Administration Fund (including accrued interest), less expenses and any costs which have either

been disbursed pursuant to ¶5.1(a) or (b) hereto, or are chargeable to the Notice and Administration

Fund, shall be refunded or paid out by the Escrow Agent as directed by the terms of the Escrow

Agreement.  At the request of counsel for DHB, or David H. Brooks, the Escrow Agent or its

designee shall apply for any tax refund owed to the Settlement Fund and pay the proceeds, after

deduction of any reasonable fees or expenses incurred in connection with such application(s) for

refund, to such other person or entity as counsel for DHB and David H. Brooks may designate.

7.5　　In the event that the Settlement is not approved by the Court or this Stipulation shall

terminate or shall not become Effective for any reason, the Settling Parties shall be restored to their

respective positions in the Actions as of July 12, 2006, before the MOU was executed, and all

negotiations, proceedings, documents prepared and statements made in connection herewith shall be without prejudice to the Settling Parties, shall not be deemed or construed to be an admission by any Settling Party of any act, matter or proposition and shall not be used in any manner or for any purpose in any subsequent proceeding in the Actions or in any other action or proceeding. In such event, the terms and provisions of this Stipulation, with the exception of ¶¶1.1-1.32, 2.3, 2.5-2.11, 6.1, 6.4-6.8, 7.1-7.7, 8.4-8.15 herein, shall have no further force and effect with respect to the Settling Parties and shall not be used in the Actions or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Stipulation shall be treated as vacated, *nunc pro tunc*.

7.6    If the Effective Date does not occur, or if this Stipulation is terminated or shall not become Effective for any reason, neither the Class Plaintiff, the Derivative Plaintiff nor any of their counsel shall have any obligation to repay any amounts actually and properly incurred or disbursed pursuant to ¶5.1(a) or (b).

7.7    In the event that a material part of the amount paid for the benefit of the Class is determined to be a preference, voidable transfer, fraudulent transfer, or similar transaction under Title 11 of the United States Code (Bankruptcy) or applicable state law by a final order of a court of competent jurisdiction and the Lead Plaintiffs in the Class Action are required to return such amount to any of the Defendants, then such Lead Plaintiffs shall have the right to either: (i) return that amount of the settlement, less the deductions specified in ¶5.1(a) or (b) applicable thereto, to that Defendant(s) and bring, revive, or reinstate all claims against that Defendant(s); or (ii) return the entire amount of the Settlement, less the deductions specified in ¶5.1(a) or (b), and bring, revive, or reinstate all claims against the Settling Defendants.

7.8     The Settling Parties agree that the Escrow Agent's receipt of the cash portion of the Settlement Fund, the Claims Administrator's receipt of the common stock described in ¶2.4 above, DHB's agreement to adopt the corporate governance provisions set forth in ¶2.13 above, and the additional consideration set forth in ¶¶2.14-2.16 above, constitutes the transfer of value in exchange for, among other things, the non-necessity of the Defendants defending the Class and Derivative Actions.

## 8.     Miscellaneous Provisions

8.1     The Settling Parties (a) acknowledge that it is their intent to consummate the terms and conditions of this Stipulation; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of this Stipulation.

8.2     Each Defendant warrants as to himself, herself, or itself that the transfer of the cash portion of the Settlement by or on his, her or its behalf will not render him, her or it insolvent.  This representation is made by each Defendant as to himself, herself or itself and is not made by any counsel for the Defendants.

8.3     The Settling Parties intend this Settlement to be a final and complete resolution of all disputes among them with respect to the Actions.  The Settlement compromises claims that are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim or defense.  While the Defendants deny that the claims advanced in the Actions were meritorious, and that any Member of the Class or DHB sustained any injury, Defendants agree and the Judgments in the Actions will state, that the Actions were filed in good faith and in accordance with the applicable Federal Rules of Civil Procedure, including Rule 11 of the Federal Rules of Civil Procedure, and are being settled voluntarily after consultation with competent legal counsel.

8.4     Neither this Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of this Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Class Claims or Released Derivative Claim, or of any wrongdoing or liability of any of the Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Class Persons or Released Derivative Persons in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  Any of the Released Class Persons or Released Derivative Persons may file this Stipulation and/or the Judgments in any related litigation as evidence of the Settlement and in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

8.5     All agreements made and orders entered during the course of the Actions relating to the confidentiality of information shall survive this Stipulation.

8.6     All of the Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

8.7     This Stipulation may be amended or modified only by a written instrument signed by or on behalf of all of the Settling Parties or their respective successors-in-interest.

8.8     This Stipulation and the Exhibits attached hereto, and the Supplemental Agreement constitute the entire agreement among the Settling Parties and no representations, warranties or inducements have been made to any party concerning this Stipulation, the Exhibits, or the Supplemental Agreement other than the representations, warranties and covenants contained and memorialized in such documents.  This Stipulation supersedes and replaces any prior or

contemporaneous writing, statement or understanding, including, without limitation, the Memorandum of Understanding pertaining to the Actions.  Except as otherwise provided herein, all parties shall bear their own costs.

8.9    Counsel for the Settling Parties are expressly authorized by their respective clients to take all appropriate actions required or permitted to be taken pursuant to this Stipulation to effectuate its terms and conditions, including, without limitation, entering into any modifications or amendments to the Stipulation they deem appropriate.

8.10    Each counsel or other Person executing this Stipulation or any of its Exhibits on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

8.11    This Stipulation may be executed in one or more counterparts.  All executed counterparts including facsimile counterparts and each of them shall be deemed to be one and the same instrument.  A complete set of original executed counterparts shall be filed with the Court by Class Plaintiffs' Counsel.

8.12    This Stipulation shall be binding upon, and inure to the benefit of, the Settling Parties and their respective successors, assigns, heirs, spouses, marital communities, executors, administrators and legal representatives.

8.13    Without affecting the finality of the Judgments entered in accordance with this Stipulation, the Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Stipulation and the Judgments, and the Settling Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Stipulation and the Judgments.

8.14    This Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of New York, and the rights and

obligations of the Settling Parties to this Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of New York without giving effect to that State's choice of law principles.

8.15     Wherever in this Stipulation or in the Exhibits "notice," "notification," or the like is provided for, such "notice," "notification," or the like shall be in writing.

IN WITNESS WHEREOF, the parties hereto have caused this Stipulation to be executed, by their duly authorized attorneys, as of November 30, 2006.

> LERACH COUGHLIN STOIA GELLER
>   RUDMAN & ROBBINS LLP
> SAMUEL H. RUDMAN (SR-7957)
> 58 South Service Road, Suite 200
> Melville, NY 11747
> Telephone: 631/367-7100
> 631/367-1173 (fax)
>
> LERACH COUGHLIN STOIA GELLER
>   RUDMAN & ROBBINS LLP
> WILLIAM S. LERACH
> KEITH F. PARK
> THOMAS G. WILHELM
>
>
> _____
>          s/ Keith F. Park
>           KEITH F. PARK
>
> 655 West Broadway, Suite 1900
> San Diego, CA 92101
> Telephone: 619/231-1058
> 619/231-7423 (fax)
>
> LABATON SUCHAROW & RUDOFF LLP
> LYNDA J. GRANT (LG-4784)
> NICOLE M. ZEISS (NZ-3894)
>
>
> _____
>          s/ Lynda J. Grant
>           LYNDA J. GRANT
>
> 100 Park Avenue, 12th Floor
> New York, NY 10017-5563
> Telephone: 212/907-0700
> 212/818-0477 (fax)
>
> Co-Lead Counsel for Plaintiffs

CAVANAGH & O'HARA
PATRICK O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiffs

LAW OFFICES OF THOMAS AMON


                    s/ Thomas Amon
_____
          THOMAS AMON

500 Fifth Avenue, Suite 1650
New York, NY  10110
Telephone:  212/810-2430
212/810-2427 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN ROBBINS


                    s/ Brian Robbins
_____
          BRIAN ROBBINS

610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

Co-Lead Counsel in the Derivative Action

BRYAN CAVE LLP
ERIC RIEDER
DAVID P. KASAKOVE


                    s/ David P. Kasakove
_____
          DAVID P. KASAKOVE

1290 Avenue of the Americas
New York, NY  10104
Telephone:  212/541-2000
212/541-4630 (fax)

Counsel for Defendant DHB Industries, Inc.

MILBANK TWEED HADLEY
  & McCLOY LLP
GEORGE S. CANELLOS
C. NEIL GRAY
DANIEL M. PERRY
ROBERT C. HORA


_____
            s/ C. Neil Gray
            C. NEIL GRAY

1 Chase Manhattan Plaza
New York, NY  10005-1413
Telephone:  212/530-5000
212/530-5219 (fax)

MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO, P.C.
R. ROBERT POPEO
JOHN F. SYLVIA


_____
            s/ R. Robert Popeo
            R. ROBERT POPEO

One Financial Center
Boston, MA  02111
Telephone:  617/542-6000
617/542-2241 (fax)

MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO, P.C.
JEROME GOTKIN


_____
            s/ Jerome Gotkin
            JEROME GOTKIN

- 43 -

666 Third Avenue
New York, NY  10017-4011
Telephone:  212/935-3000
212/983-3115 (fax)

Counsel for Defendant David H. Brooks

MILBANK TWEED HADLEY
  & McCLOY LLP
GEORGE S. CANELLOS
C. NEIL GRAY
DANIEL M. PERRY
ROBERT C. HORA


| s/ C. Neil Gray |
| --- |
| C. NEIL GRAY |

1 Chase Manhattan Plaza
New York, NY  10005-1413
Telephone:  212/530-5000
212/530-5219 (fax)

Counsel for Defendants David Brooks International
Inc., Andrew Brooks Industries Inc., sued as
Andrew Brooks International Inc., Elizabeth Brooks
Industries Inc., sued as Elizabeth Brooks
International Inc.

SERCARZ & RIOPELLE, LLP
ROLAND G. RIOPELLE


| s/ Roland G. Riopelle |
| --- |
| ROLAND G. RIOPELLE |

Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019
Telephone:  212/586-4900
212/586-1234 (fax)

Counsel for Defendant Sandra Hatfield

KOBRE & KIM LLP
STEVEN G. KOBRE

_____
s/ Steven G. Kobre
STEVEN G. KOBRE

800 Third Avenue
New York, NY  10022
Telephone:  212/488-1200
212/488-1220 (fax)

Counsel for Defendant Dawn Schlegel

CLIFFORD CHANCE US LLP
MARK HOLLAND
ROBERT G. HOUCK
MARY K. DULKA

_____
s/ Mark Holland
MARK HOLLAND

31 West 52nd Street
New York, NY  10019
Telephone:  212/878-8000
212/878-8375 (fax)

Counsel for Defendants Cary Chasin, Jerome
Krantz, Gary Nadelman, and Barry Berkman

DLA PIPER US LLP
STEPHANIE K. VOGEL

_____
s/ Stephanie K. Vogel
STEPHANIE K. VOGEL

1251 Avenue of the Americas
New York, NY  10020
Telephone:  212/335-4500
212/335-4501 (fax)

- 45 -

Counsel for Defendant Larry R. Ellis

BRACEWELL & GIULIANI LLP
MARC LEE MUKASEY


s/ Marc Lee Mukasey
MARC LEE MUKASEY

1177 Avenue of the Americas
New York, NY  10036
Telephone:  212/508-6100
212/508-6101 (fax)

Counsel for Defendants Tactical Armor Products,
Inc. and Terry Brooks

BRAFMAN & ASSOCIATES, P.C.
BENJAMIN BRAFMAN
BRIAN E. KLEIN


s/ Benjamin Brafman
BENJAMIN BRAFMAN

767 Third Avenue
New York, NY  10017
Telephone:  212/750-7800
212/750-3906 (fax)

Counsel for Defendant Jeffrey Brooks

S:\Settlement\DHB Industries 05.set\12-14 CLN STP 00033201.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 12, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Keith F. Park
KEITH F. PARK

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:KeithP@lerachlaw.com

# Mailing Information for a Case 2:05-cv-04345-JS-ETB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas G. Amon**
  tamon@amonlaw.com

- **Richard B. Brualdi**
  rbrualdi@brualdilawfirm.com

- **George S. Canellos**
  gcanellos@milbank.com,cngray@milbank.com

- **Mary K Dulka**
  mary.dulka@cliffordchance.com

- **Jeffrey Fink**
  jfink@ruflaw.com

- **Mary Gail Gearns**
  marygail.gearns@bingham.com

- **Jerome Gotkin**
  jgotkin@mintz.com

- **Christopher Neil Gray**
  cngray@milbank.com

- **Mark Holland**
  mark.holland@cliffordchance.com

- **David Paul Kasakove**
  dpkasakove@bryancave.com

- **Michael S Kim**
  michael.kim@kobrekim.com

- **Phillip C. Kim**
  pkim@law.nyc.gov

- **Robert Popeo**
  rrpopeo@mintz.com

- **Roland G. Riopelle**
  rriopelle@sercarzandriopelle.com,rriopelle@juno.com

- **Brian Robbins**

brobbins@ruflaw.com,kzimmer@ruflaw.com,sputtick@ruflaw.com,dmaytorena@ruflaw.com

- **Howard M. Rogatnick**
  hmrogatnick@bryancave.com,dortiz@bryancave.com

- **Adam L. Sisitsky**
  asisitsky@mintz.com

- **John F. Sylvia**
  jsylvia@mintz.com

- **Catherine A. Torell**
  ctorell@cmht.com,lawinfo@cmht.com

- **Steven Wedeking**
  swedeking@ruflaw.com

- **Harry H. Wise , III**
  hwiselaw@aol.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Brian Abrams
'

**Alvin Viray**
'

**EXHIBIT A**

## ESCROW AGREEMENT

ESCROW AGREEMENT, dated as of July 27, 2006, (the "Escrow Agreement") by and among DHB Industries, Inc. ("DHB"), David H. Brooks, Terry Brooks, David Brooks International Inc., Andrew Brooks Industries Inc., being sued as Andrew Brooks International Inc., Elizabeth Brooks Industries Inc., being sued as Elizabeth Brooks International Inc., Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry Ellis, Tactical Armor Products, Inc., and Jeffrey Brooks (all of the forgoing, together with DHB, being collectively referred to herein as the ("Settling Defendants"), RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Bacini (all of the forgoing being collectively referred to herein as the "Lead Plaintiffs"), Alvin Viray ("Viray") and Lerach Coughlin Stoia Geller Rudman & Robbins LLP (referred to herein as "Lead Counsel" or "Escrow Agent") having an address at 655 W. Broadway, Suite 1900, San Diego, California 92101.

WHEREAS, the Settling Defendants, the Lead Plaintiffs and Viray (hereinafter collectively referred to as the "Settling Parties") are all parties to a "Memorandum of Understanding" dated July 12, 2006 (the "MOU") with respect to settlement of litigation pending in the U.S. District Court in the Eastern District of New York; and

WHEREAS, pursuant to Paragraph 4 of the MOU, as amended herein by the Settling Parties, the Settling Parties have agreed that the Settling Defendants shall cause, on July 27, 2006, to be paid into escrow the principal sum of $22,325,000 in cash (the "July 27 Payment") and the insurers shall cause on August 14, 2006, to be paid into escrow the principal sum of $12,875,000 (the "August 14 Payment") in cash (collectively, the "Cash Settlement Amount") to be controlled by Lead Counsel in the pending litigation through an insured financial institution and subject to Court oversight; and

WHEREAS, the Escrow Agent has agreed to hold, invest, reinvest and/or release the Cash Settlement Amount pursuant to and in accordance with the terms hereof;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the MOU and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the MOU.

2.    Appointment of the Escrow Agent.  The Settling Parties hereby appoint and designate the Escrow Agent as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and designation, subject to the terms and conditions contained herein.

3.    Delivery of Escrow Property.  Simultaneously with the execution of this Escrow Agreement, the Settling Defendants have delivered or caused to be delivered to the account of the Escrow Agent at the Amalgamated Bank, 15 Union Square, West, New York, New York

10003, the July 27 Payment, to be held by the Escrow Agent pursuant to the terms and conditions of this Escrow Agreement. On August 14, 2006, the Settling Defendants will deliver or caused to be delivered to the account of the Escrow Agent at the Amalgamated Bank, the August 14 Payment, to be held by the Escrow Agent pursuant to the terms and conditions of this Escrow Agreement. The Escrow Agent hereby acknowledges receipt of the July 27 Payment and agrees to hold and distribute the July 27 Payment and, when received, the August 14 Payment, and all interest accruing thereon (together, the "Escrowed Funds") as provided herein.

    4.    <u>Escrow of Funds</u>. The Escrow Agent hereby agrees to hold the Escrowed Funds in escrow, and invest the Escrowed Funds in accordance with Paragraph 5 below, and to release the Escrowed Funds as follows:

    (a)    <u>Use of Escrowed Funds to pay expenses</u>. Upon receipt by the Escrow Agent of written notification from the Court that the Court has preliminarily approved the Settlement, the Escrow Agent shall deliver a copy of such notification to the undersigned counsel for the Settling Defendants, and after 10 days from the delivery of such notice, may authorize the use, on a non-recourse, non-refundable basis, of a portion of the Escrowed Funds for the payment of those costs set forth and permitted in Paragraph 4 of the MOU.

    (b)    <u>Release of Escrowed Funds to Plaintiffs</u>. Except as otherwise provided in Paragraphs 16 and 17 of the MOU, upon receipt by the Escrow Agent of a written Order from the Court that the Settlement, the Stipulation of Settlement and all related documents have been finally, fully and unconditionally approved by the Court, and after all applicable reconsideration and appeal periods have lapsed with respect to such Order, the Escrowed Funds shall be released by the Escrow Agent to Gilardi & Co. LLC to be distributed to and among Class Members who have submitted valid Proofs of Claim forms pursuant to the Plan of Allocation as finally approved by the Court.

    (c)    <u>Release of Escrowed Funds to Settling Defendants</u>. Upon the earlier of (a) receipt by the Escrow Agent of a written Order from the Court that the Court has finally disapproved the Settlement, the Stipulation of Settlement and the related documents, and all available reconsideration and appeal periods have lapsed, or (b) the failure of the Settling Parties to come to agreement on the terms of the Stipulation of Settlement and all related documents by February 28, 2007, the Escrow Agent shall release and distribute the Escrowed Funds as follows:

    <u>First</u>, to pay to the Escrow Agent all costs of notice and related expenses, taxes and tax preparation expenses, if any, out of the Escrowed Amount pursuant to Paragraph 8 of the MOU;

    <u>Second</u>, (i) in the event that DHB has not separately paid or caused to be paid to David H. Brooks the sum of $4,500,000 pursuant to Paragraph B6(a) of Exhibit B to the MOU, upon receipt of joint written instructions from DHB and Mr. Brooks, to pay to Mr. Brooks $4,500,000 plus the interest earned thereon pursuant to the terms of this Escrow Agreement in accordance with Paragraph B6(a) of Exhibit B to the MOU, by wire transfer in immediately available funds to an account indicated by Mr. Brooks; or (ii) in the event that DHB has paid Mr. Brooks pursuant to Paragraph B6(a) of Exhibit B to the MOU, upon receipt of joint written instructions from DHB and Mr. Brooks (A) to

2

pay to DHB $4,500,000 by wire transfer in immediately available funds to an account indicated by DHB, and (B) to pay to Mr. Brooks the interest earned on such $4,500,000 pursuant to the terms of this Escrow Agreement by wire transfer in immediately available funds to an account indicated by Mr. Brooks;

Third, as directed within 90 days thereafter, pursuant to joint written instructions from DHB and David H. Brooks, to pay such amounts to Mr. Brooks and/or DHB, the aggregate amount of which shall not exceed $14,825,000, as indicated in such joint written instructions, by wire transfer in immediately available funds to the account or accounts listed in such instructions; provided, however, that if no joint written instructions are received within such 90 day period, to pay $14,825,000 pursuant to Paragraph Fifth below;

Fourth, to fund a reserve to be held by the Escrow Agent in an amount equal to the August 14 Payment and any interest earned thereon, pursuant to the terms of this Escrow Agreement, to be distributed in accordance with a certain Agreement of Insureds entered into among the Settling Defendants as of the date hereof; and

Fifth, to pay to DHB the remaining balance of the Escrowed Funds, including, without limitation, any interest earned thereon, pursuant to the terms of this Escrow Agreement, not otherwise distributed in accordance with this Paragraph 4(c).

If a controversy exists between the Settling Defendants, or any of them and the Lead Plaintiffs as to the correct disposition of the Escrowed Funds and either party gives written notice to the Escrow Agent of such controversy, the Escrow Agent shall continue to hold the Escrowed Funds until (i) the parties to such disagreement subsequently deliver to the Escrow Agent a joint written notice with respect to the disposition of the Escrowed Funds, or (ii) the Escrow Agent receives a certified copy of a final decree, order or decision of a court of competent jurisdiction constituting the final determination of any dispute between such disputing parties with respect to the Escrowed Funds to be distributed hereunder, which distribution shall be made in accordance with such notice or judicial determination.

Notwithstanding any provision of this Escrow Agreement to the contrary, if at any time the Escrow Agent shall receive written instructions signed by all of the Settling Parties with respect to delivery of all or part of the Escrowed Funds, the Escrow Agent shall deliver such portion of the Escrowed Funds in accordance with such written instructions.

5.    Investment of Escrowed Amount.    During the term of this Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrowed Funds in United States Treasury Bills of ninety (90) days or less duration to maturity, until such time as the entire amount of the Escrowed Funds is released from escrow and paid out by the Escrow Agent in accordance with the terms of this Escrow Agreement. All payments of interest on such investments and other accretions thereto shall be added to and become part of the Escrowed Funds. The record owner of any securities or other investments in which the Escrowed Funds are from time to time invested or reinvested shall be the Escrow Agent or its nominee. In no event shall any part of the Escrowed Funds be commingled with any other funds held by the Escrow Agent or any of its parents, subsidiaries or affiliates. The Escrow Agent shall, promptly following the end of each

calendar month, send the Settling Parties a reasonably detailed, written statement of holdings and transactions with respect to the Escrowed Funds.

For tax purposes, all income or earnings with respect to the Escrowed Funds shall be treated by the Escrow Agent as earnings from a "qualified settlement fund" within the meaning of Treas. Regs. §§ 1.468-B-1 through 1.468B-5 and the Escrow Agent shall make such elections and do all else necessary to have the Escrowed Funds thereafter treated as a "qualified settlement fund".

The Escrow Agent shall be authorized at all times and from time to time to liquidate any investment of the Escrowed Funds as may be necessary to provide available cash to make any release, disbursement or payment called for under the terms of this Agreement. The Escrow Agent shall have no responsibility or liability for any losses resulting from liquidation of the Escrowed Funds (such as liquidation prior to maturity).

6.    Termination of Agreement. When all of the Escrowed Funds have been distributed pursuant to the provisions of this Escrow Agreement, this Escrow Agreement, except for the provisions of Paragraphs 7(b) and 7(f) hereof, shall terminate, and be of no further force or effect.

7.    Escrow Agent.

(a)    Duties and Responsibilities. (i) The duties and responsibilities of the Escrow Agent hereunder shall be limited to those expressly set forth in this Escrow Agreement and in the MOU, and the Escrow Agent shall not be bound in any way by any other contract or agreement between the parties hereto, whether or not the Escrow Agent has knowledge of any such contract or agreement or of the terms or conditions thereof. In the event that the Escrow Agent shall be uncertain as to any duties or responsibilities hereunder or shall receive instructions from any of the parties hereto with respect to the Escrowed Funds which in the Escrow Agent's belief are in conflict with any of the provisions of this Escrow Agreement, the Escrow Agent shall be entitled to refrain from taking any action until it shall be directed to do so in writing by all parties hereto or by order of a court of competent jurisdiction in proceedings which the Escrow Agent or any other party hereto shall be entitled to commence. The Escrow Agent may act upon the advice of its counsel in taking or refraining from taking any action hereunder and may act upon any instrument or other writing believed in good faith to be genuine and to be signed and presented by the proper person or persons.

(ii)    The Escrow Agent shall not be responsible for the genuineness of any signature or document presented to it pursuant to this Escrow Agreement and may rely conclusively upon and shall be protected in acting upon any list, advice, judicial order or decree, certificate, notice, request, consent, statement, instruction or other instrument believed by it in good faith to be genuine or to be signed or presented by the proper person hereunder, or duly authorized by such person or properly made. The Escrow Agent shall not be responsible for any of the agreements contained herein except the performance of its duties as expressly set forth herein. The duties and obligations of the Escrow Agent hereunder shall be governed solely by the provisions of this Escrow Agreement and the Escrow Agent shall have no duties other than the duties expressly imposed herein and shall not be required to take any action other than in

4

accordance with the terms hereof. The Escrow Agent shall not be bound by any notice of, or demand with respect to, any waiver, modification, amendment, termination, cancellation, rescission or restatement of this Escrow Agreement , unless in writing and signed by all of the parties hereto, and, if the duties of the Escrow Agent are affected thereby, unless Escrow Agent shall have given its prior written consent thereto.

(b)    Liability.  The Escrow Agent shall not be liable to anyone for any damage, loss or expense incurred as a result of any act or omission of the Escrow Agent, unless such damage, loss or expense is caused by the Escrow Agent's willful default or gross negligence. Accordingly, and without limiting the foregoing, the Escrow Agent shall not incur any such liability with respect to (i) any action taken or omitted under this Agreement, or (ii) any action taken or omitted in reliance upon any instrument, including any written notice or instruction provided for herein, not only as to its due execution by an authorized person and as to the validity and effectiveness of such instrument, but also as to the truth and accuracy of any information contained therein.  Should any issue arise with respect to the delivery or ownership of the Escrowed Funds, the Escrow Agent shall have no liability to any party hereto for retaining dominion and control over the Escrowed Funds until such issue is resolved by (i) mutual agreement of the parties; or (ii) final order, decree or judgment by a court of competent jurisdiction.  In no event shall the Escrow Agent be under any duty whatsoever to institute or defend such proceeding.

(c)    Disputes.  In the event of a dispute between any of the parties hereto sufficient in the discretion of the Escrow Agent to justify its initiation of legal proceedings, or in the event that Escrow Agent is joined as a party to a lawsuit by virtue of the fact that it is holding the Escrowed Funds, the Escrow Agent may, at its option, either (i) tender the Escrowed Funds into the registry or custody of the court of competent jurisdiction before which such lawsuit is pending, and thereupon be discharged from all further duties and liabilities under this Escrow Agreement with respect to the Escrowed Funds so tendered or (ii) deliver the Escrowed Funds in accordance with the court's orders or ultimate disposition of such lawsuit.  Any legal action initiated by the Escrow Agent may be brought in any court as the Escrow Agent shall determine to have jurisdiction with respect to such matter.

(d)    Attachment.  In the event all or any part of the Escrowed Funds shall be attached, garnished or levied upon pursuant to any court order, or the delivery thereof shall be stayed or enjoined by a court order, or any other order, judgment or decree shall be made or entered by any court affecting the Escrowed Funds or any part hereof or any act of the Escrow Agent, the Escrow Agent is authorized to obey and comply with all writs, orders, judgments or decrees so entered or issued by any such court, without the necessity of inquiring whether such court has jurisdiction; and if the Escrow Agent obeys or complies with any such writ, order, or decree, the Escrow Agent shall not be liable to any of the parties hereto or any other person by reason of such compliance.

(e)    Legal Action.  The Escrow Agent shall have no duty to incur any out-of-pocket expenses or to take any legal action in connection with this Escrow Agreement or towards its enforcement, or to appear in, prosecute or defend any action or legal proceeding that would result in or might require it to incur any cost, expense, loss, or liability, unless and until it shall

5

receive confirmation and at its option, security, with respect to indemnification in accordance with Paragraph 7(f) of this Escrow Agreement.

(f)    Indemnification.  Without determining or limiting any rights as between The Settling Parties, which rights shall exist outside this Escrow Agreement and not be prejudiced hereby, the Lead Plaintiffs and DHB jointly and severally hereby agree to indemnify and hold harmless the Escrow Agent from and against any and all cost, loss, damage, disbursement, liability, and expense, including reasonable attorneys' fees and costs, which may be imposed upon or incurred by the Escrow Agent hereunder, or in connection with the performance of its duties hereunder, including any litigation arising out of this Escrow Agreement, or involving the subject matter hereof, except only costs, losses, claims, damages, disbursements, liabilities and expenses arising out of the Escrow Agent's acts or omissions for which the Escrow Agent is adjudged willfully malfeasant or grossly negligent by a final decree, order or judgment of a court of competent jurisdiction from which no appeal is taken within the applicable appeals period.

(g)    Law Firm Escrow Agent.  The Settling Parties each acknowledge and agree that nothing contained herein shall be deemed to prevent any law firm serving as the Escrow Agent, or as a successor escrow agent, from acting as counsel for any one or more of the Settling Parties, or any of their respective stockholders, or any of their respective affiliates, or any other party in any matter, including resolution of disputes and claims subject to, arising under or related to the MOU or this Escrow Agreement, or acting as an escrow agent on behalf of others.

(h)    Accounting.  The Escrow Agent will provide to each Settling Party a written accounting of the investments held in escrow hereunder and all transactions relating to this Escrow Agreement, including any distributions of the Escrowed Funds, within twenty (20) business days following written request of any such Party.

8.    Escrow Agent Compensation and Expenses.  The Escrow Agent shall not be entitled to compensation for its services hereunder as Escrow Agent.  The Escrow Agent shall be entitled to reimbursement out of the Escrowed Funds for its out of pocket costs and expenses related to its activities as Escrow Agent.  The Lead Plaintiffs and DHB shall jointly and severally be responsible for all amounts to which the Escrow Agent is entitled under the indemnification provisions contained herein.

9.    Miscellaneous.

(a)    Notices.  All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) made by telex, telecopy or facsimile transmission, (iii) sent by overnight courier, or (iv) sent by registered or certified mail, return receipt requested, postage prepaid.

> If to Settling Defendants or any of them:
> c/o
> All defense counsel as per the signature pages hereto
>
> With a copy to Lead Plaintiffs and Viray c/o their counsel

6

If to Lead Plaintiffs and/or Viray:
c/o Lerach Coughlin Stola Geller Rudman & Robbins LLP
Keith F. Park
655 W. Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

     and

Labaton Sucharow & Rudoff LLP
Lynda J. Grant
100 Park Avenue, 12th Floor
New York, NY 10017-5563
Tel: 212-907-0700
Fax: 202-818-0477

     and

c/o Law offices of Thomas G. Amon
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-820-2430
Fax: 202-810-2427

     and

Robbins Umeda & Fink, LLP
Brian J. Robbins
610 W. Ash Street, Suite 1800
San Diego, CA 92101
Tel: 619-525-3990
Fax: 619-525-3991

With a copy to all defense counsel

If to the
Escrow Agent:
c/o Lerach Coughlin Stola Geller Rudman & Robbins LLP
Keith F. Park
655 W. Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

7

With a copy to all defense counsel and counsel for Lead Plaintiffs and Viray

All notices, requests, consents and other communications hereunder shall be deemed to have been given either (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if made by telex, telecopy or facsimile transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, or (iv) if sent by registered or certified mail, on the 5th business day following the day such mailing is made.

     (b)    <u>Entire Agreement</u>.  This Escrow Agreement embodies the entire agreement and understanding among  the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings between or among the parties relating to the subject matter hereof.  No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Escrow Agreement shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Escrow Agreement.

     (c)    <u>Amendments, Waivers and Consents</u>.  Except as otherwise expressly provided herein, the terms and provisions of this Escrow Agreement may be modified or amended only by written agreement executed by all parties hereto.  The terms and provisions of this Escrow Agreement may be waived, or consent for the departure therefrom granted, only by a written document signed by the party entitled to the benefits of such terms or provisions.  No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Escrow Agreement, whether or not similar.  Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

     (d)    <u>Assignment</u>.  The rights and obligations under this Escrow Agreement may not be assigned by any of the parties hereto without the prior written consent of the other parties.

     (e)    <u>Benefit, Binding Effect; Third Party Beneficiaries</u>.  All statements, representations, warranties, covenants and agreements in this Escrow Agreement shall be binding on the parties hereto and shall inure to the benefit of the respective successors and permitted assigns of each party hereto.  Nothing in this Escrow Agreement shall be construed to create any rights or obligations except among the parties hereto, and no person or entity shall be regarded as a third-party beneficiary of this Escrow Agreement.

     (f)    <u>Governing Law</u>.  This Escrow Agreement and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the [State of New York], without giving effect to the conflict of law principles thereof.

     (g)    <u>Severability</u>.  In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Escrow Agreement shall be unenforceable or invalid in any respect, then such provision shall be deemed limited to the extent that such court deems it valid or enforceable, and as so limited shall remain in full force and effect.  In the event that such court shall deem any such provision, partially or wholly

8

unenforceable, the remaining provisions of this Escrow Agreement shall nevertheless remain in full force and effect.

(h)     Expenses.  Except for the expenses of the Escrow Agent which shall be paid as provided in Paragraph 8, each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Escrow Agreement and the transactions contemplated hereby, whether or not the transactions contemplated in this Escrow Agreement or in the MOU are consummated.

(i)     Headings and Captions.  The headings and captions contained in this Escrow Agreement are for convenience only and shall not affect the meaning or interpretation of this Escrow Agreement or of any of its terms or provisions.

(j)     Interpretation.  The parties hereto acknowledge and agree that they have participated jointly in the negotiation and drafting of this Escrow Agreement, have each been represented by counsel in such negotiation and drafting, and that in the event an ambiguity or question of intent or interpretation arises, this Escrow Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Escrow Agreement.

(k)     Counterparts.  This Escrow Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement under seal as of the day and year first above written.

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

By:  _____
Keith F. Park
Escrow Agent and Co-Lead Counsel for Lead
    Plaintiffs

LABATON SUCHAROW & RUDOFF LLP

By:  _____
Lynda J. Grant
Co-Lead Counsel for Lead Plaintiffs

LAW OFFICES OF THOMAS AMON

By:  _____

9

LIT 1581125v.3

unenforceable, the remaining provisions of this Escrow Agreement shall nevertheless remain in full force and effect.

(h) Expenses. Except for the expenses of the Escrow Agent which shall be paid as provided in Paragraph 8, each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Escrow Agreement and the transactions contemplated hereby, whether or not the transactions contemplated in this Escrow Agreement or in the MOU are consummated.

(i) Headings and Captions. The headings and captions contained in this Escrow Agreement are for convenience only and shall not affect the meaning or interpretation of this Escrow Agreement or of any of its terms or provisions.

(j) Interpretation. The parties hereto acknowledge and agree that they have participated jointly in the negotiation and drafting of this Escrow Agreement, have each been represented by counsel in such negotiation and drafting, and that in the event an ambiguity or question of intent or interpretation arises, this Escrow Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Escrow Agreement.

(k) Counterparts. This Escrow Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement under seal as of the day and year first above written.

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

By: _____
Keith F. Park
Escrow Agent and Co-Lead Counsel for Lead Plaintiffs

LABATON SUCHAROW & RUDOFF LLP

By: _____
Lynda J. Grant
Co-Lead Counsel for Lead Plaintiffs

LAW OFFICES OF THOMAS AMON

By: _____

9

LIT 1581125v.3

unenforceable, the remaining provisions of this Escrow Agreement shall nevertheless remain in full force and effect.

(h)    Expenses.  Except for the expenses of the Escrow Agent which shall be paid as provided in Paragraph 8, each of the parties hereto shall pay its own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Escrow Agreement and the transactions contemplated hereby, whether or not the transactions contemplated in this Escrow Agreement or in the MOU are consummated.

(i)    Headings and Captions.  The headings and captions contained in this Escrow Agreement are for convenience only and shall not affect the meaning or interpretation of this Escrow Agreement or of any of its terms or provisions.

(j)    Interpretation.  The parties hereto acknowledge and agree that they have participated jointly in the negotiation and drafting of this Escrow Agreement, have each been represented by counsel in such negotiation and drafting, and that in the event an ambiguity or question of intent or interpretation arises, this Escrow Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Escrow Agreement.

(k)    Counterparts.  This Escrow Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement under seal as of the day and year first above written.

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

By:  _____
Keith F. Park
Escrow Agent and Co-Lead Counsel for Lead
    Plaintiffs

LABATON SUCHAROW & RUDOFF LLP

By:  _____
Lynda J. Grant
Co-Lead Counsel for Lead Plaintiffs

LAW OFFICES OF THOMAS AMON

By:  _____

9

Thomas Amon
ROBBINS UMEDA & FINK, LLP

By: _____

Brian Robbins
Co-Lead Counsel in the Derivative Action

10

BAKER BOTTS LLP

By: _____

R. Stan Mortenson
Time Warner
1299 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: 202-639-7979
Fax: 202-585-1092

and

Richard Harper
30 Rockefeller Plaza
New York, NY 10112
Tel: 212-408-2675
Fax: 212-259-2475

Counsel for Defendant DHB Industries, Inc.

MILBANK TWEED HADLEY & McCLOY LLP

By: _____

George S. Canellos
1 Chase Manhattan Plaza
New York, NY 10005
Tel: 212-530-5000
Fax: 212-530-5219

MINTZ LEVIN COHN FERRIS CLOVSKY &
POPEO, P.C.

By: _____

R. Robert Popeo
John F. Sylvia
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

and

Jerome Gotkin
666 Third Avenue, 25th Floor
New York, NY 10017
Tel: 212-935-3000

11

LIT 1581125v.3

BAKER BOTTS LLP

By: _____

R. Stan Mortenson
Time Warner
1299 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: 202-639-7979
Fax: 202-585-1092

    and

Richard Harper
30 Rockefeller Plaza
New York, NY 10112
Tel: 212-408-2675
Fax: 212-259-2475

Counsel for Defendant DHB Industries, Inc.

MILBANK TWEED HADLEY & McCLOY LLP

By: _____

George S. Canellos
1 Chase Manhattan Plaza
New York, NY 10005
Tel: 212-530-5000
Fax: 212-530-5219

MINTZ LEVIN COHN FERRIS CLOVSKY &
    POPEO, P.C.

By: _____

R. Robert Popeo
John F. Sylvia
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

    and

Jerome Gotkin
666 Third Avenue, 25th Floor
New York, NY 10017
Tel: 212-935-3000

11

LIT 1581125v.3

BAKER BOTTS LLP

By:    _____

R. Stan Mortenson
Time Warner
1299 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: 202-639-7979
Fax: 202-585-1092

and

Richard Harper
30 Rockefeller Plaza
New York, NY 10112
Tel: 212-408-2675
Fax: 212-259-2475

Counsel for Defendant DHB Industries, Inc.

MILBANK TWEED HADLEY & McCLOY LLP

By:    _____

George S. Canellos
1 Chase Manhattan Plaza
New York, NY 10005
Tel: 212-530-5000
Fax: 212-530-5219

MINTZ LEVIN COHN FERRIS CLOVSKY &
POPEO, P.C.

By:    _____    *JEROME GOTKIN*

R. Robert Popeo
John F. Sylvia
One Financial Center
Boston, MA 02111
Tel:  617-542-6000
Fax: 617-542-2241

and

Jerome Gotkin
666 Third Avenue, 25th Floor
New York, NY 10017
Tel: 212-935-3000

11

Fax: 212-983-3115

Counsel for Defendant David H. Brooks

MILBANK TWEED HADLEY & McCLOY LLP

By: _____

    George S. Canellos
    1 Chase Manhattan Plaza
    New York, NY 10005
    Tel: 212-530-5000
    Fax: 212-530-5219

    Counsel for Defendants Terry Brooks, David
    Brooks International Inc., Andrew Brooks
    Industries Inc. and Elizabeth Brooks Industries Inc.


SERCARZ & RIOPELLE, LLP

By: _____

    Roland G. Riopelle
    Carnegie Hall Tower
    152 W. 57th Street, Ste. 24C
    New York, NY 10019
    Tel: 212-586-4900
    Fax: 212-586-1234


    Counsel for Defendant Sandra Hatfield

KOBRE & KIM LLP

By: _____

    Steven G. Kobre
    800 Third Avenue
    New York, NY 10022
    Tel: 212-488-1200
    Fax: 212-488-1220


    Counsel for Defendant Dawn Schlegel

Fax: 212-983-3115

Counsel for Defendant David H. Brooks

MILBANK TWEED HADLEY & McCLOY LLP

By: _____

George S. Canellos
1 Chase Manhattan Plaza
New York, NY 10005
Tel: 212-530-5000
Fax: 212-530-5219

Counsel for Defendants Terry Brooks, David
Brooks International Inc., Andrew Brooks
Industries Inc. and Elizabeth Brooks Industries Inc.

SERCARZ & RIOPELLE, LLP

By: _____

Roland G. Riopelle
Carnegie Hall Tower
152 W. 57th Street, Ste. 24C
New York, NY 10019
Tel: 212-586-4900
Fax: 212-586-1234

Counsel for Defendant Sandra Hatfield

KOBRE & KIM LLP

By: _____

Steven G. Kobre
800 Third Avenue
New York, NY 10022
Tel: 212-488-1200
Fax: 212-488-1220

Counsel for Defendant Dawn Schlegel

12

Fax: 212-983-3115

Counsel for Defendant David H. Brooks

MILBANK TWEED HADLEY & McCLOY LLP

By:     _____

George S. Canellos
1 Chase Manhattan Plaza
New York, NY 10005
Tel: 212-530-5000
Fax: 212-530-5219

Counsel for Defendants Terry Brooks, David
Brooks International Inc., Andrew Brooks
Industries Inc. and Elizabeth Brooks Industries Inc.

SERCARZ & RIOPELLE, LLP

By:     _____

Roland G. Riopelle
Carnegie Hall Tower
152 W. 57th Street, Ste. 24C
New York, NY 10019
Tel: 212-586-4900
Fax: 212-586-1234

Counsel for Defendant Sandra Hatfield

KOBRE & KIM LLP

By:     _Steven G. Kobre_ (EAC)

Steven G. Kobre
800 Third Avenue
New York, NY 10022
Tel: 212-488-1200
Fax: 212-488-1220

Counsel for Defendant Dawn Schlegel

12

LIT 1581125v.3

CLIFFORD CHANCE US LLP

By:  *Mark Holland*

Mark Holland
31 W. 52nd Street
New York, NY 10019
Tel: 212-878-8000
Fax: 212-878-8375

Counsel for Defendants Cary Chasin, Jerome
Krantz, Gary Nadelman, and Barry Berkman

DLA PIPER RUDNICK GRAY CARY US LLP

By:  _____

Earl Silbert
1200 Nineteenth Street, NW
Washington, DC 2003-2430
Tel: 202-861-3900
Fax: 202-223-2085

Counsel for Defendant Gen. (Ret.) Larry R. Ellis

DAY, BERRY & HOWARD LLP

By:  _____

Robert Knuts
875 Third Avenue
New York, NY 10022
Tel: 212-829-3620
Fax: 212-829-3601

Counsel for Defendants Tactical Armor Products,
Inc. and Jeffrey Brooks

13

CLIFFORD CHANCE US LLP

By: _____

Mark Holland
31 W. 52nd Street
New York, NY 10019
Tel: 212-878-8000
Fax: 212-878-8375

Counsel for Defendants Cary Chasin, Jerome
Krantz, Gary Nadelman, and Barry Berkman

DLA PIPER RUDNICK GRAY CARY US LLP

By: _____

Earl Silbert
1200 Nineteenth Street, NW
Washington, DC 2003-2430
Tel: 202-861-3900
Fax: 202-223-2085

Counsel for Defendant Larry Ellis

DAY, BERRY & HOWARD LLP

By: _____

Robert Knuts
875 Third Avenue
New York, NY 10022
Tel: 212-829-3620
Fax: 212-829-3601

Counsel for Defendants Tactical Armor Products,
Inc. and Jeffrey Brooks

13

CLIFFORD CHANCE US LLP

By: _____

Mark Holland
31 W. 52nd Street
New York, NY 10019
Tel: 212-878-8000
Fax: 212-878-8375

Counsel for Defendants Cary Chasin, Jerome
Krantz, Gary Nadelman, and Barry Berkman


DLA PIPER RUDNICK GRAY CARY US LLP

By: _____

Earl Silbert
1200 Nineteenth Street, NW
Washington, DC 2003-2430
Tel: 202-861-3900
Fax: 202-223-2085


Counsel for Defendant Gen. (Ret.) Larry R. Ellis


DAY, BERRY & HOWARD LLP

By: _____

Robert Knuts
875 Third Avenue
New York, NY 10022
Tel: 212-829-3620
Fax: 212-829-3601

Counsel for Defendants Tactical Armor Products,
Inc. and Jeffrey Brooks

13

**EXHIBIT B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : : : | Civil Action No. 2:05-cv-04296-JS-ETB<br><br>CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | : : : : : | [PROPOSED] ORDER PRELIMINARILY APPROVING SETTLEMENT OF CLASS ACTION AND PROVIDING FOR NOTICE |
| | x | EXHIBIT B |

WHEREAS, the parties having made application, pursuant to Federal Rule of Civil Procedure 23(e), for an order approving the settlement (the "Settlement") of a certain Class Action (the "Class Action"), in accordance with a Stipulation and Agreement of Settlement dated as of November 30, 2006 (the "Stipulation"), which, together with the Exhibits annexed thereto sets forth the terms and conditions for a Settlement and dismissal of the Class Action and a certain related Derivative Action (collectively the "Actions") upon the terms and conditions set forth therein; and

WHEREAS, all capitalized terms contained herein shall have the same meanings as set forth in the Stipulation (in addition to those capitalized terms defined herein); and

WHEREAS, the Court having read and considered the Stipulation and the Exhibits annexed thereto:

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.    The Court does hereby preliminarily approve, subject to further consideration at the Settlement Hearing described below, the Stipulation and the Settlement set forth therein, including the terms and conditions for settlement and dismissal with prejudice of the Class Action.

2.    For purposes of settlement only, the Court hereby certifies a Class defined as all Persons who purchased or otherwise acquired (including by exchange, conversion or otherwise) the publicly traded securities of DHB (including puts, calls and other securities) on or after November 18, 2003 until and including November 30, 2006, and were allegedly damaged thereby.  Excluded from the Class are the Class Defendants and the Derivative Defendants and Persons related to Defendants, including any subsidiaries or affiliates of DHB; the officers and directors of DHB during the Class Period; members of the individual Defendants' immediate families; any person, firm, trust, officer, director or any individual or entity in which any Defendant has a controlling interest or which is related to, or affiliated with, any of the Defendants, and the legal representatives,

agents, affiliates, heirs, successors in interest or assigns of any such excluded person or entity. Also excluded from the Class are those Persons who timely and validly request to be excluded from the Class pursuant to the "Notice of Pendency and Settlement of Class Action" to be sent to Class Members. The Court hereby appoints the Lead Plaintiffs as representatives of the Class.

3.    With respect to the Class, again for purposes of settlement only, this Court finds that: (a) the Members of the Class are so numerous that joinder of all Class Members in the Class Action is impracticable; (b) there are questions of law and fact common to the Class which predominate over any individual question; (c) the claims of the Class Plaintiffs are typical of the claims of the Class; (d) the Class Plaintiffs and their counsel have fairly and adequately represented and protected the interests of the Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering: (i) the interests of the Members of the Class in individually controlling the prosecution of the separate actions, (ii) the extent and nature of any litigation concerning the controversy already commenced by Members of the Class, (iii) the desirability or undesirability of concentrating the litigation of these claims in this particular forum, and (iv) the difficulties likely to be encountered in the management of the Class Action.

4.    A hearing (the "Settlement Hearing") shall be held before this Court on _____, 2007, at __:__ __.m., at the Alfonse M. D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York 11722-4438, to determine whether the Settlement of the Class Action and the Derivative Action on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate and should be approved by the Court; whether a Judgment as provided in §1, ¶1.18 of the Stipulation should be entered herein; whether the proposed Plan of Allocation should be approved; and to determine the amount of fees and expenses that should be awarded to Class Plaintiffs' Counsel and the amount, if any, to be awarded to the Class

Plaintiffs in the Class Action to reimburse them for their costs and expenses.  The Court may adjourn the Settlement Hearing or modify any of the dates herein without further notice to Members of the Class.

5.      The Court approves, as to form and content, the Notice of Pendency and Settlement of Class Action (the "Class Notice"), the Proof of Claim and Release form (the "Proof of Claim"), and the Summary Notice for Publication of Settlement of Class Action (the "Summary Class Notice") annexed as Exhibits B-1, B-2 and B-3 hereto, respectively, and finds that the mailing and distribution of the Class Notice and publishing of the Summary Class Notice, substantially in the manner and form set forth in this Order, meets the requirements of Federal Rule of Civil Procedure 23, 15 U.S.C. §78u-4(a)(7), and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto.

6.      Gilardi & Co. LLC ("Claims Administrator") is hereby appointed to supervise and administer the notice procedure and the processing of claims as more fully set forth below:

(a)      Not later than _____, 2006 ("Notice Date"), Class Plaintiffs' Counsel shall cause a copy of the Class Notice and the Proof of Claim, substantially in the forms annexed as Exhibits B-1 and B-2 hereto, to be mailed by first class mail to all Class Members who can be identified with reasonable effort;

(b)      Not later than _____, 2006, Class Plaintiffs' Counsel shall cause the Summary Class Notice, substantially in the form annexed as Exhibit B-3 hereto, to be published once in *Investor's Business Daily*; and

(c)      At least seven (7) business days prior to the Settlement Hearing, Class Plaintiffs' Counsel shall serve on Defendants' counsel and file with the Court proof, by affidavit or declaration, of such mailing and publishing.

7.      Nominees who held or hold DHB publicly traded securities for the beneficial ownership of Persons who purchased or otherwise acquired DHB publicly traded securities during the period November 18, 2003 through November 30, 2006, inclusive, shall send the Class Notice and the Proof of Claim to such beneficial owners of such DHB securities within ten (10) days after receipt thereof, or send a list of the names and addresses of such beneficial owners to the Claims Administrator within ten (10) days of receipt thereof in which event the Claims Administrator shall promptly mail the Class Notice and Proof of Claim to such beneficial owners.

8.      Class Plaintiffs and all other Members of the Class shall be bound by all orders, determinations and the Judgment in the Class Action concerning the Settlement, whether favorable or unfavorable to the Members of the Class or any of them.

9.      Any Person falling within the definition of the Class may, upon request, be excluded from the Settlement.  Any such Person must submit to the Claims Administrator a request for exclusion ("Request for Exclusion"), postmarked no later than _____, 2007.  A Request for Exclusion must state:  (1) the name, address, and telephone number of the Person requesting exclusion; (2) the number of shares of DHB publicly traded securities purchased during the Class Period; and (3) that the Person wishes to be excluded from the Class.  All Persons who submit valid and timely Requests for Exclusion in the manner set forth in this paragraph shall have no rights under the Stipulation, shall not share in the distribution of the Settlement Fund, and shall not be bound by the Stipulation or the Judgment.

10.     Class Members who wish to participate in the Settlement shall complete and submit Proof of Claim forms in accordance with the instructions contained therein.  Unless the Court orders otherwise, all Proof of Claim forms must be postmarked no later than ninety (90) days from the Notice Date.  Any Class Member who does not timely submit a Proof of Claim within the time

provided for, shall be barred from sharing in the distribution of the proceeds of the Settlement Fund, unless otherwise ordered by the Court, but shall nevertheless be bound by the terms and conditions of the Settlement.  Notwithstanding the foregoing Class Plaintiffs' Counsel shall have the discretion to accept late submitted claims for processing so long as the distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed.

11.    Any Member of the Class may enter an appearance in the Class Action, at his, her or its own expense, individually or through counsel of his, her or its own choice.  If he, she or it does not enter an appearance, he, she or it will be represented by Class Plaintiffs' Counsel.

12.    Pending final determination of whether the Settlement should be approved, no Class Member, either directly, representatively, or in any other capacity, shall commence or prosecute against any of the Released Class Persons, any action or proceeding in any court or tribunal asserting any of the Released Class Claims.

13.    Any Member of the Class may appear and show cause, if he, she or it has any, why the Settlement of the Class Action should not be approved as fair, reasonable and adequate, or why a Judgment should not be entered thereon, why the Plan of Allocation should not be approved, or why attorneys' fees and expenses should not be awarded to Class Plaintiffs' Counsel as requested or why the Class Plaintiffs should not be reimbursed for their costs and expenses as requested; provided, however, that no Class Member shall be heard or entitled to contest the approval of the terms and conditions of the Settlement, or, if approved, the Judgment to be entered thereon approving the same, or the order approving the Plan of Allocation, or the attorneys' fees and expenses to be awarded to Class Plaintiffs' Counsel, or any award reimbursing the Class Plaintiffs for their costs and expenses, unless that Person, on or before _____, 2007, has filed with the Court and served on the

following counsel (delivered by hand or sent by first class mail) written objections and copies of any

papers and briefs in support thereof:

Samuel H. Rudman
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747

William S. Lerach
Keith F. Park
Thomas G. Wilhelm
LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

Lynda J. Grant
Nicole M. Zeiss
LABATON SUCHAROW & RUDOFF LLP
100 Park Avenue, 12th Floor
New York, NY  10017-5563

Co-Lead Counsel for Class Plaintiffs

Eric Rieder
David P. Kasakove
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104

Counsel for Defendant DHB Industries, Inc.

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
  & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

R. Robert Popeo
John F. Sylvia
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111

Jerome Gotkin
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew Brooks
Industries Inc., sued as Andrew Brooks International Inc., Elizabeth Brooks
Industries Inc., sued as Elizabeth Brooks International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary Nadelman, and Barry
Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

(a)    The written objections and copies of any papers and briefs in support thereof

to be filed with the Court shall be delivered by hand or sent by first class mail to:

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
United States District Court
100 Federal Plaza
Central Islip, NY  11722-4438

(b)     Any Member of the Class who does not make his, her or its objection in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, reasonableness or adequacy of the Settlement as incorporated in the Stipulation, to the Plan of Allocation, or to the award of attorneys' fees and expenses to Class Plaintiffs' Counsel or reimbursement of the costs and expenses of the Class Plaintiffs, unless otherwise ordered by the Court, but shall otherwise be bound by the judgment to be entered and the releases to be given.

14.     All papers in support of the Settlement, the Plan of Allocation, any application by Class Plaintiffs' Counsel for attorneys' fees and expenses and reimbursement of the Class or Lead Plaintiffs' costs and expenses shall be filed with the Court and served by overnight mail or hand delivery no later than seven (7) days prior to the Settlement Hearing.

15.     No Person who is not a Class Member, Class Plaintiffs' Counsel, or Class Plaintiff shall have any right to any portion of, or to any distribution of, the Settlement Fund unless otherwise ordered by the Court or otherwise provided in the Stipulation.

16.     All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court.

17.     Neither Class Defendants nor Class Defendants' Counsel shall have any responsibility for the Plan of Allocation or any application for attorneys' fees and expenses submitted by Class Plaintiffs' Counsel or reimbursement of the Class Plaintiffs' costs and expenses

submitted by Class Plaintiffs' Counsel and all such matters will be considered separately from the fairness, reasonableness and adequacy of the Settlement.

18.     At or after the Settlement Hearing, the Court shall determine whether the Plan of Allocation proposed by Class Plaintiffs' Counsel, and any application for attorneys' fees and expenses or reimbursement of the Class Plaintiffs' costs and expenses shall be approved.

19.     All reasonable expenses incurred in identifying and notifying Class Members, as well as in administering the Settlement Fund, shall be paid as set forth in the Stipulation.  In the event the Effective Date does not occur, there is no obligation to repay any amounts actually and properly disbursed from or chargeable to the Notice and Administration Fund.

20.     Neither the Stipulation, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Defendants, or any of them, of the truth of any of the allegations in the Class Action, or of any liability, fault, or wrongdoing of any kind.

21.     The Court reserves the right to adjourn the date of the Settlement Hearing or modify any of the dates set forth herein without further notice to the Members of the Class, and retains jurisdiction to consider all further applications arising out of or connected with the Settlement.  The Court may approve the Settlement, with such modifications as may be agreed to by the Settling Parties, if appropriate, without further notice to the Members of the Class.

IT IS SO ORDERED.


DATED: _____     _____
                                        THE HONORABLE JOANNA SEYBERT
                                        UNITED STATES DISTRICT JUDGE

S:\Settlement\DHB Industries 05.set\3-7-07 CLN EB ORDER 00033738.doc

**EXHIBIT B-1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ─────────────────────── x | | |
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : | Civil Action No. 2:05-cv-04296-JS-ETB |
| | : | |
| | : | <u>CLASS ACTION</u> |
| ─────────────────────── | : | |
| This Document Relates To: | : | NOTICE OF PENDENCY AND |
| | : | SETTLEMENT OF CLASS ACTION |
| ALL ACTIONS. | : | |
| | : | |
| ─────────────────────── x | | |
| | | EXHIBIT B-1 |

TO:    ALL PERSONS AND ENTITIES THAT PURCHASED OR OTHERWISE ACQUIRED (INCLUDING BY EXCHANGE, CONVERSION OR OTHERWISE) DHB INDUSTRIES, INC. ("DHB") PUBLICLY TRADED SECURITIES (INCLUDING PUTS, CALLS AND OTHER SECURITIES) ON OR AFTER NOVEMBER 18, 2003 UNTIL AND INCLUDING NOVEMBER 30, 2006 (THE "CLASS" AS MORE PARTICULARLY DEFINED BELOW:

PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.  YOUR RIGHTS MAY BE AFFECTED BY PROCEEDINGS IN THIS ACTION.  PLEASE NOTE THAT IF YOU ARE A MEMBER OF THE CLASS YOU MAY BE ENTITLED TO SHARE IN THE PROCEEDS OF THE SETTLEMENT FUND DESCRIBED IN THIS NOTICE.  TO CLAIM YOUR SHARE OF THIS FUND, YOU MUST SUBMIT A VALID PROOF OF CLAIM AND RELEASE POSTMARKED ON OR BEFORE _____, 2007.

This Notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Eastern District of New York (the "Court"). The purpose of this Notice is to inform you of the settlement ("Settlement") of a class action (the "Class Action") pursuant to an agreement (the "Stipulation") to resolve the claims in the Class Action and a related derivative action (the "Derivative Action") (collectively, the "Actions"), and of the hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement.  This Notice describes the rights you may have in connection with the Settlement and what steps you may take in relation to the Settlement and the Class Action.

The Settlement creates a fund in the principal amount of $34,900,000 in cash and 3,184,713 shares of DHB common stock (the "Settlement Fund"), the cash portion of which is earning interest. The Settlement also provides for the adoption by DHB of certain corporate governance measures and the resignation of certain senior DHB management personnel and certain members of DHB's Board of Directors.  Based on an estimate of the number of shares entitled to participate in the Settlement and the anticipated number of claims to be submitted by Class Members and the current price of

- 1 -

DHB common stock, the average distribution from the Settlement Fund (with the stock portion converted to a dollar amount based on its current trading price) will be approximately $0.46 per share before deduction of Court-approved fees and expenses.  However, your actual recovery from the Settlement Fund will depend on a number of variables, including the number of claimants, the number of shares you purchased during the Class Period, the expense of administering the claims process, and the timing of your purchases and sales, if any.

The parties to the Class Action do not agree on the average amount of damages per share that would have been recoverable if the Class Plaintiffs had prevailed on the claims asserted in the Class Action, or even whether the Class Plaintiffs would have prevailed on any of those claims.  The issues on which the parties disagree include: (1) the appropriate economic model for determining the amount by which the trading price of DHB securities was allegedly artificially inflated (if at all) at any time during the Class Period; (2) the effect of various market forces influencing the trading price of DHB securities at various times during the Class Period; (3) the extent to which external factors, such as general market conditions, influenced the trading price of DHB securities at various times during the Class Period; (4) the extent to which the various matters that the Class Plaintiffs alleged were materially false or misleading influenced (if at all) the trading price of DHB securities at various times during the Class Period; (5) the extent to which the various allegedly adverse material facts that the Class Plaintiffs alleged were omitted influenced (if at all) the trading price of DHB securities at various times during the Class Period; and (6) whether any of the statements made or facts allegedly omitted were false, material or otherwise actionable under the federal securities laws.

Counsel for the Class Plaintiffs believe that the Settlement is a  substantial recovery and is in the best interests of the Class.  Because of the risks associated with continuing to litigate and proceeding to trial, there was a danger that the Class Plaintiffs would not have prevailed on any of

their claims, in which case the Class would have received nothing.  In addition, the amount of damages recoverable by the Class, if any, was and continues to be vigorously challenged by the Defendants.  If the cases were tried, recoverable damages, if any, would have been limited to losses caused by conduct actionable under the securities laws and, had the Class Action gone to trial, Defendants intended to assert that all or most of the alleged losses of the Class Members were caused by non-actionable market, industry or general economic factors.

Class Plaintiffs' Counsel have not received any payment for their services in conducting the Class Action on behalf of the Members of the Class, nor have they been reimbursed for their out-of-pocket expenditures.  If the Settlement is approved by the Court, Class Plaintiffs' Counsel will apply to the Court (1) for attorneys' fees not to exceed 25% of the settlement proceeds (in both cash and DHB stock), and reimbursement of expenses incurred not to exceed $350,000.00, and (2) up to $25,000.00 for each Class Plaintiff to reimburse them for their costs and expenses, all to be paid from the Settlement Fund.  If the amounts requested by Class Plaintiff's Counsel are approved by the Court, the average cost would be approximately $0.12 per share.  The average cost per share would also vary depending on the number of shares for which valid claims are submitted.

This Notice is not an expression of any opinion by the Court about the merits of any of the claims or defenses asserted by any party in the Class Action or the fairness or adequacy of the Settlement.

For further information regarding this Settlement you may contact a representative of Class Plaintiffs' Counsel: Rick Nelson, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, Telephone: 800/449-4900.  Please do not contact the Court or DHB.

- 3 -

## I.    NOTICE OF HEARING ON PROPOSED SETTLEMENT

A settlement hearing (the "Settlement Hearing") will be held on _____, 2007, at

_____ __.m., before the Honorable Joanna Seybert, United States District Judge, at the Alfonse M.

D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York

11722-4438.   The purpose of the Settlement Hearing will be to determine: (1) whether the

Settlement consisting of $34,900,000 in cash (plus accrued interest) and 3,184,713 shares of DHB

common stock should be approved as fair, reasonable and adequate to Members of the Class (as

defined below); (2) whether the proposed plan to distribute the settlement proceeds (the "Plan of

Allocation") is fair, reasonable, and adequate; (3) whether the application by Class Plaintiffs'

Counsel for an award of attorneys' fees and reimbursement of expenses and the Class Plaintiffs'

request for reimbursement of their time and expenses should be approved; and (4) whether the Class

Action should be dismissed with prejudice and the Defendants released from all Released Class

Claims against them.   The Court may adjourn or continue the Settlement Hearing or modify any

dates set forth herein without further notice to the Class.

## II.    DEFINITIONS

1.    "Authorized Claimant" means any Class Member whose claim for recovery has been

allowed pursuant to the terms of the Stipulation.

2.    "Claims" means any and all claims, demands, rights, liabilities, damages and causes

of action of every nature and description whatsoever, known or unknown, whether or not concealed

or hidden, including, without limitation, "Unknown Claims" (as defined below) and claims for

negligence, gross negligence, breach of fiduciary duty, breach of duty of care, breach of duty of

loyalty, waste, insider trading, unjust enrichment, abuse of control, mismanagement, fraud, and

violations of any local, state or federal statutes, rules, regulations or common law.

- 4 -

3.       "Class" means all Persons who purchased or otherwise acquired (including by exchange, conversion or otherwise) the publicly traded securities of DHB (including puts, calls and other securities) on or after November 18, 2003 until and including November 30, 2006, and were allegedly damaged thereby.  Excluded from the Class are the Defendants and Persons related to the Defendants, including any subsidiaries or affiliates of DHB; the officers and directors of DHB during the Class Period; members of the individual Defendants' immediate families; any person, firm, trust, officer, director or any individual or entity in which any Defendant has a controlling interest or which is related to, or affiliated with, any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors in interest or assigns of any such excluded person or entity.  Also excluded from the Class are those Persons who timely and validly request to be excluded from the Class pursuant to this Notice.

4.       "Class Defendants" means DHB, David H. Brooks, Terry Brooks, David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman.

5.       "Class Member" or "Member of the Class" means a Person who falls within the definition of the Class as set forth in ¶3 above.

6.       "Class Period" means the period commencing on November 18, 2003 through and including November 30, 2006.

7.       "Class Plaintiffs' Counsel" means Keith F. Park, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 655 W. Broadway, Suite 1900, San Diego, CA 92101, Samuel H. Rudman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 58 South Service Road, Suite 200,

Melville, NY 11747, and Lynda J. Grant, Labaton Sucharow & Rudoff LLP, 100 Park Avenue, 12th Floor, New York, NY 10017.

8.    "Current DHB Shareholders" means any Person(s) who owned DHB common stock as of November 30, 2006.

9.    "Defendants" means the Class Defendants and the Derivative Defendants.

10.    "Derivative Defendants" means nominal defendant DHB, David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Jerome Krantz, Gary Nadelman, Cary Chasin, Barry Berkman, Larry Ellis, Tactical Armor Products, Inc., David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Terry Brooks and Jeffrey Brooks.

11.    "Derivative Plaintiff" means Alvin Viray.

12.    "Effective Date" means the first date by which all of the events and conditions specified in ¶7.1 of the Stipulation shall have been met and have occurred, unless one or more of such conditions is waived or modified in writing and signed by Class Plaintiffs' Counsel, Derivative Counsel, and counsel for each of the Defendants.

13.    "Judgments" means the final judgments to be rendered by the Court in the Actions, substantially in the forms attached as Exhibits D and E to the Stipulation.

14.    "Non-Released Claims" means all of DHB's obligations to David H. Brooks and to all of the other Defendants to whom DHB has indemnification obligations, of and for indemnification and reimbursement for fees, expenses and liabilities, as provided for in DHB's Articles of Incorporation and By-Laws, in the laws of Delaware, and in this Stipulation, as the latter is approved by the Court, all of which shall remain in full force and effect, and David H. Brooks' undertaking to DHB, regarding his indemnification by DHB, and the undertakings of the other

Defendants to whom DHB has indemnification obligations, shall also remain in full force and effect. "Non-Released Claims" shall also include any and all obligations of any Defendant to any other Defendant under any existing contract or agreement between or among them, including, without limitation, any agreement entered into in connection with the Settlement.

15.     "Person" means an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, joint venture, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, and assignees.

16.     "Related Persons" means each of a Defendant's present and former parents, subsidiaries, affiliates, divisions, joint ventures, joint venturers, and his, her or its present and former officers, directors, employees, agents, representatives, attorneys, insurers, excess insurers, advisors, investment advisors, auditors, accountants, spouses and immediate family members, and the predecessors, heirs, successors and assigns of any of them, and any Person in which any Related Person has or had a controlling interest or which is or was related to or affiliated with any Related Person, and any trust of which any Defendant is the settler or which is for the benefit of any Defendant and/or a member(s) of a Defendant's family.  Stockbrokers in their capacity as such are excluded from this definition.

17.     "Released Class Claims" means any and all Claims arising from either the purchase or other acquisition (including by an exchange, conversion or otherwise) of any publicly-traded securities of DHB, including, without limitation, put and call options thereon, during the Class Period and based on any facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were or could have been asserted by the Lead Plaintiffs or any Class

Member in the Class Action, in a direct, indirect, representative, derivative or other capacity against the Released Class Persons, or any of them.

18.    "Released Class Persons" means the Class Defendants and each of them, and each of their respective Related Persons in their capacities as such.

19.    "Released Derivative Claims" means any and all Claims based on any facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were or could have been asserted by the Derivative Plaintiff on behalf of DHB, or by DHB on its own behalf, or by any Current DHB Shareholder in the Derivative Action, in a direct, indirect, representative, derivative or other capacity against the Released Derivative Persons, or any of them. In addition, Released Derivative Claims includes, without limitation, a release by DHB of David H. Brooks and Dawn M. Schlegel, and each of them, from any and all liability under §304 of the Sarbanes-Oxley Act of 2002 to reimburse DHB for any bonus or other incentive-based or equity based compensation received by them or either of them, or for any profits realized by them or either of them from the sale of any securities of DHB.

20.    "Released Derivative Persons" means the Derivative Defendants, and each of them, and each of their respective Related Persons in their capacities as such.

21.    "Released Persons" means, collectively, the Released Class Persons and the Released Derivative Persons.

22.    "Settlement Fund" means the principal amount of Thirty-Five Million Two Hundred Thousand Dollars ($35,200,000) plus 3,184,713 shares of DHB common stock.

23.    "Settling Parties" means, collectively, each of the Defendants, and the Class Plaintiffs and the Derivative Plaintiff on behalf of, respectively, themselves, the Members of the Class, the Current DHB Shareholders and derivatively on behalf of DHB.

24.    "Unknown Claims" means any Released Class Claims or any Released Derivative Claims which any Class Plaintiff or Class Member (as to Released Class Claims), and/or the Derivative Plaintiff, any Current DHB Shareholder, or DHB (as to Released Derivative Claims), respectively, does not know of or suspect to exist in his, her or its favor at the time of the release of the Released Class Persons and/or the Released Derivative Persons which, if known by him, her or it, might have affected his, her or its settlement with, and release of, the Released Class Persons and/or Released Derivative Persons, or might have affected his, her or its decision not to object to this Settlement. With respect to any and all Released Class Claims and Released Derivative Claims, the Settling Parties stipulate and agree that, upon the Effective Date, the Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived the provisions, rights and benefits of California Civil Code §1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Class Plaintiffs, the Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code §1542. Each of the Class Plaintiffs, the Derivative Plaintiff, the Class Members, DHB, and the Current DHB Shareholders, may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the Released Class Claims or Released Derivative Claims, but each Class Plaintiff, Derivative Plaintiff and DHB, and each of the Class Members and the Current DHB Shareholders, upon the Effective Date, shall be deemed to have, and by operation of the Judgments shall have, fully, finally, and

- 9 -

forever settled and released any and all Released Class Claims and Released Derivative Claims, respectively, known or unknown, suspected or unsuspected, contingent or non-contingent, accrued or unaccrued, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  The Class Plaintiffs, the Derivative Plaintiff, DHB, and the Class Members and the Current DHB Shareholders, shall be deemed by operation of the Judgments to have acknowledged that the foregoing waivers were separately bargained for and are key elements of the Settlement of which this release is a part.

## III.    THE CLASS ACTIONS AND THE DERIVATIVE ACTIONS

On and after September 9, 2005, multiple actions were filed in the Court as class actions on behalf of persons who purchased the publicly traded shares of DHB alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78(j)(b) and 78(t).  The complaints made allegations that DHB's stock price was artificially inflated by the dissemination of materially false and misleading statements about the quality of DHB's products, its government contracts, and the value of its inventory which resulted in significant damage to class members when the truth was revealed.  On January 31, 2006, the Court consolidated the class actions filed as *In re DHB Industries, Inc. Sec. Litig.*, No. CV 05-4296(JS)(ETB) and appointed RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Baciu as Lead Plaintiffs (the "Class Plaintiffs") pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and approved the Class Plaintiffs' choice of Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow & Rudoff LLP as Lead Counsel ("Class Plaintiffs' Counsel").  On _____, 2007, the Court certified a Class for settlement purposes only.  The Class is defined at §II.3, above.

- 10 -

On and after September 14, 2005, multiple actions were filed in the Court as derivative actions on behalf of DHB. The complaints in the derivative actions generally allege causes of action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. On January 31, 2006, the Court consolidated the derivative actions filed as *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345(JS)(ETB) and appointed Robbins Umeda & Fink, LLP and Law Offices of Thomas G. Amon as Co-Lead Counsel in the Derivative Action.

The Class Action is being settled contemporaneously with the Derivative Action (collectively, the "Actions"). Approval of the Settlement of the Class Action is a condition to the effectiveness of the Settlement of the Derivative Action, and vice versa. A separate "Notice of Pendency and Settlement of Derivative Action" is being sent to the Current DHB Shareholders, contemporaneously herewith.

## IV.    CLAIMS OF THE CLASS PLAINTIFFS AND BENEFITS OF SETTLEMENT

The Class Plaintiffs believe that the claims asserted in the Class Action have merit. However, Class Plaintiffs and Class Plaintiffs' Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Class Action against the Class Defendants through trial and appeal. Class Plaintiffs and Class Plaintiffs' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Class Action, as well as the difficulties and delays inherent in such litigation. Class Plaintiffs and Class Plaintiffs' Counsel also are mindful of the inherent problems of proof of, and possible defenses to, the violations asserted in the Class Action. Class Plaintiffs and Class Plaintiffs' Counsel believe that the Settlement set forth in the Stipulation confers substantial benefits upon and is in the best interests of the Class and each of the Members of the Class.

## V.     DEFENDANTS' STATEMENT AND DENIALS OF WRONGDOING AND LIABILITY

The Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Class Plaintiffs in the Class Action. The Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them or any of them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Class Action. The Defendants also have denied and continue to deny, *inter alia*, the allegations that the Class Plaintiffs or Class Members have suffered any damage, that the price of DHB securities was artificially inflated by reason of alleged misrepresentations, non-disclosures or otherwise, or that the Class Plaintiffs or the Class Members were harmed by any of the conduct alleged in the Class Action.

Nonetheless, the Defendants have concluded that further conduct of the Class Action would be protracted, expensive, and distracting to DHB and its management and that it is desirable that the Class Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation. The Defendants also have taken into account the uncertainty and risks inherent in any litigation, especially in complex cases like the Class Action. The Defendants have, therefore, determined that it is desirable that the Class Action be settled in the manner and upon the terms and conditions set forth in the Stipulation.

## VI.     TERMS OF THE PROPOSED SETTLEMENT

The Settlement Fund ("Settlement Fund") consists of $34.9 million in cash and 3,184,713 shares of DHB common stock. Approximately $12.9 million of the cash portion of the Settlement Fund has been funded by DHB's directors' and officers' liability insurers. The balance of the cash portion of the Settlement Fund was generated through two stock transactions between Defendant David H. Brooks and DHB. Mr. Brooks exercised a warrant for 3,000,000 shares of DHB common

stock at a price which was above both the exercise price of the warrant and the market price of DHB's common stock at the time, in mid-July, 2006, when the parties' agreed in principle to settle; in a private placement transaction, Mr. Brooks purchased an additional 3,007,099 shares of DHB common stock from the Company (again, at above the market price of the stock at that time). The money received from Mr. Brooks in these transactions was used to fund the Settlement.

A portion of the settlement proceeds will be used for certain administrative expenses, including costs of printing and mailing notice of the Settlement, the cost of publishing a newspaper notice, payment of any taxes assessed against the Settlement Fund and costs associated with the processing of claims submitted. In addition, as explained below, a portion of the Settlement Fund may be awarded by the Court to Class Plaintiffs' Counsel as attorneys' fees and for reimbursement of out-of-pocket expenses. The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation described below to the Class Members in the Class who submit valid and timely Proof of Claim and Release forms.

In addition to the Settlement Fund, DHB, through its Board of Directors, shall adopt the corporate governance provisions set forth below. The corporate governance provisions set forth below were jointly developed and negotiated by the Class Plaintiffs, the Derivative Plaintiff and Counsel in the Class Action and Counsel in the Derivative Action.

DHB shall adopt the following Corporate Governance Principles and Policies no later than the Effective Date of the Settlement, or as soon as practicable thereafter, and shall maintain the same in effect for at least two years. Nothing in these Principles and Policies shall dilute any existing or future legal requirements to which DHB is subject as a public corporation or as a publicly-traded stock on any national listing.

- 13 -

## CORPORATE GOVERNANCE PRINCIPLES AND POLICIES

### A.    THE ROLE OF THE BOARD OF DIRECTORS

### 1.    Direct the Affairs of DHB Industries Inc. (the "Company") for the Benefit of Stockholders

The primary responsibility of directors is to oversee the affairs of the Company for the benefit of stockholders. The Board of Directors (the "Board") agrees that day-to-day management of the Company is the responsibility of management and that the role of the Board is to oversee management's performance of that function. The Board shall also mandate and administer a corporate compliance program, which shall include the creation of a Company Code of Business and Ethics, the maintenance of accounting, financial and other controls, and the review of the adequacy of such controls.

### 2.    Long Range Strategy Development

Long range strategic issues should be discussed as a matter of course at regular Board meetings. The Board may choose to devote one of its regularly scheduled meetings exclusively to strategic planning.

### 3.    Review of Financial Goals and Performance

The Board reviews the annual operating plan and specific goals at the start of the fiscal year and financial performance quarterly (actual and in comparison to plan). The Board also believes it is important to establish and evaluate both short and long term objectives.

### 4.    Ethical Business Environment

The Board insists on an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates. The Board expects that management will conduct operations in a manner supportive of this view. The Board is committed to avoiding any transactions that compromise, or appear to compromise, director independence. The Company shall prepare for the Board's review and approval a Code of Business Conduct and Ethics, and shall receive periodic reports from the Company's General Counsel with respect to such Code.

### 5.    Chairman and Chief Executive Officer Performance Evaluation

The Chairman and Chief Executive Officer's performance should be evaluated annually and as a regular part of any decision with respect to their respective compensation. The Board shall delegate the performance and compensation evaluation as it deems appropriate to specified Board members or to the Compensation Committee of the Board. Notwithstanding such delegation, however, the Board as a whole shall be responsible for the oversight of the

Chairman, Chief Executive Officer and senior management. The offices of the Chairman and the Chief Executive Officer may be from time to time combined and may be from time to time separated. The Board has discretion in combining or separating the positions as it deems appropriate in light of prevailing circumstances.

**6.    Succession Planning**

The Board is responsible for succession planning. The Board will have the Chairman and Chief Executive Officer annually review with the independent directors the abilities of the key senior managers and their likely successors. Additionally, the independent directors may meet periodically to discuss, among other things, management succession issues. As part of the succession and development process, the Board, or at the Board's direction, the Compensation Committee, will familiarize itself with the Chairman's and Chief Executive Officer's direct reports through periodic management and operating reports and meetings. The independent directors shall call a meeting upon any sudden temporary or permanent incapacity of the Chairman or Chief Executive Officer.

**7.    Material Transactions**

The Board shall evaluate and, if appropriate, approve all material Company transactions not arising in the ordinary course of business.

**8.    Stockholder Communications; Attendance at Annual Stockholders Meetings**

The Board shall establish procedures to allow for stockholders to communicate directly with the Board, the non-management directors, and the committees of the Board. To further facilitate stockholder communication with the Board, all directors are encouraged to attend the Company's Annual Meeting of Stockholders.

**9.    Governing Documents**

In the event of any conflict between the Company's Certificate of Incorporation, By-laws and these Principles and Policies, the Certificate shall first govern and next the By-law and then these Principles and Policies, in that order.

**B.    MEETINGS OF THE BOARD OF DIRECTORS**

**1.    Selection of Chairman of the Board**

The Chairman of the Board shall be selected by the Board. The Chairman will be elected annually and shall serve at the pleasure of the Board.

### 2.    Frequency of Meetings

The Board will regularly meet at least one time each quarter and one quarterly meeting may be in conjunction with the annual meeting of stockholders. An annual calendar for the succeeding year will be agreed upon from time to time. Special meetings may be called as necessary.

While the Board recognizes that directors discharge their duties in a variety of ways, including personal meetings and telephone contact with management and others regarding the business and affairs of the Company, the Board shall inform its members that it feels it is the responsibility of individual directors to make themselves available to attend both regular and special Board and committee meetings on a consistent basis. Active attendance at meetings shall be taken into account in the determination whether to nominate for reelection any director.

### 3.    Meetings of Independent Directors

Independent directors should meet routinely and regularly without management as they deem appropriate in their discretion, and should meet at any time upon the request of any director.

### 4.    Access to Management and Outside Experts

Board members shall have reasonable direct access to the Chairman, Chief Executive Officer, Chief Operating Officer and General Counsel, in their discretion. The Board shall have access to other members of senior management on a case by case basis after a courtesy call to the Chairman or Chief Executive Officer. Upon prior notice to the Chairman and/or General Counsel, the Board or a Board committee may seek legal or other expert advice from a source independent of management. Board members will use judgment to ensure that contact with management is not distracting to the business operation of the Company and that such contact, if in writing, be copied to the Chairman, Chief Executive Officer and General Counsel.

### 5.    Attendance of Non-Directors at Meetings

The Chairman and the Chief Executive Officer shall have discretion to invite any members of management, other Company employees or third parties they deem appropriate to attend Board meetings at appropriate times, subject to the Board's right to request that such attendance be limited or discontinued. The Board shall have the authority to request non-management guests to sign a confidentiality agreement in form satisfactory to the General Counsel prior to such guest's participation in any Board or committee meeting. The Board and committees may exclude any guest from part or all of any meeting upon its determination that it is in the best interests of the Company to do so.

**6.      Agendas and Presentations**

The Board shall indicate it believes the Chairman and Chief Executive Officer are jointly responsible, and should establish, the agenda for each Board meeting, taking into account suggestions of Board members. Board members may include particular items on the agenda by contacting the Chairman and the Chief Executive Officer and the Chairman and Chief Executive Officer are expected to ask directors for their suggestions or opinions on possible agenda items before each meeting.

As with the agenda, the Board shall indicate it believes that the Chairman and Chief Executive Officer should determine the form of each presentation to the Board and the person to make such presentation. Each meeting should include reports from the Board committees, as appropriate.

It shall be the policy of the Board that the Chief Executive Officer or Chief Financial Officer will give a presentation on the financial and operating results of the Company and related issues at each Board meeting.

**7.      Information Flow**

The Board shall receive salient information helpful in understanding the presentations, discussions and issues to be covered at such meeting, in writing and sufficiently in advance of such meeting to permit appropriate review. Where appropriate, longer and more complex documents shall contain executive summaries. Absent unusual circumstances, in no event will such information be distributed less than three days in advance of any regular Board meeting and 24 hours in advance of any special meeting.

The Board shall periodically review the information flow to Board members to ensure that directors receive the right kind and amount of information from management in sufficient time to prepare for meetings. The Chairman or Chief Executive Officer, or their designee, shall coordinate the information flow to the directors, periodically discuss director satisfaction with Board materials with individual directors and encourage directors to offer suggestions on materials. In addition, this topic shall be considered annually by the independent directors as part of its regular review of Board performance.

**8.      Additional Service**

From time to time the Company may request the services of a Board member other than in his or her capacity as a director. In such situations, before assigning any task to a Board member that would require additional compensation, the Chairman, Chief Executive Officer or General Counsel shall first review such assignment with the Compensation Committee. Any Board member requested to perform services by the Company that he or she believes do not lie within his or her capacity as a director, shall inform the Compensation Committee prior to accepting such

assignment. Any such engagement will be consistent with the independence requirements of the American Stock Exchange.

**C.    BOARD STRUCTURE**

**1.    Composition of Board**

The majority of the members of the Board shall be independent directors. Independent directors should have appropriate skills and characteristics required of Board members. This assessment should include issues of diversity, age and skills, all in the context of an assessment of the perceived needs of the Board at that point in time. Unless otherwise determined by a majority of the independent directors, all independent directors shall offer their resignation as a matter of course upon a change in employer or other significant changes in their professional roles or responsibilities that might reasonably be seen to affect their ability to serve, and the Board shall consider the appropriateness of continued service in light of such changes. Any such resignation shall be communicated to the Chairman or Chief Executive Officer and may be considered by the Board or by the independent directors.

The Chairman, Chief Executive Officer, and any other directors other than independent directors, shall offer his or her resignation from the Board as a matter of course upon resignation or any other significant change in his or her professional roles or responsibilities, unless otherwise provided in such individual's employment, consulting or other agreement with the Company.

Any resignation submitted as a matter of course shall be reviewed by the Board as a whole or at the Board's direction the independent directors, and, if the Board or such independent directors determines that such director continues to contribute significantly to the Company, the director's membership on the Board may continue.

To the extent that they serve on DHB's Board of Directors at the time of the Effective Date of the settlement, Cary Chasin, Gary Nadelman and Barry Berkman shall be replaced as Board members within one year. Upon cessation of employment and/or service on the Board of Directors, David H. Brooks, Terry Brooks, Dawn Schlegel, Sandra Hatfield, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman and Jeffrey Brooks will be barred for a period of 5 years from any employment (direct or indirect) at DHB or any of its subsidiaries or affiliates (but not including Tactical Armor Products, Inc., if the same may be deemed to be such an affiliate), including, but not limited to, serving as any manner of consultant or in any capacity on or in service to the Board of Directors.

**2.    Definition of Independent Director**

The Board of Directors defines an "independent director" as a director who, in the opinion of the Board meets the independence requirements of the American Stock Exchange or other market or exchange on which the Company's stock may be

listed. To evaluate "independence," the Board may consider all relevant factors. The Board recognizes that director independence is an issue that is actively being reviewed by multiple constituencies and may amend its criteria for determining what constitutes an "independent director" to reflect changing standards.

**3.      Size of the Board**

The Board acknowledges that it should not be too large and understands that the size of the Board will fluctuate from time to time depending on circumstances. The independent directors will make recommendations regarding increasing or decreasing size from time to time.

**4.      Director Retirement Age and Term Limits**

The Board believes that consistent quality in the directorship can be achieved effectively without term limits or any mandatory retirement age. However, each director shall stand for election or re-election annually and serve a one-year term.

**5.      Director Appointments**

A majority of the independent directors shall nominate candidates for election to the Board. It is the independent directors' responsibility to make director recommendations to the full Board for appointments to fill vacancies of any unexpired term on the Board and to recommend nominees for submission to stockholders for approval at the time of the Annual Meeting.

The Company does not set specific criteria for directors except to the extent required to meet applicable legal, regulatory and exchange requirements. The Board shall seek candidates that show evidence of leadership in their particular field, have broad experience and the ability to exercise sound business judgment, have specific knowledge about the Company's business and be able to network in a way to promote the Company's interests.

**6.      Director Evaluation**

The independent directors shall prepare, for the Board's review and approval, Board and director assessment methods and criteria, taking the Chairman's and Chief Executive Officer's views into consideration. The independent directors shall annually evaluate the Board's overall performance and evaluate individual directors performance using the Board approved methods and criteria for such review.

**7.      Director Compensation and Stock Ownership**

The Board believes that the level of director compensation generally should be competitive with that paid to directors of other corporations of similar size and profile in the United States. The Compensation Committee is responsible for making recommendations for the full Board's review and approval with respect to director compensation and benefit programs.

8.      **Interlocking Directorates**

All directors shall seek approval from the independent directors prior to accepting any other board memberships in for-profit companies to avoid legally impermissible interlocking directorships or other conflicts of interest; provided that no director shall serve on more than four (4) outside public boards of for-profit companies.  Similarly, the Chairman, Chief Executive Officer and other members of management shall seek approval of the Board prior to accepting outside board memberships in for-profit companies.

D.      **COMMITTEES OF THE BOARD**

1.      **Number and Types of Committees**

The Board shall create and disband committees depending on the particular interests of the Board, issues facing the Company and legal requirements. The current "standing" committees of the Board (that is, committees expected to operate over an extended period) are the Audit Committee, the Compensation Committee, and the Corporate Governance Committee.  Each Committee shall be comprised solely of Independent Directors, as described in §C.2.  The independent directors shall periodically recommend changes to the composition of the Board committees. Directors shall be free to make suggestions regarding committees at any time and are encouraged to do so. The Board shall consider from time to time the committee structure as part of the review of overall Board effectiveness. The composition, members and responsibilities will also be defined periodically by the Board.

2.      **Assignment and Rotation of Committee Members**

The Board shall make assignments within the following guidelines: assignments may be rotated periodically, though not necessarily within any specified time frame; all shall be comprised solely of independent directors; and committee assignments must comply with any applicable stock exchange and legal requirements.  The Chairman of the Audit Committee and other Audit Committee members shall meet the financial sophistication and independence requirements of the American Stock Exchange and applicable law.

3.      **Frequency of Committee Meetings**

Management will generally recommend an annual committee meeting schedule for all standing committees, but it shall be the responsibility of committee chairpersons, in consultation with committee members, to determine the frequency and length of committee meetings.  The Audit Committee will meet at least quarterly; other committees will meet at least twice annually.

4.      **Committee Agendas**

Committee chairpersons, in consultation with appropriate members of management and committee members, shall determine committee agendas. Any

director may suggest an item for consideration as part of any committee agenda. The Chief Financial Officer will act as the primary management liaison to provide committees requested financial data and analyses. The General Counsel will act as the management liaison to assemble and distribute agendas and facilitate minutes and reports preparation.

**5.     Committee Reports**

Reports of committee meetings are submitted to the full Board following each committee meeting. Committee actions shall be binding consistent with such Committee's charter and applicable corporate law. Committee chairpersons shall be offered the opportunity to comment or report on committee activities at each Board meeting.

**6.     Specific Roles and Responsibilities**

The specific roles and responsibilities of each committee shall be outlined in their respective charters.

In addition to the foregoing, as additional consideration for the Settlement, David H. Brooks has voluntarily resigned from the Board of Directors of DHB and from all of the other positions held by him in DHB and its subsidiaries.  In addition, to the extent that they serve on DHB's Board of Directors at the time of the Effective Date of the Settlement, Cary Chasin, Gary Nadelman and Barry Berkman shall be replaced as Board members within one year thereafter.  Also, upon cessation of employment and/or service on the Board of Directors, and for a period of five years thereafter, David H. Brooks, Dawn Schlegel, Sandra Hatfield, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman will not be employed (directly or indirectly) by DHB or any of its subsidiaries or affiliates (but not including Tactical Armor Products, Inc., if the same may be deemed to be such an affiliate), including, but not limited to, serving as any manner of consultant or in any capacity on or in service to the Board of Directors.  This same restriction on employment shall apply to Terry Brooks and Jeffrey Brooks, commencing as of the Effective Date.

## VII.    PLAN OF ALLOCATION

The Net Settlement Fund will be distributed to Class Members who submit valid and timely Proof of Claim and Release forms ("Authorized Claimants") under the Plan of Allocation described here.  You will be eligible to participate in the distribution of the Net Settlement Fund only if you have a net loss on all transactions in DHB securities.

To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below.  If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants.  Payment in this manner shall be deemed conclusive against all Authorized Claimants.

A "Claim" will be calculated as follows:

### *COMMON STOCK*

1.    For shares of DHB common stock purchased from November 18, 2003 through March 16, 2005, and

(a)    sold prior to March 17, 2005, the claim per share is $0;

(b)    sold between March 17, 2005 through April 14, 2005, the claim per share is $1.49 (March 17, 2005 price decline);

(c)    sold between April 15, 2005 through July 28, 2005, the claim per share is $2.20 (March 17, 2005 and April 15, 2005 price declines);

(d)    sold between July 29, 2005 through August 29, 2005, the claim per share is $3.25 (March 17, 2005, April 15, 2005 and July 29, 2005 price declines);

(e)     sold between August 30, 2005 through November 30, 2006, or retained at the end of November 30, 2006, the claim per share is $4.81 (March 17, 2005, April 15, 2005, July 29, 2005 and August 30, 2005 price declines).

2.     For shares of DHB common stock purchased between March 17, 2005 through April 14, 2005, and

(a)     sold prior to April 15, 2005, the claim per share is $0;

(b)     sold between April 15, 2005 through July 28, 2005, the claim per share is $0.71 (April 15, 2005 price decline);

(c)     sold between July 29, 2005 through August 29, 2005, the claim per share is $1.76 (April 15, 2005 and July 29, 2005 price declines);

(d)     sold between August 30, 2005 through November 30, 2006, or retained at the end of November 30, 2006, the claim per share is $3.32 (April 15, 2005, July 29, 2005 and August 30, 2005 price declines).

3.     For shares of DHB common stock purchased between April 15, 2005 through July 28, 2005, and

(a)     sold prior to July 29, 2005, the claim per share is $0;

(b)     sold between July 29, 2005 through August 29, 2005, the claim per share is $1.05 (July 29, 2005 price decline);

(c)     sold between August 30, 2005 through November 30, 2006, or retained at the end of November 30, 2006, the claim per share is $2.61 (July 29, 2005 and August 30, 2005 price declines).

4.     For shares of DHB common stock purchased between July 29, 2005 through August 29, 2005, and

- 23 -

(a)     sold prior to August 30, 2005, the claim per share is $0;

(b)     sold between August 30, 2005 through November 30, 2006, or retained at the end of November 30, 2006, the claim per share is $1.56 (August 30, 2005 price decline).

5.     For shares of DHB common stock purchased between August 30, 2005 and November 30, 2006, and

(a)     sold prior to December 1, 2006, the claim per share shall be 10% of the difference between the purchase price per share less the sales price per share;

(b)     retained at the end of November 30, 2006, the claim per share shall be 10% of the difference between the purchase price per share less $2.65 (closing price on December 1, 2006).

### *CALL OPTIONS*

1.     For call options on DHB common stock purchased between November 18, 2003 through November 30, 2006, and

(a)     owned at the end of one of the following dates: March 16, 2005, April 14, 2005, July 28, 2005, or August 29, 2005 the claim per call option is the difference between the price paid for the call option less the proceeds received upon the settlement of the call option contract;

(b)     not owned at the end of one of the following dates: March 16, 2005, April 14, 2005, July 28, 2005, or August 29, 2005, the claim per call option is $0.

2.     For call options on DHB common stock written between November 18, 2003 through November 30, 2006, the claim per call option is $0.

### *PUT OPTIONS*

1.      For put options on DHB common stock written between November 18, 2003 through November 30, 2006, and

      (a)      owned at the end of one of the following dates: March 16, 2005, April 14, 2005, July 28, 2005, or August 29, 2005, the claim per put option is the difference between the amount paid upon settlement of the put option contract less the initial proceeds received upon the sale of the put option contract;

      (b)      not owned at the end of one of the following dates: March 16, 2005, April 14, 2005, July 28, 2005, or August 29, 2005, the claim per put option is $0.

2.      For put options on DHB common stock that were purchased between November 18, 2003 through November 30, 2006, the claim per put option is $0.

If the option was exercised for DHB common stock, the amount paid, or proceeds received, upon the settlement of the option contract equals the intrinsic value of the option using DHB common stock's closing price on the date the option was exercised.

The combined recovery for the call option and put options shall not exceed 3% of the Net Settlement Fund.

For Class Members who held shares at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the first-in, first-out ("FIFO") method will be applied to such holdings, purchases and sales for purposes of calculating a claim. Under the FIFO method, sales of shares during the Class Period will be matched, in chronological order, first against shares held at the beginning of the Class Period. The remaining sales of shares during the Class Period will then be matched, in chronological order, against shares purchased during the Class Period.

A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if that Class Member had a net loss, after all profits from transactions in DHB common stock, put calls or other options during the Class Period are subtracted from all losses. No distributions to Authorized Claimants who would otherwise receive less than $10.00 will be made.

The Court has reserved jurisdiction to allow, disallow or adjust the claim of any Class Member on equitable grounds.

## VIII.   PARTICIPATION IN THE CLASS

If you fall within the definition of the Class, you are a Class Member unless you elect to be excluded from the Class (*see* Section IX. below). If you do not request to be excluded from the Class, you will be bound by any Judgment entered with respect to the Settlement in the Class Action whether or not you submit a Proof of Claim and Release form.

***If you are a Class Member, you need do nothing (other than timely submit a properly filled out Proof of Claim and Release form if you wish to participate in the distribution of the Net Settlement Fund). Your interests will be represented by Class Plaintiffs' Counsel***. If you choose, you may enter an appearance individually or through your own counsel at your own expense.

**TO PARTICIPATE IN THE DISTRIBUTION OF THE NET SETTLEMENT FUND, YOU MUST TIMELY COMPLETE AND RETURN THE PROOF OF CLAIM AND RELEASE FORM THAT ACCOMPANIES THIS NOTICE.** The Proof of Claim and Release form must be postmarked on or before _____, 2007, and sent to the Claims Administrator at the address below. Unless the Court orders otherwise, if you do not timely submit a valid Proof of Claim and Release form, you will be barred from receiving any payments from the Net Settlement Fund, but will in all other respects be bound by the provisions of the Stipulation and the Judgment.

## IX.    EXCLUSION FROM THE CLASS

You may request to be excluded from the Class.  To do so, you must mail a written request stating that you wish to be excluded from the Class to:

> *In re DHB, Inc. Securities Litigation*
> Claims Administrator
> c/o Gilardi & Co. LLC
> P.O. Box 8040
> San Rafael, CA  94912-8040

The request for exclusion must state: (1) your name, address, and telephone number; and (2) all purchases and other acquisitions of DHB securities (including common stock, puts, calls and other securities) made during the Class Period, including the dates of purchase or acquisition, the number of shares of such securities purchased or otherwise acquired and the price paid or received per share.  YOUR EXCLUSION REQUEST MUST BE POSTMARKED ON OR BEFORE _____, 2007, AND, IN ORDER TO BE VALID, MUST CONTAIN ALL OF THE FOREGOING INFORMATION.  IF YOU SUBMIT A VALID AND TIMELY REQUEST FOR EXCLUSION, YOU SHALL HAVE NO RIGHTS UNDER THE SETTLEMENT, SHALL NOT SHARE IN THE DISTRIBUTION OF THE NET SETTLEMENT FUND, AND SHALL NOT BE BOUND BY THE STIPULATION OR THE JUDGMENT, AND YOU WILL NOT BE DEEMED TO HAVE RELEASED ANY OF THE DEFENDANTS.

## X.    DISMISSAL AND RELEASES

If the Settlement is approved, the Court will enter a Judgment in the Class Action.  The Judgment will dismiss the Released Class Claims (including all Unknown Claims) with prejudice as to all Released Class Persons.

The Judgment will also provide that all Class Members who have not validly and timely requested to be excluded from the Class shall be deemed to have released and forever discharged all

Released Class Claims (to the extent Members of the Class have such claims) (including all Unknown Claims) against all Released Class Persons.

In addition, at the Settlement Hearing, the Court will be asked to approve the Settlement reached in the Derivative Action and to thereafter dismiss the Derivative Action with prejudice. The effectiveness of the Settlement of the Class Action is conditioned upon the effectiveness of the Settlement of the Derivative Action, and vice versa.

## XI.    APPLICATION FOR FEES AND EXPENSES

At the Settlement Hearing, Class Plaintiff's Counsel will request the Court to award attorneys' fees not to exceed 25% of the Settlement Fund, plus reimbursement of the expenses, not to exceed $350,000.00, which were incurred in connection with the Class Action, plus interest thereon. In addition, the Class Plaintiffs in the Class Action may seek compensation of up to $25,000.00 each for their costs and expenses incurred in prosecuting the Class Action. This compensation will be paid from the Settlement Fund. Class Members are not personally liable for any such fees, expenses or compensation.

To date, Class Plaintiffs' Counsel have not received any payment for their services in conducting the Class Action, nor have counsel been reimbursed for their out-of-pocket expenses incurred. The fees requested are within the range of fees awarded to plaintiffs' counsel under similar circumstances in litigation of this type.

## XII.    CONDITIONS FOR SETTLEMENT

The Settlement is conditioned upon the occurrence of certain events described in the Stipulation. Those events include, among other things: (1) entry of the Judgments by the Court, including a Judgment dismissing the Derivative Action, as provided for in the Stipulation; and (2) expiration of the time to appeal from or alter or amend the Judgments. If, for any reason, any one of the conditions described in the Stipulation is not met, the Stipulation might be terminated and, if

terminated, will become null and void, and the parties to the Stipulation will be restored to their respective positions as of July 12, 2006, before a certain Memorandum of Understanding was executed by the Settling Parties.

## XIII.   THE RIGHT TO BE HEARD AT THE HEARING

Any Class Member who has not validly and timely requested to be excluded from the Class, and who objects to any aspect of the Settlement, the Plan of Allocation, the application for attorneys' fees and expenses, or the Class Plaintiffs' request for cost and expense reimbursement, may appear and be heard at the Settlement Hearing.  Any such Person must file a written notice of objection, filed with the Clerk of the Court on or before _____, 2007, and served by hand or first class mail on each of the following:

> Clerk of the Court
> UNITED STATES DISTRICT COURT
> EASTERN DISTRICT OF NEW YORK
> Alfonse M. D'Amato Federal Building
> United States District Court
> 100 Federal Plaza
> Central Islip, NY  11722-4438
>
> Samuel H. Rudman
> LERACH COUGHLIN STOIA GELLER
>     RUDMAN & ROBBINS LLP
> 58 South Service Road, Suite 200
> Melville, NY  11747
>
> William S. Lerach
> Keith F. Park
> Thomas G. Wilhelm
> LERACH COUGHLIN STOIA GELLER
>     RUDMAN & ROBBINS LLP
> 655 West Broadway, Suite 1900
> San Diego, CA  92101
>
> Lynda J. Grant
> Nicole M. Zeiss
> LABATON SUCHAROW & RUDOFF LLP
> 100 Park Avenue, 12th Floor
> New York, NY  10017-5563

Co-Lead Counsel for Plaintiffs

Patrick O'Hara
CAVANAGH & O'HARA
407 East Adams Street
Springfield, IL  62701

Additional Counsel for Plaintiffs

Eric Rieder
David P. Kasakove
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104

Counsel for Defendant DHB Industries, Inc.

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

R. Robert Popeo
John F. Sylvia
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111

Jerome Gotkin
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew Brooks
Industries Inc., sued as Andrew Brooks International Inc., Elizabeth Brooks
Industries Inc., sued as Elizabeth Brooks International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary Nadelman, and Barry
Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

Any such written objection must demonstrate the objecting Person's membership in the Class, including the number of shares of DHB securities purchased or otherwise acquired during the Class Period, and contain a statement of the reasons for objection.  Only Class Members who have submitted written notices of objection in this manner will be entitled to be heard at the Settlement Hearing, unless the Court orders otherwise.

## XIV.   SPECIAL NOTICE TO NOMINEES

If you, as nominee, hold or held any DHB securities purchased or otherwise acquired (including by exchange, conversion or otherwise) for a beneficial owner during the Class Period then, within ten (10) days after you receive this Notice, you must either: (1) send a copy of this Notice and the Proof of Claim and Release by first class mail to all such beneficial owners; or (2) provide a list of the names and addresses of such beneficial owners to the DHB Claims Administrator:

*In re DHB, Inc. Securities Litigation*
Claims Administrator
c/o Gilardi & Co. LLC
P.O. Box 8040
San Rafael, CA  94912-8040

If you choose to mail the Notice and Proof of Claim and Release yourself, you may obtain from the DHB Claims Administrator (without cost to you) as many additional copies of these documents as you will need to complete the mailing.

Regardless of whether you choose to complete the mailing yourself or elect to have the mailing performed for you, you may obtain reimbursement for or advancement of reasonable administrative costs actually incurred or expected to be incurred by you in connection with forwarding the Notice and Proof of Claim and Release form and which would not have been incurred but for the obligation to forward the Notice and Proof of Claim and Release form, upon submission of appropriate documentation to the Claims Administrator.

## XV.    EXAMINATION OF PAPERS

This Notice is a summary and does not describe all of the details of the Stipulation.  For full details of the matters discussed in this Notice, you may review the Stipulation filed with the Court, which may be inspected during business hours, at the office of the Clerk of the Court, United States District Court, Eastern District of New York, Alfonse M. D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, NY  11722-4438 or viewed at www.gilardi.com.

If you have any questions about the Settlement of the Class Action, you may contact Class Plaintiffs' Counsel by writing:

> Keith F. Park
> Thomas G. Wilhelm
> LERACH COUGHLIN STOIA GELLER
>   RUDMAN & ROBBINS LLP
> 655 West Broadway, Suite 1900
> San Diego, CA  92101
>
> Lynda J. Grant
> Nicole M. Zeiss
> LABATON SUCHAROW & RUDOFF LLP
> 100 Park Avenue, 12th Floor
> New York, NY  10017-5563

Co-Lead Counsel for Plaintiffs

**PLEASE DO NOT CONTACT THE COURT OR DHB REGARDING THIS NOTICE.**


DATED: _____     BY ORDER OF THE COURT
                                    UNITED STATES DISTRICT COURT
                                    EASTERN DISTRICT OF NEW YORK

S:\Settlement\DHB Industries 05.set\3-12-07 CLN B1 NOTICE 00033746.doc

**EXHIBIT B-2**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

In re DHB INDUSTRIES, INC. CLASS       :     Civil Action No. 2:05-cv-04296-JS-ETB
ACTION LITIGATION                       :
————————————————————      :     CLASS ACTION
                                        :
This Document Relates To:               :     PROOF OF CLAIM AND RELEASE
                                        :
        ALL ACTIONS.                    :     EXHIBIT B-2
                                        :
———————————————————— x

## I.     GENERAL INSTRUCTIONS

1.     To recover from the Settlement Fund as a Member of the Class based on the claims in the action entitled *In re DHB, Inc. Securities Litigation*, No. 2:05-cv-04296-JS-ETB (the "Class Action"), you must complete and, on page ___ hereof, sign this Proof of Claim and Release.  If you fail to submit a timely, properly completed and addressed (as set forth in paragraph 3 below) Proof of Claim and Release, your claim may be rejected and you may be precluded from any recovery from the Settlement Fund created in connection with the Settlement of the Class Action.

2.     Submission of this Proof of Claim and Release, however, does not assure that you will share in the Settlement Fund.

3.     **YOU MUST MAIL YOUR COMPLETED AND SIGNED PROOF OF CLAIM AND RELEASE POSTMARKED ON OR BEFORE _____, 2007, ADDRESSED AS FOLLOWS**:

> *In re DHB, Inc. Securities Litigation*
> Claims Administrator
> c/o Gilardi & Co. LLC
> P.O. Box 8040
> San Rafael, CA  94912-8040

If you are NOT a Member of the Class (as defined in the Notice of Pendency and Settlement of Class Action) DO NOT submit a Proof of Claim and Release form.

4.     If you are a Member of the Class and you have not timely requested exclusion, you will be bound by the terms of the Judgment entered in the Class Action, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM AND RELEASE.

## II.     DEFINITIONS

All other capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Notice of Pendency and Settlement of Class Action ("Notice") which accompanies this Proof of Claim and Release.

## III.    IDENTIFICATION OF CLAIMANT

1.    If you purchased or otherwise acquired (including by exchange, conversion or otherwise) DHB securities (including common stock, puts, calls and other securities) during the Class Period and held the securities in your name, you are the beneficial purchaser or acquirer as well as the record purchaser or acquirer.  If, however, you purchased or otherwise acquired DHB securities during the Class Period and the securities were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser or acquirer of these securities, but the third party is the record purchaser or acquirer of these securities.

2.    Use Part I of this form entitled "Claimant Identification" to identify each beneficial purchaser or acquirer of DHB securities which forms the basis of this claim, as well as the purchaser or acquirer of record if different.  THIS CLAIM MUST BE SUBMITTED BY THE ACTUAL BENEFICIAL PURCHASER(S) OR AUTHORIZED ACQUIRER(S) OR LEGAL REPRESENTATIVE(S) OF SUCH PURCHASER(S) OR ACQUIRER(S) OF THE DHB SECURITIES UPON WHICH THIS CLAIM IS BASED.

3.    All joint beneficial purchasers or acquirers must sign this claim.  Executors, administrators, guardians, conservators and trustees must complete and sign this claim on behalf of Persons represented by them and their authority must accompany this claim and their titles or capacities must be stated.  The Social Security (or taxpayer identification) number and telephone number of one of the beneficial owner(s) may be used in verifying this claim.  Failure to provide the foregoing information could delay verification of your claim or result in rejection of your claim.

## IV.    IDENTIFICATION OF TRANSACTION(S)

1.    Use Part II of this form entitled "Schedule of Transactions in DHB Securities" to supply all required details of your transaction(s) in DHB securities.  If you need more space or

additional schedules, attach separate sheets giving all of the required information in substantially the same form.  Sign and print or type your name on each additional sheet.

2.      On the schedules, provide all of the requested information with respect to **all** of your holdings of DHB securities as of the beginning of trading on November 18, 2003, **all** of your option transactions open as of the beginning of trading on November 18, 2003, **all** of your purchases , other acquisitions and sales of DHB securities and **all** of your option transactions which took place at any time beginning November 18, 2003 through and including November 30, 2006 (the "Class Period"), as well as proof of your holdings of DHB securities and/or options as of the close of trading on November 30, 2006, whether such purchases, acquisitions, sales or transactions resulted in a profit or a loss.  Failure to report all such transactions may result in the rejection of your claim.

3.      List each purchase, acquisition, sale and transaction in the Class Period separately and in chronological order, by trade date, beginning with the earliest.  You must accurately provide the month, day and year of each such transaction you list.

4.      The date of covering a "short sale" is deemed to be the date of purchase of the DHB security involved.  The date of a "short sale" is deemed to be the date of sale of the DHB security involved.

5.      Broker confirmations or other documentation of your purchases, acquisitions, sales or transactions in DHB securities or options should be attached to your claim.  Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

*In re DHB, Inc. Sec. Litig.*
No. 2:05-cv-04296-JS-ETB

PROOF OF CLAIM

Must be Postmarked No Later Than:
_____, 2007

Please Type or Print

PART I:        CLAIMANT IDENTIFICATION

_____

Beneficial Owner's Name (First, Middle, Last)

_____

Street Address

_____        _____

City                                    State and Zip Code

_____        _____

Foreign Province                        Foreign Country

_____        _____        Individual

Social Security Number or               _____        Corporation/Other
Taxpayer Identification Number

_____        _____

Area Code           Telephone Number (work)

_____        _____

Area Code           Telephone Number (home)

_____

Record Owner's Name(s) (if different from beneficial owner listed above)

PART II:        SCHEDULE OF TRANSACTIONS IN DHB STOCK OR OPTIONS

    A.     Number of shares of DHB securities held at the beginning of trading on November 18, 2003: _____

    B.     Purchases or other acquisitions, including by way of exchange, conversion or otherwise (November 18, 2003 – November 30, 2006, inclusive) of DHB securities or options:

| Trade Date<br>Month Day Year | Type of Security | Number of<br>Shares or Options<br>Purchased or Acquired | Total Purchase<br>Price |
|---|---|---|---|
| 1. _____ | _____ | _____ | _____ |
| 2. _____ | _____ | _____ | _____ |
| 3. _____ | _____ | _____ | _____ |

IMPORTANT:        Identify by number listed above all purchases in which you covered a "short sale": _____

    C.    Sales (November 18, 2003 – November 30, 2006, inclusive) of DHB securities or options:

| Trade Date<br>Month Day Year | Type of Security | Number of<br>Shares or Options<br>Sold | Total Sales Price |
|---|---|---|---|
| 1. _____ | _____ | _____ | _____ |
| 2. _____ | _____ | _____ | _____ |
| 3. _____ | _____ | _____ | _____ |

    D.    Number of shares of DHB securities or open options held at close of trading on November 30, 2006: _____

If you require additional space, attach extra schedules in the same format as above.  Sign and print your name on each additional page.

**YOU MUST READ THE RELEASE AND SIGN ON PAGE ____.  FAILURE TO SIGN THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.**

## V.    SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS

I (We) submit this Proof of Claim and Release under the terms of the Stipulation and Agreement of Settlement ("Stipulation") described in the Notice. I (We) also submit to the jurisdiction of the United States District Court for the Eastern District of New York with respect to my (our) claim as a Class Member and for purposes of enforcing the release set forth herein. I (We) further acknowledge that I (we) will be bound by and subject to the terms of any Judgment that may be entered in the Class Action. I (We) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so. I (We) have not submitted any other claim covering the same purchases, acquisitions or sales or holdings of DHB securities or options during the Class Period and know of no other Person having done so on my (our) behalf.

## VI.    RELEASE

1.    I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally and forever settle, release and discharge from the Released Class Claims each and all of the Released Class Persons as those terms and terms related thereto are defined in the accompanying Notice.

2.    This release shall be of no force or effect unless and until the Court approves the Stipulation and the Effective Date (as defined in the Stipulation) has occurred.

3.    I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

4.    I (We) hereby warrant and represent that I (we) have included information about all of my (our) purchases, acquisitions, and sales and other transactions in DHB securities and options which occurred during the Class Period and the number of shares of DHB securities and options held

by me (us) at the beginning of trading on November 18, 2003, and at the close of trading on November 30, 2006.

     5.     I (We) hereby warrant and represent that I (we) am (are) not excluded from the Class as defined herein and in the Notice.

## SUBSTITUTE FORM W-9

Request for Taxpayer Identification Number ("TIN") and Certification

PART I

NAME: _____

Check appropriate box:

| | | | |
|---|---|---|---|
| ☐ | Individual/Sole Proprietor | ☐ | Pension Plan |
| ☐ | Corporation    ☐ Partnership | ☐ | Trust |
| ☐ | IRA            ☐ Other | | |

　　　　Enter TIN on appropriate line.

　　　　For individuals, this is your social security number ("SSN").

　　　　For sole proprietors, you must show your individual name, but you may also enter your business or "doing business as" name.  You may enter either your SSN or your Employer Identification Number ("EIN").

　　　　For other entities, it is your EIN.

__ __ __ - __ __ - __ __ __ __　　　　or　　　　__ __ - __ __ __ __ __ __ __
Social Security Number　　　　　　　　　　　　Employer Identification Number

PART II

For Payees Exempt from Backup Withholding

If you are exempt from backup withholding, enter your correct TIN in Part I and write "exempt" on the following line: _____.

PART III

Certification

UNDER THE PENALTY OF PERJURY, I (WE) CERTIFY THAT:

1.　　　　The number shown on this form is my correct TIN; and

2.　　　　I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406 (a)(1)(C) of the Internal Revenue Code because:  (a) I am (we are) exempt from backup withholding; or (b) I (we) have not been notified by the Internal Revenue Service that I am (we are) subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the Internal Revenue Service has notified me (us) that I am (we are) no longer subject to backup withholding.

- 8 -

NOTE:        If you have been notified by the Internal Revenue Service that you are subject to backup withholding, you must cross out Item 2 above.

*SEE* ENCLOSED FORM W-9 INSTRUCTIONS

The Internal Revenue Service does not require your consent to any provision of this document other than the certification required to avoid backup withholding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____,
                                                    (Month / Year)

in _____, _____.
            (City)                              (State / Country)


_____
(Sign your name here)


_____
(Type or print your name here)


_____
(Capacity of person(s) signing,
*e.g.*, Beneficial Purchaser,
Executor or Administrator)

**ACCURATE CLAIMS PROCESSING TAKES A
SIGNIFICANT AMOUNT OF TIME.
THANK YOU FOR YOUR PATIENCE.**

Reminder Checklist:

    1.      Please sign the above release and declaration.

    2.      Remember to attach supporting documentation, if available.

    3.      Do not send original or copies of stock certificates.

    4.      Keep a copy of your claim form for your records.

    5.      If you desire an acknowledgment of receipt of your claim form, please send it Certified Mail, Return Receipt Requested.

    6.      If you move, please send the Claims Administrator your new address.

S:\Settlement\DHB Industries 05.set\11-29 CLN B2 CLAIM FORM 00033755.doc

**EXHIBIT B-3**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : | Civil Action No. 2:05-cv-04296-JS-ETB |
| | : | |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : | SUMMARY NOTICE FOR PUBLICATION OF SETTLEMENT OF CLASS ACTION |
| | : | |
| ALL ACTIONS. | : | |
| | x | EXHIBIT B-3 |

TO:  ALL PERSONS THAT PURCHASED OR OTHERWISE ACQUIRED DHB
INDUSTRIES, INC. ("DHB") PUBLICLY TRADED SECURITIES ON OR AFTER
NOVEMBER 18, 2003 UNTIL AND INCLUDING NOVEMBER 30, 2006, INCLUSIVE

YOU ARE HEREBY NOTIFIED, pursuant to an Order of the United States District Court

for the Eastern District of New York, that a hearing will be held on _____, 2007, at __:__

__.m., before the Honorable Joanna Seybert, United States District Judge, at the Alfonse M.

D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York

11722-4438.  The hearing is to consider a settlement of a Class Action brought on behalf of the Class

defined above (the "Class Action").  More specifically, the purpose of the hearing is to determine:

(1) whether the proposed settlement of the claims in the Class Action for $34.9 million in cash and

3,184,713 shares of DHB common stock (the "Settlement Fund"), the adoption of certain corporate

governance measures and the resignation of certain senior management personnel and certain

members of the Board of Directors of DHB should be approved by the Court as fair, reasonable and

adequate; (2) whether, thereafter, the Class Action should be dismissed with prejudice; (3) whether

the Plan of Allocation of the Settlement Fund is fair, reasonable and adequate and should be

approved; (4) whether the application of Plaintiffs' Counsel for the payment of attorneys' fees and

reimbursement of expenses incurred by Plaintiffs' Counsel in connection with the Class Action

should be approved; and (5) whether the application for reimbursement of the costs and expenses of

the Class Plaintiffs in the Class Action should be approved.

If you purchased or otherwise acquired, whether directly or indirectly, or by an exchange,

conversion or otherwise, publicly traded DHB securities during the period beginning November 18,

2003 through and including November 30, 2006, your rights may be affected by the settlement of the

Class Action.

If you have not received a detailed Notice of Pendency and Settlement of Class Action and a

copy of the Proof of Claim and Release, you may obtain copies of the same by contacting: *In re*

*DHB Inc. Sec. Litig.*, Claims Administrator, c/o Gilardi & Co. LLC, P.O. Box 8040, San Rafael, CA

94912-8040 or downloading these documents at www.gilardi.com.  If you are a Class Member, in

order to be eligible to share in the distribution of the Settlement Fund, you must submit a Proof of

Claim and Release no later than _____, 2007, establishing that you are entitled to recovery.

You will be bound by any Judgment rendered in the Class Action whether or not you make a claim,

unless you request exclusion from the Class.

Если you wish to request exclusion from the Class you must do so in writing by _____,

2007.  If you request exclusion from the Class you will not participate in the distribution of the

Settlement Fund and you will not be bound by the Judgment in the Class Action.

Any objection to the settlement must be mailed or delivered such that it is filed with the

Court and served on each of the following no later than _____, 2007:

> Clerk of the Court
> UNITED STATES DISTRICT COURT
> EASTERN DISTRICT OF NEW YORK
> Alfonse M. D'Amato Federal Building
> United States District Court
> 100 Federal Plaza
> Central Islip, NY  11722-4438
>
> Samuel H. Rudman
> LERACH COUGHLIN STOIA GELLER
>   RUDMAN & ROBBINS LLP
> 58 South Service Road, Suite 200
> Melville, NY  11747
>
> William S. Lerach
> Keith F. Park
> Thomas G. Wilhelm
> LERACH COUGHLIN STOIA GELLER
>   RUDMAN & ROBBINS LLP
> 655 West Broadway, Suite 1900
> San Diego, CA  92101
>
> Lynda J. Grant
> Nicole M. Zeiss

LABATON SUCHAROW & RUDOFF LLP
100 Park Avenue, 12th Floor
New York, NY  10017-5563

Co-Lead Counsel for Plaintiffs

Eric Rieder
David P. Kasakove
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104

Counsel for Defendant DHB Industries, Inc.

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

R. Robert Popeo
John F. Sylvia
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111

Jerome Gotkin
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew Brooks
Industries Inc., sued as Andrew Brooks International Inc., Elizabeth Brooks
Industries Inc., sued as Elizabeth Brooks International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary Nadelman, and Barry
Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

- 4 -

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

**PLEASE DO NOT CONTACT THE COURT OR DHB REGARDING THIS NOTICE.**

DATED:  _____, 2006          BY ORDER OF THE COURT
                                             UNITED STATES DISTRICT COURT
                                             DISTRICT OF NEW YORK


S:\Settlement\DHB Industries 05.set\11-29 CLN B3 SUMMARY NOTICE 00033791.doc

**EXHIBIT C**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ x
In re DHB INDUSTRIES, INC. DERIVATIVE :   Civil Action No. CV 05-4345(JS(ETB)
LITIGATION   :
  :   <u>DERIVATIVE ACTION</u>
  :
This Document Relates To:   :   [PROPOSED ORDER PRELIMINARILY
  :   APPROVING SETTLEMENT OF
  ALL ACTIONS.   :   DERIVATIVE ACTION AND PROVIDING
_____ x   FOR NOTICE

  EXHIBIT C

WHEREAS, the parties have made application, pursuant to Federal Rule of Civil Procedure 23.1, for an order approving the settlement (the "Settlement") of the Derivative Action, in accordance with a Stipulation and Agreement of Settlement dated as of November 30, 2006 (the "Stipulation"), which, together with the Exhibits annexed thereto, sets forth the terms and conditions for a proposed Settlement and dismissal of the Derivative Action and a certain Class Action (collectively, the "Actions"), upon the terms and conditions set forth therein; and

WHEREAS, all capitalized terms contained herein shall have the same meanings as set forth in the Stipulation (in addition to those capitalized terms defined herein); and

WHEREAS, and the Court having read and considered the Stipulation and the Exhibits annexed thereto:

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     The Court does hereby preliminarily approve, subject to further consideration at the Settlement Hearing described below, the Stipulation and the Settlement set forth therein, including the terms and conditions for settlement and dismissal with prejudice of the Derivative Action.

2.     A hearing (the "Settlement Hearing") shall be held before this Court on _____, 2007, at __:__ __.m., at the Alfonse M. D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York 11722-4438, to determine whether the Settlement of the Derivative Action and the Class Action on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate to the Current DHB Shareholders, to DHB and to the Members of the Class and should be approved by the Court; whether a Judgment as provided in §1, ¶1.18 of the Stipulation should be entered herein; and to determine whether the application of Derivative Counsel for an award of attorneys' fees and reimbursement of expenses should be

granted. The Court may adjourn the Settlement Hearing or modify any of the dates set forth herein without further notice to the Current DHB Shareholders.

     3.    The Court approves, as to form and content, the Notice of Pendency and Settlement of Derivative Action ("Derivative Notice") and Summary Notice for Publication of Settlement of Derivative Action ("Summary Derivative Notice") annexed as Exhibits C-1 and C-2 hereto, and finds that the mailing and distribution of the Derivative Notice and publishing of the Summary Derivative Notice, substantially in the manner and form set forth in this Order, meets the requirements of Federal Rule of Civil Procedure 23.1 and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto.

     4.    Gilardi & Co. LLC ("Claims Administrator") is hereby appointed to supervise and administer the notice procedure as more fully set forth below:

     (a)    Not later than _____, 2006, (the "Notice Date"), Derivative Counsel shall cause a copy of the Derivative Notice substantially in the form annexed as Exhibit C-1 hereto to be mailed by first class mail to the Current DHB Shareholders.

     (b)    Not later than _____, 2006, Derivative Counsel shall cause the Summary Derivative Notice to be published once in *Investor's Business Daily*; and

     (c)    At least seven (7) business days prior to the Settlement Hearing, Derivative Counsel shall serve on counsel for the Defendants in the Derivative Action and file with the Court proof, by affidavit or declaration, of such mailing and publishing.

     5.    Nominees who held or hold the common stock of DHB on behalf of any Person shall send the Derivative Notice to such beneficial owners of DHB common stock within ten (10) days after receipt thereof, or send a list of the names and addresses of such beneficial owners to the

- 2 -

Claims Administrator within ten (10) days of receipt thereof, in which event the Claims Administrator shall promptly mail the Derivative Notice to such beneficial owners.

6.      All Current DHB Shareholders shall be bound by all orders, determinations and judgments in the Derivative Action concerning the Settlement, whether favorable or unfavorable to the Current DHB Shareholders or any of them.

7.      Any Current DHB Shareholders may enter an appearance in the Derivative Action, at his, her or its own expense, individually or through counsel of his, her or its own choice.  If he, she or it does not enter an appearance, he, she or it will be represented by Derivative Counsel.

8.      Pending final determination of whether the Settlement should be approved, no Current DHB Shareholder, either directly, representatively, or in any other capacity, shall commence or prosecute against any of the Released Derivative Persons, any action or proceeding in any court or tribunal asserting any of the Released Derivative Claims.

9.      All papers in support of the Settlement and any application for attorneys' fees and expenses shall be filed with the Court and served by overnight mail or hand delivery on or before seven (7) days before the Settlement Hearing.

10.     Any Current DHB Shareholder may appear and show cause, if he, she or it has any, why the Settlement of the Derivative Action should not be approved as fair, reasonable and adequate, or why a Judgment should not be entered thereon, or why attorneys' fees and expenses should not be awarded to Derivative Counsel as requested; provided, however, that no Current DHB Shareholder shall be heard or entitled to contest the approval of the terms and conditions of the Settlement, or, if approved, the Judgment to be entered thereon approving the same, or the attorneys' fees and expenses to be awarded to Derivative Counsel, unless that Person, on or before _____, 2007, has filed with the Clerk of the Court and served on the following counsel

- 3 -

(delivered by hand or sent by first class mail) written objections and copies of any papers and briefs

in support thereof:

        Thomas Amon
        LAW OFFICES OF THOMAS AMON
        500 Fifth Avenue, Suite 1650
        New York, NY  10110

        Brian Robbins
        ROBBINS UMEDA & FINK, LLP
        610 West Ash Street, Suite 1800
        San Diego, CA  92101

        Co-Lead Counsel in the Derivative Action

        Eric Rieder
        David P. Kasakove
        BRYAN CAVE LLP
        1290 Avenue of the Americas
        New York, NY  10104

        Counsel for Defendant DHB Industries, Inc.

        George S. Canellos
        C. Neil Gray
        Daniel M. Perry
        Robert C. Hora
        MILBANK TWEED HADLEY
          & McCLOY LLP
        1 Chase Manhattan Plaza
        New York, NY  10005-1413

        R. Robert Popeo
        John F. Sylvia
        MINTZ LEVIN COHN FERRIS
          GLOVSKY AND POPEO, P.C.
        One Financial Center
        Boston, MA  02111

        Jerome Gotkin
        MINTZ LEVIN COHN FERRIS
          GLOVSKY AND POPEO, P.C.
        666 Third Avenue
        New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
  & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew Brooks
Industries Inc., sued as Andrew Brooks International Inc., Elizabeth Brooks
Industries Inc., sued as Elizabeth Brooks International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary Nadelman, and Barry
Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

      (a)     The written objections and copies of any papers and briefs in support thereof to be filed in Court shall be delivered by hand or sent by first class mail to:

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
United States District Court
100 Federal Plaza
Central Islip, NY  11722-4438

      (b)     Any Current DHB Shareholder who does not make his, her or its objection in the manner provided herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, reasonableness or adequacy of the Settlement as incorporated in the Stipulation, or to the award of attorneys' fees and expenses to Derivative Counsel, but shall otherwise be bound by the Judgment to be entered and the releases to be given.

      11.     All reasonable expenses incurred in identifying and notifying Current DHB Shareholders, as well as in administering the Settlement, shall be paid as set forth in the Stipulation. If the Effective Date fails to occur, there shall be no obligation to refund any amounts actually and properly disbursed from or chargeable to the Notice and Administration Fund.

12.     All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court.

13.     No Current DHB Shareholder shall have any right to any portion of, or to any distribution from, the Settlement Fund, unless, and only to the extent that, he, she or it is also a Member of the Class who has duly and timely submitted a Proof of Claim and Release in the Class Action and who has been duly made an award therefrom.

14.     Neither the Derivative Defendants nor Derivative Defendants' Counsel shall have any responsibility for any application for attorneys' fees and expenses submitted by Derivative Counsel and such matters will be considered separately from the fairness, reasonableness and adequacy of the Settlement.

15.     Neither the Stipulation, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Derivative Defendants or any of them of the truth of any of the allegations in the Derivative Action, or of any liability, fault, or wrongdoing of any kind.

16.     The Court reserves the right to adjourn the date of the Settlement Hearing or modify any other dates set forth herein without further notice to the Current DHB Shareholders, and retains jurisdiction to consider all further applications arising out of or connected with the Settlement. The Court may approve the Settlement, with such modifications as may be agreed to by the Settling Parties, if appropriate, without further notice to the Current DHB Shareholders.

IT IS SO ORDERED.


DATED: _____     _____
                                    THE HONORABLE JOANNA SEYBERT
                                    UNITED STATES DISTRICT JUDGE

S:\Settlement\DHB Industries 05.set\11-29 CLN EC ORDER 00033793.doc

**EXHIBIT C-1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ———————————————— x | |
| In re DHB INDUSTRIES, INC. DERIVATIVE : | Civil Action No. CV 05-4345(JS(ETB) |
| LITIGATION : | |
| : | DERIVATIVE ACTION |
| : | |
| This Document Relates To: : | NOTICE OF PENDENCY AND |
| : | SETTLEMENT OF DERIVATIVE ACTION |
| ALL ACTIONS. : | |
| ———————————————— x | EXHIBIT C-1 |

TO:    **ALL HOLDERS OF DHB INDUSTRIES, INC. ("DHB") COMMON STOCK AS OF
NOVEMBER 30, 2006**

### PLEASE READ THIS NOTICE CAREFULLY

### IT MAY AFFECT YOUR RIGHTS

THIS NOTICE RELATES TO A SETTLEMENT OF A SHAREHOLDERS' DERIVATIVE

ACTION AND CLAIMS ASSERTED THEREIN ON BEHALF OF DHB.

This Notice is given pursuant to an Order of the United States District Court for the Eastern

District of New York (the "Court").  The purpose of the Notice is to advise you that the above-

entitled action (the "Derivative Action") is now pending in the Court and that the parties thereto

have reached a settlement (the "Settlement"), as set forth in a Stipulation of Settlement dated as of

November 30, 2006 (the "Stipulation"), which will fully, finally and forever resolve the Derivative

Action on the terms and conditions set forth in the Stipulation and summarized in this Notice.

This Notice is not intended to be and should not be construed as an expression of any opinion

by the Court with respect to the truth, validity or merits of the allegations or claims made in the

Derivative Action or of the validity or merits of the defenses asserted.  This Notice is merely to

advise you of the pendency and Settlement of the Derivative Action and of your rights thereunder.

## I.    THE SETTLEMENT HEARING

A hearing (the "Settlement Hearing") will be held before the Honorable Joanna Seybert,

United States District Judge, on _____, 2007, at __:___ _.m., at the Alfonse M.

D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York

11722-4438, for the purpose of determining whether the Settlement is fair, reasonable and adequate,

whether it should be approved by the Court, whether a Judgment should be entered dismissing the

Derivative Action with prejudice, and whether an application by Derivative Counsel for attorneys'

fees and reimbursement of expenses should be granted.  The Settlement Hearing may be continued

or adjourned from time to time by the Court at the Settlement Hearing or at any continued or adjourned session thereof without further notice. Any of the dates set forth herein may also be modified by the Court without further notice.

## II.    THE DERIVATIVE ACTIONS AND THE CLASS ACTIONS

On and after September 14, 2005, multiple actions were filed in the Court as derivative actions on behalf of DHB. The complaints in the derivative actions generally allege causes of action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. On January 31, 2006, the Court consolidated the derivative actions filed as *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345(JS)(ETB) and appointed Robbins Umeda & Fink, LLP and Law Offices of Thomas G. Amon as Co-Lead Counsel in the Derivative Action ("Derivative Counsel").

On and after September 9, 2005, multiple actions were filed in the Court as class actions on behalf of persons who purchased the publicly traded shares of DHB, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78(j)(b) and 78(t). On January 31, 2006, the Court consolidated the class actions filed as *In re DHB Industries, Inc. Sec. Litig.*, No. CV 05-4296(JS)(ETB) (the "Class Action") and appointed RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Baciu as Lead Plaintiffs (the "Class Plaintiffs") pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and approved the Class Plaintiffs' choice of Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow & Rudoff LLP as Lead Counsel.

The Derivative Action is being settled contemporaneously with the settlement of the Class Action. Approval of the Settlement of the Class Action is a condition to the effectiveness of the Settlement of the Derivative Action, and vice versa. A separate "Notice of Pendency and Settlement of Class Action" is being sent to Members of the Class, contemporaneously herewith.

- 2 -

III.    **CLAIMS OF THE DERIVATIVE PLAINTIFF AND BENEFITS OF THE SETTLEMENT**

The Derivative Plaintiff believes that the claims asserted in the Derivative Action have merit. However, he and Derivative Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Derivative Action against the Derivative Defendants through trial and appeal.  He and Derivative Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Action, as well as the difficulties and delays inherent in such litigation.  He and Derivative Counsel also are mindful of the inherent problems of proof of and possible defenses to the violations asserted in the Derivative Action.  He and Derivative Counsel believe that the Settlement summarized in this Notice is beneficial to DHB.  Specifically, DHB benefits by the adoption of the corporate governance proposals and other terms described herein, and by avoiding the costs and distraction to current management in litigating the derivative claims.

IV.    **DERIVATIVE DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY**

The Derivative Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Derivative Plaintiff in the Derivative Action.  The Derivative Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them or any of them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Derivative Action.  The Derivative Defendants also have denied and continue to deny, *inter alia*, the allegations that DHB has suffered damage or that DHB was harmed by any of the conduct alleged in the Derivative Action.

Nonetheless, the Derivative Defendants have concluded that further conduct of the Derivative Action would be protracted, expensive, and distracting to DHB's management and that it is desirable and beneficial that the Derivative Action be fully and finally settled in the manner and

upon the terms and conditions summarized herein.  The Derivative Defendants also have taken into account the uncertainty and risks inherent in any litigation, especially in complex cases like the Derivative Action.

## V.     DEFINITIONS

As used in this Notice and in the Stipulation, the following terms have the meanings specified below:

1.     "Claims" means any and all claims, demands, rights, liabilities, damages and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, including, without limitation, "Unknown Claims" (as defined below) and claims for negligence, gross negligence, breach of fiduciary duty, breach of duty of care, breach of duty of loyalty, waste, insider trading, unjust enrichment, abuse of control, mismanagement, fraud, and violations of any local, state or federal statutes, rules, regulations or common law.

2.     "Class Defendants" means DHB, David H. Brooks, Terry Brooks, David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman.

3.     "Class Member" or "Member of the Class" means a Person who falls within the definition of the Class as set forth in §1, ¶1.5 of the Stipulation.

4.     "Current DHB Shareholders" means any Person who owned DHB common stock as of November 30, 2006.

5.     "Defendants" means the Class Defendants and Derivative Defendants.

6.     "Derivative Counsel" means Brian Robbins, Robbins Umeda & Fink, LLP, 610 West Ash Street, Suite 1800, San Diego, CA 92101 and Thomas G. Amon, Law Offices of Thomas G. Amon, 500 Fifth Avenue, Suite 1650, New York, NY 10110.

7.    "Derivative Defendants" means nominal defendant DHB, David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Jerome Krantz, Gary Nadelman, Cary Chasin, Barry Berkman, Larry Ellis, Tactical Armor Productions, Inc., David Brooks International Inc., Andrew Brooks Industries Inc. (sued as Andrew Brooks International Inc.), Elizabeth Brooks Industries Inc. (sued as Elizabeth Brooks International Inc.), Terry Brooks and Jeffrey Brooks.

8.    "Derivative Plaintiff" means Alvin Viray.

9.    "Effective Date" means the first date by which all of the events and conditions specified in ¶7.1 of the Stipulation shall have been met and have occurred, unless one or more of such conditions is waived or modified in writing and signed by Class Plaintiffs' Counsel, Derivative Counsel, and counsel for each of the Defendants.

10.    "Judgments" means the final judgments to be rendered by the Court in the Actions, substantially in the forms attached as Exhibits D and E to the Stipulation.

11.    "Non-Released Claims" means all of DHB's obligations to David H. Brooks and to all of the other Defendants to whom DHB has indemnification obligations, of and for indemnification and reimbursement for fees, expenses and liabilities, as provided for in DHB's Articles of Incorporation and By-Laws, in the laws of Delaware, and in the Stipulation, as the latter is approved by the Court, all of which shall remain in full force and effect, and David H. Brooks' undertaking to DHB, regarding his indemnification by DHB, and the undertakings of the other Defendants to whom DHB has indemnification obligations, shall also remain in full force and effect. "Non-Released Claims" shall also include any and all obligations of any Defendant to any other Defendant under any existing contract or agreement between or among them, including, without limitation, any agreement entered into in connection with the Settlement.

- 5 -

12.    "Person" means an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, joint venture, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, and assignees.

13.    "Related Persons" means each of a Defendant's present and former parents, subsidiaries, affiliates, divisions, joint ventures, joint venturers, and his, her or its present and former officers, directors, employees, agents, representatives, attorneys, insurers, excess insurers, advisors, investment advisors, auditors, accountants, spouses and immediate family members, and the predecessors, heirs, successors and assigns of any of them, and any Person in which any Related Person has or had a controlling interest or which is or was related to or affiliated with any Related Person, and any trust of which any Defendant is the settler or which is for the benefit of any Defendant and/or a member(s) of a Defendant's family.  Stockbrokers in their capacity as such are excluded from this definition.

14.    "Released Derivative Claims" means any and all Claims based on any facts, transactions, events, occurrences, acts, disclosures, statements, omissions or failures to act that were or could have been asserted by the Derivative Plaintiff on behalf of DHB, or by DHB on its own behalf, or by any Current DHB Shareholder in the Derivative Action, in a direct, indirect, representative, derivative or other capacity against the Released Derivative Persons, or any of them. In addition, Released Derivative Claims includes, without limitation, a release by DHB of David H. Brooks and Dawn M. Schlegel, and each of them, from any and all liability under §304 of the Sarbanes-Oxley Act of 2002 to reimburse DHB for any bonus or other incentive-based or equity

based compensation received by them or either of them, or for any profits realized by them or either of them from the sale of any securities of DHB.

15.    "Released Derivative Persons" means the Derivative Defendants, and each of them, and each of their respective Related Persons in their capacities as such.

16.    "Settling Parties" means, collectively, each of the Defendants, and the Class Plaintiffs and the Derivative Plaintiff on behalf of, respectively, themselves, the Members of the Class, the Current DHB Shareholders, and derivatively on behalf of DHB.

17.    "Unknown Claims" means any Released Derivative Claims which any Derivative Plaintiff, each Current DHB Shareholder, or DHB does not know of or suspect to exist in his, her or its favor at the time of the release of the Released Derivative Persons which, if known by him, her or it, might have affected his, her or its settlement with, and release of, the Released Derivative Persons, or might have affected his, her or its decision not to object to this Settlement.  With respect to any and all Released Derivative Claims, the Settling Parties have stipulated and agreed that, upon the Effective Date, the Derivative Plaintiff and DHB, and each of the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived the provisions, rights and benefits of California Civil Code §1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The Derivative Plaintiff, DHB and each of the Current DHB Shareholders, shall be deemed to have, and by operation of the Judgments shall have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code §1542.  The Derivative Plaintiff, DHB, and each of the Current DHB Shareholders may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the

- 7 -

Released Derivative Claims, but the Derivative Plaintiff, DHB, and each of the Current DHB

Shareholders, upon the Effective Date, shall be deemed to have, and by operation of the Judgments

shall have, fully, finally, and forever settled and released any and all Released Derivative Claims,

known or unknown, suspected or unsuspected, contingent or non-contingent, accrued or unaccrued,

whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of

law or equity now existing or coming into existence in the future, including, but not limited to,

conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule,

without regard to the subsequent discovery or existence of such different or additional facts.  The

Derivative Plaintiff, DHB, and each of the Current DHB Shareholders, shall be deemed by operation

of the Judgments to have acknowledged that the foregoing waivers were separately bargained for

and are key elements of the Settlement of which this release is a part.

## VI.     THE SETTLEMENT

Derivative Counsel have investigated the facts and the applicable law regarding the alleged

claims of DHB on whose behalf they are acting and the potential defenses thereto.  Based on this

investigation, Derivative Counsel has agreed with DHB that it is in the best interests of DHB and the

Current DHB Shareholders to settle the Derivative Action on the following terms:

DHB shall adopt the Corporate Governance Principles and Policies set forth below.  The

Settling Parties acknowledge that the Corporate Governance Principles and Policies set forth below

were jointly developed and negotiated by the Class Plaintiffs, the Derivative Plaintiff, Counsel in the

Class Action and Counsel in the Derivative Action.  DHB shall adopt these Corporate Governance

Principles and Policies no later than the Effective Date of the Settlement, or as soon as practicable

thereafter and shall maintain the same in effect for at least two years.  Nothing in these Principles

and Policies shall dilute any existing or future legal requirements to which DHB is subject as a

public corporation or as a publicly-traded stock on any national listing.

## CORPORATE GOVERNANCE PRINCIPLES AND POLICIES

### A.    THE ROLE OF THE BOARD OF DIRECTORS

### 1.    Direct the Affairs of DHB Industries Inc. (the "Company") for the Benefit of Stockholders

The primary responsibility of directors is to oversee the affairs of the Company for the benefit of stockholders. The Board of Directors (the "Board") agrees that day-to-day management of the Company is the responsibility of management and that the role of the Board is to oversee management's performance of that function. The Board shall also mandate and administer a corporate compliance program, which shall include the creation of a Company Code of Business and Ethics, the maintenance of accounting, financial and other controls, and the review of the adequacy of such controls.

### 2.    Long Range Strategy Development

Long range strategic issues should be discussed as a matter of course at regular Board meetings. The Board may choose to devote one of its regularly scheduled meetings exclusively to strategic planning.

### 3.    Review of Financial Goals and Performance

The Board reviews the annual operating plan and specific goals at the start of the fiscal year and financial performance quarterly (actual and in comparison to plan). The Board also believes it is important to establish and evaluate both short and long term objectives.

### 4.    Ethical Business Environment

The Board insists on an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates. The Board expects that management will conduct operations in a manner supportive of this view. The Board is committed to avoiding any transactions that compromise, or appear to compromise, director independence. The Company shall prepare for the Board's review and approval a Code of Business Conduct and Ethics, and shall receive periodic reports from the Company's General Counsel with respect to such Code.

### 5.    Chairman and Chief Executive Officer Performance Evaluation

The Chairman and Chief Executive Officer's performance should be evaluated annually and as a regular part of any decision with respect to their respective compensation. The Board shall delegate the performance and compensation evaluation as it deems appropriate to specified Board members or to the Compensation Committee of the Board. Notwithstanding such delegation, however, the Board as a whole shall be responsible for the oversight of the

Chairman, Chief Executive Officer and senior management. The offices of the Chairman and the Chief Executive Officer may be from time to time combined and may be from time to time separated. The Board has discretion in combining or separating the positions as it deems appropriate in light of prevailing circumstances.

**6.    Succession Planning**

The Board is responsible for succession planning. The Board will have the Chairman and Chief Executive Officer annually review with the independent directors the abilities of the key senior managers and their likely successors. Additionally, the independent directors may meet periodically to discuss, among other things, management succession issues. As part of the succession and development process, the Board, or at the Board's direction, the Compensation Committee, will familiarize itself with the Chairman's and Chief Executive Officer's direct reports through periodic management and operating reports and meetings. The independent directors shall call a meeting upon any sudden temporary or permanent incapacity of the Chairman or Chief Executive Officer.

**7.    Material Transactions**

The Board shall evaluate and, if appropriate, approve all material Company transactions not arising in the ordinary course of business.

**8.    Stockholder Communications; Attendance at Annual Stockholders Meetings**

The Board shall establish procedures to allow for stockholders to communicate directly with the Board, the non-management directors, and the committees of the Board. To further facilitate stockholder communication with the Board, all directors are encouraged to attend the Company's Annual Meeting of Stockholders.

**9.    Governing Documents**

In the event of any conflict between the Company's Certificate of Incorporation, By-laws and these Principles and Policies, the Certificate shall first govern and next the By-law and then these Principles and Policies, in that order.

**B.    MEETINGS OF THE BOARD OF DIRECTORS**

**1.    Selection of Chairman of the Board**

The Chairman of the Board shall be selected by the Board. The Chairman will be elected annually and shall serve at the pleasure of the Board.

2.      **Frequency of Meetings**

The Board will regularly meet at least one time each quarter and one quarterly meeting may be in conjunction with the annual meeting of stockholders. An annual calendar for the succeeding year will be agreed upon from time to time. Special meetings may be called as necessary.

While the Board recognizes that directors discharge their duties in a variety of ways, including personal meetings and telephone contact with management and others regarding the business and affairs of the Company, the Board shall inform its members that it feels it is the responsibility of individual directors to make themselves available to attend both regular and special Board and committee meetings on a consistent basis. Active attendance at meetings shall be taken into account in the determination whether to nominate for reelection any director.

3.      **Meetings of Independent Directors**

Independent directors should meet routinely and regularly without management as they deem appropriate in their discretion, and should meet at any time upon the request of any director.

4.      **Access to Management and Outside Experts**

Board members shall have reasonable direct access to the Chairman, Chief Executive Officer, Chief Operating Officer and General Counsel, in their discretion. The Board shall have access to other members of senior management on a case by case basis after a courtesy call to the Chairman or Chief Executive Officer. Upon prior notice to the Chairman and/or General Counsel, the Board or a Board committee may seek legal or other expert advice from a source independent of management. Board members will use judgment to ensure that contact with management is not distracting to the business operation of the Company and that such contact, if in writing, be copied to the Chairman, Chief Executive Officer and General Counsel.

5.      **Attendance of Non-Directors at Meetings**

The Chairman and the Chief Executive Officer shall have discretion to invite any members of management, other Company employees or third parties they deem appropriate to attend Board meetings at appropriate times, subject to the Board's right to request that such attendance be limited or discontinued. The Board shall have the authority to request non-management guests to sign a confidentiality agreement in form satisfactory to the General Counsel prior to such guest's participation in any Board or committee meeting. The Board and committees may exclude any guest from part or all of any meeting upon its determination that it is in the best interests of the Company to do so.

6.     **Agendas and Presentations**

The Board shall indicate it believes the Chairman and Chief Executive Officer are jointly responsible, and should establish, the agenda for each Board meeting, taking into account suggestions of Board members. Board members may include particular items on the agenda by contacting the Chairman and the Chief Executive Officer and the Chairman and Chief Executive Officer are expected to ask directors for their suggestions or opinions on possible agenda items before each meeting.

As with the agenda, the Board shall indicate it believes that the Chairman and Chief Executive Officer should determine the form of each presentation to the Board and the person to make such presentation. Each meeting should include reports from the Board committees, as appropriate.

It shall be the policy of the Board that the Chief Executive Officer or Chief Financial Officer will give a presentation on the financial and operating results of the Company and related issues at each Board meeting.

7.     **Information Flow**

The Board shall receive salient information helpful in understanding the presentations, discussions and issues to be covered at such meeting, in writing and sufficiently in advance of such meeting to permit appropriate review. Where appropriate, longer and more complex documents shall contain executive summaries. Absent unusual circumstances, in no event will such information be distributed less than three days in advance of any regular Board meeting and 24 hours in advance of any special meeting.

The Board shall periodically review the information flow to Board members to ensure that directors receive the right kind and amount of information from management in sufficient time to prepare for meetings. The Chairman or Chief Executive Officer, or their designee, shall coordinate the information flow to the directors, periodically discuss director satisfaction with Board materials with individual directors and encourage directors to offer suggestions on materials. In addition, this topic shall be considered annually by the independent directors as part of its regular review of Board performance.

8.     **Additional Service**

From time to time the Company may request the services of a Board member other than in his or her capacity as a director. In such situations, before assigning any task to a Board member that would require additional compensation, the Chairman, Chief Executive Officer or General Counsel shall first review such assignment with the Compensation Committee. Any Board member requested to perform services by the Company that he or she believes do not lie within his or her capacity as a director, shall inform the Compensation Committee prior to accepting such

assignment. Any such engagement will be consistent with the independence requirements of the American Stock Exchange.

## C.    BOARD STRUCTURE

### 1.    Composition of Board

The majority of the members of the Board shall be independent directors. Independent directors should have appropriate skills and characteristics required of Board members. This assessment should include issues of diversity, age and skills, all in the context of an assessment of the perceived needs of the Board at that point in time. Unless otherwise determined by a majority of the independent directors, all independent directors shall offer their resignation as a matter of course upon a change in employer or other significant changes in their professional roles or responsibilities that might reasonably be seen to affect their ability to serve, and the Board shall consider the appropriateness of continued service in light of such changes. Any such resignation shall be communicated to the Chairman or Chief Executive Officer and may be considered by the Board or by the independent directors.

The Chairman, Chief Executive Officer, and any other directors other than independent directors, shall offer his or her resignation from the Board as a matter of course upon resignation or any other significant change in his or her professional roles or responsibilities, unless otherwise provided in such individual's employment, consulting or other agreement with the Company.

Any resignation submitted as a matter of course shall be reviewed by the Board as a whole or at the Board's direction the independent directors, and, if the Board or such independent directors determines that such director continues to contribute significantly to the Company, the director's membership on the Board may continue.

To the extent that they serve on DHB's Board of Directors at the time of the Effective Date of the settlement, Cary Chasin, Gary Nadelman and Barry Berkman shall be replaced as Board members within one year. Upon cessation of employment and/or service on the Board of Directors, David H. Brooks, Terry Brooks, Dawn Schlegel, Sandra Hatfield, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman and Jeffrey Brooks will be barred for a period of 5 years from any employment (direct or indirect) at DHB or any of its subsidiaries or affiliates (but not including Tactical Armor Products, Inc., if the same may be deemed to be such an affiliate), including, but not limited to, serving as any manner of consultant or in any capacity on or in service to the Board of Directors.

### 2.    Definition of Independent Director

The Board of Directors defines an "independent director" as a director who, in the opinion of the Board meets the independence requirements of the American Stock Exchange or other market or exchange on which the Company's stock may be

- 13 -

listed. To evaluate "independence," the Board may consider all relevant factors. The Board recognizes that director independence is an issue that is actively being reviewed by multiple constituencies and may amend its criteria for determining what constitutes an "independent director" to reflect changing standards.

**3.      Size of the Board**

The Board acknowledges that it should not be too large and understands that the size of the Board will fluctuate from time to time depending on circumstances. The independent directors will make recommendations regarding increasing or decreasing size from time to time.

**4.      Director Retirement Age and Term Limits**

The Board believes that consistent quality in the directorship can be achieved effectively without term limits or any mandatory retirement age. However, each director shall stand for election or re-election annually and serve a one-year term.

**5.      Director Appointments**

A majority of the independent directors shall nominate candidates for election to the Board. It is the independent directors' responsibility to make director recommendations to the full Board for appointments to fill vacancies of any unexpired term on the Board and to recommend nominees for submission to stockholders for approval at the time of the Annual Meeting.

The Company does not set specific criteria for directors except to the extent required to meet applicable legal, regulatory and exchange requirements. The Board shall seek candidates that show evidence of leadership in their particular field, have broad experience and the ability to exercise sound business judgment, have specific knowledge about the Company's business and be able to network in a way to promote the Company's interests.

**6.      Director Evaluation**

The independent directors shall prepare, for the Board's review and approval, Board and director assessment methods and criteria, taking the Chairman's and Chief Executive Officer's views into consideration. The independent directors shall annually evaluate the Board's overall performance and evaluate individual directors performance using the Board approved methods and criteria for such review.

**7.      Director Compensation and Stock Ownership**

The Board believes that the level of director compensation generally should be competitive with that paid to directors of other corporations of similar size and profile in the United States. The Compensation Committee is responsible for making recommendations for the full Board's review and approval with respect to director compensation and benefit programs.

8.      **Interlocking Directorates**

All directors shall seek approval from the independent directors prior to accepting any other board memberships in for-profit companies to avoid legally impermissible interlocking directorships or other conflicts of interest; provided that no director shall serve on more than four (4) outside public boards of for-profit companies. Similarly, the Chairman, Chief Executive Officer and other members of management shall seek approval of the Board prior to accepting outside board memberships in for-profit companies.

D.      **COMMITTEES OF THE BOARD**

1.      **Number and Types of Committees**

The Board shall create and disband committees depending on the particular interests of the Board, issues facing the Company and legal requirements. The current "standing" committees of the Board (that is, committees expected to operate over an extended period) are the Audit Committee, the Compensation Committee, and the Corporate Governance Committee. Each Committee shall be comprised solely of Independent Directors, as described in §C.2. The independent directors shall periodically recommend changes to the composition of the Board committees. Directors shall be free to make suggestions regarding committees at any time and are encouraged to do so. The Board shall consider from time to time the committee structure as part of the review of overall Board effectiveness. The composition, members and responsibilities will also be defined periodically by the Board.

2.      **Assignment and Rotation of Committee Members**

The Board shall make assignments within the following guidelines: assignments may be rotated periodically, though not necessarily within any specified time frame; all shall be comprised solely of independent directors; and committee assignments must comply with any applicable stock exchange and legal requirements. The Chairman of the Audit Committee and other Audit Committee members shall meet the financial sophistication and independence requirements of the American Stock Exchange and applicable law.

3.      **Frequency of Committee Meetings**

Management will generally recommend an annual committee meeting schedule for all standing committees, but it shall be the responsibility of committee chairpersons, in consultation with committee members, to determine the frequency and length of committee meetings. The Audit Committee will meet at least quarterly; other committees will meet at least twice annually.

4.      **Committee Agendas**

Committee chairpersons, in consultation with appropriate members of management and committee members, shall determine committee agendas. Any

director may suggest an item for consideration as part of any committee agenda. The Chief Financial Officer will act as the primary management liaison to provide committees requested financial data and analyses. The General Counsel will act as the management liaison to assemble and distribute agendas and facilitate minutes and reports preparation.

5.      **Committee Reports**

Reports of committee meetings are submitted to the full Board following each committee meeting. Committee actions shall be binding consistent with such Committee's charter and applicable corporate law. Committee chairpersons shall be offered the opportunity to comment or report on committee activities at each Board meeting.

6.      **Specific Roles and Responsibilities**

The specific roles and responsibilities of each committee shall be outlined in their respective charters.

In addition to the foregoing, as additional consideration for the Settlement, David H. Brooks has voluntarily resigned from the Board of Directors of DHB and from all of the other positions held by him in DHB and its subsidiaries.  In addition, to the extent that they serve on DHB's Board of Directors at the time of the Effective Date of the Settlement, Cary Chasin, Gary Nadelman and Barry Berkman shall be replaced as Board members within one year thereafter.  Also, upon cessation of employment and/or service on the Board of Directors, and for a period of five years thereafter, David H. Brooks, Dawn Schlegel, Sandra Hatfield, Cary Chasin, Jerome Krantz, Gary Nadelman and Barry Berkman will not be employed (directly or indirectly) by DHB or any of its subsidiaries or affiliates (but not including Tactical Armor Products, Inc., if the same may be deemed to be such an affiliate), including, but not limited to, serving as any manner of consultant or in any capacity on or in service to the Board of Directors.  This same restriction on employment shall apply to Terry Brooks and Jeffrey Brooks, commencing as of the Effective Date.

## VII.    NOTICE TO BANKS, BROKERS, AND OTHER NOMINEES

Banks, brokerage firms, institutions, and other persons who are nominees who, on November 30, 2006, held the common stock of DHB for the beneficial interest of another Person(s), are requested within ten (10) days of receipt of this Notice, to: (a) provide Derivative Counsel (at the address set forth below) with the names and addresses of such beneficial holders, or (b) forward a copy of this Notice to each such beneficial holder and provide Derivative Counsel with written confirmation that the Notice has been so forwarded.  Your reasonable costs and expenses of complying with this provision will be paid upon submission of appropriate documentation to Derivative Counsel.  Additional copies of the Derivative Notice may be obtained from Derivative Counsel for forwarding to such beneficial owners.  All such correspondence should be addressed as follows:

> *DHB Derivative Litigation*
> Claims Administrator
> c/o Gilardi & Co. LLC
> P.O. Box 8040
> San Rafael, CA  94912-8040

## VIII.    THE RIGHT TO BE HEARD AT THE HEARING

Any Current DHB Shareholder may appear at the Settlement Hearing to show cause why the Settlement should not be approved, why a Judgment should not be entered thereon or why Derivative Counsel's application for attorneys' fees and expenses should not be approved; provided, however, that no such Person shall be heard, unless his, her or its objection, or opposition, including the basis therefore, is made in writing, together with proof of ownership of DHB common stock as of November 30, 2006, and is filed, together with copies of all other papers and briefs in support thereof, by hand delivery or first class mail, no later than _____, 2007, with the Court, Derivative Counsel and counsel for Defendants as follows:

- 17 -

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
United States District Court
100 Federal Plaza
Central Islip, NY  11722-4438

Thomas Amon
LAW OFFICES OF THOMAS AMON
500 Fifth Avenue, Suite 1650
New York, NY  10110

Brian Robbins
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101

Co-Lead Counsel in the Derivative Action

Eric Rieder
David P. Kasakove
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104

Counsel for Defendant DHB Industries, Inc.

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

R. Robert Popeo
John F. Sylvia
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111

Jerome Gotkin
MINTZ LEVIN COHN FERRIS

- 18 -

GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew
Brooks Industries Inc., sued as Andrew Brooks International Inc.,
Elizabeth Brooks Industries Inc., sued as Elizabeth Brooks
International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary
Nadelman, and Barry Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

- 20 -

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

Unless otherwise ordered by the Court, any Current DHB Shareholder who does not make his, her or its objection or opposition in the manner provided shall be deemed to have waived all objections and opposition to the fairness, reasonableness and adequacy of the Settlement and the application of Derivative Counsel for attorneys' fees and expenses.

## IX.    DISMISSAL AND RELEASES

If the Settlement is approved, the Court will enter a Judgment in the Derivative Action.  The Judgment will dismiss the Released Derivative Claims (including all Unknown Claims) with prejudice as to all Released Derivative Persons.  The Judgment will also provide that all Current DHB Shareholders and DHB shall be deemed to have released and forever discharged all Released Derivative Claims (to the extent the Current DHB Shareholders and DHB have such claims) (including all Unknown Claims) against all Released Derivative Persons.

In addition, at the Settlement Hearing, the Court will be asked to approve the Settlement reached in the Class Action and to thereafter dismiss the Class Action with prejudice.  The effectiveness of the Settlement of the Derivative Action is conditioned upon the effectiveness of the Settlement of the Class Action, and vice versa.

## X.      APPLICATION FOR FEES AND EXPENSES

At the Settlement Hearing, Derivative Counsel will request the Court to award them attorneys' fees and expenses in the amount of $300,000. The Current DHB Shareholders are not personally liable for any such fees or expenses.

To date, Derivative Counsel have not received any payment for their services in conducting the Derivative Action, nor have counsel been fully reimbursed for their out-of-pocket expenses incurred. The fees requested are within the range of fees awarded to plaintiffs' counsel under similar circumstances in litigation of this type.

## XI.     CONDITIONS FOR SETTLEMENT

The Settlement is conditioned upon the occurrence of certain events described in the Stipulation. Those events include, among other things: (1) entry of the Judgments by the Court, including a Judgment dismissing the Derivative Action, as provided for in the Stipulation; and (2) expiration of the time to appeal from or alter or amend the Judgments. If, for any reason, any one of the conditions described in the Stipulation is not met, the Stipulation might be terminated and, if terminated, will become null and void, and the parties to the Stipulation will be restored to their respective positions as of July 12, 2006, before a certain Memorandum of Understanding was executed by the Settling Parties.

## XII.    EXAMINATION OF PAPERS AND INQUIRIES

This Notice contains only a summary of the terms of the Settlement. For a more detailed statement of the matters involved in the Derivative Action and the Class Action, reference is made to the Stipulation which may be inspected at the Office of the Clerk of the United States District Court for the Eastern District of New York, Alfonse M. D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York 11722-4438, during business hours of each business day or viewed at www.gilardi.com.

Any other inquiries regarding the Settlement or the Actions should be addressed in writing to

Derivative Counsel as follows:

Brian Robbins
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101

Thomas Amon
LAW OFFICES OF THOMAS AMON
500 Fifth Avenue, Suite 1650
New York, NY  10110

Co-Lead Counsel in the Derivative Action

**PLEASE DO NOT CONTACT THE COURT OR DHB REGARDING THIS NOTICE.**

DATED:  _____, 2006          BY ORDER OF THE COURT
                                            UNITED STATES DISTRICT COURT
                                            EASTERN DISTRICT OF NEW YORK

S:\Settlement\DHB Industries 05.set\3-7-07 CLN C1 NOTICE 00033795.doc

- 23 -

**EXHIBIT C-2**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————— x
In re DHB INDUSTRIES, INC. DERIVATIVE :    Civil Action No. CV 05-4345(JS(ETB)
LITIGATION                            :
                                         :    <u>DERIVATIVE ACTION</u>
                                         :
This Document Relates To:                 :    SUMMARY NOTICE FOR PUBLICATION
                                         :    OF SETTLEMENT OF DERIVATIVE
      ALL ACTIONS.                  :    ACTION
—————————————————— x

                                         EXHIBIT C-2

**TO:    ALL HOLDERS OF DHB INDUSTRIES, INC. ("DHB") COMMON STOCK AS OF NOVEMBER 30, 2006**

YOU ARE HEREBY NOTIFIED that the parties to the above derivative action (the "Derivative Action") have entered into a Stipulation and Agreement of Settlement (the "Stipulation") to resolve the issues raised by the Derivative Action (the "Settlement").

PLEASE BE FURTHER ADVISED that pursuant to an Order of the United States District Court for the Eastern District of New York, a hearing will be held on _____, 2007, at __:__ __.m., before the Honorable Joanna Seybert, United States District Judge, Alfonse M. D'Amato Federal Building, United States District Court, 100 Federal Plaza, Central Islip, New York 11722-4438 for the purpose of determining: (a) whether the Settlement of the Derivative Action by way of the adoption of certain corporate governance provisions and resignations of certain senior DHB management personnel and resignations of certain members of DHB's Board of Directors (as set forth in more detail in the Stipulation on file with the Court and in the Notice of Pendency and Settlement of Derivative Action described below) should be approved by the Court as fair, reasonable and adequate to DHB and its common stockholders; (b) whether the Derivative Action should be dismissed with prejudice; and (c) whether the application of counsel for the Plaintiff in the Derivative Action for attorneys' fees and expenses should be approved.

If you were a shareholder of DHB as of November 30, 2006, your rights to pursue certain derivative claims on behalf of DHB may be affected by the Settlement of the Derivative Action.

If you owned DHB common stock as of November 30, 2006, and have not received a detailed Notice of Pendency and Settlement of Derivative Action, you may obtain a copy of the same by contacting: *In re DHB, Inc. Derivative Litigation*, Claims Administration, c/o Gilardi & Co. LLC, P.O. Box 8040, San Rafael, CA 94912-8040, or by downloading this document at www.gilardi.com.

Any objection to the Settlement must be mailed or delivered such that it is filed with the

Court and served on each of the following no later than _____, 2007:

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
United States District Court
100 Federal Plaza
Central Islip, NY  11722-4438

Brian Robbins
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101

Thomas Amon
LAW OFFICES OF THOMAS AMON
500 Fifth Avenue, Suite 1650
New York, NY  10110

Co-Lead Counsel in the Derivative Action

Eric Rieder
David P. Kasakove
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104

Counsel for Defendant DHB Industries, Inc.

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
   & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

R. Robert Popeo
John F. Sylvia
MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111

Jerome Gotkin
MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY  10017-4011

Counsel for Defendant David H. Brooks

George S. Canellos
C. Neil Gray
Daniel M. Perry
Robert C. Hora
MILBANK TWEED HADLEY
  & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413

Counsel for Defendants David Brooks International Inc., Andrew
Brooks Industries Inc., sued as Andrew Brooks International Inc.,
Elizabeth Brooks Industries Inc., sued as Elizabeth Brooks
International Inc.

ROLAND G. RIOPELLE
SERCARZ & RIOPELLE, LLP
Carnegie Hall Tower
152 W. 57th Street, Suite 24C
New York, NY  10019

Counsel for Defendant Sandra Hatfield

Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue
New York, NY  10022

Counsel for Defendant Dawn Schlegel

- 3 -

Mark Holland
Robert G. Houck
Mary K. Dulka
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY  10019

Counsel for Defendants Cary Chasin, Jerome Krantz, Gary
Nadelman, and Barry Berkman

Earl Silbert
DLA PIPER US LLP
1200 Nineteenth Street, N.W.
Washington, DC  20036-2430

Counsel for Defendant Larry R. Ellis

Marc Lee Mukasey
BRACEWELL & GIULIANI LLP
1177 Avenue of the Americas
New York, NY  10036

Counsel for Defendants Tactical Armor Products, Inc. and Terry Brooks

Benjamin Brafman
Brian E. Klein
BRAFMAN & ASSOCIATES, P.C.
767 Third Avenue
New York, NY  10017

Counsel for Defendant Jeffrey Brooks

**PLEASE DO NOT CONTACT THE COURT OR DHB REGARDING THIS NOTICE.**


DATED: _____          _____
                                        BY ORDER OF THE COURT
                                        UNITED STATES DISTRICT COURT
                                        EASTERN DISTRICT OF NEW YORK
S:\Settlement\DHB Industries 05.set\11-29 CLN C2 SUMMARY NOTICE 00033825.doc

**EXHIBIT D**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | : : : | Civil Action No. 2:05-cv-04296-JS-ETB<br><br>CLASS ACTION |
| | : | |
| This Document Relates To: | : : | [PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL OF CLASS |
| ALL ACTIONS. | : : | ACTION WITH PREJUDICE |
| | x | |
| | | EXHIBIT D |

This matter came before the Court for hearing pursuant to the Order of this Court, dated

_____, 2006 ("Order"), on the application of the parties for approval of the settlement

(the "Settlement") set forth in the Stipulation and Agreement of Settlement dated as of November

30, 2006 (the "Stipulation").  Due and adequate notice having been given to the Class as required in

said Order, and the Court having considered all papers filed and proceedings had herein and

otherwise being fully informed in the premises and good cause appearing therefor, IT IS HEREBY

ORDERED, ADJUDGED AND DECREED that:

1.     This Judgment incorporates by reference the definitions in the Stipulation, and all

capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

2.     This Court has jurisdiction over the subject matter of the Class Action, including all

matters necessary to effectuate the Settlement, and over all parties to the Class Action, including all

Members of the Class and the Class Defendants.

3.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby finally

certifies a Class consisting of all Persons who purchased or otherwise acquired (including by

exchange, conversion or otherwise) the publicly traded securities of DHB (including puts, calls and

other securities) on or after November 18, 2003 until and including the November 30, 2006, and

were allegedly damaged thereby.  Excluded from the Class are the Class Defendants and the

Derivative Defendants and Persons related to Defendants, including any subsidiaries or affiliates of

DHB; the officers and directors of DHB during the Class Period; members of the individual

Defendants' immediate families; any person, firm, trust, officer, director or any individual or entity

in which any Defendant has a controlling interest or which is related to, or affiliated with, any of the

Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of

any such excluded Person.  Also excluded from the Class are those Persons who timely and validly

- 1 -

requested to be excluded from the Class pursuant to the "Notice of Pendency and Settlement of Class Action" sent to Class Members.

4.      Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who have validly and timely requested exclusion from the Class, the Class Action and all Claims contained therein, as well as all of the Released Class Claims, are dismissed with prejudice. The Settling Parties are to bear their own costs, except as otherwise provided in the Stipulation.

5.      The Court finds that the Stipulation and Settlement are fair, just, reasonable and adequate as to each of the Settling Parties, and hereby finally approves the Stipulation and Settlement in all respects and directs the Settling Parties to perform its terms to the extent the Settling Parties have not already done so.

6.      Upon the Effective Date, each Class Plaintiff and each of the Class Members, on behalf of themselves and each of their present or former predecessors, successors, parents, subsidiaries, affiliates, officers, directors, employees, joint ventures, joint venturers, attorneys, insurers, excess insurers, advisors, investment advisors, auditors, accountants, custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees, trust beneficiaries, administrators, spouses, marital communities, and immediate family members, having any legal or beneficial interest in the publicly traded securities of DHB during the Class Period, shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished and discharged all Released Class Claims (including all Unknown Claims), and any and all Claims (including all Unknown Claims) relating to or arising out of or connected with the Settlement or the institution, prosecution, assertion, settlement or resolution of the Class Action, against all of the Released Class Persons, whether or not such Class Plaintiff or Class Member executes and delivers the Proof of Claim and Release.

7.    Upon the Effective Date, each Class Plaintiff and each of the Class Members, and each of their present or future predecessors, successors, parents, subsidiaries, affiliates, officers, directors, employees, joint ventures, joint venturers, attorneys, insurers, excess insurers, advisors, investment advisors, auditors, accountants, custodians, agents, assigns, representatives, heirs, estates, executors, trusts, trustees, trust beneficiaries, administrators, spouses, marital communities, and immediate family members, having any legal or beneficial interest in the publicly traded securities of DHB during the Class Period, is hereby forever barred and enjoined from commencing, instituting or prosecuting any of the Released Class Claims (including all Unknown Claims), or any action or other proceeding, against any of the Released Class Persons based on, arising out of, related to, or connected with, the Released Class Claims (including all Unknown Claims).

8.    Upon the Effective Date, each of the Released Class Persons shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished and discharged each of the Class Plaintiffs, each and all of the Class Members and Class Plaintiffs' Counsel from all Claims (including all Unknown Claims), relating to or arising out of, or connected with the Settlement or the institution, prosecution, assertion, settlement or resolution of the Class Action, and/or the Released Class Claims.

9.    Pursuant to and to the extent allowed by 15 U.S.C. §70u-4(f)(7)(A), all claims for contribution, however denominated, are barred.

10.    The Court finds that the Notice of Pendency and Settlement of Class Action ("Class Notice") and Summary Notice for Publication of Settlement of Class Action ("Summary Notice," together with the Class Notice, "Notice") given to the Class was the best notice practicable under the circumstances, including mailing the individual Class Notice to all Members of the Class who could be identified through reasonable effort.  Said Notice also provided the best notice practicable under

the circumstances of these proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Stipulation, to all Persons entitled to such notice, and said Notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

11.     Any Plan of Allocation submitted by Class Plaintiffs' Counsel or any order entered regarding the attorneys' fees and expense application or the request for reimbursement of Class Plaintiffs' time and expenses shall in no way disturb or affect this Judgment and shall be considered separate and apart from this Judgment.

12.     Neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Class Claim, or of any wrongdoing or liability of any of the Class Defendants or any of the Released Class Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Class Defendants or any of the Released Class Persons, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  The Class Defendants and the Released Class Persons, or any of them, may file the Stipulation and/or this Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim, or in related litigation as evidence of the Settlement.

13.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of the Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund;

(c) hearing and determining applications for attorneys' fees, interest and expenses in the Class Actions and reimbursement of Class Plaintiffs' costs and expenses; and (d) the Settling Parties for the purpose of construing, enforcing and administering the Stipulation and Settlement.

14.    The Court finds that the Class Action was filed in good faith and in accordance with the Federal Rules of Civil Procedure, including Rule 11 of the Federal Rules of Civil Procedure.

15.    In the event that the Effective Date does not occur or in the event that the Settlement Fund, or any portion thereof, is returned, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

IT IS SO ORDERED.


DATED: _____    _____
THE HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE

S:\Settlement\DHB Industries 05.set\11-29 CLN ED JUDGMENT 0033829.doc

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DHB INDUSTRIES, INC.<br>DERIVATIVE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS.<br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CV-05-4345 (JS) (ETB) |

**DECLARATION OF BRIAN J. ROBBINS IN SUPPORT OF PLAINTIFF'S MOTION
FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND APPROVAL OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

1.      I am an attorney duly licensed to practice before all of the courts of the State of California.  I am a partner at the law firm of Robbins Umeda & Fink, LLP ("RUF") and Court-appointed Co-Lead Counsel for plaintiff Alvin Viray ("Derivative Plaintiff") in the above-captioned consolidated derivative action (the "Derivative Action").  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I make this Declaration in support of Derivative Plaintiff's Motion for Final Approval of Settlement, including payment of Plaintiff's Counsel's Attorneys' Fees and Reimbursement of Expenses ("Motion").

I.      **INTRODUCTION AND OVERVIEW OF THE DERIVATIVE ACTION**

3.      This is a consolidated shareholder derivative action brought on behalf of DHB Industries, Inc. ("DHB" or the "Company" or "Nominal Defendant") against certain of its former officers and members of the Company's Board of Directors ("Board") for violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between April 2004 and the present ("Relevant Period").

4.     DHB is comprised of two divisions: DHB Armor Group and DHB Sports Group.[1] DHB Armor Group consists of Point Blank Body Armor, Inc. ("Point Blank") and Protective Apparel Corporation of America ("PACA"), engaged in the development, manufacturing and distribution of advanced bullet and projectile resistant garments, bullet resistant and fragmentation vests, bomb projectile blankets, and related ballistic accessories and technologies for the United States Military and Law Enforcement Agencies.  DHB Armor Group accounts for 98% of DHB's revenues.

5.     The Complaint alleged that the Individual Defendants[2] caused DHB to issue improper statements about DHB's product quality and business prospects of the Company's bullet resistant body armor products and related contracts.  Contrary to Defendants' continual assurances of product quality, DHB's vests suffered from material quality problems and DHB's Tactical Interceptor vests continually failed to meet military contract specifications. The complaint alleges Defendants were aware of the serious quality issue with both the DHB Zylon® bulletproof vests and the DHB Interceptor vests.

6.     The Complaint alleged that prior to disclosing these adverse facts to the investing public:  (i) Individual Defendants caused or allowed Brooks to use DHB to enrich himself and his family through self-dealing transactions at the expense of the Company; and (ii) certain insiders sold over 10 million of their personally-held shares of DHB stock valued at more than $201 million to the unsuspecting public.

7.     On November 30, 2004, DHB's Chief Operating Officer Hatfield signed a waiver constructively acknowledging that DHB vests failed to meet the Marine Corp's minimum test standards.  On August 30, 2005, the truth regarding the Company's material omissions and

---

[1]  All factual information is derived from Verified Shareholder Derivative Complaint and Jury Demand (the "Complaint").

[2]  "Individual Defendants" means Jerome Krantz ("Krantz"), Gary Nadelman ("Nadelman"), Gary Chasin ("Chasin"), Barry Berkman ("Berkman"), David H. Brooks ("Brooks"), Larry Ellis ("Ellis"), Dawn M. Schlegel ("Schlegel") Sandra Hatfield ("Hatfield")  and collectively with DHB ("Defendants").

misstatements was revealed when the Individual Defendants caused or allowed DHB to issue a press release announcing that it had discontinued the use of Zylon® in its bullet resistant products due to the National Institute of Justice's ("NIJ") decision to revoke the NIJ's previously issued certifications of all vests containing Zylon® in the marketplace.

8.      Following the August 30, 2005 press release, the Company's market capitalization was devastated by over 24% as its share price fell from $6.66 to $5.10 per share, a far cry from the all-time high share price of over $20. As a result of the discontinued sales of Zylon® based vests and prospects in 3Q:05, DHB had to record $60 million charge to write down its Zylon® inventory and replace its Zylon® containing bullet-resistant products. Then, on March 17, 2006, the Company announced that it may have to restate its financial results for certain periods of 2005 due to "inaccurate inventory records" and potential errors in "estimates of the cost of the Voluntary Replacement Program for Zylon®-containing armor products that the Company announced in the third quarter of 2005."

## II.    PROCEDURAL HISTORY OF THE DERIVATIVE ACTION

9.      On and after September 9, 2005, multiple actions were filed in the Court as class actions on behalf of persons who purchased the publicly traded shares of DHB between approximately November 18, 2003 and August 29, 2005, inclusive, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78(j) (b) and 78(t)). On January 31, 2006, the Court consolidated the class actions filed as *In re DHB Industries, Inc. Securities Litigation*, No. CV 05-4296 and appointed RS Holdings, NECA-IBEW Pension Fund (the "Decatur Group") and George Baciu as Lead Plaintiffs (the "Class Plaintiffs") pursuant to provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and approved the Class Plaintiffs' choice of Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow & Rudoff LLP as Co-Lead Counsel.

10.     On and after September 14, 2005, multiple actions were filed in the Court as derivative actions on behalf of DHB. The complaints in the derivative actions generally allege

causes of action for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

11.     In November 2005, Derivative Counsel moved for a temporary restraining order and a preliminary injunction imposing a constructive trust over proceeds related to the insider trading of DHB stock.  On November 9, 2005, the Court denied the request for a temporary restraining order, and deferred ruling on the preliminary injunction.

12.     On January 31, 2006, the Court consolidated the derivative actions filed as *In re DHB Industries, Inc. Derivative Litigation*, No. CV 05-4345.  Also, after extensive briefing and oral arguments, the Court appointed Robbins Umeda & Fink, LLP and Law Offices of Thomas G. Amon as Co-Lead Counsel in the Derivative Action.

13.     On March 20, 2006, after extensive investigation, Derivative Plaintiff filed the 96 page, 185 paragraph Complaint alleging on behalf of DHB claims against the Individual Defendants for breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment based on allegations that the Individual Defendants, among other things, with knowing or extreme recklessness issued, or caused DHB to issue, a series of improper and misleading statements regarding: (a) the Company's then-current operating condition and its future prospects; and (b) the quality and safety of DHB's body armor products. The foregoing conduct caused DHB to suffer damages.

14.     On May 4, 2006, DHB and the Individual Defendants, in a 35 page motion, moved to dismiss the Derivative Complaint based on the grounds that no demand was made upon the Board and Derivative Plaintiff did not adequately plead his causes of action.

15.     On June 19, 2006, Derivative Plaintiff filed a 35 page Opposition, after extensive research and revisions.

## III.    THE SETTLEMENT, PRELIMINARY APPROVAL AND NOTICE

16.     Beginning in the summer 2006, the parties engaged in arm's-length settlement discussions.

- 4 -

17.    On November 30, 2006, the Settling Parties entered into the Stipulation. [3] The Stipulation is contingent upon final approval of this Court and entry of the Final Order and Judgment Approving Settlement.  The specific terms and conditions of the Settlement applicable to the Derivative Action include substantial corporate governance enhancements that will increase the value of DHB, make the Board more responsive to shareholders and assist in preventing the type of conduct alleged in the Derivative Action from recurring.  For example, the Settlement requires the Board to administer a corporate compliance program and establish procedures to further facilitate stockholder communication with the Board.  Furthermore, the Chairman and Chief Executive Officer's ("CEO") performance is to be evaluated annually and as a regular part of any decision in regards to their respective compensation.  Also, as part of the Settlement, the founder of DHB, David H. Brooks, resigned from the Board of Directors of DHB and from all of the other positions held by him in DHB.  Also, Directors Cary Chasin, Gary Nadelman and Barry Berkman were replaced as Board members.

18.    On December 15, 2006, Derivative Plaintiff filed a Motion for Preliminary Approval of Derivative Settlement.

19.    On January 19, 2007 and May 29, 2007, this Court held hearings on whether to preliminarily approve the Settlement.  At the preliminary approval stage, the Court had before it objections to the settlement, including its preliminarily approval.

20.    On July 3, 2007, after extensive briefing and oral argument, the Court preliminarily approved the Settlement and directed that the Notice of Pendancy and Proposed Settlement of Derivative Action and the Summary Notice of Proposed Settlement of Derivative Action be mailed by first class mail to DHB shareholders and published, respectively.  The notice advised DHB shareholders that a hearing to determine whether the proposed settlement should be approved would be held on October 5, 2007.

---

[3] All capitalized terms shall have the same definition as set forth in the Stipulation of Settlement ("Stipulation") previously filed with this Court.

21.     On or before July 18, 2007, the Notice Administrator sent 130 notice packets to DHB shareholders of record. *See* Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Pendancy and Proposed Settlement of Derivative Actions and the Proof of Claim and Release Form; and B) Publication of the Summary Notice filed on September 26, 2007.   The Notice Administrator also sent a cover letter with the Notice to 80 entities, most of which were brokerage houses. *Id.*   These entities commonly hold securities in "street name" as nominees for the benefit of their customers who are the beneficial purchasers of the securities. *Id.*   The letter advised the nominees of the pending action and requests their cooperation in forwarding the Notice to the beneficiary. *Id.*   In addition, on July 20, 2007 the Notice Administrator caused noticed to be published in the *Investor's Business Daily*, and their website (www.gilardi.com). *See id.*

22.     In response to correspondence or inquiries from shareholder and/or nominees an additional 11,282 Notices were mailed. *Id.*   To date, the Notice Administrator has mailed 11,412 notice packets to DHB shareholders. *Id.*

23.     The deadline for DHB shareholders to object to this Settlement was September 21, 2007.   To date, Derivative Counsel is aware of only a small amount of objectors.[4]   The objectors claim that the settlement process was flawed, the notice was insufficient, that more money should have been returned to DHB, and the defendants should not have been released from liability.   The objectors, however, fail to consider the difficulty in prosecuting a derivative action, the substantial benefit of the corporate therapeutics and the wisdom in securing a definite benefit to DHB now, as opposed to a risky and costly trial.   Further, the objectors represent a very small portion of DHB stockholders, reporting to hold only .06% of DHB's common stock.

## IV.     THE SETTLEMENT IS IN THE BEST INTEREST OF DHB AND WARRANTS APPROVAL BY THIS COURT

24.     Despite Derivative Counsel's belief that the claims asserted in the Derivative Action have merit, we also believe that an advantageous settlement for DHB now outweighs the

---

[4] The shareholder objections to the Settlement are attached hereto as Exhibits A-C.

risks of continued litigation. The corporate governance therapeutics will help prevent any future misconduct. Further, the principal actors allegedly behind the misconduct have been or will be removed from their positions with the Company. These changes will be a continued lasting benefit for DHB. *See* Declaration of Robert A.G. Monks ¶¶3-8, attached hereto as Exhibit D.

25.    Derivative Plaintiff faced significant risks given the complex factual and legal issues in the case. There was considerable uncertainty as to whether Derivative Plaintiff would be able to maintain the Derivative Action against all of the Defendants in the face of the demand futility attack mounted by Defendants in their Motion to Dismiss. Defendants vigorously argued that Derivative Plaintiff had to make a demand upon the Board.

26.    Even if the Derivative Action would have survived this initial motion, to establish liability, Derivative Plaintiff would still have to overcome the business judgment rule and its presumption that Defendants acted in good faith. Further, DHB might have chosen to create a special litigation committee ("SLC"). A SLC may assess the validity of a derivative action and make a recommendation whether or not to dismiss it. The SLC's recommendation is protected by the same powerful business judgment rule as a Board decision. Under Delaware law, Derivative Plaintiff would be required to demonstrate that the SLC, should it choose to dismiss the Derivative Action, was not independent and did not investigate the Derivative Action reasonably or with good faith. Additionally, Defendants would likely argue that indemnification agreements entered into with the Company prevented them from being held liable for their actions.

27.    In addition to these forceful defenses and procedural hurdles, just completing discovery and preparing the case for trial would have required substantial additional expenses and time to be expended by Derivative Counsel. Although Derivative Plaintiff believes that he has strong claims against Defendants, Defendants are formidable and well-financed and assisted by experienced counsel with national reputations for aggressiveness and excellent legal skills.

28.    The damages would be difficult to calculate and collect in this action and would inevitably be the subject of conflicting and complicated expert testimony. The amount of

damages would be sharply disputed and it is impossible to predict which arguments on damages would find favor with the trier of fact.    Also, it is likely that Defendants would claim that there actions were indemnified by DHB.  Such indemnification could prevent collection of a monetary benefit for DHB.  Moreover, even if the Court or jury accepted Derivative Plaintiff's version of facts, Defendants would surely appeal, thereby extending this Derivative Action and adding additional risk to a no recovery result. Further, DHB was in a precarious position financially. There was a legitimate concern that DHB would declare bankruptcy over the course of the litigation. Any delay in recovery would further exasperate DHB's financial condition.

29.      The expertise of Derivative Counsel is another important factor in assessing the adequacy of a settlement. As shown in the firm biographies, attached hereto as Exhibits E and F, Derivative Counsel consists of experienced and skilled practitioners in the field of shareholder derivative litigation and corporate law.  Derivative Counsel is also responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted.

30.      The Stipulation also states that Derivative Counsel will be compensated $300,000 for the substantial benefit provided to DHB and reimbursement of expenses, subject to court approval (the "Fee and Expense Provision").  The Fee and Expense Provision is also reasonable and warrants approval.  Derivative Counsel prosecuted this action on a wholly contingent fee basis, making any recovery uncertain.   The contingent nature of the fee is appropriate in situations like this because an individual rarely has the financial resources to pay customary fixed rate hours.  In the course of this prosecution, Derivative Counsel devoted considerable financial resources and time to this case.  In total, Derivative Counsel expended over 1,400 hours prosecuting and settling this complex Derivative Action.  Derivative Counsel's total lodestar in this case, including paralegal and professional staff time is $539,237.75, nearly double the amount agreed to in the Fee and Expense Provision. Furthermore, Derivative Counsel incurred significant expenses totaling $27,435.11 prosecuting and settling the Derivative Action.[5]

---

[5]   Derivative Counsel is willing to submit a detailed breakdown of all time and expenses if requested by the Court.

31.    For more than two years, Derivative Counsel pursued this action with as much vigor and skill as possible in the face of great risks.  Over these two years, as described above, Derivative Counsel took on substantial costs and financial burdens in order to advance this action.

32.    Throughout the litigation, Derivative Counsel engaged in a continuing investigation of the allegations in the Action and the alleged injuries suffered by the Company. Specifically, Plaintiffs: (i) investigated the facts of the suspiciously timed stock trades by Company insiders; (ii) analyzed the various types of claims available against Defendants; (iii) reviewed SEC filings, press releases and other publicly available news information regarding each of the persons and entities involved; (iv) researched applicable provisions of Federal and Delaware law; (v) negotiated the Settlement and prepared and revised the Stipulation; (vi) analyzed and responded to arguments raised by objectors to the settlement; and (vi) responded to shareholders of the Company that required further explanation of the Settlement.

33.    In light of this effort and the substantial benefit conferred upon DHB through the significant corporate governance measures adopted and/or maintained by DHB, the Fee and Expense Provision of the Settlement requesting $300,000 for attorney compensation and reimbursement of expenses and costs is incredibly reasonable and should be approved.

34.    The Fee and Expense Provision amount represents only a .5 lodestar multiplier. The lodestar multiplier is calculated by multiplying the number of hours expended by the hourly rate.  A court, at its discretion, may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys.  Here, Derivative Counsel is not requesting any such increase.

35.    As explained in more detail above, derivative actions are extremely risky. There are numerous and difficult obstacles to overcome that prevent establishing liability.  Further, Derivative Counsel are experienced and extremely competent attorneys in the field of complex shareholder litigation. *See* Biographies of Robbins Umeda & Fink, LLP attached as Exhibit F. Derivative Counsel has litigation scores of shareholder derivative actions and they have a well-

known national reputation for pursuing their cases to a successful resolution. Given the risky nature of derivative actions in general, of this one in particular and the experience of Derivative Counsel, the multiplier sought is extremely reasonable and incredibly fair to DHB.

36.    For the reasons discussed above, it is the considered and informed judgment of Derivative Counsel, based on all the proceedings to date and their extensive experience in litigating complex derivative actions, that the Settlement: (i) provides substantial to DHB and its shareholders; (ii) allows DHB to put the Derivative Action behind; (iii) outweighs any potential benefits of the continued prosecution of the Derivative Action; and (iv) is fair, reasonable, adequate and in the best interests of DHB and its shareholders and should be approved by the Court.

## V.    CONCLUSION

37.    The proposed Settlement has been achieved as the result of hard fought litigation over 2 years and waged by skilled lawyers for both sides. The terms of the Settlement were arrived at through arduous arm's-length negotiations between the parties. Consequently, Derivative Counsel believe the Settlement is fair, reasonable, adequate and in the best interests of DHB and its shareholders and should be approved by the Court.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 28th day of September, 2007, at San Diego, California.

DATED: September 28, 2007                ROBBINS UMEDA & FINK, LLP
                                         BRIAN J. ROBBINS
                                         JEFFREY P. FINK


                                              /s/ Brian J. Robbins
                                         _____
                                           BRIAN J. ROBBINS (BR4747)

                                         610 West Ash Street, Suite 1800
                                         San Diego, CA 92101
                                         Telephone: (619) 525-3990
                                         Facsimile: (619) 525-3991

283488_5.DOC

# Exhibit A

Graham Hunt
318 Desplaine Rd.
De Pere, WI 54115

September 18, 2007

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Alfonse M. D'Amato Federal Building
100 Federal Plaza
Central Islip, NY 11722-4438

In re: DHB INDUSTRIES, INC. DERIVATIVE LITIGATION

To Whom It May Concern:

As a DHB shareholder since October 8, 2003, I write to object to the proposed settlement of derivative action. My proof of ownership of DHB common stock as of November 30, 2006 is enclosed.

It is easy to do what is expedient and difficult to do what is just. I would urge the court to take the harder path in this case and to do what is just, namely to reject the current settlement. I believe the settlement to be unfair to DHB shareholders for at least three reasons:

(1) I object that the settlement prohibits DHB from taking any further legal action against the defendants.

Please allow me to explain how my wife and I have been personally hurt by the actions of the defendants. We are not wealthy people. We do not own a home. We have nothing saved for our children's college education. We have less than $30,000 in combined retirement savings as of today's date.

We believed in the company so much that, in hindsight, we over-weighted DHB in our IRA portfolios. Thus, we have fully borne the consequences of this company's recent accounting scandals.

One final impact regards our ability to purchase a home. As the stock hovered around its high in December of 2004, we began to talk about withdrawing some of the money from my IRA to take advantage of the IRS's penalty-free withdrawal of IRA funds for the purchase of a first-time home. As the price fell through 2005, this opportunity seemed

Graham Hunt, Page 1

less and less feasible. With the recent accounting scandals, and the further drop in price, this option now seems impossible.

I mention this to remind the court that the actions of the defendants hurt real, middle-class people. We believe that DHB Industries should have every right to seek restitution in a way that maximizes shareholder value. The settlement does not maximize shareholder value; it dilutes it.

Objection #2: I object that the settlement indemnifies certain defendants against any liability under Section 304 of the Sarbanes-Oxley Act of 2002.

The great personal irony of my role as a DHB shareholder is that, simultaneously at my own place of employment, I was working very hard on some Sarbanes-Oxley related projects. Thus, at the same time I was putting in many extra hours to protect the investors of the company for which I worked, no level of government in my opinion was stepping in to protect me from shareholder abuse and material misrepresentation at DHB. In short, I received all the pain of Sarbanes-Oxley and none of the benefits. To indemnify the defendants from this section of Sarbanes-Oxley would be grossly unfair to all those shareholders, like myself, who have worked to improve accounting standards and corporate governance in American companies. Please allow Sarbanes-Oxley to fulfill its role.

Objection #3: I object that the settlement permits defendants to resume roles within DHB after 5 years. Also, I object that, through the settlement, David Brooks has received 6,007,099 new shares of stock.

I believe that I am not alone among shareholders in thinking that DHB's growth and potential is hindered by its association with David Brooks. In order for the company to prosper and for its share price to appreciate, it must sever ties to Mr. Brooks. Increasing Mr. Brooks' overall percentage of total common stock and allowing for even the possibility of some resumed role within five years places a cloud over the future independence and integrity of this company. I believe his exchange of $22,325,000 for 6,007,099 shares should be reversed. I also believe that the defendants should be permanently barred from future involvement with DHB.

Thank you very much for reading and considering my objections to the settlement. I would ask the court not to forget the many small shareholders of DHB who have been significantly impacted by the actions of the defendants, seek a just restitution from those responsible, and look forward to a revitalized company beholden to shareholders that can stand with full integrity. Please reject this settlement as it works against these goals.

Sincerely,

Graham Hunt

Graham Hunt



Brokerage Account
January 1 to December 31, 2006
Page 3 of 5

USAA FED SVGS BNK C/F SDIRA
GRAHAM C HUNT

# Brokerage Account

## Commission level

Current commission level is:               Gold
You have executed 0 trades
Please visit usaa.com to see the current commission
schedule.

# Brokerage summary

## Gain/(loss)

|  | This period | Year to date |
|---|---|---|
| Unrealized gain/(loss) | $(1,754.90) LT | Not applicable |

The gain/ (loss) on your current portfolio is only
informational and should not be used for tax reporting.
LT-long term:  assets held for more than 1 year.
ST-short term:  assets held for 1 year or less.

# Balances and Holdings

For your detailed cost basis information on realized and unrealized gains (losses) see page 05 .
C - Cash account, S - Short account, M - Margin account, MM - Money market account, O - Other accounts.

* Please go to usaa.com to see the current dividend data.

## Cash equivalents

|  | Current rate | 7-day yield | Balance |
|---|---|---|---|
| USAA MONEY MARKET | - | 4.850% | $8,201.00 |

## Equities/other exchange traded holdings

Small cap stocks/funds

| Symbol/Description | Acct Type | Quantity | Price | Est.annual income* | Market value |
|---|---|---|---|---|---|
| DHBT | C | 1,500.000 | $2.9500 | - | $4,425.00 |
| DHB INDUSTRIES INC |  |  |  | - |  |

# Activity

## Earnings

# Exhibit B

William F. Sondericker (WS7480)
Gary D. Sesser (GS7706)
Laura Anne Reeds (LR9681)
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York 10005
(212) 732-3200

D. David Cohen, Esq. (DC2051)
LAW OFFICES OF D. DAVID COHEN
500 North Boradway Suite 133
Jericho, New York 11753
(516) 621-5813

Attorneys for D. David Cohen, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re DHB INDUSTRIES, INC. CLASS          :       2:05-cv-04296-JS-ETB
ACTION LITIGATION                         :       CLASS ACTION
                                          :
In re DHB INDUSTRIES, INC. DERIVATIVE     :       2:05-cv-04345-JS-ETB
LITIGATION                                :       DERIVATIVE ACTION
                                          :
This document relates to:                 :
ALL ACTIONS                               :
                                          :
------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## OBJECTION TO DERIVATIVE SETTLEMENT

    D. David Cohen, a member of the proposed class and current shareholder of DHB

Industries, Inc., submits this Memorandum of Law in support of the Objections to the Derivative

Settlement pursuant to Rules 23(e)(4)(A) and 23.1 of the Federal Rules of Civil Procedure. See

Fed. R. Civ. Pro. 23(e)(4)(A), 23.1; see also § 21.1.11 (discussing shareholder objections to

settlement of derivative actions).

I.    THE DERIVATIVE AND CLASS ACTION SETTLEMENTS SHOULD NOT BE
      APPROVED BECAUSE THEY ARE NOT FAIR, REASONABLE OR ADEQUATE

Before a court may approve the settlement of a class action, it must hold a hearing to

determine whether that settlement is "fair, reasonable and adequate."  Fed. R. Civ. Pro.

23(e)(1)(C).  This requirement is applicable to derivative settlements as well.  See Weinberger v.

Kendrick, 698 F.2d 61, 73 (2d Cir. 2001); In re AOL Time Warner Shareholder Derivative Litig.,

No. 02 Civ. 6302, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006); In re Met. Life Derivative

Litig., 935 F.Supp. 286, 291 (S.D.N.Y.).  Moreover, where the settlement of a derivative action is

concerned, there must be a finding that the settlement "fairly and adequately serves the interests

of the corporation on whose behalf the derivative action was instituted."  AOL Time Warner,

2006 WL 2572114, at *2; Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980); Lewis v.

Anderson, 81 F.R.D. 436, 438 (S.D.N.Y. 1978).

The court must assess the fairness, reasonableness and adequacy of "the negotiating

process leading up to settlement as well as the settlement's substantive terms."  D'Amato v.

Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001); AOL Time Warner, 2006 WL 2572114, at *2.

With respect to procedural fairness, reasonableness and adequacy, if the court cannot assure itself

that the settlement was the product of "arms-length negotiations" or cannot ascertain that the

plaintiff's counsel "have engaged in the discovery[] necessary to effective representation of the

class's interests," the proposed settlement should not be approved.  D'Amato, 236 F.3d at 85;

Weinberger, 698 F.2d at 73; AOL Time Warner, 2006 WL 2572114, at *3.  As discussed below,

the proposed Settlement is not procedurally fair, reasonable or adequate.

2

In evaluating the substantive fairness, reasonableness and adequacy of a proposed class action settlement, the court may evaluate a variety of factors, including those set forth by the Supreme Court in Detroit v. Grinnell Corporation:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974). Courts may modify the Grinnell factors when evaluating the substantive fairness, reasonableness and adequacy of a proposed derivative settlement. See, e.g., AOL Time Warner, 2006 WL 2572114, at *3 (evaluating "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the proposed settlement") (citing Grinnell); Met. Life, 935 F.Supp. at 292 (evaluating "(a) the benefits achieved by the Proposed Settlement; (b) the likelihood of success if the case were to be litigated; (c) the potential recovery; (d) the likely duration and cost of continued litigation; (e) the quality of the negotiating process and the views of counsel; and (f) the objections") (citing Grinnell). Regardless of the other factors that the court deems pertinent, its principal concern must be "the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." Grinnell, 495 F.2d at 455; AOL Time Warner, 2006 WL 2572114, at *3; Saylor v. Bastedo, 100 F.R.D. 44, 49 (S.D.N.Y. 1983); Mathes, 85 F.R.D. at 714; Lewis, 81 F.R.D. at 439. As discussed below, the proposed Settlement fails miserably on this account.

3

It is clear that the proposed Settlement of the class and derivative actions is not fair, reasonable or adequate, in either a procedural or substantive sense. The substantive elements of the proposed Settlement are especially egregious. The inadequacy of the investigation performed by the proponents of the Settlement makes it difficult to balance "the strength of the case for plaintiffs on the merits [] against the amount offered in settlement." Grinnell, 495 F.2d at 455. Since the full extent of the wrongdoing by the Individual Defendants is still unknown, it is impossible to know what "the best possible recovery" might be. Id. at 463. Although the members of the proposed class[1] will indeed receive a monetary recovery, that recovery might well be inadequate when compared against the full amount that could likely be recovered from the Individual Defendants if the full extent of their wrongdoing were exposed. See Saylor, 100 F.R.D. at 57 (rejecting $250,000 settlement where court determined that recovery could be as high as $800,000). While its proponents claim that the Settlement would recover between thirty and forty percent of "estimated" damages, they have provided no basis for this estimate. And, although the proponents claim that DHB cannot afford a larger settlement, this would clearly not be the case if the Individual Defendants were being required to disgorge the money that they wrongfully acquired from the Company.

It is obvious that the proposed Settlement fails to serve the interests of the public company and instead serves the interests of the Individual Defendants. Under the proposed

---

[1] The proposed class is almost certainly erroneous. The initial class period began on March 24, 2004 and ended on August 29, 2005. The Settlement would change the start date to November 18, 2003. Both of these proposed start dates fail to acknowledge that the Individual Defendants began falsifying the Company's financial statements at least as early as the first quarter of 2003, and have continued to falsify each statement thereafter. It also appears that the proposed end date is erroneous. The original class period was to have ended on August 29, 2005, the day before DHB announced a massive $60,000,000 write-off relating to its Zylon product line. The proposed Settlement would change the end date to November 30, 2006. Both dates are likely erroneous. The August 30, 2005 announcement was just one of the many false and misleading acts, many of which likely occurred between August 30, 2005 and November 30, 2006, or after. Until an appropriate class period is established, there is no way to estimate what the actual scope of the recovery might be.

Settlement, DHB releases the Individual Defendants from all liability for their illegal actions and pays for the entire class action award, yet recoups none of the money stolen from it by those Defendants. Instead, Brooks will be permitted to exercise 5,250,000 stock options at a highly attractive price, and to acquire additional shares of the Company outright, giving him greater control over the Company. Although the proponents of Settlement tout the new "Governance Principles and Policies," those policies are largely a rehash of standard by-laws and are free to be amended by DHB at any time. The derivative Settlement permits DHB to continue to be a model of bad corporate governance, including control by Brooks, no stockholder election of directors, refusal to provide Board representation or input to the Company's largest public shareholders, no compliance with financial reporting obligations, very selective financial reporting, and grants of thousands of free Shares to principals of DHB who "went along" with the Settlement. At the end of the day, the Individual Defendants are the only ones who benefit from the Settlement, and the public company continues to be harmed as a result.

The proposed Settlement likewise fails in terms of procedure. The proponents of the Settlement have not produced any evidence that the Settlement was the product of serious, non-collusive, arms-length negotiation, and there are strong indications to the contrary: the MOU was arrived at while the Individual Defendants still controlled DHB, and there was no independent representation for Company; the Settlement allows the Individual Defendants to completely escape liability for their crimes without paying back a penny of the money they stole; DHB recoups none of the losses it suffered at the hands of the Individual Defendants; and DHB is forced to pay the entire class action award, partially from proceeds received through the sale of shares to Brooks at suspiciously favorable prices, a transaction that not only benefits Brooks monetarily but allows him to strengthen his control over the Company. While its proponents

5

continue to claim that this shocking outcome was arrived at through arms-length negotiation, no evidence as to the nature of these negotiations has been produced. There has been no attempt to describe which individuals participated in the negotiations, when and where these negotiations took place, what issues were discussed, or what documents were exchanged.

Nor have the proponents of Settlement produced evidence to show that they engaged in the discovery necessary to adequately represent the interests of the class or of DHB. While its proponents continue to claim that the Settlement was arrived at after extensive investigation, no evidence of such an undertaking has been produced. It appears that little or no document discovery has been conducted[2] and no attempt was made to take a single deposition from any of the Individual Defendants or other witnesses.[3] Nor does it appear that the Company's books and records were ever reviewed in a meaningful way. The Company did not file an audited financial statement for 2006 or any financial statement whatsoever for 2006, and there has been no attempt to procure the results of the accounting performed by Alix Partners or obtain a review by any

---

[2] No documentary evidence concerning any of the matters at issue in the underlying dispute or the Settlement was subpoenaed by Class Counsel and there is no record of any voluntary production of documentary evidence of any kind by the Individual Defendants or the Company prior to the Settlement.

[3] The proponents of Settlement have yet to explain how taking the following depositions was unnecessary to the adequate representation of the class:

     (a)     Defendant David H. Brooks (CEO), alleged to have been the primary wrongdoer;

     (b)     Defendant Dawn Schlegel (CFO), who was indicted on August 17, 2007;

     (c)     Defendant Sandra Hatfield (COO), who was also indicted on August 17, 2007;

     (d)     Defendants Jerome Krantz, Gary Nadelman, Cary Chasin or Barry Berkman, the so-called "outside" directors of DHB, who (together with Brooks) engaged in simultaneous warrant exercises and share sales (collecting in total over $200,000,000) between November 29, 2004 and December 30, 2004, on false financial information and other nondisclosures and misinformation;

     (e)     The two prominent accounting firms, each of whom resigned from their employment with DHB during the periods in question;

     (f)     The underwriting, brokerage and other firms which handled the sale of 10,000,000 DHB Common Shares by the Individual Defendants from November 29, 2004 to December 30, 2004;

     (g)     Defendant Terry Brooks, the wife of Defendant David Brooks, who owned TAP, one of the Company's principal suppliers during the Class period, and received millions of dollars from the public Company's coffers during that period;

     (h)     Present and/or former employee of the Company, its subsidiaries, TAP and other Brooks-related persons and entities which did business with the Company during the Class period.

other independent accountant. It is clear that whatever investigation was conducted by the proponents of Settlement was wholly inadequate.

## II.    THE DISTRICT COURT MINIMALLY SHOULD REQUIRE A FULL TESTIMONIAL HEARING BEFORE APPROVING ANY SETTLEMENT

A testimonial hearing taken in an appropriate adversarial proceeding with a full and fair opportunity for the objecting parties to call and examine witnesses would demonstrate beyond a doubt that the Settlement does not serve the interests of DHB or its public shareholders and is not a fair, reasonable and adequate settlement. There are so many unanswered questions about so many different issues—such as the conduct of the negotiations leading up to the Settlement, the investigations undertaken to determine the extent of the wrongdoing by the Individual Defendants, and the propriety of the currently proposed class periods—that approval of the Settlement at this time would plainly be premature. See Chateau de Ville Productions, Inc. v. Tams-Witmark Music Library, Inc., 586 F.2d 962, 966 (2d Cir. 1978) (overturning class certification where district judge decided certification motion without sufficient development of the facts).

There is a responsible alternative to premature approval of the Settlement. If the Court is disinclined to deny approval of the Settlement outright, it should set dates for full evidentiary hearings after allowing the objecting parties to conduct discovery on contested issues relevant to the fairness, reasonableness and adequacy of the Settlement. See Heerwagen v. Clear Channel Commc'n, 435 F.3d 219, 233–34 ("Discovery on the prerequisites of Rule 23 is plainly appropriate, and in some cases necessary." (internal citation omitted)); Chateau de Ville Productions, 586 F.2d at 966 ("The court should defer decision on certification pending

7

discovery if the existing record is inadequate for resolving the relevant issues."). <u>Accord</u> Letter from KGS to the Court, September 9, 2007.

III.    CONCLUSION

For the foregoing reasons, the court should reject the proposed class action and derivative Settlements as unfair, unreasonable and inadequate.   At the very least, the court should permit discovery and hold full evidentiary hearings to resolve the many unanswered questions surrounding the proposed Settlement.

Dated:  September 20, 2007

New York, New York

> D. David Cohen
> by his Counsel:
> Carter Ledyard & Milburn LLP
> By:
>
> 2 Wall Street
> New York, NY 10005
> (212) 238-8820
> (212) 732-3232
> William F. Sondericker, Esq.
> Gary D. Sesser, Esq.
> Laura Anne Reeds, Esq.
>
> D. David Cohen, Esq.
> Pro se
> 500 North Broadway
> Suite 133
> Jericho, NY 11753
> (516) 933-1700
> (516) 033-8454

# Exhibit C

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | ) ) ) ) ) | Civil Action No. 2:05-CV-04296-JS-ETB Class Action |
| IN RE DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | ) ) ) ) ) | Civil Action No. 2:05-CV-04345-JS-ETB Derivative Action |
| This Document Relates To: ALL ACTIONS | ) ) ) ) ) | |

## OBJECTIONS TO PROPOSED SETTLEMENT

## PRELIMINARY STATEMENT

On July 3, 2007, this Court issued an order granting preliminary approval of the settlement (the "Settlement") of the referenced class and derivative actions concerning fraud and misconduct at DHB Industries, Inc. ("DHB") (collectively, the "Action"). Thereafter, on August 3, 2007, after a telephonic conference with the Court, a revised notice of the Settlement was submitted (the "Revised Notice"). This memorandum is submitted in opposition to the Settlement of the Action on behalf of a committee of DHB shareholders, certain of whose members have submitted in the

1

aggregate six objections to the fairness of the proposed Settlement. They are: Graham

Hunt, Susan O'Donnell, Michael Shapiro, Chaim and Victoria Jedwale, Daryl

Lowenstein, Neale Monte, and Ron Henson (the "Committee Objectors"). They are

large and small shareholders of DHB Industries, Inc. ("DHB") who believe the

Settlement is unfair for three separate reasons: the Settlement amount is inadequate; the

Notice and Revised Notice are incomplete; and the process by which the Settlement

was reached was flawed. Indeed the process is so flawed that the Second Circuit has

added to the substantive motion calendar two separate appeals from this Court's

preliminary approval of the Settlement of the class action (Appeals docketed, Nos. 07-

3065 and 07-3117 (2d Cir. July 18, 2007).

        The Committee Objectors expect an extraordinary number of objections to

this Settlement by other DHB shareholders, both large and small, who will seek to

convince the Court of its unfairness. Each will submit papers; each will seek to speak

at the fairness hearing.[1]  Committee Objectors may also seek to be heard at the

Settlement hearing because they are angry and feel betrayed by the system that has

permitted this obviously inadequate Settlement to have reached this stage. Arguments

against its fairness are legion, and this memorandum will refer to, but not deal with

---

[1]      The Committee Objectors incorporate by reference the arguments made
by Lena Bedik in her memorandum objecting to the Settlement.

2

each in detail, because of the numerous prior objections and communications with the

Court concerning the Settlement's unfairness. This memorandum is intended to

describe why the Committee Objectors' rights would be trampled were this Settlement

approved.

## ARGUMENT

### A.    THE CONSIDERATION IS INADEQUATE AND ILLUSORY

1.    The Settlement Is Funded In Part By
Selling DHB Stock At A Bargain Price.

A significant portion of the Settlement is being funded by selling

additional corporate control to David H. Brooks ("Brooks"), former Chief Executive

Officer of DHB, and the alleged architect of the alleged fraud, at an inadequate price.

On the date of the Revised Notice, DHB stock was selling at $5.15 per share. Yet to

fund the Settlement in part, DHB permitted Brooks to exercise a warrant to purchase

3,000,000 DHB shares at $2.50 per share and sold him 3,007,099 additional DHB

shares at $4.93 per share, less than their August 3rd price. Thus, approximately $22

million of the approximately $35 million cash component of the Settlement is based on

selling Brooks over 6,000,000 shares of DHB stock at a bargain price, thereby

increasing his ownership of DHB's stock to 28%.

3

Increasing Brooks' ownership is in sharp contrast to the picture painted

for this Court at the January 19, 2007 hearing.  There, counsel for DHB touted to the

Court Brooks' separation from DHB as follows:

> THE COURT:  He [Brooks] is on administrative leave now.
> Am [sic] correct?
>
> MR. RIDER:  No.  He was placed on administrative leave
> by the board before the MOU was entered into.  Thereafter,
> he resigned as part of this agreement.
>
> So he is no longer an officer nor director of this Company.
> He is a shareholder but he is no longer an officer or director
> of this Company.

Jan. 19, 2007 Tr. at 61, l. 6-14.

> 2.     The Parties Reached A Settlement, Then Expanded
>         The Class For No Additional Consideration.

The first DHB securities class and derivative actions were action were

filed in  September 2005.  On January 31, 2006, the class and derivative actions that

had been filed were consolidated, and Co-Lead Plaintiffs were appointed.  On March

20, 2006, Lead Plaintiffs filed their amended class action complaint alleging securities

fraud claims against Defendants on behalf of all purchasers of DHB securities between

March 24, 2004 and August 29, 2005 (the "Initial Class Period") and against certain of

its officers and directors on behalf of DHB.  DHB's outside auditors were not named as

defendants.  Thereafter, Defendants filed motions to dismiss the Action.  Lead

4

Plaintiffs never responded to those motions. No discovery was conducted in the Action.

On August 17, 2006, DHB effectively withdrew its interim and annual financial statements for the years ended December 31, 2003 and December 31, 2004, noting those financial statements could not be relied upon. The Initial Class Period alleged in Lead Plaintiff's class action complaint excludes a substantial portion of that period.

On December 15, 2006, the parties filed the stipulation of settlement (the "Stipulation") including both the class and derivative actions. The class period was extended in the Stipulation to include all purchasers of DHB securities between November 18, 2003 (over five months before the starting point of the Initial Class Period) and November 30, 2006 (over 15 months after the closing date of the Initial Class Period) (the "New Class Period"). The New Class Period swept in much of the time-period covered by the August 17 withdrawal announcement. Yet, the parties entered into the Memorandum of Understanding upon which the Settlement was reached prior to that announcement. Nevertheless, the Stipulation also provided for the release of all Class members' claims for the enlarged class period against DHB's auditors for the entire New Class Period, even though the accountants had never been named in the Action, no consideration was being paid by the accountants, and no

5

defendant paid any additional consideration.    Thus, the Settlement provides no additional compensation to shareholders from DHB's auditors, or any additional compensation for the newly revealed claims in the earlier period.

In addition, the settlement of the companion derivative action provided that all current DHB shareholders, also putative class members who still hold DHB stock, are being forced to release their individual direct federal securities claims for no consideration, regardless of whether they opt out of the proposed class action settlement, and with no right to exclude themselves from the derivative release.

## B.    THE NOTICE AND REVISED NOTICE ARE INADEQUATE

It is impossible for the class members to make an informed judgment on the fairness of the Settlement because the Notice and Revised Notice fail to address numerous material matters necessary to determine whether to object or opt out.

The recent decision in In re Veritas Software Corp. Sec. Litig., _ F.3d _, 2007 U.S. Dist. LEXIS 17623 at *16-17 (9th Cir. July 25, 2007), highlights the basic purpose of class notice, holding "[i]t is the clear purpose of the notice requirement to allow class members to evaluate a proposed settlement" to determine whether to opt out or object.  Because the parties advocating the settlement are permitted to go last (as opposed to the standard rule that a movant provide his or her support for the requested relief sought), because there has been a Revised Notice without an extension of time to

6

object or opt out, with absent class members having to submit papers in opposition <u>before</u> the moving parties have filed meaningful and informative papers and evidence in support of the relief they seek to impose, class members cannot decide meaningfully whether to object or opt out..

Those material omissions from the Notice and Revised Notice include:

1.    Failure to disclose that the Court has certified a Class pursuant to the agreement of the parties (as distinguished from the normal litigation process) or to inform class members that they have the right to challenge its certification and/or definition;

2.    Failure to disclose any damage analysis, which is necessary to determine whether to object or opt out;

3.    Failure to identify the class representatives or the dates they purchased DHB shares, if they did, and whether they sustained losses;

4.    Failure to provide any discussion of the factual basis or substance of any of the claims, issues, or defenses, or how those claims vary among the various subclasses;

5.    Failure to provide any discussion of potential or actual conflicts that may exist with respect to the claims of different subclasses;

6.    Failure to specify why DHB's accountants are being released for no consideration, and why;

7.    Failure to discuss the settlement negotiations, including the fact that Lead Plaintiffs' counsel agreed to an open-ended date for the Class and extended the beginning date of the class period back several months after fixing the Settlement amount, thereby sweeping numerous persons into the class not represented by lead plaintiffs under the operative complaint, or the reasons why;

8.    Failure to disclose that no claims have been asserted in any pleading for the putative subclasses;

9.    Failure to disclose the interaction between the class and derivative releases, including the fact that current DHB shareholders can have their direct individual securities fraud claims released whether or not the class action settlement is approved and for no consideration; and

10.    Failure to disclose that the class settlement amount was agreed upon before the parties agreed on the parameters of the class and, therefore, before the allocation of the proceeds of the settlement was determined, while simultaneously diluting the benefits to the members of initial class.

8

### C.     THE SETTLEMENT PROCESS WAS FLAWED

Based on the Notice and Revised Notice, it is impossible to determine what, if any, investigation Lead Counsel engaged in to arrive at the Settlement, or what damage analysis led to the consideration therein. Lead Counsel appear not to have taken any discovery. And while significant events occurred after the parties entered into the Memorandum of Understanding, there appears to have been no investigation of those events nor an increase in the Settlement consideration based on those events. Lead Counsel appear to have been unfazed by the withdrawal of DHB's financials for 2003 and 2004 and similarly uninterested in the fact that two defendants in this action, Dawn Schlegel, DHB's former Chief Financial Officer, and Sandra Hatfield, former President of DHB's principal subsidiary, were indicted for crimes allegedly committed while acting in those capacities.

While seemingly unmotivated to obtain the greatest possible recovery for the class they purport to represent, Lead Counsel seek to achieve significant benefit for each subclass lead plaintiff they purportedly represent, namely $25,000 each for acting as a class representative. See Revised Notice of Pendency and Settlement, Document 271-2, at p. 3. Who are these plaintiffs? They are not named in the Notice. (Indeed the Notice names the derivative plaintiff – Alvin Viray – but conspicuously fails to name class plaintiffs.) Are there eight of them? There should be, because there are

9

eight subclasses. In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 204

(S.D.N.Y. 2003) ("[l]ead plaintiffs have a responsibility to identify and include named

plaintiffs who have standing to represent the various potential subclasses of plaintiff").

Is class counsel asking for a total of $200,000 for these unnamed plaintiffs, who

should be, but are not, named? If so – what did they do to deserve $25,000 each?

Lead Counsel never deposed any defendants in this Action; surely there were no

depositions of plaintiffs - at least the Notice and Revised Notice fail to reveal their

occurrence. What the named plaintiffs may have done to earn $25,000 each is

certainly not illuminated by the communications with absent class members.

## CONCLUSION

For the reasons stated herein, the Committee Objectors respectfully

request the Court not approve the Settlement of the Action.

Dated:  September 21, 2007

HARWOOD FEFFER LLP

By:  _Samuel K. Rosen_

Robert I. Harwood (RH-3286)
Samuel K. Rosen (SR – 3287)
488 Madison Avenue
New York, New York 10022
Telephone: (212)935-7400
Facsimile: (212) 753-3630

*Attorneys for Committee Objectors*

10

# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | Civil Action No. CV 05-4296 (JS)(ETB) <br> CLASS ACTION |
| In re DHB INDUSTRIES, INC. DERIVATIVE LITIGATION | Civil Action No. CV 05-4345 (JS)(ETB) <br> DERIVATIVE ACTION |

## DECLARATION OF ROBERT A.G. MONKS

I, ROBERT A.G. MONKS, declare as follows:

1.     I am the founder of Lens Governance Advisors, LLC ("LGA"), an organization that specializes in the field of improving corporate governance.

2.     Since 2002, LGA has advised the country's leading plaintiffs' securities law firms and their clients on corporate governance remedies for more than fifty of the largest alleged securities frauds in recent years, yielding landmark settlement provisions for governance reforms. A more detailed description of the work of my firms is attached hereto as Exhibit A, and my curriculum vitae is attached as Exhibit B.

3.     As discussed in greater detail below, I believe that the governance remedies agreed to in connection with the DHB Industries, Inc. ("DHB") settlement are at the forefront of good corporate governance, are beneficial to the company and its shareholders, and would not have been implemented but for the Plaintiffs' actions and the work of Plaintiffs' counsels.

1

4.    There are new standards of best practice in corporate governance and some companies have taken longer to adopt them than others. DHB, through the settlement, is coming into compliance with current standards of corporate governance best practices. The terms of the settlement create a structure for advancing the corporate governance of the company, and the company has already shown, through actions taken in recent months, that they will enliven the potential of these reforms by a real commitment – for example, the board's decisions to reconstitute itself and elect an independent chair.

5.    Corporate governance reforms have a substantial impact on the valuation and management of public companies and the best corporate governance. The leading international consulting firm *McKinsey & Company* began in 2000 to survey the largest – approximately 2,000 – institutional investors ($3.25 trillion of assets under management) with respect to the value they placed on good corporate governance.

6.    The actual premium respondents said they would be willing to pay for a well-governed company differs by country. The premium reported for the United States is 18.3%.

7.    The *McKinsey* report concludes: "Although it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through.... If companies could capture but a small portion of the governance premium that is apparently available, they would create significant shareholder value."

8.    Efforts to understand and codify "good governance" in the past several years have moved out of the realm of academia and not-for-profit associations and into the reality of the marketplace. As corporate leaders and market managers have

2

recognized the value of governance to performance, these efforts have assumed a sense of urgency and governance reforms have been more dramatic. These reforms recognize the reality described by the academics but, more importantly, confirmed by disastrous events in recent years, recognize that good corporate governance reduces risk and enhances performance.

9.     The DHB settlement agreement embodies the spirit of these best practices in the following important respects:

10.     **Adoption of Corporate Goverance Guildelines.** Before this settlement, the company had no published corporate governance guidelines at least readily available for shareholders or potential investors in the company to review. The terms of settlement expressly spell out new corporate governance guidelines in a public document. It is to be hoped that the company will post these guidelines for public view on its website. The availability of such guidelines gives shareholders comfort and reduces investment risk by clearly demonstrating the board's commitment to transparency and review of a system of governance. Furthermore, the guidelines themselves identify a more empowered board of directors. Increasing the accountability, focus and overall independence of directors will promote a board that is committed to playing an active informed role in the company.

11.     **Meetings of Independent Directors.** The settlement stipulates that "independent directors should meet routinely and regularly without management". Such meetings are an important opportunity for directors to voice their concerns that they may otherwise not. This is a critical part to effective board oversight and functionality. The last available proxy from the company does not mention any such meetings.

12.     **Director Over-Commitment.** The settlement further requires that "…no director shall serve on more than four (4) outside public boards of for-profit companies."

Studies by The Corporate Library, an independent governance research firm, strongly suggest that 'professional directors' who sit on more than four boards are rarely the most effective board members.

13.    **Directors' Attendance at Shareholder Meetings.**  The settlement provides that DHB's "directors are encouraged to attend the Company's Annual Meeting of Stockholders".  The shareholder meeting is the one time each year where all shareholders have access to the directors of their company and therefore it is imperative that the directors be present.  By implementing this reform, DHB shareholders will benefit from direct access to the members of the board of directors.  The 2005 proxy stated that "No members of the Board of Directors attended the Company's 2004 annual stockholders meeting."

14.    **Other Governance Reforms Implemented During Pendency of Case.** The company made other changes to its governance over the course of the lawsuits that merit mention, including the following:

    (a)    Changing the composition of the Board of Directors to replace those directors, including the founder, who had served during the period covered by the litigations; and

    (b)    Electing an independent Chairman of the Board.

15.    The cumulative impact of the governance changes agreed upon as an essential part of this settlement will be to increase the value of the ownership of DHB shares on a going-forward basis.  While precision is not appropriate with a settlement of this kind, we estimate that, after implementation of the settlement terms, the market value of DHB shares will be fortified with the governance improvements provided for in this settlement.

4

16.     It is, therefore, my conclusion that the governance provision of the settlement with DHB is a significant accomplishment in both scope and substance, and one that has and will increase the value of the company.  It is also a remarkable achievement that is, I believe, the direct result of Plaintiffs' and their counsel's diligence and commitment to pursuing the litigation.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of September, 2007.

ROBERT A.G. MONKS

5

## EXHIBIT A

Lens Governance Advisors, LLC, is a firm founded by Robert A.G. Monks, its sole partner, in 2002. Mr. Monks created the firm to further his three decades of work in corporate governance and accountability and in improving shareholder value through increasing shareholder involvement. Corporate scandals coming to light in recent years have underscored the potential of shareholder litigation as a means of reforming and enforcing corporate governance practices. LGA's purpose is to realize that potential, while continuing the work of shareholder consulting and engagement performed successfully by Lens Investment Management, LLC, from 1992 to 2002.

Since 2002, LGA has advised the country's leading plaintiffs' securities law firms and these firms' clients on corporate governance remedies for more than 50 of the largest alleged securities frauds in recent years.

### Robert A.G. Monks

Mr. Monks is a graduate of Harvard College (magna cum laude, 1954), Cambridge University (1955), and Harvard Law School (1958; winner Ames moot court competition). He was a general partner in the Boston, Massachusetts, law firm of Goodwin Procter & Hoar. Subsequent to the full-time practice of law, he has had careers in business (CEO of C. H. Sprague & Son Company - coal and oil distribution), investments (principal of Gardner Associates and Chairman of the Board of the Boston Company and Boston Safe Deposit & Trust Company), and state government administration (Energy Commissioner for the State of Maine, Chairman of two commissions to oversee the administration of the Maine State Retirement System appointed by Governor McKernan). Mr. Monks also has served in federal government administration as founding Trustee of the Federal Employees' Retirement System and a Director of the United States Synthetic Fuels Corporation by appointment of President Reagan, and Administrator (office is now Assistant Secretary) of the Office of Pension and Welfare Benefits Administration (Department of Labor) in charge of overseeing the private pension system in the United States.

Subsequent to his federal government service in 1985, Mr. Monks has devoted his full time and energy to the creation of a system of effective corporate governance in the United States. In order to accomplish this, he has been active in several different, but importantly related, spheres. He has founded five businesses which provide needed governance services:

- Institutional Shareholder Services (1985) provides proxy and ownership services to institutional investors around the world. ISS has achieved the position that its recommendation is often the single deciding factor in contested proxy situations, such as the merger of Compaq and Hewlett Packard in 2002. ISS is today a major company dominating the proxy field worldwide. Monks sold his interest in 1994 to the Thompson Group. In 1999 the Thompson Group sold ISS via a private

auction, and it was bought by a consortium organized by Mr. Monks's son, Robert
Monks, the younger, who was its chairman until the sale of ISS to RiskMetrics in
January 2007.

- Subsequent to disposing of his interest in ISS, Mr. Monks organized <u>Lens
Investment Management</u> (LIM), an activist investment manager with several
private and public partners, which functioned as an "activist investor" and over
the decade of the 1990s materially outperformed the principal stock market
indices.

- Mr. Monks also organized (1999) <u>Hermes Focus Asset Management Company</u> in
the United Kingdom which has successfully employed the same "activist
investment" policy in other funds in the UK and Europe as that employed by LIM
in the United States.

- With his long time partner, Nell Minow, Mr. Monks organized <u>The Corporate
Library</u> (2000), an independent information, investment and rating service which
provides corporate governance data and analysis to institutional and individual
investors around the world.

- Mr. Monks was one of the founders and is Chairman of the Board of <u>Governance
4 Owners</u> in London, an activist investment fund.

Mr. Monks has written and spoken about corporate governance widely. With Nell
Minow, he published *Power & Accountability* (Harper Collins, 1991), *Watching the
Watchers* (Blackwell, 1996), and four editions of the standard case book, *Corporate
Governance*, (Blackwell, 4th ed. 2008). Mr. Monks also published *The Emperor's
Nightingale*, (Capstone, 1999), *The New Global Investors* (Capstone, 2001), *Corpocracy*
(Wiley, 2007) and the novel *Reel and Rout* (Brook Street Press, 2004). He has published
more than a hundred papers in publications around the world and has spoken about
corporate governance on six continents. He has lectured widely, including to classes at
Oxford, Cambridge, Harvard, Yale, Columbia, Stanford, University of California,
Dartmouth, Chicago, and Northwestern. He has testified more than a dozen times before
Congressional and Senate Committees on governance-related matters. He maintains a
live relationship with corporate governance experts around the world on his web site -
http://www.ragm.com - and is a frequent commentator in television, radio, magazine and
newspaper coverage of corporate governance subjects.

He is referred to by *The Economist* and *Fortune* magazines as the leading shareholder
activist and governance advocate in the world. He was the recipient of both the Award for
Excellence in Corporate Governance from the International Corporate Governance
Network ("ICGN") in 2002 and the Award for Outstanding Financial Executive from the
Financial Management Association ("FMA") in 2007.

**Organization of Lens Governance Advisors**

Mr. Monks organized repeated efforts to improve corporate governance systems in the United States, including prominently a self-nominated candidacy for the board of directors of Sears Roebuck in 1991. Notwithstanding the successful effort to organize a majority of shareholders to express their policy preferences in many companies, it became clear to Mr. Monks that managements could largely ignore shareholder expressions with impunity. Mr. Monks has become convinced that one of the best ways to improve the governance of American corporations is through the settlement process of securities lawsuits. This insight has been ratified by many other class action and derivative litigators and by the United States Bankruptcy Court in enforcing the comprehensive governance restatement proposed by former SEC Chairman Richard Breeden in the MCI (formerly WorldCom) matter. Mr. Monks has been involved in settlements with respect to Shell, British Petroleum, Citigroup and Nortel, among others. This work has yielded landmark settlements at Sprint, Hanover Compressor, and Broadcom.

8

## EXHIBIT B

ROBERT A. G. MONKS
Ram Island Farm
Cape Elizabeth, Maine 04107

T: (207) 741-2795  F: (207) 767-1835
Email: ragmonks@ragm.com  Web: www.ragm.com

## EDUCATION

**Harvard College**, 1954, BA
**Trinity College**, Cambridge University, 1955
**Harvard Law School**, 1958, LLB

## PRIVATE SECTOR - Work Experience

**Practicing Lawyer** (specialized in corporate law)
Goodwin, Procter & Hoar, General Partner, 1958-65

**Management of Investments**
Gardner Associates (now Gardner & Preston Moss), Vice President, 1965-67 (a Boston-based company which manages money)

**Industrial Management**
C.H. Sprague & Son Company, President and CEO, 1968-72 (a New England based energy firm - coal, oil)
Sulpetro of Canada, Ltd., (natural gas) Finance Committee, Chairman, 1973-76

**Trust Company Management**
The Boston Company and The Boston Safe Deposit & Trust Co., Director, 1975-81 (a bank holding company that provides financial services to, among others, public and private pension funds)
Finance Committee, Chairman, 1977-79
Board of Directors, Chairman, 1979-81

**Corporate Governance**
Lens Governance Advisors, LLC, Founder, 2002 to present
Institutional Shareholder Services, President, 1985-1990
LENS Inc., President, 1990 to 2002
Hermes Lens Asset Management, Joint Deputy Chairman, 1998 to 2000
Hermes Asset Fund Management, Deputy Chairman 2000 to 2005
The Corporate Library, Director, 2000 to present
Governance 4 Owners, Chairman, 2005 to present

9

**Miscellaneous Corporate Directorships**
> Esterline, 1966-71 (NYSE)
> Westmoreland, 1965-70 (OTC)
> Jefferies & Company, Los Angeles, CA, Director, 1989-May 1990 (OTC)
> John Hancock Capital Growth Management, Inc., Boston, MA, Advisory
> Board Member, 1988-89
> Mitsubishi International Corporation, New York, Advisor, 1987-1991
> (Dec) (wholly owned subsidiary of Mitsubishi Corporation; listed on
> Tokyo Exchange)
> Tyco Laboratories, Inc., Exeter, NH, Director, 1985-1994 (Jan) (NYSE)
> Lambert Brussels Capital Corporation, New York, Director, 1983-May
> 1990 (affiliated corporations, listed Geneva, Brussels).
> Kennedy Group, Advisory Director - Jan 1993-December 1994

## PUBLIC SECTOR - Work Experience

**Vice President Bush's Commission on Deregulation**, 1981-84

**Federal Corporation (Presidential Appointment, Senate Confirmation)**
> Synthetic Fuels Corporation, Director, 1981-84

**Federal Government (Management of Pension Benefit Plans)**
> U.S. Department of Labor, Administrator of the Office of Pension &
> Welfare Benefit Programs ("ERISA"), 1984-85

**Federal Employee Retirement System (Presidential Appointment)**
> Federal Retirement Thrift Investment Board, Member - 1986-88

**State Government (Governor's Appointment)**, Chairman
> Committee to Study the Maine State Retirement System, 1987-88
>
> Committee to Study the Maine State Retirement System, 1993-94

**State Government (Senate Appointment)**, Committee Member
> California Senate Commission on Corporate Governance, Shareholder
> Rights and Securities Transactions, 1986

**State Government (Governor's Appointment)**, Administrator of Office of
Energy Resources (Maine), 1973-74

## MISCELLANEOUS

Chairman, Massachusetts Republican State Committee, Finance 1967-68,

Republican Candidate for U.S. Senate, Maine 1972, 1976, 1996

Member, Republican National Committee, 1977-78

Chairman, Maine Republican State Committee, 1977-78

Member Massachusetts, Maine and various federal bars

Member Phi Beta Kappa

Security Clearance - Federal Security Clearance obtained - Secret - July 1986 - Present

Author of many articles and books on Corporate Governance. With Nell Minow, he published *Power & Accountability* (Harper Collins, 1991), *Watching the Watchers* (Blackwell, 1996), and four editions of the standard case book, *Corporate Governance* (Blackwell, 4th, 2008). Mr. Monks also published *The Emperor's Nightingale* (Capstone, 1999), *The New Global Investors* (Capstone, 2001), *Corpocracy* (2007) and the novel *Reel and Rout* (Brook Street Press, 2004). He has published more than a hundred papers in publications around the world and has spoken about corporate governance on six continents. He has lectured widely, including to classes at Oxford, Cambridge, Harvard, Yale, Columbia, Stanford, University of California, Dartmouth, Chicago, and Northwestern. He has testified more than a dozen times before Congressional and Senate Committees on governance-related matters. He maintains a live relationship with corporate governance experts around the world on his web site - http://www.ragm.com - and is a frequent commentator in television, radio, magazine and newspapers coverage of corporate governance subjects. Mr. Monks was also the subject of a biography chronicling the corporate governance movement, *A Traitor to His Class* by Hilary Rosenberg.

# Exhibit E

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

## ABOUT THE FIRM

## LEGAL EXCELLENCE, DEDICATION TO CLIENTS, COMMITMENT TO PUBLIC SERVICE

Today, businesses face greater scrutiny and more "bet the company" issues than ever before. With a practice that offers unparalleled representation across a comprehensive range of practice areas, we have the ability to anticipate obstacles, seize opportunities and get the case resolved or the deal done—and the experience and know-how to prevent it from being undone.

Our firm, the Law Offices of Thomas G. Amon (**"AmonLaw"**) was formed in 2004 as a venture law/litigation boutique. To each practice, we bring outstanding reputations for quality, excellence and service to clients.

Our firm fosters a collaborative culture that allows each lawyer to draw freely on the expertise and time of others to serve any client. We balance our proud heritage and thorough understanding of the law with an innovative and entrepreneurial spirit. Our practice is constantly evolving in response to our clients' needs, the demands of the market and the emergence of new technologies.

We have a rich heritage of commitment to public service and the causes of justice and fairness.

Most importantly, our firm stands for a steadfast commitment to the highest standards in everything we do—a commitment reflected in the continued success of our clients across the globe.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

## PRINCIPAL ATTORNEYS

**Thomas G. Amon**, senior partner, formerly partner Sokolow, Dunaud, Mercadier & Carreras.  Harvard College and University of Virginia School of Law.  Practice areas: Mass tort, product liability, oil and gas securities fraud, shareholder derivative cases and general commercial.  Representative clients: Exxon-Mobil, Westinghouse Electric, San Paolo Imi Bank, Merrill Lynch & Co., Inc.  Over thirty years experience in all State and Federal Courts.

**Mark J. Lawless**, formerly counsel Prentice Hall Corporation and Simon and Schuster; Fordham College and Columbia University School of Law; Practice areas: copyright, publishing, arbitration, employment law, shareholder class actions and derivative actions, general commercial; representative clients: Simon & Schuster, WRC Media Group, Hachette Publishing. Over thirty years litigation experience in all State and Federal Courts.

**Harry H. Wise**, formerly partner, Gadsby & Hannah, Boston, Massachusetts.  Yale University and Boston College School of Law; Practice areas: media and libel, oil and gas securities fraud, contracts, international arbitration, shareholder class actions and derivative actions and general commercial; representative clients:  Raytheon Corporation, Navistar, Exxon-Mobil, Diamond Shamrock, Daily News.  Over thirty years experience in all State and Federal Courts.

**Michael Gold**, formerly assistant United States Attorney, E.D.NY. Brandeis University, Brooklyn Law School; Practice areas: white color criminal law, including money laundering, civil and criminal Rico, bank fraud and securities fraud, shareholder class actions and derivative actions. Over twenty years as criminal defense trial attorney.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

**Primary Practice Area**

**Venture Law Group**

AmonLaw has established one of the premier emerging technology practices in the country. We combine senior-level counseling and extensive industry knowledge to help emerging technology companies grow and prosper. We work in partnership with clients to build and represent deal-intensive emerging growth companies, both public and private, as well as with the venture capital and investment banking firms that support them.

We provide emerging companies with focused business and legal advice from incorporation through initial public offering, merger and beyond. We concentrate on general corporate counseling, venture financings, public offerings, mergers and acquisitions, intellectual property, technology transactions, employment, executive compensation and tax. We possess relationships with the nation's leading institutional, seed and angel venture capital investors and are among the leaders in structuring and negotiating venture capital financings. We play an active role in bringing together entrepreneurs and investors.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

**Primary Practice Areas**

**Broadcasting (Mass Media)**

AmonLaw has extensive experience in advising its commercial and non-profit educational broadcast clients on all facets of regulatory compliance, policy, and transactional matters, and the practical commercial and business issues attendant to them. Our clients in this area include major radio and television station group owners, national and international television and cable television programming networks and producers, various individual, minority and women station owners, venture capital/ private equity firms, and financial institutions with media-related interests.

Our day-to-day counseling goes beyond traditional FCC matters to include many aspects of a station's business and operations and the development of business structures appropriate for our clients' objectives. We also prepare talent, programming, and contest/event agreements, in addition to sports rights and syndication agreements. Our attorneys review advertising copy and promotional materials for state and federal compliance. We regularly counsel our broadcast clients on labor and employment matters, and the preparation of personal service agreements.

**Entertainment and Media**

AmonLaw's Media Group has substantial experience in entertainment, telecommunications, corporate finance, mergers and acquisitions, trademark and copyright and litigation and dispute resolution. We represent clients in contract negotiations, acquisitions, financings, copyright, trademark and licensing matters, international co-productions ventures, venture capital transactions, public and private offerings, guild arbitrations and other labor matters. Our clients include television and radio stations, television production companies, record companies, motion picture production companies, lenders to the industry, talent agencies, screenwriters, actors, directors, writers, publishers, cartoonists, new media and software developers.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

**Primary Practice Areas**

**Litigation – General**

AmonLaw represents clients in complex civil and criminal litigation, corporate investigations, class actions and stockholders derivative cases and domestic and international arbitrations. Our lawyers receive national and international recognition as top-rated practitioners. With a strong record of success as both trial and appellate lawyers, we have the experience and skill to execute a winning strategy from the outset of a case. We have extensive experience in the defense of toxic tort class actions and multi-district litigation.

Clients retain us not only for our litigation skill, but also because of our understanding of their industries and business goals, our knowledge of the regulatory and political environments in which they operate, and our experience in the technical and scientific disciplines at the core of many of their operations.

**Securities Litigation**

AmonLaw, in conjunction with leading national class action litigation firms, has a history of asserting the rights of investors in companies whose management violates the securities laws, or fiduciary or state statutory duties. The firm achieves this primarily through class action and derivative lawsuits.

The Firm's experience in class action securities litigation, in particular, **securities fraud claims** arising under the federal securities laws and regulations, including the Private Securities Litigation Reform Act of 1995 ("PSLRA"), is particularly extensive. The Firm, in conjunction with affiliated counsel, has recouped millions of dollars on behalf of classes of investors who purchased stock at prices artificially inflated by the defendants' material misstatements or omissions.

AmonLaw also has extensive experience litigating **shareholder derivative actions**, where shareholders bring actions on behalf of the corporation against persons who have harmed the corporation. For example, shareholders might claim that the officers and directors of a company breached their fiduciary duties to the company or its

shareholders by engaging in "self-dealing," or arranging a corporation's affairs in ways that benefit an officer and his friends at the expense of the corporation. AmonLaw was named Co-Lead Counsel in the case of <u>Thomas Huston, Derivatively on Behalf of DHB Industries, Inc. v. David H. Brooks, Sandra L. Hatfield, Dawn M. Schlegel, Jerome Krantz, Gary Nadelman, Cary Chasin, Barry Berkman and Larry Ellis and DHB Industries, Inc. as Nominal Defendant</u>, Case No. 05-CV-4529(JS) U.S. District Court. E.D.N.Y. and Liaison Counsel in the case of <u>Carolyn Phillips, Derivatively On Behalf of First BanCorp v Angel Alvarez-Perez, Annie Astor-Carbonell, Aurelio Aleman, Jose Julian Alvarez-Bracero, Jose Luis Ferrer-Canals, Sharee Ann Umpierre-Catinchi, Richard Reiss-Huyke, Jorge L. Diaz, Jose Teixidor-Mendez and Jose Menendez-Cortada and First BanCorp, as Nominal Defendant,</u> Case No. 05-CV-10244(VA/JSR), U.S. District Court S.D.N.Y. Most recently, AmonLaw is Co-Lead Counsel in <u>In Re Symbol Technologies Derivative Litigation</u>, File No: 2:05-CV-04536-DRH-WDW, U.S. District Court. E.D.N.Y.

Finally, AmonLaw has an established practice defending the interests of shareholders of corporations involved in **mergers or acquisitions**. In such situations, a corporation's officers and directors are required by law to maximize the value of the shareholders' investments.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

**White Collar Criminal Defense**

AmonLaw offers a complete range of white collar criminal defense services, from conducting internal corporate investigations, to defending corporations and individuals in grand jury (and related administrative) investigations and trials. We respond to allegations ranging from securities fraud to healthcare fraud and from customs violations and money laundering to antitrust violations. Our U.S. and international client base includes employees, chief executive officers, professional firms and corporations from a variety of industries. Each potential criminal case is unique and must be handled with the highest degree of care. The best result for a client who is the subject of an investigation is to avoid being charged at all, and we aggressively seek this result whenever possible. If a case does go to trial, we have the dedication, resources, skill and experience to provide the best defense. We also have achieved considerable success in handling the civil and administrative litigation that often accompanies criminal investigations, such as qui tam cases, SEC investigations and civil securities fraud litigation.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

## Securities

We assist clients in raising capital through a wide range of public equity and debt financings. These financings include both IPOs and additional offerings for a broad range of businesses, including financial services, retail, manufacturing, mining, natural resources, biotechnology, pharmaceuticals, film and television production and distribution, insurance, real estate, computer software and other technology, mutual fund management, and communications. Our practice includes a broad range of offering structures, from the "plain vanilla" to the novel and complex, in both domestic and international markets. We have worked with most major Canadian and U.S. underwriter and have acted on many cross-border and international offerings. This experience allows us to counsel public companies on regulatory compliance and risk and assist them if offenses occur.

AmonLaw has a preeminent international securities law practice. Considering our size, our practice is extremely diverse. We also offer sophisticated regulatory compliance advice and corporate governance counseling to companies and other financial market participants in the United States and Europe, and are highly regarded for our representation of investment management and broker-dealer businesses.

## Corporate Finance

Our corporate finance practice encompasses traditional and innovative financing transactions in both domestic and international capital markets. Our clients include major corporations and entrepreneurial and growth-oriented companies in all major industrial sectors, including technology, e-commerce and telecommunications; investment funds; major U.S., Canadian and foreign investors; commercial and merchant banking groups; and major insurance companies and other financial institutions.

We are regularly involved in public and private debt and equity financings, project financing, secured lending, and securitization and private equity transactions.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

**Intellectual Property**

Our intellectual property (IP) practice provides comprehensive solutions to the intellectual property business challenges that face companies at all stages of growth. Clients turn to us because we combine the specialized legal and technical skills normally associated with boutique intellectual property firms, with the broad business and litigation capabilities of a major general practice firm. Like similar boutique firms, we counsel inventors, R&D teams and management on trademark, copyright and trade secret protection, and IP portfolio development. Unlike most IP practices, however, we also offer interdisciplinary experience in technology transfer and licensing, litigation, sponsored and collaborative research agreements, and IP-related due diligence because we understand how IP relates to your company's business. We work closely with affiliated firms who draft and prosecute patent applications.

We also are uniquely positioned to counsel clients on their business and legal IP strategies, analyzing the value of existing IP portfolios and tailoring these portfolios to match the client's business needs. This often includes targeting future technological areas of interest, protecting existing areas from competitors and preparing for market changes.

**LAW OFFICES OF THOMAS G. AMON**
500 Fifth Avenue, Suite 1650
New York, NY 10110
Tel: 212-810-2430
Fax: 212-810-2427

## Corporate

We have been recognized for our preeminence in the representation of technology companies in the U.S. and Europe. Our corporate lawyers are well known for their work in initial public offerings, venture capital, private equity, mergers and acquisitions, strategic alliances, corporate governance matters and the representation of start-up companies.

Our business lawyers draw on the resources of our intellectual property, tax, labor and employment, employee benefits, real estate, bankruptcy and litigation practices to provide a one-stop solution to our corporate clients.

Our corporate lawyers service a diverse range of clients, from public and private companies to families and individual entrepreneurs.

## Financial Institutions

Clients look to us for assistance with complex, challenging federal regulatory and legislative, litigation, enforcement, and business transaction matters that impact them as banks, broker dealers, mortgage lenders, database operators, on-line firms, and other financial services providers. We have extensive experience in particular areas including commercial financial services, privacy and information security, international banking, and anti-money laundering matters. Our lawyers, in conjunction with affiliated partners, remain at the forefront of complex issues that impact financial institutions and providers of financial services here and worldwide.

# Exhibit F

# ROBBINS UMEDA & FINK, LLP
## ATTORNEYS AT LAW

610 West Ash Street, Suite 1800
San Diego, California 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991
Email: info@ruflaw.com

# FIRM RESUME

## ROBBINS UMEDA & FINK, LLP

Robbins Umeda & Fink, LLP (the "Firm") specializes in the nationwide prosecution of class and representative actions. The Firm is dedicated to vindicating the rights of shareholders, employees, consumers, and small businesses by passionately litigating these actions in state and federal courts throughout the United States. The Firm focuses on the prosecution of securities fraud actions, shareholder derivative actions, corporate merger actions, and ERISA/401K class actions brought in connection with publicly traded companies against their officers, directors, auditors, and investment banking firms. In addition, the Firm also litigates several consumer fraud and antitrust class actions. By doing so, the Firm has successfully negotiated several noteworthy settlements for its clients.

For example, in a recent securities class action in San Diego, *In re Titan, Inc. Sec. Litig.*, Master File No. 04-CV-0676-LAB (NLS) (S.D. Cal.), the Firm, serving in a Co-Lead Counsel capacity, was able to secure a $61.5 million settlement on behalf of the Class. This amounted to half of the estimated damages to the class and far exceeded the normal settlement gained in this type of case. It was also one of the largest securities fraud class action settlements in San Diego's history.

1

The Firm's lawyers also negotiated a settlement in *In re Nicor, Inc. S'holder Derivative Litig.*, Case No. 02 CH 15499, a shareholder derivative action in the Circuit Court of Cook County, Illinois, which resulted in personnel changes among Nicor's executive officers and board members, as well as securing $33 million for Nicor. In recognition of the hard work and significant benefits conferred during the litigation, the Honorable Sophia H. Hall, presiding Judge for the court, stated "Thank you very much for the good work that you all did. And I think that your stockholders will appreciate it, too. Thank you very much." Recently, the Firm secured a settlement of *In re OM Group, Inc. Derivative Litig.*, Case No. 1:03CV0020 (N.D. Ohio). As part of this resolution, the company received a $29 million benefit, the termination of OM Group's long term CEO, the addition of two shareholder nominated directors, and numerous other highly beneficial corporate governance matters.

The Firm's reputation for excellence has been recognized on repeated occasions by various courts throughout the country by appointing the Firm to leadership positions in complex class and derivative actions. The Firm currently serves as lead counsel in several high profile complex actions around the country. *See In re American International Group, Inc. Derivative Litig.*, Case No. 04 Civ. 08406 (S.D.N.Y.); *In re Forest Labs., Inc. Derivative Litig.*, Case No. 05-CV-3489 (S.D.N.Y.); *Pringle v. Merck & Co., Inc., et al.*, Case No. 03-3125 (D.N.J.); *In re Tenet Healthcare Corporation Derivative Litig.*, Case No. 01098905 (Santa Barbara Super. Ct.); *In re DHB Industries, Inc. Derivative Litig.*, Case No. CV-05-4345 (E.D.N.Y.).

**MEMBERS**

**BRIAN J. ROBBINS**

Brian J. Robbins, the Managing Partner and Co-Founder of the Firm, has been an active litigator of shareholder, employee, consumer, and small business rights for several years. In addition

2

to prosecuting actions for which he has principal responsibility, Mr. Robbins oversees and coordinates the work of the Firm's nearly 50 employees and all its litigation departments. As a litigator, Mr. Robbins has negotiated several noteworthy settlements of complex actions and successfully argued several noteworthy legal issues.

For example, Mr. Robbins was the lead negotiator for the derivative plaintiffs in *Harbor Finance Partners v. McGhan, et al.*, No. H-02-0761 (S.D. Tex.), litigation filed on behalf of Hanover Compressor Company. The "groundbreaking" and "unprecedented" Hanover settlement resulted in, among other things, a $26.5 million payment to the company, the return of 2.5 million shares to the company, the appointment of two shareholder nominated directors and the agreement to rotate the company's auditing firm. *See This Settlement Raises the Governance Bar; Hanover Compressor's Landmark Agreement with Shareholders to Embrace Major Corporate Reforms Could Have Profound Repercussions*, Stephanie Anderson Forest, BusinessWeek Online, May 15, 2003. Additionally, Mr. Robbins, as sole lead counsel, recently settled *In re OM Group, Inc. Derivative Litig.*, Case No. 1:03CV0020 (N.D. Ohio). As part of this resolution, Mr. Robbins helped secure $29 million for OM Group, the termination of OM Group's long term CEO, the addition of two shareholder nominated directors, and numerous other highly beneficial corporate governance matters. Mr. Robbins negotiated another groundbreaking settlement to resolve *In re Dynegy, Inc. Derivative Litig.*, Lead Case No. 2002-25250 (Harris County, TX, 164th Judicial District). This settlement acknowledged the role of the litigation in implementing extensive corporate governance reforms including: replacement of 11 members of the Board of Directors and several key officers, adoption of extensive measures specifically designed to increase the independence of the Board of Directors and its various committees, and the establishment of new committees and senior positions to

specifically enhance ethics and compliance efforts, as well as the integrity of the Company's financial reports, and assisted the company in securing a $150 million benefit, and implemented several critical and necessary corporate governance practices. Mr. Robbins also served in a Co-Lead Counsel capacity in *Larret v. Robertson, et al.*, Lead Case No. GIC754696 (S.D. Super. Ct.), a shareholder derivative action brought on behalf of MP3.com, Inc. ("MP3") which resulted in MP3's adoption of extensive corporate governance measures designed to specifically increase the independence of the board of directors and its committees and the transparency of any trading by insiders. In another shareholder derivative action settled through Mr. Robbins' efforts and the efforts of the Firm, the Honorable Robert S. Lasnik stated:

> "Well, I did review the papers here and I think you've actually set the bar kind of high for future settlements. This looks like an excellent result for the various class members in both the derivative action and the other action.... And it's to the credit of the lawyers that they were able to achieve this result before a lot of discovery and a lot of expenses were undertaken.... And so, I would be quite delighted and satisfied to make the necessary findings that this is an excellent settlement for plaintiffs."

*In re Cutter & Buck Sec. Litig.*, No. C02-1948L, Hearing on Settlement Transcript at 6-7 (W.D. Wash. Dec. 2, 2003).

Mr. Robbins has also negotiated several very highly beneficial settlements of securities fraud class action lawsuits. In a recent securities fraud class action in San Diego, *In re Titan, Inc. Sec. Litig.*, Master File No. 04-CV-0676-LAB (NLS) (S.D. Cal.), Mr. Robbins, along with his Firm, serving in a Co-Lead Counsel capacity, were able to secure a $61.5 million settlement on behalf of the Class. This amounted to half of the estimated damages to the class and far exceeded the normal settlement gained in this type of case. It was also one of the largest securities fraud class action settlements in San Diego's history. Mr. Robbins, as the lead attorney for his prior firm in *Garza, et*

4

*al. v. J.D. Edwards & Co., et al.*, Case No. 99-1744 (D. Col.), also helped secure over a $15 million recovery for a class of purchasers of J.D. Edwards & Co. stock.

Likewise, Mr. Robbins has also helped settle numerous other complex class action lawsuits. For example, Mr. Robbins played a pivotal role in *Supnick v. Amazon.com, Inc., et al.*, Case No. C-00-0221-P (W.D. Wash.), litigation which resulted in a $3.8 million cash recovery for the class and critical injunctive relief protecting the privacy of class members and other users of the Internet.

Mr. Robbins has also been at the forefront of litigation on several novel legal topics. For example, as Co-Lead Counsel in a class action brought on behalf of Internet users who had allegedly had their privacy violated because of the design of certain web pages, Mr. Robbins successfully briefed an opposition to a motion to dismiss brought by defendant Website operator Intuit, Inc. ("Intuit"). The issue, whether Intuit violated sections of the Electronic Communications Privacy Act through the manipulation of cookies placed on its visitors' computers, was a novel and untested application of the law. The court denied the defendant's motion to dismiss plaintiffs' cause of action based upon a violation of 18 U.S.C. §2701, *et seq.*, which prohibits unauthorized access to facilities where electronic communication services are provided. *See In re Intuit Privacy Litig.*, 138 F. Supp. 2d 1272 (C.D. Cal. 2001). This success eventually secured a settlement that resulted in numerous privacy protections provided to the class and future users of the quicken.com Website.

In *In re Toys R Us, Inc. Privacy Litig.*, Mr. Robbins successfully opposed a motion to dismiss claims brought under the Electronic Communications Privacy Act by Toys R Us, Inc. and Coremetrics, Inc. in an action alleging surreptitious monitoring of the activities of the users of the toysrus.com website. Despite the highly technical nature of these types of claims, Mr. Robbins was able to help defeat a motion to dismiss a 18 U.S.C. §2520 claim against Coremetrics and a 18 U.S.C.

5

§1030 claim against Toys R Us and Coremetrics. *See In re Toys R Us, Inc. Privacy Litig.*, No. 00-CV-2746, 2001 WL 34517252 (N.D. Cal. Oct. 9, 2001). The upholding of these claims against website providers was believed to be the first of their kind. This success lead to a settlement that provided significantly enhanced privacy protections to future users of the toysrus.com Website.

Mr. Robbins has also successfully briefed two issues of first impression as to whether removal of a shareholder derivative action to federal court based upon federal question grounds was proper. In a shareholder derivative action brought on behalf of JDS Uniphase Corporation ("JDS"), the defendants removed the case claiming that a shareholder derivative action based on similar factual allegations as a securities fraud class action brought against JDS and certain of its officers was not an "exclusively derivative" action under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") and thus SLUSA authorized removal of the action. Mr. Robbins, however, successfully argued that the similarity of the factual allegations could not alter the derivative nature of the action and the case was therefore not removable under SLUSA and should be remanded. *See Coykendall v. Kaplan*, 2002 U.S. Dist. LEXIS 22483 (N.D. Cal. Aug. 1, 2002). As Co-Lead Counsel in a shareholder derivative action brought on behalf of L90, Inc. ("L90"), Mr. Robbins, on another issue of first impression, was also successful in arguing that the removal provisions of SLUSA were not applicable to a shareholder derivative action because that action also included a class action claim seeking to protect the voting rights of L90's shareholders on equitable grounds. *See Shen v. Bohan*, 2002 U.S. Dist. LEXIS 22485 (C.D. Cal. Oct. 16, 2002). Mr. Robbins has also successfully briefed to the Supreme Court of Texas that a trial court's determination of whether a plaintiff has adequately alleged that a demand to initiate suit upon a company's board of directors would have been a futile and useless act is not an issue justifying interlocutory review. *See In re Dynegy, Inc.*,

6

No. 03-0768, Order (Sup. Ct. Tex. Sept. 8, 2003).

Currently, Mr. Robbins is also acting as lead counsel or as an executive committee member in several other complex litigation matters. Mr. Robbins is also commonly acknowledged as a prominent and respected litigator in his field as evidenced by a recent invitation by the Washington State Bar Association to be a panelist for "After the Storm: Securities and Corporate Litigation in the Post-Sarbanes World" at its 26th Annual Northwest Securities Institute.

Mr. Robbins graduated in only two and one-half years from the University of California at Berkeley with a Bachelor of Arts degree in Sociology in 1993. Mr. Robbins then received his law degree from the Vanderbilt School of Law in 1997. While at Vanderbilt, Mr. Robbins received the top score in constitutional law, corporate law, corporate and securities transactions, and soviet law and was a research assistant for two very well respected corporate and securities law professors: (1) Professor Donald C. Langevoort, the Lee S. and Charles A. Speir Professor at Vanderbilt University School of Law, former Special Counsel for the U.S. Securities and Exchange Commission in the Office of the General Counsel, co-author, with Professors James Cox and Robert Hillman, of Securities Regulation: Cases and Materials, the author of Insider Trading: Regulation, Enforcement and Prevention, and author of many law review articles, a number of which seek to incorporate insights from social psychology and behavioral economics into the study of corporate and securities law and legal ethics. Professor Langevoort also has testified numerous times before Congressional committees on issues relating to insider trading and securities litigation reform; and (2) Professor Larry D. Soderquist, one of the best known and most respected corporate and securities law professors in America, who has authored numerous books and articles on these subjects, including Understanding the Securities Laws, the most widely distributed book of its kind. Professor

7

Soderquist also was the Director of Vanderbilt's Corporate and Securities Law Institute. After graduating from Vanderbilt Law School, Mr. Robbins received his LL.M. in Securities and Financial Regulation from the Georgetown University Law Center in 1998. Mr. Robbins is licensed to practice in the State of California, the State of Connecticut, and the United States District Courts for the Central, Northern and Southern Districts of California, the District of Colorado and the United States Court of Appeals for the Fifth Circuit.

### MARC M. UMEDA

Mr. Umeda is Co-Founder and a Principal of the Firm. Mr. Umeda earned his Bachelor of Arts Degree in Political Science from the University of California at Berkeley in 1994 and his law degree from the University of San Diego School of Law in 1998, where he received the top score in Criminal Law and Property Law. Mr. Umeda was also a member of the *San Diego Law Review* and a Dean's Scholarship and Richardson Scholarship recipient. Mr. Umeda is licensed to practice law in the State of California, the United States District Courts for the Northern, Central and Southern Districts of California, the District of Colorado and the United States Court of Appeals for the Second, Third, Fourth and Seventh Circuits.

Mr. Umeda has practiced complex litigation throughout his legal career and devotes all of his time to the area of complex shareholder litigation, including securities fraud and shareholder class and derivative actions nationwide. Mr. Umeda is the lead attorney responsible for the day-to-day management of many complex shareholder derivative actions. In this capacity, Mr. Umeda has successfully written and argued numerous discovery and dispositive motions. Mr. Umeda has also negotiated the settlements of numerous class and shareholder derivative actions. For example, Mr. Umeda was one of the lead counsel in the *In re Nicor, Inc. Shareholder Derivative Litigation*, Case

8

No. 02 CH 15499, a shareholder derivative action in the Circuit Court of Cook County, Illinois. His efforts were a meaningful factor in the personnel changes among the company's executive officers and Board members, as well as the securing of $33 million for the company. In recognition of the hard work and significant benefits conferred during the litigation, the Honorable Sophia H. Hall, Presiding Judge for the court, stated "Thank you very much for the good work that you all did. And I think that your stockholders will appreciate it, too. Thank you very much." Mr. Umeda was also described as "an excellent lawyer" who is "trying to do the best possible job he can for [his client]" by the Honorable Mark R. Forcum of the Superior Court of California, County of San Mateo.

Mr. Umeda, on behalf of the Firm, was also appointed co-lead counsel by the court in *Imler, et al. v. AES Corporation, et al.*, No. 1:03-CV-00194-LJM-WTL (S.D. Ind.), to head the securities fraud class action litigation against AES Corporation and certain of its officers, wherein he assisted in the recovery of $5 million for the class of stock purchasers. Mr. Umeda has also secured extensive corporate governance reforms in numerous shareholder derivative actions throughout the nation.

**JEFFREY P. FINK**

Mr. Fink is Co-Founder and a Principal of the Firm. Mr. Fink received his Bachelor of Science degree in Finance from the University of Rhode Island in 1986. Thereafter, Mr. Fink served Cowen and Company and its institutional, options and arbitrage departments as a Floor Clerk on the American Stock Exchange. Mr. Fink then earned his Master of Science in Hotel Administration from the University of Nevada Las Vegas in 1995 where he was awarded the Outstanding Graduate Research Award for his paper "The Impact on Clark County Gaming Revenues from the Proliferation of Gaming Throughout the Country." While earning his degree, Mr. Fink worked for

Mirage Resorts in Las Vegas, Nevada conducting casino analysis. In 1998, Mr. Fink received his law degree from the University of San Diego School of Law. Mr. Fink is licensed to practice in the State of California, the United States District Courts for the Northern, Central and Southern Districts of California, the Eastern District of Wisconsin, and the United States Court of Appeals for the Ninth Circuit.

Mr. Fink has extensive experience in litigating complex insurance class action cases, securities arbitration cases, consumer fraud cases, invasion of privacy and wiretapping cases, shareholder derivative cases, ERISA class actions and securities fraud cases. Mr. Fink's expertise has been recognized on numerous occasions by courts who have appointed him to leadership positions charged with prosecuting complex litigations on behalf of plaintiffs.

Jeffrey P. Fink has broad experience in corporate, securities and shareholder derivative litigation. Most recently, Mr. Fink, in one of the most politically controversial corporate mergers in recent history, recently secured over $500 million to Unocal Corporation shareholders as part of an increased bid by Chevron Corporation in *Leib, et al. v. Unocal Corp., et al.*, Case No. BC331316 (Cal. Super. Ct.). Additionally, Mr. Fink was instrumental in causing Unocal to issue a supplemental proxy statement that allowed Unocal shareholders to have a fully informed vote when considering Chevron Corporation's bid versus that of the Chinese National Offshore Oil Corporation.

Mr. Fink was appointed Co-Lead Counsel and assumed the role as lead litigator in *In re Titan, Inc. Sec. Litig.*, Master File No. 04-CV-0676-LAB (NLS) (SD Cal.). Through Mr. Fink's efforts the class received $61.5 million, which amounted to half of the calculated damages, for Titan's violations of the Foreign Corrupt Practices Act which caused Lockhead Martin to back out of its multibillion dollar offer for Titan.

10

## FELIPE J. ARROYO

Mr. Arroyo is a Principal of the Firm. He received his Bachelor of Arts degree in Economics from the University of California at Los Angeles in 1989 and his law degree from the Yale Law School in 1992. While at Yale, he served as a Senior Editor of the *Yale Law Journal* and a Director of the Yale Moot Court of Appeals. After law school, Mr. Arroyo spent 2 years with New York-based Weil Gotshal & Manges, over 10 years with Los Angeles-based O'Melveny & Myers LLP and 2 years as corporate General Counsel for a fitness company. Mr. Arroyo is licensed to practice law in California and the United States District Court for the Central District of California. In addition to litigating complex shareholder derivative, securities fraud and corporate breach of fiduciary duty actions, Mr. Arroyo is committed to training and developing core litigation and trial skills for attorneys at the Firm.

Mr. Arroyo's entire legal career has been dedicated to complex litigation. He has prosecuted and defended numerous complex commercial, patent, securities fraud and breach of fiduciary duty actions. In leading many of these actions, Mr. Arroyo has conducted approximately 100 lay witness and expert depositions and argued numerous discovery, evidentiary and dispositive motions.

Mr. Arroyo has had broad exposure to an array of complex commercial litigation subjects arising in many different industries. In recent years, he led an investigation on behalf of a publicly traded entertainment company into alleged improprieties raised by a stock exchange concerning trading in its securities. He also managed and supervised a complex litigation defense team of 20 lawyers in contract litigation brought by hotel owners against a global, multi-billion dollar hotel management company. In that multi-year case, Mr. Arroyo honed his electronic document management expertise as he negotiated and supervised the production of millions of pages of

11

documents. He also has approximately 5 years securities litigation experience in separate cases in which he defended a computer microprocessor manufacturer, biotechnology company, and accounting firm. Mr. Arroyo has also led an international patent infringement litigation team in a successful effort to obtain approximately $25 million in value for the inventor of a fitness device.

Mr. Arroyo is also an experienced trial lawyer. From 2001 through 2006, he directed a unique public/private partnership called the Trial Advocacy Prosecution Program (T.A.P.P.) in which attorneys from O'Melveny & Myers prosecuted approximately 10 to 20 criminal jury trials to verdict per year. In this time as the director of T.A.P.P., Mr. Arroyo was lead trial lawyer for 7 jury trials that went to verdict, and prosecuted innumerable motions *in limine* and suppression motions. In the last 18 months alone, Mr. Arroyo spent approximately 7 weeks in trial. As the director of T.A.P.P., Mr. Arroyo was also responsible for training and supervising other O'Melveny & Myers trial lawyers. In such capacity, he supervised and trained over 100 lawyers in core trial mechanics, including developing and delivering opening statements, conducting direct and cross examinations, working with exhibits and demonstratives in paper and electronic form, resolving evidentiary issues and giving persuasive closing arguments.

## OF COUNSEL

### BENJAMIN ROZWOOD

Mr. Rozwood is Of Counsel to the Firm. Mr. Rozwood received his J.D. from Harvard Law School in 1994, where he served as President of the International Law Society and was awarded the Reginald Lewis International Fellowship. Prior to law school, Mr. Rozwood graduated *magna cum laude*, Phi Beta Kappa, and as a Regents Scholar from UCLA in 1991.

Prior to joining the Firm, Mr. Rozwood spent six years in the securities and insurance

12

litigation practice groups of O'Melveny & Myers LLP, one of the top firms in California and internationally. Mr. Rozwood also previously served as a corporate finance associate handling public and private, debt and equity offerings, combination transactions, tender offers, and related SEC filings. Mr. Rozwood has broad experience in corporate and securities litigation matters involving inadequate business and financial data reporting, GAAP noncompliance, insider trading, and illegal product pricing and sales practices in various industries including finance, energy, entertainment, communications, insurance, and the Internet. Some of Mr. Rozwood's complex litigation experience includes:

- Defeating a suit by bondholder plaintiffs to enjoin a $12.9 billion debt exchange offer;

- Serving as counsel to the Audit Committee of a board of directors of a publicly traded company investigating certain accounting entries when the company's outside auditor expressed concerns before a scheduled earnings announcement. As part of this process, Mr. Rozwood interviewed current and former company employees including the CEO, CFO, and Controller, analyzed relevant books and records, reviewed company policies and procedures, and prepared conclusions and recommendations for presentation to the Audit Committee;

- Working on several securities fraud class actions, taking the lead role in researching and writing motions to dismiss, including the review of analyst reports, news releases, and SEC filings, and analysis of pleading requirements and "forward-looking" statement safe harbor issues. Mr. Rozwood also has significant experience interviewing witnesses in such cases, before and after the commencement of formal discovery;

- Successfully defending several executives of a de-listed public company in a suit brought by sophisticated foreign investors alleging fraud and breach of contract in a "death spiral" PIPE transaction. Mr. Rozwood was responsible for mapping out and executing the discovery plan, taking and defending depositions, presenting arguments at the mediation, supervising a team of over 10 lawyers and staff to execute an expanded discovery and dispositive motion strategy, and successfully writing and arguing key motions for summary adjudication. Mr. Rozwood's representation resulted in his client paying nothing and plaintiffs making a significant payment to Mr. Rozwood's client in settlement of its cross-claims;

- Researching, preparing and arguing a motion to compel NASD arbitration in a case involving complex securities and insurance products. Mr. Rozwood negotiated the protective order and handled all fact development and legal issues, including the respective duties of

13

broker/dealers and issuers in those transactions. Based on witness interviews and review of key documents, Mr. Rozwood prepared the Statement of Answer, including a cross-claim for indemnity, wrote the mediation brief, presented the case at mediation, handled all negotiations and settled the case without his client paying anything. Mr. Rozwood also prevailed on the cross-claim for indemnity;

• Representing a major insurance company in shaping case strategy and organizing and supervising a team of associates to execute a discovery plan in an arbitration that went to trial before a panel of AAA arbitrators. Mr. Rozwood took and defended numerous depositions, and prepared and prevailed on a motion to compel key witnesses and documents. Mr. Rozwood also reviewed and analyzed key documents, including the Underwriting and Quota Share Reinsurance Agreements and damages production, and worked with damages expert to prepare his report. After researching relevant fiduciary duty principles for agents in insurance law contexts, Mr. Rozwood drafted the trial brief on that point and addressed form and rate filings with regulatory authorities and related actuarial justifications. After Mr. Rozwood cross-examined the other side's chief actuary and underwriter at trial, Mr. Rozwood's trial team defeated all adverse claims, and their client prevailed on some of its affirmative claims;

• Researching and preparing the opposition to plaintiffs' motion for a temporary restraining order and settling the case on favorable terms for his client before the hearing in a trademark infringement action brought by a major computer company;

• Researching and revising a demurrer based on plaintiff's improper joinder of defendants, and obtaining an outright dismissal of the suit in a unfair premium refund practices complaint alleging violations of Cal. Bus. & Prof. Code §17200 brought against a Bermuda-based property and casualty reinsurer; and

• Working on a trial team that defeated a $100 million claim at trial for tortious business practices and contract breaches against one of the largest telecommunications services companies in the world. Mr. Rozwood researched and wrote numerous motions *in limine*, worked with statistics expert to prepare rebuttal declaration testimony supporting same, and drafted portions of the trial brief.

Mr. Rozwood also has extensive experience representing studios and television networks in a variety of assignments, including researching and writing anti-SLAPP motions, and successfully demurring to a false advertising suit on first amendment grounds. Mr. Rozwood has also represented the executives of a top network in negotiating an extension to showrunner team's production contract in connection with renewal of a well-known TV series.

14

Mr. Rozwood has handled numerous contract and copyright claims and AFMA arbitrations, including several arbitrations relating to pre-sales and delivery disputes arising out of distribution contracts, and a suit to recover a Minimum Guarantee advance payment based on failure to meet delivery specifications.

Mr. Rozwood now focuses his litigation efforts on representing shareholders, consumers and employees in complex class and representative actions in California and throughout the United States.

**ASSOCIATES**

**STEVEN J. SIMERLEIN**

Mr. Simerlein earned a B.A. in Political Science from Tulane University, New Orleans, Louisiana, in 1983, graduating cum laude with departmental honors. Receiving a commission in the U.S. Navy after graduation, he first served as the Main Propulsion Assistant on the USS Dubuque (LPD-8), an amphibious transport dock for the U.S. Marines. While onboard, he received recognition as a top shiphandler in the Pacific Fleet for his ship type. In 1986, he was assigned as the Combat Systems Officer on the Navy hydrofoil USS Aquila (PHM-4). He participated in extensive drug smuggling interdiction and other special operations in the Caribbean Sea.

Following his military service, Mr. Simerlein attended Loyola of Los Angeles Law School, earning his J.D. in 1991. While at Loyola, he received the highest grade in Insurance Law and served on the school's International and Comparative Law Journal. He also served in the Los Angeles District Attorney's office, where he prosecuted 25 felony preliminary hearings and a successful jury trial.

Mr. Simerlein began his legal career with the San Diego law firm of Jennings, Engstrand &

Henrikson, where he practiced bankruptcy and public agency law. In his first year, Mr. Simerlein assisted the U.S. Trustee's office and creditors in Bankruptcy Court. In particular, he made numerous appearances on behalf of secured creditors that successfully moved for relief from the automatic bankruptcy stay. He also assisted the federal Resolution Trust Corporation with the favorable resolution of disputed loan guaranties. Finally, he also began to develop expertise in the representation of public entities, handling such diverse areas of practice from eminent domain, water and environmental law, and First Amendment disputes.

Mr. Simerlein then moved to the San Diego office of Weissburg & Aronson, Inc. He focused his practice on the representation of public agencies and public & private health care entities. Mr. Simerlein spent significant time as counsel to client boards and staff relative to service contracts, real estate acquisitions, eminent domain disputes, redevelopment, California Environmental Quality Act, insurance and self-insurance, conflict of interest, public records and open meetings laws. He also defended the firm's health care providers in regulatory enforcement proceedings by the state and federal government.

In 1996, Weissburg & Aronson, Inc. merged with the national law firm of Foley & Lardner LLP. Mr. Simerlein then began to focus the majority of his practice as a litigator in administrative, state and federal court forums. Mr. Simerlein became a partner at Foley & Lardner LLP in 2000. His wide variety of clients included public self-insurance pools, school, fire, and health care districts, skilled nursing and assisted living facilities for the elderly, and physician groups. He developed significant expertise in the areas of insurance and self-insurance pools, public contracts, bidding disputes, mechanic's liens and stop notices, construction claims and disputes, regulatory and enforcement proceedings against health care clients, and the development of web sites.

In particular, his efforts on behalf of health care clients in about 50 matters before state and federal administrative law judges and hearing officers allowed clients to strike or minimize substantial proposed penalties, improve the quality of care rendered at the facilities and avoid closures that would have disrupted patient continuity of care. For his public entity clients, Mr. Simerlein litigated a wide variety of matters, including a bench trial in which the court granted an emergency easement to allow the timely completion of a school, post-judgment motions on behalf of a client that reduced potential interest on a claim by several million dollars, and school construction disputes in state and federal courts that uniformly resulted in favorable settlements or arbitrations for his clients.

Since joining the Firm, Mr. Simerlein's practice has narrowed to the litigation of class actions, shareholder derivative lawsuits, insurance disputes and related matters. Mr. Simerlein also is fluent in the Spanish language and has undertaken occasional pro bono work for under-represented Latino clients to help facilitate their access to the judicial system.

**KEVIN A. SEELY**

Kevin A. Seely is a former Assistant United States Attorney ("AUSA") with substantial experience in both criminal and civil fraud prosecutions. He is a trial lawyer with over 14 years of litigation practice in government and in the private sector. He graduated, *cum laude*, from the University of California at Irvine in 1989 and earned his Juris Doctor degree in 1992 from the Northwestern School of Law of Lewis & Clark College, where he was an Associate Editor of Law Review. He is licensed to practice law in California, Guam and the Northern Mariana Islands. At the Firm, Mr. Seely focuses on representing shareholders, consumers and employees in complex class and representative actions in California and throughout the United States.

17

Mr. Seely has a proven track record in litigating and trying complex criminal and civil fraud cases. Throughout his career, Mr. Seely has been responsible for developing and implementing complex fraud and public corruption investigation and litigation strategies. While he was with the government, he has worked with and consulted, among others, numerous auditors, forensic accountants, and other experts, including agents from the Federal Bureau of Investigations, Office of Inspector General, and Central Intelligence Agency. He has worked with these experts and agents to develop complicated investigations and to prepare matters for trial. In prosecuting these cases, Mr. Seely mastered, among other things, the tracing of fraudulent transactions through mazes of accounting spreadsheets and accounting records.

Over the years, Mr. Seely has handled countless complex and document-intensive discovery issues and disputes. He has represented several foreign entities, obtained documents from foreign countries, and taken depositions of foreign nationals. He has ample experience working closely with expert witnesses in a variety of technical fields and has logged hundreds of hours working with experienced forensic accountants in order to master complex accounting systems of the companies that were being investigated. He has perfected the skill of being able to translate complex and convoluted subject matter into understandable and logical facts able to be comprehended by the average juror.

Mr. Seely has argued numerous motions in both civil and criminal matters. He has assisted federal agencies in drafting detailed search warrants and document demands. He has taken numerous depositions and ample Grand Jury testimony. He has tried cases before judges and juries and he has negotiated multi-million dollar settlements.

In doing all of this, Mr. Seely earned a reputation as a solid and tenacious trial lawyer. For

18

example, he was once appointed by a court to perform as the lead defense counsel in a murder trial. Later in his career, as an AUSA, he successfully prosecuted high-ranking government officials, corporate entities, and sophisticated business professionals for a variety of fraud schemes, including wire and mail fraud, bribery, theft of government services, embezzlement, and healthcare fraud, among other things.  Following a jury trial, wherein Mr. Seely obtained a guilty verdict against a former Finance Secretary for stealing public funds, the veteran District Court Judge presiding over the matter later commented that Mr. Seely's trial presentation was one of the best presentations that the judge had seen in his courtroom.

Before serving as an AUSA, Mr. Seely had already acquired substantial civil litigation experience.  From 1992 to 1998, Mr. Seely was first an associate and then later a partner of the law firm of Mair, Mair, Spade & Thompson, P.C., where he primarily represented corporate clients in complex business and litigation matters.  His primary areas of focus were in commercial litigation and insurance defense.  During his tenure with the firm, Mr. Seely worked on a number of complex commercial cases, conducting numerous depositions and arguing countless discovery and dispositive motions and appeals.

As an AUSA for the Districts of Guam and Northern Mariana Islands from 1998 through 2000, Mr. Seely handled complex criminal matters for the United States government.  His focus was on white collar crime and public corruption matters.  Many of these cases involved claims of embezzlement and wire fraud by white collar professionals in the banking, government services and healthcare industries.

From 2000 to 2006, Mr. Seely served as an AUSA in the Southern District of California.  In this position, Mr. Seely expanded his complex fraud prosecution practice to encompass civil fraud

19

claims under the Federal False Claims Act. These cases, while varied, primarily involved the investigation and civil prosecution of fraudulent billing practices by defense contractors and healthcare providers.

### CAROLINE ANN SCHNURER

Ms. Schnurer graduated with a Bachelor of Arts degree in Politics from Scripps College in Claremont, California in 1995. She earned her law degree at the University of Notre Dame Law School in South Bend, Indiana in 1999. Ms. Schnurer is licensed to practice in the State of California.

Upon graduation from law school, Ms. Schnurer began an extensive practice in estate planning, probate, trust administration, conservatorships, elder law, and probate and trust litigation in Palm Springs, California. After moving to San Diego, Ms. Schnurer has concentrated her practice in the litigation of complex class actions, securities fraud and shareholder derivative actions. In the context of shareholder derivative claims, Ms. Schnurer has been successful in remanding shareholder derivative suits from federal court to state court. For example, in *Rabin v. Antioco, et al.,* No. 03CV1058 D (N.D. Tex.), a shareholder derivative suit brought on behalf of Blockbuster, Inc., the defendants removed the case to federal court based upon plaintiff's allegations of the defendants' violations of federal securities laws. Ms. Schnurer successfully argued that the allegations of the defendants' violations of federal securities were merely used as support for the defendants' violations of state fiduciary laws and were not essential in determining whether or not the defendants breached their fiduciary duties under state law. Then again, in *Fathergill v. Rouleau, et al.,* No. 03CV0879 D (N.D. Tex.), a shareholder derivative suit on behalf of Michaels Stores, Inc., the defendants claimed that the case should be removed to federal court because plaintiff's allegations of federal

20

securities violations had to be adjudicated in order to resolve plaintiff's state law claims.  Ms. Schnurer once again successfully argued that the allegations of federal securities violations were peripheral to the state law issues and that the state law allegations did not involve the resolution of a substantial question of federal law.  Both cases were remanded and plaintiffs in both actions were awarded their attorneys' fees and costs incurred in connection with defendants' improvident removal. *See Young ex rel. Blockbuster, Inc. v. Antioco*, 2003 U.S. Dist. LEXIS 13786 (N.D. Tex. Aug. 6, 2003); *Fathergill v. Rouleau,* 2003 U.S. Dist. LEXIS 10654 (N.D. Tex. June 23, 2003).

### MARK A. GOLOVACH

Mr. Golovach graduated from the University of Illinois at Urbana-Champaign with a Bachelor of Arts in Political Science in 1998, where he was named to the Dean's List each semester. Mr. Golovach obtained a Juris Doctor degree from Tulane University School of Law in New Orleans, Louisiana in 2001.  During law school, Mr. Golovach was selected by faculty members to participate in Tulane's Civil Law Clinic, where he represented indigent clients in employment, family law and landlord/tenant disputes as a student attorney.  Mr. Golovach spent his law school summers working as a law clerk for the Honorable J.E. DeVilbiss in Aspen, Colorado and as a summer associate for Hillyer & Irwin in San Diego (concentrating on civil litigation matters).  At the Firm, Mr. Golovach litigates complex commercial matters, including securities fraud class actions and shareholder derivative suits.

Since the beginning of his legal career, Mr. Golovach has focused on complex commercial litigation matters, including class actions.  Mr. Golovach has gained experience throughout his legal career in all phases of commercial litigation and complex case and fact development, from discovery to motion work.  He has conducted or defended nearly 100 depositions in a varied range of cases.

21

Mr. Golovach has also successfully written and argued numerous discovery and dispositive motions in both state and federal courts.

In addition to honing his legal skills over the years, Mr. Golovach has also remained a committed member of his community. His community leadership dates back to law school, where he was elected Vice President of the Sports Law Society. More recently, in 2003, Mr. Golovach served as a member of the Board of the San Diego Barristers Club. He is also involved in skill development organizations. In 2006, for example, he participated in the American Inns of Court, Louis M. Welsh chapter, a workshop that builds a variety of litigation skills. Mr. Golovach is licensed to practice law in the State of California and the United States District Court for the Southern District of California.

### LOUIS A. KERKHOFF

Mr. Kerkhoff graduated with a B.A. in Psychology and a minor in Economics from the Louisiana State University in 1998. He earned his law degree at the Louisiana State University, Paul M. Hebert Law Center in 2002, where he was awarded the Center for Computer Assisted Legal Instruction Excellence for the Future Award for the top score in Uniform Commercial Code Sales. While in law school, Mr. Kerkhoff was also a member of the *Louisiana Law Review*.

Since joining the Firm, Mr. Kerkhoff has concentrated his practice in the litigation of complex class actions and shareholder derivative actions. Mr. Kerkhoff is licensed to practice law in the State of California.

### SHANE P. SANDERS

Mr. Sanders received his Bachelor of Arts in Sociology from the University of California at Santa Barbara ("UCSB") in May 2001. He was also a member of UCSB's Division I track and field

team, specializing in the 400-meter dash.  In May 2004, he obtained his Juris Doctor from the University of San Diego School of Law ("USD").  During law school, Mr. Sanders worked as a law clerk at the San Diego County Public Defender's Office, where he represented clients in various criminal matters and gained invaluable experience both in and out of the courtroom.  He gained further experience in legal writing and oral argument through his participation in USD's Thorsnes Closing Argument Competition and Senior Honors Moot Court Competition.  He was also a member of the Sports and Entertainment Law Society and the Association of Trial Lawyers of America.

Since joining the Firm, Mr. Sanders has concentrated his practice in the litigation of complex class actions, securities fraud and shareholder derivative actions.  Mr. Sanders is licensed to practice law in the state of California.

### REBECCA A. PETERSON

Ms. Peterson received her Bachelor of Arts in Political Science with a focus in Philosophy of Political Thought and a concentration in Environmental Studies from St. Olaf College in Northfield, Minnesota in 1998.  While attending St. Olaf, Ms. Peterson was a frequent contributor of opinion pieces to the student newspaper, Manitou Messenger.  As an undergraduate, Ms. Peterson was also an intern for the American Bar Association's Section of International Law in Washington D.C. Upon graduation, Ms. Peterson went to work at North State Advisers, a governmental and public relations firm in Minneapolis, Minnesota, where she served as the Communications Specialist and a Lobbyist.  While at North State Advisers, Ms. Peterson advised clients on political strategies, effectively argued client issues before elected officials, drafted amendments and introduced bills on behalf of clients. Ms. Peterson left North State Advisers in 2002 to attend law school.

In May 2005, Ms. Peterson received her Juris Doctor from the University of San Diego

School of Law. During law school, Ms. Peterson was a law clerk for the County Attorney's Office of Ramsey County in Minnesota and a research assistant to Kevin Cole, the present Dean of the University of San Diego School of Law. Additionally, Ms. Peterson was a law clerk at the Attorney General's Office of the State of California in the Criminal division of Appeals, Writs and Trials in San Diego. Ms. Peterson, as a certified law student, had the very unique opportunity to submit multiple Respondent Briefs on behalf of the State and successfully argue two cases in front of the Court of Appeals.

In the fall of 2005, Ms. Peterson was licensed under the General Securities Representative Examination, informally known as the Series 7, to solicit, purchase and/or sell all securities products and under the series 66 as an Investment Advisor Representative.

Since joining the Firm, Ms. Peterson has concentrated her practice in the litigation of complex securities class actions and shareholder derivative actions. Ms. Peterson is licensed to practice law in the State of California.

**ASHLEY R. PALMER**

Ms. Palmer received her Bachelor of Arts in Psychology from the University of California at Santa Barbara ("UCSB") in May 2002. She then accepted a full scholarship to Thomas Jefferson School of Law, where she obtained her Juris Doctor in May 2006. Ms. Palmer graduated from law school, *summa cum laude*, second in her class out of 194 students. While in law school, Ms. Palmer was Chief Articles Editor and Notes Editor of Law Review and Vice President of Operations of the Tax Society, as well as a summer associate with the Firm. She also received the Outstanding Scholastic Achievement Award for the 2004-2005 school year in recognition of her significant contribution toward overall legal scholarship. Ms. Palmer was also on the Dean's List throughout

24

law school and achieved the highest grade in Honors Legal Writing II, Trusts, Property II, Business Associations and Securities Regulations.

Since joining the firm, Ms. Palmer has concentrated her practice in the litigation of complex actions, including securities fraud class actions and shareholder derivative actions. Ms. Palmer is licensed to practice law in the state of California.

### JILL E. KLEMANN

Ms. Klemann graduated from the State University of New York ("SUNY") at Geneseo in 2003 with a Bachelor of Arts degree in Sociology and a minor in Legal Studies. While at SUNY Geneseo, Ms. Klemann served as a research assistant to Dr. Anne Eisenberg, researching a national lobby group from its inception as a family and friends support group. She was also a member of the Alpha Kappa Delta Sociology Honor Society and on the Dean's List her senior year.

Ms. Klemann then earned her law degree and mediator certificate at Roger Williams University School of Law in Bristol, Rhode Island in 2006. During law school, Ms. Klemann participated in the Roger Williams University Community Justice and Legal Assistance Clinic, where she represented clients from the Adult Correctional Institute in various family law matters, gaining invaluable experience both in and out of the courtroom. Additionally, Ms. Klemann interned at the Monroe County District Attorney's Office, Major Felonies Bureau, in Rochester, New York collaborating on case and trial strategy, as well as participating in trial preparation. Ms. Klemann gained insight into the American and English legal systems as a Mini-Pupil during a comparative advocacy study abroad program in London, England. As a Mini-Pupil, Ms. Klemann was able to shadow both a criminal barrister and solicitor and assisted in a criminal trial.

Since joining the Firm, Ms. Klemann has concentrated her practice in the litigation of breach

25

of fiduciary duty actions involving publicly traded companies and their current and past officers and directors. Ms. Klemann is licensed to practice in the State of California.

**DANIEL R. FORDE**

Mr. Forde received his Bachelor of Arts in Political Science from the University of Arizona in December 2002. While at the University of Arizona, Mr. Forde served as an intern for two years for United States Senator John McCain, working directly with constituents to resolve disputes with various federal agencies. Mr. Forde also assisted Senator McCain in his year 2000 presidential bid. As an undergraduate, Mr. Forde also served as the president and philanthropy chair of the 120-member fraternity of Phi Gamma Delta.

Mr. Forde earned his Juris Doctor from California Western School of Law in April 2006. During law school, Mr. Forde earned an Academic Achievement Award in Securities Regulation and authored original thesis papers providing analysis of: (i) the U.S. Sherman Antitrust Act; and (ii) the European Union's Anti-Competition Laws. Prior to his completion of law school, Mr. Forde worked as a summer associate for the Firm and also completed an internship with the San Diego City Attorney, Civil Division, working on numerous municipal bond offerings. Additionally, Mr. Forde worked as a law clerk with a solo practitioner in a major California Blue Sky securities fraud bench trial. Finally, Mr. Forde also completed an internship at British Telecom in London, England, working with in-house counsel on important corporate governance matters.

Since joining the Firm, Mr. Forde has concentrated his practice in the litigation of corporate merger actions, complex class actions, and securities fraud and shareholder derivative actions. Mr. Forde is licensed to practice in the state of California.

**ARSHAN AMIRI**

Mr. Amiri earned his Bachelor of Science degree in Chemistry with an emphasis in Biological Chemistry from the University of Utah in 2001. Following his undergraduate studies, Mr. Amiri enrolled in the graduate program for Bioengineering at the University of Utah, and completed his Master of Science program in 2003. During his Master of Science studies, Mr. Amiri's research focused on the targeted delivery of polymer conjugated anti-cancer compounds to tumor sites for cancer therapy. In the summer of 2003, he presented his work at an international science conference for the Controlled Release Society.

Mr. Amiri earned his law degree at the University of San Diego School of Law in 2006. While in law school, Mr. Amiri served as a judicial extern to the Honorable Rudi M. Brewster of the United States District Court for the Southern District of California. Mr. Amiri focused much of his legal coursework on the study of Intellectual Property law by taking such classes as Patent law, Biotechnology law, Intellectual Property Seminar, and an International Intellectual Property. Additionally, Mr. Amiri served as a law clerk to a sole patent practitioner.

Since joining the firm, Mr. Amiri has concentrated his practice in the litigation of corporate merger actions, shareholder derivative actions and breach of fiduciary duty actions involving publicly traded companies. Mr. Amiri is licensed to practice in the state of California.

**JULIA M. WILLIAMS**

Ms. Williams graduated with a Bachelor of Arts degree in Political Science and Economics (with Honors) from the University of California, San Diego in 2002. After graduation, she worked as a financial analyst at a Fortune 500 company. In this position, she prepared presentations and accompanying materials for monthly, quarterly and annual board of directors and executive officer meetings, drafted company financial reports, and participated in the preparation of company wide

financials and Securities and Exchange Commission filings.

In May 2006, Ms. Williams obtained her law degree from the University of California, Los Angeles School of Law, with a concentration in Business Law. While in law school, Ms. Williams was Managing Editor for the Entertainment Law Review, and a staff member of the Journal of International Law and Foreign Affairs. Ms. Williams also participated in Moot Court and numerous student volunteer organizations, and was the recipient of the Graduate Opportunity Fellowship.

Upon graduation from law school, Ms. Williams began practice in general civil and business litigation. Since joining the Firm, she has concentrated her practice in the litigation of corporate merger actions, complex class actions, and securities fraud and shareholder derivative actions. Ms. Williams is licensed to practice in the state of California.

## PARALEGALS

### KATHERINE B. SCHEELE

Ms. Scheele graduated from the University of California at San Diego in June of 2003 with a Bachelor of Arts degree in Political Science and Studio Art, with a minor in Spanish Literature. In June of 2005, Ms. Scheele earned her American Bar Association approved paralegal certificate from the University of California San Diego. Since joining the Firm, Ms. Scheele has concentrated on assisting the Firm in litigating complex shareholder derivative and class action litigation.

### KRISTIN E. HUSTON

Ms. Huston graduated *magna cum laude* from the California State University San Marcos in 1999 with a Bachelor of Arts degree in Liberal Studies and a minor in Sociology. Ms. Huston then earned her American Bar Association approved paralegal certificate from the University of California San Diego in 2002. Since joining the Firm, Ms. Huston has concentrated on assisting the

28

Firm in litigating complex shareholder derivative and class action litigation.

### SEAN M. PUTTICK

Mr. Puttick graduated with a Bachelor of Arts (with Honors) degree in Economics and Political Science from the University of Leeds (U.K.) in 1997. After college, Mr. Puttick became a Document Clerk at Beasley and Co. Solicitors in Manchester, England. He then moved to London to work for an independent record label, Hooj Choons Ltd., as an assistant to the Director, helping to sign new artists and negotiate contracts with their management. In 2002, Mr. Puttick took a job as an Editorial Assistant at the San Francisco Chronicle where he gained a copy editing qualification. In 2004, Mr. Puttick earned his American Bar Association approved paralegal certificate from New York University. During and after obtaining his certificate, Mr. Puttick worked as a paralegal at Milberg Weiss, assisting in the litigation of several mutual funds securities cases and multi-district litigation in the health care arena. He moved to San Diego in 2005 and joined Robbins Umeda & Fink, LLP as a paralegal. Since joining the Firm, Mr. Puttick has concentrated on assisting the Firm in litigating complex shareholder derivative and class action litigation.

### LISA A. DOZIER

Ms. Dozier graduated from the University of Southern Indiana in 1986 with a Bachelor of Science degree in Communications with an emphasis in Journalism and a minor in Psychology. Prior to becoming a paralegal, Ms. Dozier focused on assisting her small business with drafting overseas licensing contracts and preparing and filing copyright and trademark applications. In September 2006, Ms. Dozier earned her American Bar Association approved paralegal certificate from the University of California San Diego, graduating with a perfect 4.0 G.P.A. Since joining the Firm, Ms. Dozier has concentrated on assisting the Firm in litigating complex shareholder derivative

29

and class action litigation.

### CHRISTOPHER M. BOUCHER

Mr. Boucher received his Bachelor of Arts in History from Williams College in 2003, which included coursework at the University of London. As an undergraduate, Mr. Boucher served as an intern to an Associate Justice of the Juvenile Court for the Commonwealth of Massachusetts, where he worked closely with social workers and observed legal procedures relating to the care and protection of children. Most recently, Mr. Boucher was a paralegal with Kasowitz, Benson, Torres & Friedman LLP in New York City where his work focused on complex civil matters such as mass tort and product liability, including performing in-court trial work regarding the 1993 World Trade Center Bombing. Since joining the Firm, Mr. Boucher has concentrated on assisting the Firm in litigating complex shareholder derivative and class action litigation.

### APRIL R. LYONS

Ms. Lyons graduated from San Diego State University in 2005 with a Bachelor of Arts degree in Social Work. As an undergraduate student, Ms. Lyons worked for the San Diego County Health and Human Services Agency: Child Welfare Services, where she worked closely with children and families in connection with issues of child abuse and neglect. Ms. Lyons also received her American Bar Association approved paralegal certificate in 2005 from the University of San Diego, where she graduated with Honors with an emphasis in Business and Environmental Law. Since joining the Firm, Ms. Lyons has concentrated on assisting the Firm in litigating complex shareholder derivative and class action litigation.

### ANNA-MARIE BOEHMER

Ms. Boehmer received her American Bar Association approved paralegal certificate in 1997

from Fairleigh Dickinson University, in Madison, New Jersey. Ms. Boehmer, however, began her legal career in 1989 with the law firm of Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C., assisting with debtor representation in Chapter 7, 11 and 13 bankruptcy matters in the federal districts of New Jersey, New York and Delaware. After moving to Las Vegas, Nevada in July of 2000, Ms. Boehmer joined the firm of Shea & Carlyon, Ltd. as a paralegal, assisting with creditor representation in Nevada bankruptcy cases and civil litigation matters. In 2007, Ms. Boehmer moved to San Diego and joined Robbins Umeda & Fink, LLP as a paralegal. Since joining the Firm, Ms. Boehmer has concentrated on assisting the Firm in litigating complex shareholder derivative and class action litigation.

## INVESTIGATIONS

### ALICE CURRY

Ms. Curry received her Bachelor of Arts in English and Communication from Boston College in 1989. While attending Boston College, Ms. Curry interned for both The Boston Phoenix newspaper and the Screen Actors Guild. In 1993, Ms. Curry received her Juris Doctor from Pepperdine University School of Law.

Following graduation from Pepperdine, Ms. Curry worked for Court TV, a 24 hour cable network, dedicated to televising the judicial system. She began in their documentary unit and later became a field producer covering live and taped trials across the country. In 2001, she won the Alfred I. DuPont-Columbia University award, for her work on "The Interrogation of Michael Crowe," a one hour program on coerced confessions which involved a San Diego teenager wrongly accused of murdering his sister. The award, created in 1935, is to honor the contribution of those who work in television and radio journalism. At Court TV, Ms. Curry conducted numerous

31

on-camera interviews with the defense, the prosecution and the accused, and drafted news packages for daily broadcasts.

Following her work with Court TV, Ms. Curry worked in the investigation unit of one of the largest class action firms in the United States. Ms. Curry conducted hundreds of interviews with former executives and employees of companies in an effort to assist in the prosecution of securities fraud actions. Ms. Curry's experience covers a broad spectrum of corporate mismanagement, including Medicaid fraud, bid-rigging in the insurance industry, the use of soft dollars in the mutual fund industry and the use of pipe financing in internet start-ups.

Since joining the firm, Ms. Curry has concentrated on investigating corporate mismanagement and self-dealing in connection with shareholder derivative lawsuits. Ms. Curry is licensed to practice law in the State of California.

S:\Admin\Resumes\RUF Resumes\RUF resume.wpd